IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| John Doe and Jane Doe 1 through 20, John Doe and Jane Doe A through K, Doe 12 on behalf of Does H and K, minors, and Doe G on behalf of Doe I, minor,<br><br>Plaintiffs,<br><br>vs.<br><br>State of Nebraska, *et al.*,<br><br>Defendants. | No. 8:09CV-456<br><br><br>**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

This matter comes before the Court on the Plaintiffs' Motion for Preliminary Injunction wherein they seek to have Defendants enjoined from enforcing or complying with the provisions of Neb. Rev. Stat. § 29-4001 through § 29-4014 and § 28-35501 recently modified by the Nebraska Legislature during the 101st legislative session as LB 97 and LB 285 (hereinafter referred to as "the New Act"). The New Act seeks to tighten the restrictions on convicted sex offenders, but in fact violates the constitutional rights of family members, employers, roommates, and offenders convicted prior to its passage. The Plaintiffs seek to be protected from the irreparable harm caused by impending constitutional violations by the imposition of a Preliminary Injunction against Defendants during the pendency of this action.

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II.  FACTS .............................................................................................................4
   A.  The Parties...............................................................................................4
   B.  Federal Legislative History ....................................................................4
   C.  Nebraska's Legislative History ..............................................................7
   D.  The New Sex Offender Laws .................................................................8

III.  PLAINTIFFS MEET THE LEGAL STANDARD FOR A PRELIMINARY
    INJUNCTION UNDER RULE 65.......................................................................20
   A.  If the New Act is enforced the Plaintiffs will suffer irreparable harm .......................21
   B.  The Plaintiffs' irreparable harm far outweighs any injury the Defendants might
       incur by granting the injunction ...................................................23
   C.  The Plaintiffs have a likelihood of prevailing on the merits ...................25
       1.  **Ex post facto** .......................................................................25
       2.  **Double Jeopardy** .................................................................48
       3.  **Cruel and Unusual Punishment** ............................................49
       4.  **Unreasonable Searches and Seizures** ...................................51
       5.  **Substantive and Procedural Due Process** ...........................60
       6.  **Equal Protection and Special Legislation** ...........................102
       7.  **Freedom of Speech** ............................................................106
       8.  **Contract Clause** .................................................................108
       9.  **Separation of Powers** ........................................................113
   D.  A preliminary injunction is in the Public's interest ...................................114

IV.  CONCLUSION.......................................................................................114

# I.

## INTRODUCTION

On January 1, 2010, the Nebraska State Patrol is prepared to launch a new sex offender registry and enforce new restrictions and punishment on past offenders. This new law, enacted under LB 97, signed on May 20, 2009 and modified by LB 285, on May 28, 2009, goes far beyond what the old act provided. Additionally, it goes far beyond the Federal Adam Walsh Act, and what other states have done, in implementing the Adam Walsh Act.

The New Act does away will all due process hearings and classifications that were previously in place to determine risk to reoffend and level of information dissemination. Unless enjoined, on January 1, 2010, all sex offenders, including those previously determined to be a low-risk to reoffend, will be subjected to mass media exposure, forced consent to unwarranted search of all electronic devises that are capable of Internet connection, a new crime for accessing "social networking sites", and travel restrictions that require approval and additional registration for stays lasting longer than three days. These new restrictions violate a number of constitutional rights. Furthermore, the New Act includes phrases such as "habitual living location", "global unique identifier", "electronic communication device", "remote communication device", and "possessed by the person", that unless defined present challenges both to offenders and the law enforcement officers now charged with arresting offenders that fail to register a "habitual living location", their "global unique identifier", a "remote communication device", or a "electronic communication device" "possessed by the person", whatever those terms might mean.

While the laws may have been passed out of a desire to promote public safety, they do not in fact further public safety. Instead, numerous people such as the Plaintiff Does 1 through 20, some of whom have accepted plea agreements subject to the full force of law at the time they entered into them, who have dutifully obeyed registration restrictions for years, and who have shown themselves to not be at risk to society, will be facing the deprivation of their constitutional rights; to wit:

• Severe criminal penalties for violating a law so vague and ambiguous that it is impossible to determine how to comply, in violation of the Due Process Clause of the U.S. and Nebraska Constitutions;

• The retroactive application of the law, and a multitude of terms and conditions that deviate from the law at the time they entered their plea agreements in violation of the Contracts, Double Jeopardy, Due Process, and *Ex Post Facto* Clauses of the U.S. and Nebraska Constitutions, as well as the separation of powers clause of the Nebraska Constitution;

• The application of laws that have no rational basis and are designed merely to disadvantage them based on fear and misinformation regarding sex offenders;

• The imposition of punishment that is not graduated and proportional to the actual crimes committed, which constitutes cruel and unusual punishment in violation of the U.S. and Nebraska Constitutions; and

• Extreme burdens on their fundamental rights, in violation of the Due Process and Equal Protection Clauses of the U.S. and Nebraska Constitutions.

This lawsuit does not question the right of the State of Nebraska to impose rational, serious criminal sanctions on people who commit sex crimes. Instead, the instant

case asks whether the U.S. and Nebraska Constitutions permit the State of Nebraska to: (a) pass laws so vague and ambiguous that they will be enforced arbitrarily and capriciously while law-abiding citizens cannot possibly follow them; and (b) apply severe criminal sanctions retroactively. The answer to both of these questions is no.

While these important constitutional issues are litigated, the enforcement of the New Act must be stayed. This challenge raises questions of the utmost constitutional import, and Plaintiffs face a litany of extreme and immediate irreparable harms if enforcement of the New Act is not enjoined.  Indeed, the impacts on the convicted offenders and their families are among the most extreme imaginable. Each and every one of them - regardless of what crime they committed and how long ago they committed it - will be subject to widespread community notification. As a result, all of them fear that they - and their families - will be subjected to violence from vigilante neighbors. They also face other risks, such as the possibility of eviction and losing their jobs. These hardships are extreme and extremely damaging.  Once an offender's name and address is listed on a sex offender website as proposed by the New Act, or their photo is distributed with neighborhood warning flyers, the damage becomes irreversible and the bell cannot be un-rung for them or their families.  Likewise, once any of the Plaintiffs' rights under the ex post facto, fourth amendment, first amendment or due process and equal protection clauses of the Federal and Nebraska Constitutions has been violated, it cannot be undone.

In contrast to the great harm that the Plaintiffs face, the State of Nebraska will not be prejudiced by a stay of the law.  While the State has an important interest in enforcing laws to monitor and track dangerous sex offenders, it can continue its current, more effective system of doing so.  Further, the clarity that the Plaintiffs seek as to what the

New Act means and what they are required to do to comply with it benefits the Plaintiffs for sure, but also will be instructive for law enforcement to avoid future lawsuits. No effective enforcement can be had when laws are vague and ambiguous. Finally, there is no public interest in enforcing the changed laws prior to determining their constitutionality given the fact that they are irrational and will not actually promote public safety. The facts of this case and the important issues raised warrant a preliminary injunction to maintain the *status quo* while the Court addresses the causes of action brought by the Plaintiffs.

## II.

## FACTS

### A. THE PARTIES

Plaintiffs incorporate by reference paragraphs 3-41 and 97-127 of the Complaint as if fully set forth herein (Exhibits 1-31). Does 1-20 received letters from the State Patrol informing them of their obligation to register under the New Act (Exhibit 32).

### B. FEDERAL LEGISLATIVE HISTORY

In 2006, President Bush signed the Adam Walsh Child Protection and Safety Act ("Walsh Act") into effect. The Sex Offender Registration and Notification Act (SORNA), Title 1 of the Walsh Act, is codified primarily in 42 U.S.C. § 16911, *et seq.* The Walsh Act modifies the prior provisions contained in the Jacob Wetterling Crimes Against Children and Sexually Violent Registration Act ("Wetterling Act"), 42 U.S.C. § 14071, *et seq.,* enacted in 1994.

SORNA's goal is to establish uniform sex offender registration mechanisms including uniform definitions across state jurisdictions consistent with the federal standards in order to facilitate the national registry (including a national website) and enforcement. 18 U.S.C. § 2250(a).  SORNA created a new federal felony offense for failing to register. In order to get cooperation from the states in its goal of creating a national registry, the Walsh Act provided that states that did not implement laws substantially consistent with the Walsh Act would be "docked" ten percent of certain federal funds. Walsh Act, Sec. 125(a), enacted as 42 U.S.C. § 16925(a).

The Walsh Act has increasingly come under attack. Critics believe that SORNA is too costly, unnecessarily strict, and has the potential of harming the very victims it was designed to protect. (National Association to End Sexual Violence, Legislative Analysis: The Adam Walsh Child Protection and Safety Act of 2006, at 1, http://www.naesv.org (last checked December 6, 2009) hereinafter "NAESV").     One recent comprehensive study of registry and notification laws determined that "notification laws may harden registered sex offenders, however, making them more likely to commit sex offenses". (Prescott, JJ Do Sex Offender Registration and Notification Laws Affect Criminal Behavior? National Bureau of Economic Research, February 2008 at 28-29). Furthermore, registration laws like SORNA do little to provide victims with rights and to effectively prevent future victimization. (NAESV).  The costs associated with SORNA compliance have been routinely criticized.  The spokesman for the California Department of Justice was recently quoted, "Obviously this funding loss (10% reduction of Byrne Grant) pales in comparison with the cost of complying with the act." (Most States Have Not Adopted Sex Offender Rules, Associated Press, Dec 1, 2009).  Across the nation

state legislatures have begun to amend sex offender registries in an effort to become compliant with SORNA. Id.  In response, several courts have also begun to strike down these new laws as unconstitutional for several reasons. *see* Doe v. Alaska, 189 P.3d 999 (2008) (Alaska's registry "effects are punitive, and convincingly outweigh the statute's non-punitive purposes and effects"); Wallace v. State, 905 N.E.2d 371 (Ind. 2009) (finding excessiveness prong of Mendoa-Martinez test indicated scheme was punitive as the act afforded no procedural relief "even on clearest proof of rehabilitation"); State v. Ettenger, 2009 WL 2136928 (2009) ("having a clear expectation that his reporting as a sexual offender was going to end in ten years, to be legislatively resentenced to an irrefutable lifetime of reporting" violated ex post facto clause); ACLU of Nevada v. Masto, Case No. 2:08-cv-00822-JCM-Pal (District Court granted a permanent injunction prohibiting the retroactive application of the sex offender registration laws, concluding that they were punitive in nature and therefore violated the Ex Post Facto clause); Doe v. Prosecutor of Marion County, 566 F.Sup 862 (2008)(Scope of search provided for under Indiana sex and violent offender registration statute, which required that class of offenders not currently on parole or probation consent to warrantless searches, inside their homes, of personal computers or devices with internet capability at any time, was unconstitutional). Although the deadline for enacting compliant legislation has come and passed, only one state, Ohio, has reached SORNA compliance.  The Ohio Supreme Court heard oral arguments in a challenge to the Ohio registry in November.  (Most States Have Not Adopted Sex Offender Rules, Associated Press, Dec. 1, 2009.)

### C. NEBRASKA'S LEGISLATIVE HISTORY

In the year 2009 the State of Nebraska was set to receive $3,192,926.00 under the Byrne Grant.  www.ojp.usdoj.gov/BJA/grant/jag.html.  With $319,292.60 at stake, the State of Nebraska revised the sex offender registry act in 2009 by passing LB 97 and LB 285.  SORNA mandated that to receive the full Byrne Grant each state would need to be compliant by July 1, 2009.  With the July 1, 2009 deadline looming the Nebraska Legislature quickly passed the less restrictive LB 97 concerned that the more restrictive LB 285 would not pass.  Despite such concerns both LB 97 and LB 285 were enacted by the Nebraska Legislature and signed by Governor Heineman.  The passage of the more restrictive LB 285 either adopted or repealed all sections of LB 97 relevant to the sex offender registry act.  LB 97 also provides for a new crime, "Unlawful use of the Internet by a prohibited sex offender".  Neb. Rev. Stat. § 28-322.05 (set to go into effect January 1, 2010)

In contrast to the several states that are carefully considering the impact of SORNA, Nebraska, through enactment of the New Act, acceded to federal pressure and enacted a registry more restrictive than is necessary to become compliant with SORNA as it added new restrictions on registrants' access to the Internet and devices capable of communicating over the Internet. The enactment of the New Act was completed hastily without considerable debate or input from the public.  The Legislative History for both LB 97 and LB 285 indicates that the Nebraska Legislature believed the enhanced enforcement would not require new funding.  Furthermore, during debate Senators did not mention the fact that the New Act now applies to a vast new set of offenders.  Rather, they focused only on only high profile inducing "stranger danger" cases, whose

perpetrators make up a miniscule fraction of the registry.  The New Act authorizes the State Patrol to enforce its provisions by adopting and implementing administrative regulations.  The hearing process for the Administrative Code was not completed until December 2, 2009 and the administrative code still must be approved by both the Attorney General's office and the Governor's office.  Even if this is completed before January 1, the Secretary of State still needs to receive the final copy for the changes to become effective.  Due to the Legislature's haste, the Nebraska State Patrol is facing the task of enforcing a law for which it has no rules to receive direction.

## D. THE NEW SEX OFFENDER LAWS

### 1. Applicability of the New Act

The prior Act applied to any individual who, on or after January 1, 1997:

a. Pled guilty to or been found guilty of any of the enumerated offenses in Neb. Rev. Stat. § 29-4003(1)(a), which pertained to Nebraska statutes;

b. Entered the state and had pled guilty to or been found guilty of a substantially equivalent offense in another jurisdiction;

c. Was incarcerated, at a public or private institution, or on probation or parole for a registrable offense committed prior to January 1, 1997; or

d. Entered the state and was required to register under the laws of another jurisdiction of the United States.

Neb. Rev. Stat. §29-4003 (applicable until Jan 1, 2010).  Under the prior Act the sentencing court had limited discretion to examine mitigating circumstances and determine that, in light of all the facts, the Act did not apply when the charged offense

8

was kidnapping, false imprisonment of a minor, or debauching a minor. This was an effective means by which a sentencing court could examine the facts of a particular case, and determine that these offenses were committed without a sexual element.

The New Act vaguely expands the applicability of the registry to the extent that it undermines its intended purpose. The New Act applies to any individual who, on or after January 1, 1997:

    a. Has **_ever_** pled guilty to, pled nolo contendere to, or been found guilty of any of the enumerated offenses in Neb. Rev. Stat. § 29-4003(1)(a)(i), which pertained to Nebraska statutes, including the addition of aiding or abetting and being an accessory to a listed offense;

    b. Has **_ever_** pled guilty to, pled nolo contendere to, or been found guilty of any offense that is substantially equivalent to a registrable offense by any other jurisdiction;

    c. Is incarcerated, in a public or private institution, or on probation or parole for pleading guilty to or being found guilty of a registrable offense prior to January 1, 1997; or

    d. Enters the state and is required to register as a sex offender under the laws of another jurisdiction of the United States.

Neb. Rev. Stat. § 29-4003 (set to go into effect Jan 1, 2010). In addition, the New Act applies to any individual who, on or after January 1, 2010:

    a. Has **_ever_** pled guilty to, pled nolo contendere to, or been found guilty of a litany of new underlying offenses found in Neb. Rev. Stat. § 29-4003(1)(b)(i), including nonexclusively, various degrees of murder, manslaughter, assaults,

stalking, kidnapping, false imprisonment, sexual abuse of an inmate, parolee, or protected person, enticement by electronic communication device, etc., when a court finds evidence of sexual contact or penetration in the record

b. Has **ever** pled guilty to, pled nolo contendere to, or been found guilty of a substantially equivalent offense as those listed above, in another jurisdiction; or

c. Enters the state and is required to register as a sex offender under the laws of another jurisdiction of the United States.

Neb. Rev. Stat. §29-4003 (set to go into effect Jan 1, 2010). The New Act's addition and repeated use of "ever" is apparently intended to include all convictions that have occurred, regardless of whether the conviction was in 1997 or 1957. Furthermore, the sentencing court does not have the ability to review the facts of each case to determine they do not justify application of the New Act. Therefore, an individual convicted of false imprisonment under Neb. Rev. Stat. § 28-315, a misdemeanor that does not contain a sexual element, will be subject to registration and public notification requirements. Due to the broad scope of the definition of sexual offender, individuals who may never have been required to register as sex offenders in the past will now have to.

### 2. Registration Requirements

The New Act is vague, confusing, and virtually impossible to comply with as it relates to the notification individuals subject to registration must provide to law enforcement.

Under the prior Act, if a registrant moved, he or she must:

a.      Inform the sheriff in the county where he or she resides when he or she has a new address within that county <u>within five working days</u> of the move;

b.      Inform the sheriff in the county where he or she resides when he or she has a new address in another county in the state, and inform the new county sheriff of residence, <u>within five working days</u>;

c.      Inform the sheriff in the county where he or she resides when he or she moves out of state <u>within five working days</u> of the move.

The current Act also requires persons subject to the Act that reside in or are temporarily domiciled in another state, but are employed, carry on a vocation, or attend school in this state, to notify the county sheriff where they are employed, carry on a vocation, or attend school, or of any such changes.

The New Act now:

a.      Requires a registrant to inform the sheriff of the county in which he or she resides, in person, and complete a form, if he or she has a new address, temporary domicile, or habitual living location, within three working days before the change. Neb. Rev. Stat. § 29-4004(2)

b.      Requires a subject individual to inform the sheriff of the county in which he or she resides, in person, and complete a form, if he or she has a new address, temporary domicile, or habitual living location in a different county in this state, within three working days before the address change, and to register with the county sheriff his or her new residence within three working days after the address change. Neb. Rev. Stat. § 29-4004(3)

11

The remaining subsections of Neb. Rev. Stat. § 29-4004 impose similar notification requirements on the subject person relating to education, employment, vocations, subsequent incarceration, loss of address, temporary domicile, or habitual living location. "Temporary domicile" is defined as any place at which the person actually lives or stays for a period of at least three working days, and "habitual living location" is defined as any place that an offender may stay for a period of more than three days even though the sex offender maintains a separate permanent address or temporary domicile.

### 3.   Registration Duration

Under the prior Act, the registration period was ten years following discharge from probation, parole, supervised release, or from incarceration.  An individual who committed an aggravated offense, had a prior conviction for a registrable offense, was required to register for life in another jurisdiction, or was determined to be a sexually violent predator was required to register for life.     Does 1-7, 9-15 and 18-19, were subject to the ten year registration requirement at the time they entered into their plea agreements. (Exhibits 1-7, 9-15 and 18-19)  Under the New Act, Neb. Rev. Stat. § 29-4005 states that the registration period is determined based solely on the possible punishment for the underlying conviction, to wit:

a.  If the registrable offense carried a maximum punishment of imprisonment of one year or less, the registration period is fifteen years;

b.  If the registrable offense carried a maximum punishment of imprisonment of more than one year, the registration period is twenty five years; and

c.  If the registrable offense carried a maximum punishment of imprisonment of

more than one year and was convicted of an aggravated offense or had a prior sex offense conviction or has been determined to be a lifetime registrant in another jurisdiction, the registration period is life.

### 4. Registration Information and Law Enforcement Search of Electronic Devices

The New Act drastically expands the amount of information law enforcement is permitted to obtain from a subject person. Neb. Rev. Stat. § 29-4006 states that registration information…shall include, but not be limited to[1], certain enumerated data on the subject persons.  The list includes general information as to identity, such as name, aliases, birthday, social security numbers, etc.  This clause permits virtually an unlimited amount of information to be collected by the State Patrol, regardless of the type or subject. The information specifically includes:

a. The address of each residence at which the person resides, has a temporary domicile, has a habitual living location, or will reside;

b. The name and address of any place where the person is an employee or student or will be an employee or student, including work locations without a single worksite;

c. The license plate number and a description of any vehicle owned or operated by the person, and its regular storage location;

d. The person's motor vehicle operator's license number;

e. The person's original travel and immigration documents, professional licenses or certificates, valid motor vehicle operator's license, or state identification

---

1 Registrants cannot be sure what information they will be required to provide as the State Patrol has not adopted administrative rules consistent with the New Act.

card submitted for photocopying;

f.   The person's telephone numbers;

g.   A physical description of the person, including current photograph;

Neb. Rev. Stat. § 29-4006 (set to go into effect Jan 1, 2010)

The State Patrol will collect all remote communication device identifiers and addresses, including, but not limited to, all global unique identifiers, serial numbers, Internet protocol addresses, telephone numbers, and account numbers specific to the device.  This also includes all email addresses, instant messaging identifiers, chat room identifiers, global unique identifiers, and other Internet communication identifiers that the person uses or plans to use, all domain names registered by the registrant, and all blogs and Internet sites maintained by the person or to which the person has uploaded any content or posted any messages or information.  Neb. Rev. Stat. § 29-4006(13) imposes an affirmative obligation to provide law enforcement with any changes to this list of blogs and Internet sites by the following "working day."

### 5.   Consent Form Signed Under Threat of Duress

When a subject person provides the information relating to remote communication devices, the New Act compels the individual to sign a consent form, permitting law enforcement to search all computers or electronic communication devices **possessed** by the person, and allowing law enforcement to install hardware or software to monitor the person's Internet usage on all the computers or electronic communication devices possessed by the person. (Exhibit 33)  The New Act does not define "possessed." Additionally, it places no limitation on law enforcement in their efforts to locate or determine the existence of such electronic communication devices.  Neb. Rev. Stat. § 29-

4011, provides that any person who fails to comply with the New Act will be guilty of a Class IV Felony.

### 6. Frequency of Information Verification

Registrants are required to report periodically to verify the information on the registry is correct and updated.  This verification must be done in person at the sheriff's office in the county in which he or she resides.  A fifteen year registrant shall report once per year in their birth month.  A twenty-five year registrant shall report every six months, once in the birth month and in the sixth month following the month of his or her birth.  A lifetime registrant shall report every three months to the office of the sheriff of the county in which he or she resides: in their birth month and every three months following the month of his or her birth.  If the person required to register under the act fails to report in person, the person shall be in violation of the Act.  Although in-person verification occurs per the above schedule, any changes in a registrant's email addresses, instant messaging identifiers, chat room identifiers, global unique identifiers, and other Internet communication identifiers that the registrant uses or plans to use, all domain names registered by the person, and all blogs and Internet web sites maintained by the person or to which the person has uploaded any content or posted any messages or information, must be provided to law enforcement by the next working day.

### 7. Criminalization of Certain Communication

Neb. Rev. Stat. § 28-322.05, set to go into effect on January 1, 2010, applies to registrants convicted of one of the enumerated offenses committed against minors, including kidnapping, sexual assault, incest, pandering, visual depiction of sexually

explicit conduct of a child, possessing any visual depiction of sexually explicit conduct, criminal child enticement, child enticement by means of an electronic communication device, enticement by electronic communication device, or attempt or conspiracy to commit any of these offenses.

A registrant convicted of one or more of these offenses, or an equivalent offense committed in another jurisdiction, commits the crime of "Unlawful Use of the Internet by a Prohibited Sex Offender" when he or she knowingly and intentionally uses a social networking web site, instant messaging, or chat room service that <u>allows</u> a person who is less than eighteen years of age to access or use its social networking web site, instant messaging, or chat room service.   The terms "social networking web site," "instant messaging," or "chat room service" are not defined, rendering the statute open to interpretation and susceptible to capricious enforcement.  Next, even if a definition for these terms could be gleaned, the list of prohibited internet sites is so vast that the New Act virtually renders the internet unusable by a registrant subject to this additional punishment.

This prohibition against speech applies regardless of whether use of a social networking web site, instant messaging, or chat room was an element of the underlying offense or whether it was an instrumentality used during commission of the registrant's underlying act.   Unlawful use of the internet by a prohibited sex offender is a misdemeanor for a first offense, and a felony for any subsequent offense.


### 8. Public Notification

Under the current law, all registration information gathered by law enforcement is presumed to be confidential unless specifically exempted. Neb. Rev. Stat. §29-4009 (set

to expire January 1, 2010).  Not all registrants are subject to community notification via the State Patrol website.  Instead, the law requires the State Patrol to examine the individual registrant's conditions of release, physical conditions such as age or illness, criminal history, and other factors to determine the risk of recidivism and commensurate level of public notification.

This examination results in a three-tiered approach to public notification.  If an individual is a low risk to reoffend (Level I), only law enforcement agencies are provided with the person's registry information.  If the risk is moderate (Level II), law enforcement, schools, daycares, health care facilities for children and vulnerable adults, and religious and youth organizations are notified of the registrants presence in the community.  Only if the risk of recidivism is determined to be high (Level III), is the individual subject to community-wide notification via the State Patrol website.

The tier system allows for information to be disseminated to those groups with "a real interest in being" alerted to low and moderate risk individuals, while still providing for public notification when an individual poses a high risk to the community at-large. Currently, a registrant is only subject to public notification and scrutiny upon an individualized determination that he or she poses a high risk to recidivate, and such determination is reviewable through the Nebraska Administrative Procedures Act.  Tier system aside, Neb. Rev. Stat. § 29-4013(3) permits law enforcement to notify the public when an individual poses a danger under circumstances not provided for by the Act (Exhibit 34).

Under the New Act, Neb. Rev. Stat. § 29-4009(1), will treat all information gathered for the registry as **not** confidential, with limited exception.  This section, along

with Neb. Rev. Stat. § 29-4013(b), requires community notification for all individuals subject to the registry, not just those individuals determined to be a high risk to reoffend. This includes those registrants previously determined to be low-risk. Under the New Act, all individuals subject to registration will be subject to public notification via the State Patrol's sex offender website, regardless of the circumstances of the offense, mitigating factors, or the individual's risk of recidivism. The New Act authorizes the State Patrol to share public notification information with a number of organizations, including social service entities that protect children, volunteer organizations, public and private agencies conducting employment background checks, public housing agencies, and health care providers conducting background checks. There is no limit on or regulation over the dissemination of information under this provision.

The New Act also eliminates a hearing before the State Patrol by which an individual can provide evidence as to his risk of recidivism. Previously, Neb. Rev. Stat. § 29-4013 prescribed such a procedure and the factors the Patrol must consider. The New Act requires the State Patrol to adopt agency rules and regulations to implement the release of registry information. To date, no agency rule has been promulgated stating if there will be a procedure to challenge one's status as a registrant, although letters from the State Patrol have been sent notifying registrants of their new obligations under the New Act (Exhibit 32).

### 9. Non-Residents

Under the New Act, if a non-resident is present for three days or more within the State, the sex offender is deemed a resident offender and is required to register with the

county sheriff's department within three days of arrival. It is unclear whether these individuals will also be subject to community notification as well. After the individual sex offender registers with the county sheriff's department the New Act requires the sheriff department to forward to the State Patrol the information collected. Then, the State Patrol is required to enter the information in the community notification website, and is also required to notify the specifically listed individuals or organizations within the community. Based on the statutory provisions for how newly registered sex offenders are handled by the sheriff departments and State Patrol and the lack of any exception for non-resident sex offenders, it seems likely that non-resident sex offenders will be subject to community notification.

Another issue for non-residents is notice. There is nothing in the statutes regarding how non-residents are to receive notice that they must register with the county sheriff. Neb. Rev. Stat. § 29-4007. Individuals who are required to register as sex offenders in their own state will receive notice from their state. However, the problem lies with notification for individuals who are not required to register as sex offender in their home state. They would be classified as sex offenders under Nebraska's definition, and be required to register.

### 10. Punishment for Violation of the New Sex Offender Laws

Pursuant to Neb. Rev. § 29-4011 "any person required to register under the New Act who violates the act is guilty of a Class IV Felony". Furthermore, "any person required to register under the act who violates the act and who has previously been convicted of a violation of the act is guilty of a Class III Felony and shall be sentenced to

a mandatory minimum term of at least one year in prison unless the violation which caused the person to be placed on the registry was a misdemeanor, in which case the violation of the act shall be a Class IV Felony."  This is a serious penalty, especially for an individual who may not receive notice of their classification level or duty to register as a sex offender.

## III.

## PLAINTIFFS MEET THE LEGAL STANDARD FOR A PRELIMINARY INJUNCTION UNDER RULE 65 OF THE RULES OF FEDERAL CIVIL PROCEDURE

All Plaintiffs are threatened with imminent and irreparable harm, and therefore meet the requirements for a preliminary injunction.  Their Complaint raises important questions of constitutional law and substantial deprivations of fundamental rights; as such, the hardships they face require a stay of the New Act.

To determine whether to grant a preliminary injunction, the Eighth Circuit considers: 1) Threat of irreparable harm to the claimant, 2) The state of balance between the irreparable harm and the injury in granting the injunction will inflict on the other party, 3) The probability of success on the merits and 4) The public interest.  Dataphase Sys. Inc. v. CL Sys,. Inc., 640 F.2d 109, (8th Cir. 1981).

In Books, Inc. v. Pottawattamie County, Iowa 978 F. Supp 1247, (S.D. Iowa 1997), the court stated that "a preliminary injunction is an extraordinary relief and must be carefully considered." *Citing* Calvin Klein Cosmetics v. Parfums de Coeur, Ltd., 824 F.2d 665, 667 (8th cir. 1987).  In Books, Inc., the Court determined that the

unconstitutional ordinance that violated the Books, Inc., first amendment rights warranted such an extraordinary relief.  The New Act intrudes and offends so many constitutional rights and to such degree that the Plaintiff's require such extraordinary relief to ensure the integrity of their constitutional rights.

**A.     If the New Act is enforced the Plaintiffs will suffer irreparable harm.**

Black's Law Dictionary defines the irreparable-injury rule as "[t]he principle that equitable relief (such as an injunction) is available only when no adequate legal remedy (such as monetary damages) exists."  The Plaintiffs face two types of irreparable harm: 1) the violation of their privacy if they are subjected to public notification, and 2) the deprivation of several constitutional rights provided by the Federal and Nebraska Constitutions.  "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." General Motors Corp. v. Harry Brown's LLC., 563 F.3d 312, 319 (8th Cir. 2009).  There is no process available to the Plaintiffs to prevent their rights from being violated besides judicial decree, nor is there a remedy if Plaintiffs suffer either type of harm.

Under the New Act the registrant plaintiffs will be listed on the State Patrol public notification website whereupon previously private information will be released in the most public of modern mediums.  If the New Act is later ruled unconstitutional there is no avenue available by which the Registrant Plaintiffs may restore their privacy. Privately maintained websites such as Family Watch Dog and Neighborhood Scan, constantly monitor sex offender registries and retain information gathered therein, regardless of whether a registrant is later removed or not.  (www.familywatchdog.us, and

www.neighborhoodscan.com)  Given the prolific nature of the Internet and archiving capabilities of search engines, the stigma of being labeled a sex offender cannot be undone.

     If allowed to be enforced, the New Act will irreparably harm the Plaintiff Does by violating several constitutional rights as detailed supra.  The United States Supreme Court has routinely found such infringements on citizens' constitutional rights to be irreparable harm.  "If it were ultimately recognized by a higher court that the [informed consent] Act violates the constitutional rights of doctors or women seeking abortions, irreparable harm will have been suffered each time the unconstitutional advisories have been given" Planned Parenthood Minn., N.D., S.D. v. Rounds, 530 F.3d 724, 752 (8th Cir.2008), citing Elrod v. Burns, 427 U.S. 347, 373, 96 S. Ct. 2673, (1976) "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")  The Eighth Circuit most recently followed these cases in Phelps-Roper v. Nixon, 545 F.3d 685, (8th Cir.2008), stating that "it is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Id. at 690 citing Elrod, at 373.  Additionally, the New Act sets forth no restrictions on Law Enforcement's ability to continually violate the Plaintiffs constitutional rights. (see United States v. Lindgren, 883 F.Supp. 1321, 1324-25 (D.N.D.1995) "The recurrence of a blockade or similar conduct could cause irreparable harm by preventing individuals from obtaining lawful abortion services.")

     The New Act, if allowed to be enforced on the Plaintiffs, will not only violate their Federal rights under the first and the fourth amendment, but also Federal and Nebraska Constitutional provisions of the Ex Post Facto Clause, the Fourth Amendment,

the Due Process Clause, Separation of Powers, the Contracts Clause, Equal Protection, Cruel and Unusual Punishment, and Double Jeopardy. The Plaintiffs are afforded no other form of redress to prevent such constitutional violations, nor to be compensated for such. As detailed supra, the Plaintiff Does can establish a sufficient likelihood of success on the merits of their constitutional claims and thus have established irreparable harm as a result of constitutional deprivations. see Marcus v. Iowa Pub. Television, 97 F.3d 1137, 1140-41 (8th Cir. 1996).

**B.      The Plaintiffs' irreparable harm far outweighs any injury the Defendants might incur by granting the injunction.**

The next factor in the Dataphase analysis, the "balance of harms," requires the court to consider "the balance between the harm [to the Plaintiffs] and the injury that the injunction's issuance would inflict on other interested parties, and the public interest." Pottgen v. Missouri State High Sch. Activities Ass'n, 40 F.3d 926, 929 (8th Cir.1994). Whereas "irreparable harm" focuses on the harm or potential harm to the plaintiff of the defendant's conduct or threatened conduct, Dataphase, 640 F.2d at 114, the "balance of harm" analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public, as well. Id.; see also Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 372 (8th Cir. 1991). What must be weighed is the threat to each of the parties' rights and economic interests that would result from either granting or denying the preliminary injunction. See Baker Electric Co-op., Inc. v. Chaske, 28 F.3d 1466, 1473 (8th Cir.1994).

The Defendants will not be greatly prejudiced by a preliminary injunction that merely postpones the changed law from going into effect.  "A court issues a preliminary injunction in a lawsuit to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits." Dataphase, 640 F.2d at 113. The Plaintiffs are only seeking a preliminary injunction to maintain the status quo and allow Nebraska to continue enforcing the registry currently in effect.

Administrative inconvenience does not constitute a hardship that outweighs issues like those at issue in this case. see Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir. 1983). In Lopez, the Ninth Circuit found that a preliminary injunction requiring a reinstatement of benefits was appropriate where the Secretary of Health and Human Services implemented policies that took social security benefits from recipients.  The Ninth Circuit made clear that a sudden loss of benefits that would lead to "deprivation of life's necessities" was "far more compelling" than the government's prospective administrative inconvenience or monetary loss. Id.  As in Lopez, the State's potential loss of federal funding is not a significant contrast, especially in light of the fact that enforcing the laws will likely cost far more than the actual funds Nebraska will retain through the enactment of the New Act.[2]  Similarly, any administrative difficulty in staying enforcement cannot be considered compelling.

If the Court temporarily maintains the status quo by granting the injunction, the registry currently in effect in Nebraska will continue to provide the same protection that it has provided for the past 16 years.  If LB 97 and LB 285 protects the Public from some grave injury, it would have gone into effect immediately.  No harm will come to the

---

2 This calculation must also account for the lawsuits that will follow enactment of the New Act because of the constitutional violations it creates.

24

Defendants as it is in the Public's best interest to protect constitutional rights rather than enforce a counterproductive public safety law of which the only real benefit will be federal stimulus money.  see Connection Distrib. Co. v. Reno, 154 F. 3d 281, (6th Cir 1998), (although the government presumably would be substantially harmed if enforcement of a *constitutional* law…were enjoined, this determination, too, first requires a review of the merits of the claim).

**C.      The Plaintiffs have a likelihood of prevailing on the merits.**

In Phelps-Roper, the Eighth Circuit Court of Appeals indicated that, "where a party seeks to enjoin preliminarily the implementation of a duly enacted statute, district courts must make a threshold finding that a party is likely to prevail on the merits." Phelps-Roper. at 690.   The New Act is facially unconstitutional as it cannot be constitutionally applied in any context.   Furthermore, the New Act is unconstitutional as applied to the Plaintiffs.   For the multiple grounds detailed below, the Plaintiffs are likely to prevail on the merits.

> **1.      The retroactive application of the new sex offender laws violates the
>          ex post facto clauses of the United States and Nebraska Constitutions**

The United States Constitution and the Nebraska Constitution forbid passing any "ex post facto law." U.S. Const. Art. I, § 10; Neb. Const. art. 1 §16.  The Ex Post Facto Clause of the U.S. and Nebraska Constitutions prohibit the public from deciding that criminal sentences already issued were too light and retroactively imposing more severe sentences on offenders that were already sentenced. It "protects liberty by preventing governments from enacting statutes with 'manifestly *unjust and oppressive'* retroactive effects." Stogner v. California. 539 U.S. 607, 611 (2003) (emphasis in original) (quoting

Calder v. Bull, 3 U.S. (3 Dall.) 386, 391 (1798).  Ex post facto laws are also prohibited in order to ensure that legislative acts "give fair warning to their effect and permit individuals to rely on their meaning until explicitly changed." Weaver v. Graham, 450 U.S. 24, 28-29 (1981).  Finally, the Ex Post Facto Clause prevents the legislature from abusing its authority by enacting arbitrary or vindictive legislation aimed at disfavored groups. See Miller v. Florida, 482 U.S. 423, 429 (1987).  The Nebraska Supreme Court has previously stated that it "ordinarily construes Nebraska's ex post facto clause to provide no greater protections than those guaranteed by the federal Constitution." Slansky v. State Patrol, 268 Neb. 360, 377 (Neb. 2004).  As such, the Federal Constitution and controlling case law therein controls the analysis of ex post facto laws for the Nebraska Constitution as well.

The New Act is an Ex Post Facto statutory scheme because it is criminal in nature and effect. California Dept. of Corrections v. Morales, 514 U.S. 499, 504 (1995); Collins v. Youngblood, 497 U.S. 37, 43 (1990).  Although the Supreme Court has declined to set out a specific test for determining whether a statute is criminal or civil for purposes of the Ex Post Facto Clause, (see Morales, 514 U.S. at 508-509), it has recognized that determining whether a statute is civil or criminal is a matter of statutory interpretation. Helvering v. Mitchell. 303 U.S. 391, 399 (1938); Allen v. Illinois, 478 U.S. 364. 368 (1985).  In Doe v. Miller 405 F.3d 700 (8th Cir. 2005), the Eighth Circuit stated that "in determining whether a state statute violates the *Ex Post Facto* Clause by imposing…punishment, we apply the framework outlined in Smith v. Doe" Id. at 718.  In Smith v. Doe, the Supreme Court set forth a framework whereby a court must first "ascertain whether the legislature meant the statute to establish 'civil' proceedings." Id. at

92.  If a court determines the intent is punitive, then the statute retroactive statute is an *ex post facto* law.  Regardless of a courts determination of the intent, when the effect is punitive, the effect will control.

 If a law is criminal, it falls within the ex post facto prohibition if it meets two critical elements: it must be retroactive, applying to events occurring before its enactment, and it must disadvantage those affected by it. Miller v. Florida, 482 U.S. at 430.  A law is retrospective if it "changes the legal consequences of acts completed before its effective date." Miller, 482 U.S. at 431 (citing Weaver, 450 U.S. at 31).  A law disadvantages the offender when it is "more onerous than the prior law." Dobbert v. Florida, 432 U.S. 282, 294 (1977).

 Here, there can be no doubt that the New Act is more onerous than the prior law. There can also be no doubt that the legislature intended LB 97 and LB 285 to apply to offenders whose conduct occurred prior to its enactment.   LB 97 and LB 285 retrospectively apply to, and re-categorize offenders subject to the New Act, as any person who after July 1, 1997:

1. "has ever pled guilty to, pled nolo contendere to, or been found guilty of any of the" applicable offenses of  Neb. Rev. Stat 29-4003; or

2. "has ever pled guilty to, pled nolo contendere to, or been found guilty of any offense that is substantially equivalent to a registrable offense" in another jurisdiction; or

3. "enters the state and is required to register as a sex offender under the laws" of another jurisdiction.

Neb. Rev. Stat. § 29-4003 (set to go into effect January 1, 2010).  Thus, the only question is whether the New Sex Offender Laws are considered punitive and criminal under the "intents-effects" analysis.

    a. <u>The Legislature intended LB 97 and LB 285 to be punitive.</u>

When applying the intent effects test, a reviewing court must first determine whether the legislature, "in establishing the penalizing mechanism indicated either expressly or impliedly a preference for one label or the other." <u>United States v. Ward</u>, 448 U.S. 242, 248-249 (1980).  The Legislature impliedly indicated it's intent to create a punitive scheme.

Under the current law, classification and registration requirements are based on individualized determinations of future dangerousness and of a continuing threat to the community.  By contrast, under the New Act future dangerousness and the risk to the community are wholly irrelevant. All that matters is the "offense of conviction." Additionally, the formal attributes of a legislative enactment, such as the manner of its codification and the enforcement procedures that it establishes, are probative of legislative intent. <u>Smith v. Doe</u>, 538 U.S. 84, 94 (2003). Sections of LB 285 are codified within the criminal procedure provisions of the Nebraska Revised Statutes.    The enforcement mechanisms established are clearly criminal. Failure to comply with the registration, verification, or notification requirements of the new law subjects the offender to criminal felony prosecution and criminal penalties. Neb. Rev. Stat. 29-4011.

It is telling that the two bills modified provisions contained in Chapter 29 of the Nebraska Revised Statutes, the "Criminal Procedure" chapter. By tying sex-offender classification, registration and notification requirements directly and solely to the offense

of conviction, the New Act creates a sex-offender registration scheme that cannot be considered remedial and civil in nature. Sex-offender registration is now purely punitive - and in fact is a continuation of the original criminal sentencing process.

As noted above, the primary motivation was to comply with a federal mandate to all states to pass the Adam Walsh Act, or risk a loss of federal funds, with no regard to the effect on public safety. 42 U.S.C.A. §16925;  See also, Adam Walsh Policy, 2008-2009 Policies for the Jurisdiction of the: Law and Criminal Justice Committee, www.ncsl.org/default.aspx?tabid=16191#AdamWalsh, (identifying problems with the federal Adam Walsh Act, and stating that "[m]any of the provisions of the Adam Walsh Act were crafted without state input or consideration of current state practices. The mandates imposed by the Adam Walsh Act are inflexible and, in some instances, not able to be implemented") (last verified December 12, 2009).

Under the prior version of the law classification and registration duties were based on an offender's individualized re-offense risk. The community was notified only of the most dangerous offenders through the State Patrol public notification website.  By contrast, an offender's likelihood of committing future sexual offenses is not considered under the New Act's new offense-based classification system.

Instead, some former registrants who were classified as a low or moderate risk to reoffend have been reclassified as registrants who now must register for either 15 or 25 years, or life, solely based on the offense they committed. This method of classification obviates the prior practices of assigning a notification level based upon a risk assessment, which included an empirically validated risk assessment instrument as set forth in the prior version of Neb. Rev. Stat. § 29-4013 (Exhibit 34).   Under the New Act

classification is not based on an empirical risk assessment instrument and all documentation that may have a bearing on risk assessment.  Rather, offenders formerly classified by the State as moderate and low risk offenders will be re-classified as lifetime registrants and subjected to public notification.  Meanwhile a number of formerly deemed high-risk offenders with more favorable court outcomes, will have less limits placed on them.  After all, in the sausage making world of plea bargaining, it is an improper assumption that the offense of conviction accurately captures the actual risk posed by the particular individual.  Furthermore, as the Court of Appeals of Ohio said in State v. Ettenger, 2009 WL 2136928 (2009), said "if we were to adjudicate all sexual offenders as sexual predators, we run the risk of 'being flooded with a number of persons who may or may not deserve to be classified as high-risk individuals, with the consequence of diluting both the purpose and the credibility of the law.'" citing State v. Thompson, 748 N.E.2d 1144, (1999).

Deliberately requiring some low-risk individuals to register for the rest of their lives underscores the Nebraska Legislature's intent to make the New Act punitive.  These offenders complied with their court orders, and were not convicted of any additional sex crimes.  Yet, all of the Plaintiffs will be subject to the State Patrol pubic notification website.  The only possible legislative motivation is a desire to punish persons who have committed sex offenses in the past.

Furthermore, the Legislature expressly indicated the New Act was to be punitive in nature.  The Nebraska Legislature chronicled the intent of LB 97 and LB 285 in the legislative history.  Senator Scott Lautenbaugh introduced LB 97 in a Judiciary Committee hearing on March 11, 2009.  In that hearing he said:

> **I am not sure if I'm the ideal senator to be introducing this or not, because I have sort of a…this area is very troubling to me, and it provokes kind of a rage and maybe a lack of perspective that I probably shouldn't have as the sponsor of this bill or probably should have the perspective as sponsor of this bill.**

<u>Id</u>.  Senator Lautenbaugh's candid disclosure indicates his intent to create a punitive scheme.  By his own account, "**this is an area that I have trouble basically dealing with and processing in my own mind**." <u>Id</u>.  Senator Lautenbaugh further disclosed his punitive intent when he said:

> **These are ongoing restrictions, and it is good to believe in rehabilitation, and that fact that people can change. In this area, I don't buy that.  I don't think that anyone who thought this was a good idea once actually changes their view on it.**

<u>Id</u>.  Senator Lautenbaugh let his intent be known again on April 22, 2009, when LB 97 was considered under Floor Debate.  On that day Senator Lautenbaugh was questioned by Senator Ken Haar on the severity of restrictions under the Act.  In his response Senator Lautenbaugh said:

> **I'll admit some of the provisions in here do seem <u>harsh</u> and <u>restrictive</u> and <u>that's really the point</u>.**

<u>Id</u>.  On April 27, 2009 LB 285 was in Floor Debate when Senator John Harms said:

> **<u>If it was up to me</u>, people who commit these kinds of crimes, <u>I'd take the key and throw it away</u>.**

<u>Id</u>. One can only assume Senator Harms was indicating that he would like to retroactively impose the historical punishment of life in prison without possibility of parole.  Senator Harms went on further to state:

> **As far as I am concerned that [LB 285] should be as strict as possible.**

<u>Id</u>.  Senator Harms did indicate his desire to notify the community when registrants are present, but it is obvious from his quotes that his motivation to support LB 285 came not from the desire to monitor.  Rather, these statements indicate the desire to seek retribution through severe punishment.

Reviewing the legislative history of LB97 and LB 285 "compels a conclusion that the statutes' primary function is to serve as an additional penalty" for sex offenders. <u>Kennedy v. Mendoza- Martinez</u>, 372 U.S. 144, 169 (1963).  Under the <u>Mendoza- Martinez</u> test followed in <u>Smith</u>, the Court need look no further: the New Act violates the Ex Post Facto clause. Nonetheless, under the "effects" prong of the analysis, the New Act must also be found to violate the Ex Post Facto clause.

    b. <u>The purpose of the New Act is so punitive that it negates any civil intent.</u>

The New Act is "so punitive…in purpose…as to negate" the State's non-punitive intent. <u>Smith v. Doe.</u> at 92.  The Introducer's Statement of Intent for LB 97 indicated that the "reasons" and "purposes" sought to be accomplished by LB 97 was to "protect children from sexual predators **by strengthening penalties** and bringing Nebraska's laws up to date."  Even if the Legislature created the New Act with the intent of creating a civil scheme, the purpose was so punitive as to negate that intent.

    c.  <u>The effects of the New Act are punitive.</u>

Notwithstanding the punitive intent behind the New Act, the effects as applied on the Does 1-20 are indeed punitive.  The factors to be considered when determining an act's punitive effect are set forth in <u>Kennedy v. Mendoza-Martinez</u>, 372 U.S. 144, (1963):

(1) whether the sanction involves an affirmative disability or restraint;

(2) whether the sanction has historically been regarded as punishment;

(3) whether the sanction comes into play only on a finding of *scienter;*

(4) whether the sanction's operation will promote the traditional aims of punishment-retribution and deterrence;

(5) whether the behavior to which the sanction applies is already a crime;

(6) whether an alternative purpose to which the sanction may rationally be connected is assignable for it; and

(7) whether the sanction appears excessive in relation to the alternative purpose assigned.

Id. All factors, 1 through 7, of the Mendoza-Martinez test as applied to the New Act, weigh in the favor of a punitive effect.

**i. The Act places affirmative disabilities and restraints on the Registrant Plaintiffs not previously contained in prior Nebraska sex offender registries.**

"In order to determine whether the New Act's notification provisions impose an affirmative disability or restraint on registered sex offenders, we must 'inquire how the effects of [a sex offender registration act] are felt by those subject to it. If the disability or restraint is minor and indirect, its effects are unlikely to be punitive.'" Welvaert v. Nebraska State Patrol, 268 Neb. 400 (Neb. 2004) (quoting Smith v. Doe, 538 U.S. 84, 99-100, (2003).  When considering the affirmative disabilities and restraints of a substantially similar registry, the Indiana Supreme court said, "the short answer is that the Act imposes significant affirmative obligations and a severe stigma on every person to whom it applies".  Wallace v. State, 905 N.E.2d 371, 379 (Ind. 2009).

**Neb. Rev. Stat. § 28-322.05 constitutes a restraining of communication and disability to earn a living by subjecting some registrants to a new crime which effectively prohibits the use of the internet:**  LB 285 effectively prohibits an overly broad classification of Internet websites to some registrants.  "[A]ny registrant who intentionally uses a social networking web site, or service, instant messaging, or chat room service that allows a person who is less than eighteen years of age to access or use its social networking web site, instant messaging, or chat room service, commits the offense of" use of the Internet by a prohibited sex offender.  (LB 97 Section 14, revised by LB 285 Section 1).

First, this criminal statue is impossible to comply with as it fails to define several terms including "social networking site", "instant message" and "chat room".  Although it is clear that the new crime is targeted only at persons required to register under the New Act, it does not so clearly identify how to comply with the new crime.  Second, the definition of "social networking website" is unclear.  Although LB 285 included both the crime and a definition of "social networking website", that definition is not located in Chapter 28 of the criminal code, it is contained in Chapter 29.  If the Legislature intended the definition contained in Chapter 29 to apply to this crime, the definition creates an effective ban on the Internet.  Chapter 29 now defines social networking web site as:

> a web page or collection of web sites contained on the Internet (a) that enables users or subscribers to create, display, and maintain a profile or Internet domain containing biographical data, personal information, photos, or other types of media, (b) that can be searched, viewed, or accessed by other users or visitors to the web site, with or without the creator's permission, consent, invitation, or authorization, and (c) that **may** permit some form of communication, such as direct comment on the profile page, instant messaging, or email, between the creator of the profile and users who have viewed or accessed the creator's profile.

Neb. Rev. Stat. § 29-4001.01(13). (emphasis added)  Such a definition encompasses nearly every website that allows viewers to communicate via the website.  This restriction includes websites such as The Omaha World Herald, The Wall Street Journal and other news organizations; the Internal Revenue Service's website where citizens are encouraged to submit their yearly tax information; some of the Plaintiffs' children's school websites where they are encouraged to track school progress, schedule parent-teacher conferences and the like; any websites that offer user support via live chat; business to business and intra-business software that allows collaboration via the Internet; on-line public forums created by government entities to debate political viewpoints concerning legislative issues and budgetary concerns, etc.  The examples are nearly limitless.  Such restriction is no "minor or indirect" restraint.  It is direct and significant.

Similar Internet bans have been reversed in several federal probation and supervised release cases.  In United States v. Sofsky, 287 F.3d 122 (2d Cir. 2002) the Second Circuit vacated a complete ban on Internet access, noting that "computers and Internet access have become virtually indispensable in the modern world of communications and information gathering." Id. at 126.  In United States v. Holm, 326 F.3d 872 (7th Cir. 2003), the Court held that bans on Internet access "render modern life – in which, for example the government strongly encourages taxpayers to file their returns electronically, where more and more commerce is conducted on-line, and where vast amounts of government information are communicated via website – exceptionally difficult."  Id. at 878.  The Eighth Circuit Court of Appeals in U.S. v. Mark, 425 F.3d 505 (8th Cir. 2005), reviewed a federal sentencing restriction that completely barred a defendant twice convicted of child pornography possession from accessing the Internet.

The court stated, "the…difficult question is whether the condition is overbroad-that is, whether it involves a greater deprivation of liberty than is reasonably necessary under the circumstances." Id. at 509.  The Mark court stated:

> A complete ban on Internet access is difficult to justify as a least restrictive means of satisfying the statutory objectives of supervised release in the case of a defendant whose criminal conduct involved simple possession of child pornography.  At a minimum, such a condition should be imposed only on a record that permits a thorough evaluation of other alternatives that might be sufficient to serve the statutory purposes of protecting the public and deterring future crimes.

Id. at 509. Most of the registrant Does' underlying charges did not involve computer related offenses, let alone offenses facilitated by the Internet.  The new crime of "Unlawful Use of the Internet by a Prohibited Sex Offender" is an overbroad restriction that has not survived review in the context of probation or supervised release.  The State cannot now claim that such a restriction is civil in nature when federal courts have repeatedly denied the same contention under probation and supervised release circumstance.

This effective ban on the entire Internet represents not only a denial of the Plaintiffs' first amendment rights as discussed below, but also effectively prevents them from securing employment in modern society.  This is clearly a punitive type sanction.

**The New Act coerces the registrants into signing a consent form which allows law enforcement to search all electronic communication devices in their possession:**

Under pain of prosecution, registrants are required to sign a consent form allowing the Nebraska State Patrol to search "**all** the computers or electronic communication devices **possessed** by the person; and (b) Installation of hardware or software to monitor the person's Internet usage on all the computers or electronic communication devices

possessed by the person." Neb. Rev. Stat. § 29-4006(2).  Such consent under duress is yet another restraint: a restraint on registrants property and unconstitutional under the fourth amendment.[3]

The New Act fails to in anyway limit the type or number of searches or define "possessed".  In effect, the registrants must engage in private communication or core political speech via the Internet with governmental monitoring.

Not only will the New Act deprive the registrants of their fundamental Fourth Amendment Rights to be free from unreasonable governmental intrusion, but it also renders them virtually unemployable in our modern, technologically dependent society. When LB 97 went to floor debate on April 22, 2009 Senator Haar questioned the implication of revised Neb. Stat. § 29-4006(2).  In suggesting that the language be clarified Senator Haar said,

> **obviously the <u>intent</u> of the bill is to <u>keep sexual predators from using the Internet</u> but we also don't want to totally, you know, if somebody has served their time, we don't want to totally rope them in to the point they can't get any kind of job, and I could see where this might be threatening to an employer, the way the language is now.**

<u>Id.</u>  Despite the fact that the Legislature replaced the language "computers … used by the person", with "computers possessed by the person" in the final draft the effect is still the same.  How can a person "use" a computer unless they constructively "possess" that computer?  As Senator Haar feared, the New Act goes too far in its restriction of registrants, preventing them from maintaining "any kind of job".  Doe 10 works in a law firm specializing in tax issues, uses the computer extensively at work and has access to confidential client information.  As indicated by Doe 10's employer, "if [Doe 10] gives

---

3 See also discussion of 4th Amendment violation.

the required consent, she jeopardizes my license to practice law; yet if she refuses to give such consent, she violates the amended statute." Exhibits 10 and 23.  Similarly, Doe 12 has worked with Doe E for over two years performing computer consulting work.  To this date Doe E has spent over $60,000 on Doe 12's services.  Exhibits 12 and 25.  The implications of the New Act will force Doe E "to terminate the contact services of Doe 12" and "[result in him] not consider[ing] employing any person who is under the restrictions of LB 285 in the future."

Of the many challenges to sex offender registries across the nation, no court has considered a search and seizure provision as severe as the one enacted by the Nebraska Legislature before this court.  In the Wallace case, where the Indiana Supreme court deemed the Indiana registry unconstitutional, the statute at issue required "disclosure of any electronic mail address, instant messaging username, electronic chat room username, or social networking web site username that a sex offender uses or intends to use". Wallace at 376.  Much like the New Act, the Indiana registry required registrants to also sign a consent form allowing law enforcement to search and remotely monitor registrants' computers.  However, the Indiana act limited such consent to "any **personal** computer or device with Internet capacity." Id. at 375.  The Act considered by this Court is severely more restrictive of the Registrant Does' privacy interests than the act considered by the Wallace court.

While the New Act's vague nature and potential for arbitrary application raises constitutional problems on their own, the Registrant Does are faced with the possibility that the State will employ the most intrusive search and seizure means interpretable from this statute.  A plain language interpretation of this statute indicates that registrants will

not be allowed to possess or use computers or electronic communication devices that cannot be equipped with monitoring hardware or software. On information and belief, Plaintiffs are unaware of any hardware or software available on the market that allows monitoring of cellular telephones. Many of the Registrant Does have attempted to purchase cellular telephones incapable of Internet communication to no avail. Neb. Rev. Stat. § 29-4006(2)(b), if allowed to be enforced, will effectively prevent the Registrant Does from using cellular telephones. Given the prevalence and necessity of cellular telephones in modern society, this portion of the New Act is obviously an unlawful restraint under the Mendoza-Martinez test detailed supra.

As indicated under the Fourth Amendment argument below, the Act gives law enforcement discretion to execute warrantless searches on homes, workplaces and any other premises where the registrant might frequent. Such disregard for fourth amendment protections is certainly a direct and substantial restraint and indicative of punishment.

**The New Act restricts the Plaintiffs liberty by forcing periodic in-person reporting:** The Nebraska Supreme Court has upheld previous correspondence registration requirements. In State v. Worm, 268 Neb. 74, (Neb. 2004), the Nebraska Supreme Court stated that the Defendant only had to verify the information in person during the initial registration, allowing subsequent verifications to be submitted by mail. Under the New Act lifetime registrants must register quarterly *in person* rather than by mail. As stated in, Kansas v. Hendricks, 521 U.S. 346, 371 (1997), a state cannot allege a community protective policy is civil in nature when the restrictions "[are] adopted as a sham or mere pretext" to enforce a new punishment. Id.

This requirement that registrants appear in person at specific locations according to a recurring regime represents a significant deprivation of liberty. Not only is this requirement inherently inconvenient but it bears no rational basis to any legitimate end. Doe 19, as a lifetime registrant will be required to register in person four times a year. This represents not just a restraint on his liberty, but an actual duty to perform specific acts. In <u>Smith v. Doe</u>, 538 U.S. 84, 94 (2003), the US Supreme Court considered whether the Alaska registration constituted an affirmative disability or restraint on the registrant stating,

> the Act, on its face, does not require...updates to be made in person. The holding that the registration system is parallel to probation or supervised release is rejected because, in contrast to probationers and supervised releases, offenders subject to the Act are free to move where they wish and to live and work as other citizens, with no supervision. While registrants must inform the authorities after they change their facial features, borrow a car, or seek psychiatric treatment, they are not required to seek permission to do so.

<u>Doe v. State</u>, 538 U.S. at 87. The New Act is more restrictive than the Alaska act considered in <u>Doe v. State</u>, because it does require in-person reporting, just like supervised release.

Furthermore, the New Act will require registrants to make their initial registration within three days instead of the five days required under the existing Nebraska registry. It requires incarcerated individuals to notify change in address within three days instead of the five days allowed under the current Act. Habitual living location is defined as any place where the registrant may stay for more than three days time. These restrictions to be imposed on the registrants under the New Act are analogous to those found under the punitive provisions of parole or probation.

**The New Act requires registrants to seek permission to travel for more than 72 hours:** In Worm, the Court highlighted the fact that Worm merely had to notify law enforcement of changes in his address, occupation, vocation, or school attendance, not seek permission. Under Neb. Rev. Stat. § 29-4004 (set to go into effect January 1, 2010), the registrant must notify the sheriff in the Nebraska county where they are currently located of their intent to move to a location out of the county or state for more than 72 hours. If the registrant has to leave the county or state for an immediate emergency and is unable to submit three days prior notification, such registrant can be prosecuted for non-compliance if they fail to return to their home county within three days time. In effect, the New Act rises to the level of seeking permission to leave the county or state for more than 72 hours.

Doe 19 drives a truck carrying freight to destinations inside Nebraska and across the country. He sometimes receives orders to deliver or pick up cargo on short notice. Doe 19 faces the likelihood of not being able to comply with the New Act if he receives an order requiring him to make an immediate delivery to a location that will prevent him from returning to Nebraska within three days. He can either try to notify the sheriff in-person before he leaves, or not take the delivery. Exhibit 19. Such a restriction is analogous to probation and parole and indicative of the Act's punitive nature. All of the foregoing restrictions will be enforced under the threat of prosecution. Neb. Rev. Stat. § 29-4011. Based on the multitude of affirmative restraints to person and property, the New Act is punitive.

### ii. The New Act's effects are analogous to a historical form of punishment.

The wide dissemination of all offenders' personal information via the State Patrol's website, and the fact that law enforcement may inform numerous organizations of previously private information regarding offenders, is akin to traditional shaming punishments intended to inflict public disgrace. Stephen P. Garvey, Can Shaming Punishments Educate?, 65 U. Chi. L. Rev. 733, 739 (1998) ("Punishments widely described as 'shaming' penalties thus come in two basic but very different forms: those that rely on public exposure and aim at shaming; and those that do not rely on public exposure and aim at educating."). Clearly, the New Act is aimed at shaming. ("What distinguishes a criminal from a civil sanction and all that distinguishes it, it is ventured, is the judgment of community condemnation which accompanies and justifies its imposition."); Paul Robinson, The Criminal-Civil Distinction and the Utility of Desert, 76 B.U.L. Rev. 201, 202 (1996) (noting that "criminal sanctions signal condemnation").

### iii. The New Act comes into play on a finding of scienter.

The court must consider "whether [the statute] comes into play only on a finding of scienter." Mendoza-Martinez, 372 U.S. at 168. "The existence of a scienter requirement is customarily an important element in distinguishing criminal from civil statutes." Kansas v. Hendricks, 521 U.S. 346, 362, (1997). If a sanction is not linked to a showing of mens rea, it is less likely to be intended as a punishment. While the registry currently in effect in Nebraska applies to a few strict liability offenses, the New Act overwhelmingly applies to offenses that require a finding of scienter before an individual can be convicted. see Neb. Rev. Stat. § 29-4003(1)(b)(i)(A). The third Mendoza-Martinez factor favors treating the effects of the New Act as punitive.

### iv. The New Act promotes the traditional aims of punishment.

Along with being analogous to historical forms of punishment and placing additional restraints upon convicted sex offenders, the New Act has the primary effect of furthering the traditional aims of punishment: retribution and specific deterrence. Smith v. Doe, 538 U.S. at 102.  By classifying offenders based on their offenses of conviction and without reference to the likelihood that they will commit other sexual offenses in the future, the Nebraska Legislature is attempting both to punish the offenders and, prospectively, to deter the commission of other crimes by them. Without a risk assessment review that predicts whether the offender is likely to commit sexual offenses in the future, the argument that registration and notification are purely a remedial means of protecting the public is insupportable as there is nothing more than the offender's original crime to suggest that other crimes may be committed.  The automatic classification of an offender based on the offense of conviction, without determining whether he or she is likely to reoffend, is simple retribution. Tison v. Arizona. 481 U.S. 137, 180-181 (1987) ("Retribution...has as its core logic the crude proportionality of "an eye for an eye.").

In analyzing this prong of the Mendoza-Martinez test, the Worm Court determined that the then in force sex offender registry did "serve a retributive purpose." The Court stated that "unless an offender is assessed as having a moderate or high recidivism risk" they are not subject to public notification. Id. at 163.  The Worm opinion concluded that without public notification, enforcement was not likely to result in any stigma or public disgrace.  Worm at 163.  The New Act is substantially different.  The

43

New Act not only creates affirmative disabilities for registrants, it now requires every registrant to be subjected to public notification.  The New Act promotes the traditional aims of punishment as it is clearly retributive.

     **v. The New Act applies only to behavior that is already a crime.**

     The U.S. Supreme Court in <u>Smith v. Doe, 538 U.S. 84, (2003)</u>, concluded that this factor required little weight in the analysis of the effect of Alaska's registry statute because the statute's concern was recidivism.  The classification process proposed by the New Act is fundamentally different than the one reviewed in <u>Smith.</u>

     The New Act represents a fundamental shift from judicial and administrative based determination of risk level, as examined in <u>Smith</u>, to offense-based registration and notification.  If the Legislature were truly worried about recidivism, and no the underlying crime, the New Act would apply to other individuals who might pose a threat to society even if they avoid conviction.[4]

     In <u>Wallace</u>, the court stated that "if recidivism were the only concern, the statute would apply not only to convicted sex offenders, but also to other defendants who might pose a threat to society even if they are not convicted." Citing <u>Doe</u>, 189 P.3d at 1014<u>.</u> The <u>Wallace</u> opinion further stated,

> For example, the Washington Sex Offender Registration Act, upheld by the Ninth Circuit, includes sex offenders not found guilty-those charged with sex offenses but found incompetent to stand trial, found not guilty by reason of insanity, and those committed to mental health facilities as sexual psychopaths or sexually violent predators-as well as those who are convicted of sex offenses.

<u>Russell v. Gregoire</u>, 124 F.3d 1079, 1091 (9th Cir.1997).

---

4 There is no other public registry for other crime; only sex offenders.

The State cannot argue that this prong of the <u>Mendoza-Martinez</u> test does not indicate punitive effect, as the Nebraska Legislature fundamentally shifted the classification processes by linking the classification scheme to only the conviction of a prior crime.

### vi. Passage of the New Act can be assigned to no other purpose than punishment.

The Defendants will argue that the registry is intended to protect the public at large.  In 2003, the United States Supreme Court found that there was scientific evidence supporting the validity of sex offender laws (*see. e.g.,* <u>Smith v. Doe</u>, 583 U.S. 84 at 105). The risk based registry considered in the <u>Smith</u> case is fundamentally different from the conviction based classifications under the New Act.  Furthermore, numerous studies have since called into question the underlying assumptions of many sex offender laws.  For example, in its 2007 report, Human Rights Watch pointed out:

> With the purpose of helping parents identify unknown convicted sex offenders in the neighborhood, sex offender laws like community notification schemes reflect the assumption that children and adults are most at risk from strangers.  Yet sexual violence against children as well as adults is overwhelmingly perpetrated by family members or acquaintances. The US Bureau of Justice Statistics has found that just 14 percent of all sexual assault cases reported to law enforcement agencies involved offenders who were strangers to their victims.

<u>No Easy Answers,</u> at pg. 25.  Similarly, Human Right Watch pointed out that sex offender legislation is often premised on misinformation regarding recidivism rates:

> Sex offender laws also reflect the assumption that previously convicted sex offenders are responsible for most sex crimes. Yet according to a 1997 US Department of Justice study, 87 percent of the people arrested for sex crimes were individuals who had not previously been convicted of a sex offense.

The focus of sex offender 1aws on people who have previously been convicted of sex offenses may originate in the misperception that most if not all of those who have committed sex crimes in the past will do so again. Legislators, public officials, and members of the public routinely claim that people who have committed sex offenses pose a great risk to the public because they have "astronomically high" recidivism rates. For example, federal legislators justified the need for federal sex offender laws by asserting sex offender recidivism rates of 40 percent, 74 percent, and even 90 percent. Legislators rarely cite, nor are they asked for, the source and credibility of such figures. In addition, most of those who make public assertions about the recidivism fates of sex offenders take a "one-size-fits-all" approach; they do not acknowledge the marked variation in recidivism rates among offenders who have committed different kinds of sex offenses, nor the influence of other factors on recidivism.

Id. at p. 26 (footnotes omitted).  The New Act reflects such faulty logic.  The passage of the New Act can only be assigned to the Legislature's apparent desire to receive federal funds and punish an unpopular group that is an anathema to society.

### vii. The New Act is excessive in relation to its allegedly non-punitive purpose.

The New Act is not graduated and proportional with the nature of the crimes committed.  In Wallace, the Indiana Supreme Court said "We think it significant for this excessiveness inquiry that the Act provides no mechanism by which a registered sex offender can petition the court for relief from the obligation of continued registration and disclosure." Id. at 385.  Similar to the New Act, the registrants in Indiana were listed on the registry irrespective of differences in past behavior or current threat to society.  The Wallace Court further stated, "offenders cannot shorten their registration or notification period, even on the clearest proof of rehabilitation." Id. at 384.  The New Act affords registrants no procedural process to expunge themselves from the registry regardless of their individual situation.  In fact, the New Act strips the expungement proceedings from the previous registry act (formerly located in Neb. Rev. Stat. § 29-4010).

46

The non-punitive purpose of the Act, although of unquestioned importance, does not serve to render as non-punitive a statute that is so broad and sweeping.  The New Act creates a registry that is substantially excessive to the proposed legislative intent.  This prong of the Mendoza-Martinez test further indicates that the Act is punitive in nature.

In State v. Payan, 277 Neb. 666 (Neb. 2009), the Nebraska Supreme Court recently applied Ex Post Facto scrutiny to laws concerning registered sex offenders. Payan provides this court with a minimum threshold of punitive effect allowable in a retroactively applied regulation.  In Payan, the defendant was found guilty of first degree sexual assault by a person 19 years of age or older subjecting a person at least 12 years of age but less than 16 years of age to sexual penetration, a Class II felony. Pursuant to the trial court's finding the defendant was subject to lifetime community supervision.  The Court analyzed the lifetime community supervision provisions of Neb. Rev. Stat. § 83-174.03 under the "intent-effects" test for Ex Post Facto analysis set forth in Worm.  In it's review the Court held that lifetime community supervision:

> involves affirmative restraints and disabilities similar to and arguably greater than traditional parole.  It is not dependent upon any finding that the offender poses a risk to the safety of others at the time he or she completes a period of incarceration or civil commitment.  We therefore conclude that the legislative intent in enacting Neb. Rev. Stat. § 83-174.03 was to establish an additional form of punishment for some sex offenders.

Id. 676. The restrictions considered by the Payan Court included:

> (a) Drug and alcohol testing if the conviction resulting in the imposition of community supervision involved the use of drugs or alcohol;
> (b) Restrictions on employment and leisure activities necessary to minimize interaction with potential victims;
> (c) Requirements to report regularly to the individual's community supervision officer;

(d) Requirements to reside at a specified location and notify the individual's community supervision officer of any change in address or employment;

(e) A requirement to allow the Office of Parole Administration access to medical records from the individual's current and former providers of treatment;

(f) A requirement that the individual submit himself or herself to available medical, psychological, psychiatric, or other treatment, including, but not limited to, polygraph examinations; or

(g) Any other conditions designed to minimize the risk of recidivism, including, but not limited to, the use of electronic monitoring, which are not unduly restrictive.

Neb. Rev. Stat. § 83-174.03.  Payan sets forth a level of restrictions a retroactively imposed monitoring scheme may not include before it is determined to be a punishment. The New Act allows law enforcement to deprive the registrants of constitutional rights without even the minimum standards required under probation or parole.  Similar to the lifetime community supervision considered in Payan, the New Act creates restraints and disabilities that are more restrictive than parole or probation.  Accordingly, this Court must find that the intent of the Legislature was punitive.

### 2.    The New Act violates the double jeopardy clause of the United States Constitution and Article § 12 of the Nebraska Constitution.

The New Sex Offender Laws violate the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article I section 12 of the Nebraska Constitution, unconstitutionally inflicting a second punishment upon a sex offender for a singular offense.  Because the New Act is punitive in both its intent and effect as discussed above it rises to the level punishment.

The Double Jeopardy Clause states that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Constitution, Am. V.; see also

Neb. Const. Art. 1, § 12.   Although the Double Jeopardy Clause was commonly understood to prevent a second prosecution for the same offense, the United States Supreme Court applies the Clause to prevent a Sate from punishing an offender twice for the same offense. *See* Kansas v. Hendricks, 521 U.S. 346, 369 (1997); Witte v. United States, 515 U.S. 389, 396 (1995).  Only a "punitive" sanction is subject to the Fifth Amendment protection against multiple punishments. Hudson v. United Stales, 522 U.S. 93, 101 (1997).

The registrant Does were first punished when they were sentenced for their criminal conduct and, where applicable, classified under Nebraska's prior sex offender laws (Exhibits 1-20).  Now, several years later, the State attempts to enhance their punishment by subjecting the registrants to the New Act's onerous requirements, constituting an *ex post facto* and second punishment.

### 3.      The New Act constitutes cruel and unusual punishment.

The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The provision is applicable to the States through the Fourteenth Amendment. Furman v. Georgia, 408 U.S. 238, 239 (1972).  The Eighth Amendment guarantees individuals the right not to be subjected to excessive sanctions. Atkins v. Virginia, 536 U.S. 304 (2002). The right flows from the basic "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." Weems v. United States, 217 U.S. 349, 367 (1910). By protecting even those convicted of heinous

crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons. Roper v. Simmons, 543 U.S. 551, 560 (2005).

The prohibition against cruel and unusual punishments must be "interpreted according to its text by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design." Id. "To implement this framework [the Court] ha[s]...affirmed the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." Roper, 543 U.S. at 561.

"When it comes to laws that involve sex offenders, the passions of the majority must be tempered with reason." Joseph Lester, The Legitimacy of Sex Offender Residence and Employment Restrictions, 40 Akron L. Rev. 339, 340 (2007). "Overborne by a mob mentality for justice, officials at every level of government are enacting laws that effectively exile convicted sex offenders from their midst with little contemplation as to the appropriateness or constitutionality of their actions." Id "Politicians across the country have approved almost every measure that deals with sex offenders in order to appear strong on crime." Id.

"Given that the sex-offender lobby is neither large nor vocal, it is up to the courts to protect the interests of this disenfranchised group." Joseph Lester, *The Legitimacy of Sex Offender Residence and Employment Restrictions, supra* at 340, citing Cal. Dep't of Corr. v. Morales, (1995), 514 U.S. 499, 522 (Stevens, J., dissenting)("danger of legislative overreaching...is particularly acute when the target of the legislation is a narrow group as unpopular (to put it mildly) as multiple murderers. There is obviously little legislative hay to be made in cultivating the multiple-murderer vote."). See Wayne

A. Logan, <u>The Ex Post Facto Clause and the Jurisprudence of Punishment</u>, 35 Am. Crim. L. Rev. 1261, 1267 (Summer, 1998) ("That sex offenders are deserving of disdain is not the issue, for they surely are. The issue, rather, is whether they deserve the protection of the Constitution, which they surely do").  Particularly for those offenders who have served their periods of incarceration and have previously been determined to be low-risk to reoffend, the extension of registration duration and public notification via the State Patrol website under the New Act is a punishment that is not nearly proportional thereby constituting cruel and unusual punishment (Exhibits 1, 3, 7, 9, 10 and 11).

> **4.    The New Act unconstitutionally sanctions unreasonable searches and seizures.**

The Fourth Amendment requires that "searches and seizures be reasonable." <u>Edmond v. City of Indianapolis</u>, 531 U.S. 32, 37 (2000).  "Fourth Amendment protections [are] defined by reasonable expectations of privacy." <u>Lucas v. South Carolina Coastal Council</u>, 505 U.S. 1003, 1035 (1992) (<u>citing</u> <u>Katz v.United States</u>, 389 U.S. 347 (1967)). There is no area where citizens have a greater expectation of privacy than in their homes.

At the outset, the alarming breadth of Neb. Rev. Stat. § 29-4006(2) must be emphasized.  It requires that the registrant give blanket permission for ubiquitous consent searches to government actors. The consent gives the enforcement authorities unrestricted permission to enter the registrant's home at any time to search the person's computer or Internet devices. It also requires the registrant to install monitoring hardware or software on their electronic devices so that such a search can be accomplished remotely. (Exhibit

33). In addition to not limiting or defining who has the right to make such entry and searches, the statute contains no limitations on the searchers' publication or dissemination of any of the material that is discovered during the searches. The Fourth Amendment cannot be bent to tolerate such a suspicionless search.

The installation of software or hardware to remotely observe a registrant's computer usage is a search. If law enforcement went into a registrant's home and installed a listening device there, this would clearly be a search that would have to withstand scrutiny under the Fourth Amendment. *See e.g.* <u>Berger v. New York</u>, 388 U.S. 41 (1967) (installation of recording device in offices based on a New York statute authorizing a judge to issue an order to do so on grounds less than probable cause was unconstitutional).  In <u>Kyllo v. United States</u>, 533 U.S. 27 (2001), the Court held that using thermal imaging technology, set up outside of a private home to scan the interior of the home, was a "search" despite the fact that there was no physical intrusion into the home.  The Court noted that our common law traditions justifiably extend a reasonable expectation of privacy in our homes, and that such an expectation of privacy is at the core of Fourth Amendment protection.

> To withdraw protection of this minimum expectation would be to permit police technology to erode the privacy guaranteed by the Fourth Amendment. We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical "intrusion into a constitutionally protected area," *Silverman,* 365 U.S., at 512, 81 S.Ct. 679, constitutes a search-at least where (as here) the technology in question is not in general public use. This assures preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted. On the basis of this criterion, the information obtained by the thermal imager in this case was the product of a search.

Id. at 34-35. Using a computer to remotely invade an area where there is a reasonable expectation of privacy is similarly a search. For example, in United States v.Heckenkamp, 482 F.3d 1142 (9th Cir. 2007), the Ninth Circuit found that although the search was justified, a remote search of a computer attached to a university network was a search in fact.

"Few threats to liberty exist which are greater than that posed by the use of eavesdropping devices." Berger, 388 U.S. at 63. Reviewing the contents of one's computer remotely is no different than entering the home to do so. Both are "searches" and must satisfy the requirements of the Fourth Amendment.

"[A] search conducted pursuant to a valid consent is constitutionally permissible." Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). The New Act requires that the registrants consent to the searches demanded by the statute. Failure to consent is punishable by a Class IV felony. Although the statute utilizes the word "consent", this is hardly the valid consent that vitiates Fourth Amendment concerns.

In order for the consent to be valid to allay Fourth Amendment concerns, it must be "voluntary" and not the product of either express or implied duress or coercion. Id. at 227. "Acquiescence to a claim of lawful authority" is not voluntary consent. Bumper v. North Carolina, 391 U.S. 543, 549 (1968). Thus, in Bumper a search was deemed not to be consensual when the "consent" was given only after the officers asserted that they had a warrant. "If under all the circumstances it appears that the consent was granted only in submission to a claim of lawful authority, then the consent is invalid and the search is unreasonable." United States v. Articles of Drug, 568 F. Supp. 1182, 1185 (N.D. Calif.

1983) (*citing* Bustamonte, 412 U.S. at 233 and Bumper, 391 U.S. at 548-49). The statute

gives the registrants a Hobson's choice - consent to a search or commit a felony. Any

"consent" therefore is the product of both duress and a claim of lawful authority. It is not

a valid consent that removes the Fourth Amendment difficulties inherent in the

challenged statute.

"The right of the people to be secure in their persons, houses, papers, and effects,

against unreasonable searches and seizures, shall not be violated." (4TH Amendment US

Constitution)  There is no warrant, let alone cause, for the searches that are mandated by

Neb. Rev. Stat. § 29-4006(2). (set to take effect January 1, 2010)  This should be the end

of the inquiry.  The statute is plainly unconstitutional.  It is true that the Supreme Court

has established that, although individualized suspicion of wrongdoing is the touchstone of

reasonableness under the Fourth Amendment, there are "limited circumstances in which

the usual rule does not apply." Edmond, 531 U.S. at 37.  As the Court has noted:

> Although we usually require that a search be undertaken only pursuant to a
> warrant (and thus supported by probable cause, as the Constitution says
> warrants must be), see, *e.g.,* Payton v. New York, 445 U.S. 573, 586, 100
> S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980), we have permitted exceptions
> when "special needs, beyond the normal need for law enforcement, make
> the warrant and probable-cause requirement impracticable." New Jersey v.
> T.L.O., 469 U.S. 325, 351, 105 S. Ct. 733, 748, 83 L.Ed.2d 720 (1985)
> (BLACKMUN, J., concurring in judgment). Thus, we have held that
> government employers and supervisors may conduct warrantless, work
> related searches of employees' desks and offices without probable cause,
> O'Connor v. Ortega, 480 U.S. 709, 107 S. Ct. 1492, 94 L.Ed.2d 714
> (1987), and that school officials may conduct warrantless searches of
> some student property, also without probable cause, New Jersey v.
> T.L.O.,[495 U.S. 325 (1985)] *supra*.  Courts have also held, for similar
> reasons, that in certain circumstances government investigators conducting
> searches pursuant to a regulatory scheme need not adhere to the usual
> warrant or probable-cause requirements as long as their searches meet
> "reasonable legislative or administrative standards." Camara v. Municipal
> Court, 387 U.S. 523, 538, 87 S.Ct. 1727, 1736, 18 L.Ed.2d 930 (1967).
> See New York v. Burger, 482 U.S. 691, 702-703, 107 S.Ct. 2636,  96

L.Ed.2d 601 (1987); <u>Donovan v. Dewey</u>, 452 U.S. 594, 602, 101 S.Ct. 2534, 2539, 69 L.Ed.2d 262 (1981); <u>United States v. Biswell</u>, 406 U.S. 311, 316, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972).

<u>Griffin v. Wisconsin</u>, 483 U.S. 868, 873 (1987).  The key to all the searches referenced in <u>Edmond</u>, which may occur on less than probable cause, is that they are designed for some purpose other than detecting criminal wrongdoing.  The Court made this clear in both <u>Edmond</u> and <u>Ferguson v. City of Charleston</u>, 532 U.S. 67 (2001).  In <u>Edmond</u>, in invalidating an Indianapolis program that featured suspicion-less roadblocks designed to interdict the flow of unlawful drugs through Indiana, the Court held that:

> We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion.

<u>Edmond</u>, 531 U.S. at 41.

Instead, <u>Edmond</u> holds that if "law enforcement authorities pursue primarily general crime control purposes at checkpoints, such as here, stops can only be justified by some quantum of individualized suspicion." Id. at 47.

In <u>Ferguson</u>, the Court was faced with a policy where a public hospital would test obstetric patients suspected of drug use and if the patient tested positive the patient would be provided education and referral for treatment and the results would be turned over to law enforcement without the knowledge or consent of the patient. The drug tests were searches. <u>Id</u>. at 76.  The proponents of the policy argued that inasmuch as the ultimate purposes of the policy, to protect the health of mother and child, was a "beneficent one", the Fourth Amendment's probable cause requirement should be dispensed with. <u>Id</u>. at 81.

However, the Court disagreed, concluding that "the purpose actually served by the . . . searches 'is ultimately indistinguishable from the general interest in crime control.'" Id. at 81 (citing Edmond, 531 U.S. at 44). Given this, "[t]he Fourth Amendment's general prohibition against nonconsensual, warrantless, and suspicionless searches necessarily applies to such a policy." Id. at 86.

The same prohibition applies here. The challenged statute is unconstitutional because it provides for nonconsensual, warrantless, and suspicionless searches. Under the New Act, law enforcement is required to search and monitor any computers or electronic devices that the registrant "possesses". Nebraska courts have interpreted possession statutes in several contexts, notably possession of illegal substances. Under Nebraska law "possession includes both physical and constructive possession with knowledge of the presence of and its character as a drug." State v. Garza, 256 Neb. 752, 592 N.W.2d 485 (1999). Furthermore, "evidence that a defendant had constructive possession of a drug with knowledge of its presence and its character as a controlled substance is sufficient to support a finding of possession and to sustain a conviction for unlawful possession." State v. Garcia, 216 Neb. 769, 345 N.W.2d 826 (1984).

As the New Act mandates criminal prosecution for violations of the Act, adoption of case law interpreting possession in a criminal context is the only source Plaintiff's may rely on to determine how Neb. Rev. Stat. § 29-4006(2) will be enforced. Under the body of Nebraska case law defining possession, any premises where the Plaintiff might work, live, go to school or regularly frequent will be afforded no fourth amendment protection against warrantless search by the State.

During floor debate the Legislature recognized the constitutional problems created by the language of Neb. Rev. Stat. § 29-4006(2) as revised by LB 97. The original language concerned "computers owned or used by the offender." To address such concerns, the language was eventually changed to the language considered today, "computers or electronic devices possessed by the person." Yet, this change in language does not address the underlying concern voiced by Senator Haar during Floor Debate on April 29, 2009. Senator Haar was concerned with the implication that third parties who allow registrants to use their computers or electronic computer devices would be subject to warrantless search. As an apparent answer to such concern Senator Lautenbaugh said, "we're just dealing with computers owned as the purpose of the amendment." Despite the Legislature's recognition of the fourth amendment implications on potential bystanders, the New Act does not contain a definition of "possesses", nor does the New Act expressly limit search and monitoring to computers actually owned by registrants.

But for the purported consent demanded under the New Act, any search of the Registrant Plaintiffs', Non-Registrant Plaintiffs' and third parties' computers and Internet devices[5] can occur only with probable cause, a warrant or some other constitutionally valid exception. The only possible purpose for search of the Registrant and Non-Registrant plaintiffs' and putative class' computers is to look for evidence of criminal activity. This purpose is "indistinguishable from the general interest in crime control." Edmond, 531 U.S. at 458. Perhaps the statute has a beneficent purpose. "Such a motive, however, cannot justify a departure from Fourth Amendment protections." Ferguson, 532 U.S. at 86. The unconstitutionality of Neb. Rev. Stat. § 29-4006(2) (effective January 1,

---

5 See Exhibits 1 through 31 for a sample of the electronic devices subject to law enforcement search and seizure under the New Act.

2010) is also apparent from reviewing the Supreme Court's pronouncements on the limitations imposed on searching persons on probation. In United States v. Knights, 534 U.S. 112 (2001), the Court held that "a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." Id. at 120. One of these freedoms is the right to be free from searches without probable cause and a warrant.  In Knights, a state criminal court had imposed as a condition of probation that Mr. Knights could be searched at any time, without warrant or probable cause.  For a person on probation the Court held that the Fourth Amendment "requires no more than reasonable suspicion to conduct a search of this probationer's house. . . When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." Id. at 593.

In Griffin v. Wisconsin, 483 U.S. 868 (1987), the Supreme Court concluded that "[a] probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'" Id. at 873.  The Court determined, however, that, given that probationers do not enjoy the absolute liberty and constitutional protections that "free" citizens enjoy, a Wisconsin regulation allowing searches of probationer's homes based on "reasonable grounds" was constitutional. Id. at 880.  Thus, even the homes of persons on probation are protected by the Fourth Amendment. Even in this circumstance there must be some cause for the search.  However, Neb. Rev. Stat. § 29-4006(2) dispenses with any "cause" requirement to search the homes of persons who are not on probation, parole, or under court supervision, and therefore "enjoy, the

58

absolute liberty to which every citizen is entitled." Knights, 534 U.S. at 119 (internal quotations and citations omitted).

In Doe v. Prosecutor of Marion County, 566 F.Supp2.d 862 (2008), the United States District Court for the Southern District of Indiana considered a consent under duress issue similar to the one presented before this court.  In Prosecutor of Marion County the court considered a registry that required offenders not currently on parole or probation to consent to warrantless searches of personal computers or devices with Internet capability at any time, or be subject to felony prosecution.  The Court ruled that such a requirement was not voluntary, and thus did not serve to legitimize the statute's unconstitutional intrusions as applied to offenders, notwithstanding the suggestion that offenders could choose to avoid searches and monitoring by choosing not to own a computer or Internet capable device.  The statute imposed no limits on the types or scope of searches of computers and Internet use. The scope of search provided for under Indiana's sex and violent offender registration statute, which required that class of offenders not currently on parole or probation to consent to warrantless searches inside their homes of personal computers or devices with Internet capability at any time, was unconstitutional as applied to the offender class.  The Statute forced offenders to consent to the most fundamental sort of intrusion without warrant or any applicable exception.

Neb. Rev. Stat. § 29-4006(2) creates a consent to search provision more restrictive than the one considered in Prosecutor of Marion County.  This section of the New Act would apply to all registrants as Neb. Rev. Stat. § 29-4006(2) will apply to any registrant required to report "telephone numbers".  Neb. Rev. Stat. § 29-4006(1)(k). Furthermore, the Indiana registry allowed registrants to avoid signing the consent form if

they chose not to own devices subject to the law.  The language of the New Act indicates that Nebraska law enforcement agencies will still be able to conduct such searches on the home of a registrant who owns no such device to verify that fact.

Any premises where registrants might frequent, be it a private residence, place of business or public location, will be subject to warrantless search and seizure.  Such an implication violates the privacy of any roommates, family members, employees or employers for no fault of their own.  This cannot be. The law is unconstitutional as applied to the plaintiffs who are not on probation, parole, or under court supervision.

**5.    The New Act violates the due process clauses of the United States and Nebraska Constitutions.**

The New Act violates Plaintiffs' rights to both procedural and substantive due process under both the United States and Nebraska Constitutions.  "[N]or shall any State deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  "No person shall be deprived of life, liberty, or property, without due process of law." Neb. Const. art. I, § 3. First, the New Act is unconstitutionally vague on its face and as applied to all Plaintiffs by failing to enable ordinary people to understand what conduct it prohibits, and by authorizing and encouraging arbitrary and discriminatory enforcement.  All Plaintiffs bring this action against all Plaintiffs. Exhibits 1 through 20; A through K. Second, the New Act violates substantive due process because it retroactively eliminates the risk-based model of public notification and classifies all sex offenders as dangerous.  All Plaintiffs bring this action against all Plaintiffs (Exhibits 1 through 31).  Finally, the New Act deprives Plaintiffs of procedural

due process by eliminating fundamental rights and state law-created rights without a hearing. All Plaintiffs bring this action against all Defendants (Exhibits 1 through 31).

> a.  Numerous definitions and subsections of the New Act are vague, resulting in a statutory scheme that fails to permit ordinary people to understand prohibited conduct and encourages discriminatory enforcement.

This claim is brought by Does 1-20 and A-K.  Vagueness may invalidate a criminal law for either of two independent reasons. "[T]he void-for-vagueness doctrine requires that a penal statute (1) define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983); see also United States v. Bamberg, 478 F.3d 934, 937 (8th Cir. 2007).  The Nebraska Supreme Court recognizes the same standard when examining vagueness of a statute or ordinance under the Nebraska Constitution. See Maxon v. City of Grand Island, 273 Neb. 647, 652-53 (2007) (utilizing same standard for void-for-vagueness claim).  In substance, this test is an examination of both sides of the same coin: the law from the perspective of the person subject to it, and the law from the perspective of law enforcement.  In this case, the New Act, including the new crime of unlawful use of the internet by a prohibited sex offender, is so rife with vague and absent definitions, confusing structure, and open-ended discretion held by law enforcement, that it fails on both counts.

"A penal statute is void if it does not sufficiently define a criminal offense so that ordinary people can understand what conduct is prohibited. This inquiry looks at what a person of common intelligence would reasonably understand the statute to proscribe, not

what the particular defendant understood the statute to mean." United States v. Washam, 312 F.3d 926, 929-30 (8th Cir. 2002) (citing Kolender, 461 U.S. at 357).

In Coates v. City of Cincinnati, 402 U.S. 611 (1971), the Supreme Court held that an ordinance which prohibited "conduct...annoying to persons passing by" was impermissibly vague because it set no standard of specified conduct and required men of ordinary intelligence to guess at its meaning. Coates v. City of Cincinnati, 402 U.S. 611, 614 (1971). In Kolender, the Supreme Court invalidated a state law requiring individuals to show "credible and reliable" identification in response to an officer's request because the statute contained no standard for the individual to determine what type of identification met this requirement, thus leaving complete discretion in law enforcement officers to determine whether the identification was "credible and reliable." Kolender, 461 U.S. at 358.

The New Act is equally lacking in standards of specified conduct. Neb. Rev. Stat. § 29-4003 states that the New Act will apply to "any person who **on or after January 1, 1997**…has **ever**" been found guilty of one of the enumerated offenses. This section appears to simultaneously both limit its application to individuals who commit certain offenses after January 1, 1997, and apply to the enumerated offenses whenever committed.

Neb. Rev. Stat. § 29-4004 imposes confusing in-person reporting requirements on all registrants when he or she has a new address, temporary domicile, or habitual living location. This notification must occur within three working days before or after the change. "Temporary domicile" is defined as any place at which the person actually lives or stays for a period of at least three working days. Neb. Rev. Stat. § 29-4001.01(15).

"Habitual living location" is defined as any place that an offender may stay for a period of more than three days even though the sex offender maintains a separate permanent address or temporary domicile. Neb. Rev. Stat. § 29-4001.01(9).  The New Act fails to define "working days," leaving the entire reporting structure vague.[6]

A habitual living location includes anywhere a registrant **may stay** for a period of more than three days, which includes virtually anywhere on the planet.  Oddly, a habitual living location is measured in "days," but a temporary domicile and the time period in which a registrant must report any changes is measured in "working days."  No registrant would believe that he had an obligation to report all places he **may** stay, rendering the requirement to report all habitual living locations a nullity to the registrant and adding to the confusion.

Neb. Rev. Stat. § 29-4006 broadens the amount and nature of the information that a registrant must provide under the New Act to a bewildering and confusing extent.  This information includes the addresses where the person resides, has a temporary domicile, has a habitual living location, or will reside, although those definitions are confusing as discussed above.  The water is further muddied by use of terms such as "remote communication device," "identifiers and addresses," "global unique identifiers," and "other Internet communication identifiers" without defining what these terms mean.

The registrable information includes the license plate, description and regular storage location of any vehicle owned or operated by the person.  Since "vehicle" is not defined, it might include various manners of transportation, as has been the case in criminal driving under the influence cases, *e.g.* bicycles, riding lawnmowers, tractors,

---

6 For some registrants, this will be Monday through Friday.  However, some registrants work other days, nonconsecutive days, etc., leaving the statute open to various and disparate interpretations by men of common intelligence.

boats, etc.  It is also unclear whether this would include vehicles used by a registrant for work.  For example, Doe 1, as a requirement of his employment at a car dealer, operates several automobiles on any given workday.  To be compliant, he would be required to report every customer's automobile he operates, its license plate (which most do not have since they have not been purchased yet) and each car's location (which may be unknown at the time of reporting since dealerships constantly turn over inventory).  For Doe 1, this information changes on an almost-daily basis (Exhibit 1).

The New Act goes beyond the pale by mandating that each registrant sign a consent form giving law enforcement the ability to search all computers or other electronic communication devices possessed by the person, without defining "electronic communication device" or defining whether "possession" includes constructive possession.  This leaves open the very real possibility that a bullhorn must be searched by law enforcement as an electronic communication device, and that a registrant must consent to the search and seizure of cell phones owned by someone else but within the registrant's constructive possession.  The consent form also gives law enforcement the ability to install hardware or software to monitor the person's Internet usage on all computers or electronic communication devices possessed by the person.  By using the term "person" instead of "registrant," the Legislature specifically leaves open the possibility that computers and electronic communication devices owned by the registrant's spouse, friends, roommates, employers, etc., but in the possession of the registrant, would be subject to ongoing search and seizure and monitoring.  However, this remains unclear (Exhibits 1 through 31).

A new crime under Chapter 28 of the Nebraska Revised Statutes, unlawful use of the internet by a prohibited sex offender, was included in LB 97 and modified by LB 285. Neb. Rev. Stat. § 28-322.05 makes it a crime for a registrant convicted of one or more of certain enumerated offenses, or an equivalent offense committed in another jurisdiction, to knowingly and intentionally use a social networking web site, instant messaging, or chat room service that allows a person who is less than eighteen years of age to access or use its social networking web site, instant messaging, or chat room service.  The terms "social networking web site," "instant messaging," or "chat room service" are not defined in Chapter 28, although these terms are defined in a different Chapter: Chapter 29, Section 4001.01.  Adding to the confusion of the entire scheme is the fact that "social networking web site," while defined in Chapter 29 by the New Act, is only used in the new crime of unlawful use of the internet by a prohibited sex offender, which is located in Chapter 28.[7]  Without a clear definition of these terms, a registrant cannot understand what is required to comply with requirements of the New Act and Unlawful use crime.

The New Act also fails under the second prong of the test, which requires certainty for law enforcement.  Its vagueness lends the New Act to arbitrary enforcement and encourages a "standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." Kolender, 461 U.S. at 358.  In no uncertain terms, Neb. Rev. Stat. § 28-322.05 provides that unlawful use of the internet by a prohibited sex offender is a misdemeanor for a first offense and a felony for any subsequent offense, and

---

7 Neb. Rev. Stat. § 29-4001.01 specifically states that the definition of "social networking web site" applies only for purposes of the Sex Offender Registration Act, and there is no reference to these definitions by Neb. Rev. Stat. § 28-322.05.  If the Legislature wanted the definitions of the New Act to apply to a Chapter 28 crime, it could have done so.  See *e.g.* Neb. Rev. Stat. §§ 13-1302 (referencing definitions in Chapters 14 and 15), 44-526 (referencing Chapter 77 definitions), 39-101 (referencing Chapter 60 definitions).

Neb. Rev. Stat. § 29-4011 clearly states that a violation of the New Act is a felony for a first offense and also a felony with the possibility of a mandatory one year in prison for a subsequent violation.   This is the extent of the law's clarity.   The New Act allows capricious enforcement for the same reasons it is impossible for a registrant to comply with its terms: confusing in-person reporting requirements concerning timing and living location; unclear definitions, or complete lack thereof, for terms that do not easily lend themselves to everyday or conventional wisdom; undefined extent of "possession" of an "electronic communication device;" etc.

However, law enforcement is placed on even more uncertain ground than the registrants.   How does a law enforcement officer answer questions from a registrant who works at a car dealer and is unsure whether he is obligated to report all customer vehicles he operates at his job?   With respect to the consent form, it purports to give law enforcement the ability to (1) search all computer and electronic communication devices possessed by the person, and (2) install hardware or software to monitor Internet usage on all computers or electronic communication devices possessed by the person.   Although the consent form is signed when the registry information is provided, no further guidance is provided to law enforcement.   When does the search occur?   Immediately on the spot or at any random time selected by law enforcement, such as 3 a.m. every morning?   Also, where does that search occur?   At the sheriff's station or in the privacy of a registrant's or other's home or office?   The New Act also fails to provide for devices that are incapable of being monitored.   Can a registrant or family member or employer retain the device?   These answers are open to be determined by individual law enforcement officers.   In fact, the law is so vague and gives so much discretion to law enforcement with respect to the

search, seizure and monitoring of computers and electronic communication devices that the New Act goes beyond what constitutes a permissible warrantless search and seizure for an individual released on parole, probation, or supervised release.[8]  If Neb. Rev. Stat. § 29-4006(2) does not allow unfettered discretion, what does?

Further, Neb. Rev. Stat. § 29-4006(1) requires that the State Patrol collect certain information, "but not limited to" that enumerated data.  This gives the State Patrol unfettered discretion to collect an unforeseeable amount of information.  Once the State Patrol collects whatever it wants, the New Act provides that only limited information will be confidential, and the rest will not be confidential. Neb. Rev. Stat. § 29-4009(1).  The New Act also provides for the release of "public notification information" to third parties. Neb. Rev. Stat. § 29-4013(4) and (5).  But no provision regulates whether such third parties may disclose such confidential information, and it places no limitation on third parties as to how they disseminate information gathered under the New Act, confidential or otherwise.[9]  For example, in a December 1, 2009, interview with the Lexington Clipper Herald, Dawson County Sheriff Gary Reiber was quoted as saying, "What I'm hoping to do is set up a database for everyone to use on my Web page" (Exhibit 35). Without clearer guidance for law enforcement, the statutory scheme creates an information free-for-all.

These are material provisions of the New Act that have serious implications for registrants and law enforcement, but the entire scheme is so tenuous that it renders

8 See previous sections relating to *ex post facto*, double jeopardy, cruel and unusual punishment and the fourth amendment.
9 Since the terms "identifiers and addresses" and "global unique identifiers" are undefined, these might mean usernames and passwords for various online accounts.  This, coupled with the lack of control over dissemination of such non-confidential information, exposes the registrants to an increased risk of identity theft or other abuse.

compliance by each registrant impossible and encourages capricious enforcement.[10]  The potential of abuse of discretion is more acute considering the fact law enforcement may be more tempted to overstep its bounds when dealing with these issues related to an unpopular group: registered sex offenders.  This justifies a heightened degree of exactness, but the New Act falls woefully short of even clarity.  Since it is impossible to make heads or tails of this law no matter what side of the coin is examined, the New Act and accompanying new crime of unlawful use of the internet are unconstitutionally vague and thereby violate due process.

> b.  The New Act offends Plaintiffs' right under Substantive Due Process by unilaterally and retroactively changing from a risk-based model of public notification to an undifferentiated model whereby all registrants are subject to community-wide notification

The New Act violates the Due Process Clause of the Fourteenth Amendment and Nebraska Constitutions by infringing on many core fundamental rights and liberties held by the Plaintiffs without adequate government justification.  Substantive Due Process guarantees that a state's legislative power is subordinate to those fundamental rights encompassed within the Fourteenth Amendment, and that the state cannot infringe on those rights for arbitrary or capricious reasons. See Truax v. Corrigan, 257 U.S. 312, 329 (1921).  "The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint.  The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interest." Washington v. Glucksberg, 521 U.S. 702, 719-20 (1997) (internal

---

10 It seems clear why the only section of the prior Act that the Legislature left untouched was Neb. Rev. Stat. § 29-4012.  This section grants law enforcement officials immunity from liability for good faith conduct under the New Act, a tacit acknowledgement by the Legislature that the New Act is fertile with opportunity for arbitrary and capricious enforcement.  Unfortunately, the generosity of the Legislature ended at law enforcement.  Notwithstanding the equally confusing duties imposed on registrants, they are not afforded a similar good-faith exception for noncompliance.

citations omitted).  In short, substantive due process examines the constitutionality of an underlying statute.  "If the statute implicates a fundamental right, the state must show a legitimate and compelling governmental interest for interfering with that right. If the statute does not implicate a fundamental right, we apply a less exacting standard of review under which the statute will stand as long as it is rationally related to a legitimate governmental purpose." Gunderson v. Hvass, 339 F.3d 639, 643 (8th Cir. 2003) (citing Graham v. Richardson, 403 U.S. 365 (1971); City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985)).  "The federal and Nebraska Constitutions contain similar due process language, and both provide that no person shall be deprived of life, liberty, or property without due process of law.  Because the due process requirements of Nebraska's Constitution are similar to those of the federal Constitution, we apply the same analysis to the [Plaintiff's] state and federal constitutional claims." Scofield v. State, 276 Neb. 215, 228 (2008).

> **i.**     **The New Act triggers Substantive Due Process analysis by depriving Plaintiffs of multiple core fundamental liberty interests, including the right to defend one's reputation, right to the integrity of a family, right to travel, right to earn a living, and the right to privacy of information**

First, the New Act deprives Plaintiffs of their liberty interest in their names, reputations and standing in their communities by failing to differentiate between persons on the sex offender registry and inferring that those individuals on the public registry are high-risk sexual predators.  By grouping all sex offenders together on one State Patrol website registry, those registrants who were not subject to public notification under the prior Act are implied to be high-risk offenders and are thereby stigmatized.

In Wisconsin v. Constantineau, the Supreme Court recognized that the Due Process clause is implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." Wisconsin v. Constantineau, 400 U.S. 433, 437 (1971).  The Supreme Court later narrowed this right and clarified that damage to reputation alone is insufficient to invoke the requirements of procedural due process.   In Paul v. Davis, the Court stated that damage to one's reputation must be accompanied by some other tangible loss, such as the loss of a status recognized and protected by state law or the loss of a fundamental right such as those contained within the Bill of Rights and applied to states through the Fourteenth Amendment. Paul, 424 U.S. at 710-12.  The Eighth Circuit has defined this two-part "stigma plus" test as follows: "Damage to reputation alone…is not sufficient to invoke the procedural protections of the due process clause. The loss of reputation must be coupled with some other tangible element to rise to the level of a protectable property interest." Gunderson v. Hvass, 339 F.3d 639, 644 (8th Cir. 2003).

**Stigma:** The provisions of the New Act regarding public notification through the State Patrol's website will undoubtedly stigmatize the Plaintiffs not currently subject to public notification and cause irreparable harm to their reputations.  Based on the actions of the State, the community understands that anyone listed on the State Patrol's website poses a serious risk to them and their family, especially children.  This point is made by the State Patrol's website and the Legislature's own statements.

The State Patrol's Sex Offender Registry website states that "sex offenders present a **high risk to commit repeat offenses** and that efforts of law enforcement agencies to **protect their communities**, conduct investigations, and quickly apprehend

70

sex offenders are impaired by the lack of available information about individuals who have pleaded guilty to or have been found guilty of sex offenses and who live in their jurisdiction." (Exhibit 36, emphasis added). Furthermore, "[t]his [registration] information is being provided from a list of Nebraska State Patrol Press Releases that have been made concerning **High Risk/Level 3** Sex Offenders." (Exhibit 37, emphasis in original). Through statements made on the State Patrol website, the community believes and understands that the offenders on the website pose a "high risk" to recidivate, and that public notification is necessary for the protection of the community.

The Legislature fans these flames and reinforces the belief that the registrants listed on the State Patrol website pose the most serious danger to their community. For instance, "LB 97 seeks to **protect children** from **sexual predators** by strengthening penalties[11] and bringing Nebraska's laws up to date. As technology changes, **Internet predators** find new avenues to pursue their **victims**, like social networking sites. Nebraska's justice system must keep pace." Introducer's Statement of Intent, LB 97 (emphasis added). LB 285 buttresses the belief that all registrants pose a high risk to the community. "The purpose of [the Adam Walsh **Child Protection and Safety** Act of 2006] is to **protect the public, in particular children,** from **violent sex offenders** via a more comprehensive, nationalized system for registration of sex offenders." Introducer's Statement of Intent, LB 285 (emphasis added). The State Patrol website and Legislative history engender and encourage the presumption that those individuals listed on the website are Internet predators or violent sex offenders, seeking victims, in particular child victims. The New Act will purportedly provide a line of defense against these violent Internet predators and their intended child victims.

---

11 Again, this clearly identifies the legislative intent of the New Act: punishment.

Admittedly, some sex offenders pose a dangerous risk to society.  This point is well made by the State, and that point is communicated to viewers of the registry via the State Patrol website.  Although this may be the current state of the registry, this will not true after January 1, 2010.  The New Act requires that all registrants be listed on the website.  The State has engendered and reinforced the community-wide belief that those individuals on the website are the most dangerous and violent sexual predators, and then, through enactment of LB's 97 and 285, includes low and moderate risk offenders.  The effect on those registrants that are not high risk is stigmatizing due to the undifferentiated nature of the registry, i.e., they are guilty by association.[12]  There will be no means for someone viewing the registry to determine who is dangerous and who is not.  Therefore, the logical conclusion is that a viewer will presume that, as the State has repeatedly told him or her, all individuals subject to public notification via the website are dangerous sexual predators roaming the Internet for children.

However politically popular or fiscally expedient[13] it is to single out an already unpopular group, the state's own scientific assessment belies the assertions of a hyper-dangerous threat from all registrants.  For example, Doe 1 was removed from the registry altogether in September 2009, but under the New Act he will be placed right alongside the most dangerous of predators (Exhibit 1).  Similarly, Does 3, 7, 9, 10, and 11 were assessed by the state to have a low risk of reoffending and assigned Tier I status (Exhibits 3, 7, 9, 10, 11).  Does 2, 4, 12, 13, 14, 16, 17, 18 and 19 were assigned a Tier II risk status (Exhibits 2, 4, 12, 13, 14, 16, 17, 18 and 19). None of these Plaintiffs were

---

12 There is no other single crime that publishes a roll call of prior convicts.  The fact that this is the only crime that has a registry sets it apart and gives it the appearance of some extraordinary danger.  The mere existence of a registry highlights the state's stigmatization.
13 See 42 U.S.C. § 16925.

subject to public website notification.  However, under the New Act all of these Plaintiffs will be viewed through the prism of disdain by the community as a violent sexual predator.  They will be guilty by association, regardless of the fact that they were previously put through a rigorous assessment procedure by the State, and the State determined that, based on individualized factors, these registrants were not dangerous enough to justify public notification.

The deleterious effect of public branding someone as a sex offender has been well documented by other courts.  In fact, the Ninth Circuit in Neal v. Shimoda stated that it could "hardly conceive of a state's action bearing more 'stigmatizing consequences' that the labeling of [an individual] as a sex offender." Neal v. Shimoda, 131 F.3d 818, 829 (9th Cir. 1997).  The injurious effect of public notification as sex offender is so well understood that the court in Kritenbrink v. Crawford, stated that "as a matter of law, Plaintiff need not show stigmatization resulting from [being labeled as a sex offender]. The Ninth Circuit has held that labeling someone as a sex offender is inherently stigmatizing." Kritenbrink v. Crawford, 457 F.Supp.2d 1139, 1146 (D. Nev. Oct. 12, 2006) (citing Neal, 131 F.3d at 829).  In an analogous case, the Eighth Circuit held that a parent was stigmatized when his name was placed on a child abuse registry. Bohn v. County of Dakota, 72 F.2d 1433, 1436 n.4 (8th Cir. 1985) (discussing the stigmatizing effect).  Public notification of said Plaintiffs via the website implicitly announces that, according to the State, they are predatory sex offenders trolling the Internet for children. There is nothing more stigmatizing than being labeled as not only a criminal, but a criminal that has committed sexual offenses against children, as indicated by the state.

But stigma alone is insufficient to rise to the level of a fundamental right.  It is the further effects of the stigmatization that placed the right within the purview of the Due Process Clause: the "plus."   In this case, there are many pluses, including the right to challenge the State as to the necessity of public branding the right to the integrity of a family, the right to travel, the right to earn a living, and the right to privacy of registry information.  In addition to being "pluses" for purposes of the stigma test, these also constitute independent fundamental rights which trigger a higher degree of scrutiny under the Due Process Clause by themselves.

**Loss of the ability to remove the stigma:** The New Act eliminates Plaintiffs' fundamental right to challenge the State's stigma as a dangerous predator through the use of an individualized risk assessment.  This deprivation applies to all Plaintiffs after January 1, 2010, including those who are already stigmatized as Tier III.  The efficacy of such a hearing or other opportunity to show that public notification, such as judicial discretion, is generally acknowledged.  Douglas County Chief Deputy Sheriff Marty Bilek said in a WOWT interview, "I personally feel that more discretion is better.  I kind of thought in the past that it would be worthwhile for a judge to hear all the mitigating circumstances, all the aggravating, and then make a decision about what level this particular sex offender should be" (Exhibit 38).

This right is founded on two principles.  First, Plaintiffs have an established right and expectation under Nebraska law to request a hearing at which a registrant can present evidence to challenge his or her assessed risk status.  Under the current version of Neb. Rev. Stat. § 29-4013(2)(b), the State Patrol is required to examine each registrant using specific criteria and identify each individual's risk of recidivism.  A registrant could

challenge the risk-level classification, 272 NAC 19.015.01 and 19.016.02, and that challenge would be made pursuant to the procedures contained in the Nebraska Administrative Procedures Act, including judicial review. 272 NAC 19.015.02. This state-created right and interest has real substance and is sufficiently embraced within the term "liberty" found in the Fourteenth Amendment. Wolff v. McDonnell, 418 U.S. 539, 557 (1974) (holding that a Nebraska statutory scheme created right to good-time credit to which procedural due process applies).

Second, regardless of the state-creation of the right, the guarantee of "liberty" under the United State and Nebraska Constitutions forecloses the State from stigmatizing a citizen without substantiated and specific justification to do so. "'Liberty' and 'property' are broad and majestic terms. They are among the great constitutional concepts purposely left to gather meaning from experience. They relate to the **whole domain of social and economic fact.**" Board of Regents of State Colleges v. Roth, 408 U.S. 564, 571-72 (1972) (emphasis added; internal citations omitted).

> While this Court has not attempted to define with exactness the liberty guaranteed by the Fourteenth Amendment, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and **generally to enjoy those privileges long recognized as essential to the orderly pursuit of happiness by free men.**

Id. at 572 (emphasis added) (citing Meyer v. Nebraska, 262 U.S. 390 (1923). "In a **Constitution for a free people**, there can be no doubt that the **meaning of 'liberty' must be broad indeed.**" Id. (citing Bolling v. Sharpe, 347 U.S. 497 (1954); Stanley v. Illinois, 405 U.S. 645 (1972) (emphasis added)).

The right to an individualized risk-assessment is particularly important for high-risk offenders because it was a *de facto* challenge to the efficacy and necessity, or continued necessity, of public website notification. While there was targeted dissemination of information for Tier I and II registrants, public notification for Tier III registrants subjects them to scorn by their neighbors, churches, etc., and impacts the lives of their family members. As long as an individual did not pose a high risk to the community, registrants could expect the privacy and limited disclosure of their synthesized information. In addition, if they were subject to website notification, they had the ability to challenge their assessed risk to recidivate.

The Nebraska Supreme Court recently examined the tiered, risk-based model, and upheld its validity as a instrument to determine the threat to the community of recidivism. (See Exhibit 34). In Slansky v. Nebraska State Patrol, the Court examined the issues of, *inter alia*, whether the risk assessment tool fails to accurately reflect an offender's risk of recidivism by failing to account for certain mitigating factors, and whether the risk assessment tool was invalid, flawed or inaccurate because of an error rate of 12%. Slansky v. Nebraska State Patrol, 268 Neb. 360, 370 (2004).

The Court first examined the structure and operation of the risk-based tool. Whether information was subject to release was a question about the person's risk of recidivism, and a notification level was assigned based on the risk to reoffend. Id. at 363. The previous version directed the State Patrol to "adopt rules and regulations that identify and incorporate factors that are relevant to a sex offender's risk of recidivism." Id. at 364. These factors included, but were not limited to:

(i) Conditions of release that minimize the risk of recidivism, including probation, parole, counseling, therapy, or treatment;

(ii) Physical conditions that minimize the risk of recidivism, including advanced age or debilitating illness; and

(iii) Any criminal history of the sex offender indicative of a high risk of recidivism, including:

(A) Whether the conduct of the sex offender was found to be characterized by repetitive and compulsive behavior;

(B) Whether the sex offender committed the sexual offense against a child;

(C) Whether the sexual offense involved the use of a weapon, violence, or infliction of serious bodily injury;

(D) The number, date, and nature of prior offenses;

(E) Whether psychological or psychiatric profiles indicate a risk of recidivism;

(F) The sex offender's response to treatment;

(G) Any recent threats by the sex offender against a person or expressions of intent to commit additional crimes; and

(H) Behavior of the sex offender while confined. § 29-4013(2)(b).

Id. at 341-42.

The Court recognized that the following factors mitigated the risk of recidivism: (1) conditions of release such as supervised probation or parole; (2) counseling, therapy, or treatment following release; and (3) physical conditions such as advanced age or

77

debilitating illness.  On the other hand, factors that increased the risk of recidivism were: (1) the criminal history of the offender; (2) repetitive or compulsive behavior including the number of sex-related charges and convictions and offenses committed while confined or on supervised release; (3) age of the victim; (4) age at which the offender was first charged with a sex offense; (5) relationship of the offender to the victim; (6) convictions for sex offenses in jurisdictions other than Nebraska; (7) control of the victim through the threat or use of weapons, force, or violence, or the infliction of serious injury; (8) indications of a risk of recidivism in psychological or psychiatric profiles; (9) the offender's response to treatment; and (10) behavior of the offender while confined. Id. at 364-65.

In addition, "four factors were determined to be so indicative of a high risk of recidivism that their presence should always result in a Level 3 classification: (1) torture or mutilation of the victim or the infliction of death, (2) abduction and forcible transportation of the victim to another location, (3) threats to reoffend sexually or violently, and (4) recent clinical assessment of dangerousness." Id. at 365.

Based upon these factors, the State Patrol:

> collaborated with Mario Scalora, Ph.D., of the law-psychology program at the University of Nebraska-Lincoln. To determine what factors best correlate to sexual recidivism, Scalora and a group of researchers tracked 1,300 sex offenders who had either been released from incarceration or placed on community-based probation. Based on this research and a review of the relevant literature, Scalora crafted a risk assessment instrument which scores the risk of recidivism by examining 14 factors. This risk assessment instrument has been used by the NSP to classify every offender in the registry, including Slansky.

Id.  The fourteen factors included in the risk assessment instrument were:  (1) number of convictions for sex or sex-related offenses (including current offenses); (2) number of

convictions for other offenses, besides traffic infractions; (3) other sex or sex-related charges not resulting in conviction; (4) age at arrest for first sex or sex-related conviction; (5) relationship of offender to victim; (6) prior sex offense in jurisdictions other than from the State of Nebraska; (7) victim's gender; (8) age of sex crime victim(s); (9) use of force (includes current and previous sexual assaults); (10) release environment; (11) disciplinary history while incarcerated; (12) treatment (considers incarceration, court-ordered, or post-release); (13) mental and cognitive functioning; and (14) calculation of time elapsed from previous release from court-ordered confinement or supervision to arrest for felony or Class I or Class II misdemeanor(s) for which the offender was convicted or while under court-ordered conditions. Id. at 366.

If a certain factor was present, the offender was assigned a number of points.[14] "[T]he number of points assigned for each item depends on its correlation with recidivism; items with the highest statistical relationship with recidivism have relatively higher point values on the risk assessment instrument." Id. at 366. The registrant's score is totaled after all items are examined, and the person was is a risk assessment based on the following point system:

(1) Below 70 points, low risk and classified as a Level 1 offender;

(2) Between 75 and 125 points, he or she is considered a moderate risk and classified as a Level 2 offender; and

(3) At or over 130 points, he or she is considered a high risk and classified as a Level 3 offender.

---

14 "For example, in regard to item 1 (number of convictions for sex or sex-related offenses), if the offender has been convicted of one sex-related offense, he or she is assessed 0 points; if the offender has been convicted of two sex-related offenses, he or she is assessed 40 points; and if the offender has been convicted of three or more sex-related offenses, he or she is assessed 60 points." Slansky, 268 Neb. at 366.

If any of the four *per se* aggravating factors were present, the registrant was automatically a Tier III offender, regardless of the offender's overall score.[15]  Conversely, if either of the two mitigating factors were present, the registrant was automatically classified as a Tier I offender, regardless of the overall score.[16]  Another key component to the individualization of the risk-assessment tool was that "the investigator conducting the assessment [could] depart from the presumptive risk category, if such departure is warranted. If a departure is granted, the investigator must explain the basis for the departure." Id. at 367.

Slansky argued that the risk assessment tool was flawed because it failed to accurately reflect an offender's risk of recidivism by failing to consider certain mitigating factors. Id. at 372-73.  The Court first held that all mitigating factors that were required by the previous Act were included in the instrument, and that the Legislature delegated the ability to add more mitigating factors and to deviate from the presumptive risk when justified. Id. at 373.

Next, Slansky argued that the risk assessment tool as a whole was invalid, flawed or inaccurate.  The Supreme Court noted that the instrument had an eighty eight percent (88%) validation rate, but that it was "not tantamount to an admission that 12 percent of the offenders in the registry have been misclassified." Id. at 374.  In addition, the Court noted that while no instrument will perfectly predict a registrant's behavior,

> [clinical director of the State Patrol Sex Offender Registry, Shannon
> Black, Ph.D.]'s testimony concerning the instrument establishes that it was

---

15 These were (1) victim tortured or acts resulted in death; (2) victim abducted and forcibly transported to another location; (3) perpetrator articulates to officials or treatment professionals an unwillingness to control future sexually assaultive behavior or plans to reoffend violently or sexually; and (4) recent clinical assessment of dangerousness by a sex offender treatment or doctoral level professional asserting perpetrator presents a significant risk to reoffend.
16 These two factors were (1) debilitating illness or (2) advanced age.

carefully and rationally crafted. While acknowledging some of the instrument's shortcomings, Black testified that the instrument (1) is based on a significant amount of empirical data, (2) utilizes factors that correlate with a registrant's risk of recidivism, (3) is valid and appropriate for its purpose, and (4) is consistent with other instruments that have been developed.

Id. at 374-75.  In the end, the Court held "that the instrument is a rationally based risk assessment tool and that the grounds Slansky asserted to challenge the instrument are without merit."

Plaintiffs do not contest the State's interest in notifying the public of dangerous persons residing in the community.  But when the State places a scarlet letter on an individual, that letter should be affixed with only the utmost certitude.  This certitude, while not absolute, was provided to the greatest extent scientifically possible through the use of the risk assessment instrument.  (Exhibit 34).  The New Act eliminates this certainty, and brands all registrants as violent sexual predators, regardless of the veracity of the insinuation or a registrant's individual risk to reoffend.  This clearly violates their right to Due Process.[17]  Once affixed, the stigma associated with being labeled a sexual predator of children may never be removed.  But to the extent that it can later be relieved, that person previously singled out by the State should, at the very least, be given an opportunity to prove his or her reduction in threat to the community at-large.[18]

This interest affects all aspects of a registrant's life, making it ephemeral and difficult to quantify in words, but no less a liberty interest.  In Noble v. Board of Parole, the Oregon Supreme Court examined whether an inmate must be given a hearing and

---

17 This applies to Tier I and II registrants in particular due to the severe and acute stigma of being listed on the State Patrol website.
18 Registrants who are currently on the State Patrol's website but ask only for an opportunity to remove the stigma in the future.  This is a far cry from a Tier III registrant actually justifying to the State that he or she should not be subjected to further public notification.

opportunity to be heard before the state could label him as a "predatory sex offender." In

holding that a fundamental liberty interest was at stake, the Court stated the following:

> When a government agency focuses its machinery on the task of determining whether a person should be labeled publicly as having a certain undesirable characteristic or belonging to a certain undesirable group, and that agency must by law gather and synthesize evidence outside the public record in making that determination, the interest of the person to be labeled goes beyond mere reputation. The interest cannot be captured in a single word or phrase. It is an interest in knowing when the government is moving against you and why it has singled you out for special attention. It is an interest in avoiding the secret machinations of a Star Chamber. Finally, and perhaps most importantly, it is an interest in avoiding the social ostracism, loss of employment opportunities, and significant likelihood of verbal and, perhaps, even physical harassment likely to follow from designation. In our view, that interest, when combined with the obvious reputational interest that is at stake, qualifies as a "liberty" interest within the meaning of the Due Process Clause.

Noble v. Board of Parole, 327 Or. 485, 495-96 (1998).

Due Process demands that the state should be prohibited from stigmatizing

and ostracizing its own citizens without justification; that determination must be

specific and individualized to the person being singled out.   Conversely, Due

Process demands that citizens be given the correlative right to petition the State to

challenge the necessity or continued necessity of further public and state-

sanctioned stigmatization.   Under a federal and state Constitution for a free

people, there can be no doubt that the broad definition of "liberty" must at least

provide a citizen this opportunity.  The right to clear one's name, a right which is

certainly encompassed within liberty, is essential to the orderly pursuit of

happiness by free men.

**Family:** The New Act will infringe on some Plaintiffs' ability to raise and

maintain the integrity of their families.   "The Court has frequently emphasized the

importance of the family. The rights to conceive and to raise one's children have been deemed essential, basic civil rights of man, and rights far more precious…than property rights." Bohn v. Dakota County, 772 F.2d 1433, 1435 (8th Cir. 1985) (citing Meyer v. Nebraska, 262 US 390 (1923); Skinner v. Oklahoma, 316 US 535 (1942)).  Labeling a non-dangerous registrant as high-risk to reoffend intrudes on matters of personal choice as related to marriage and family life.  Moore v. City of East Cleveland, 431 U.S. 494, 498-99 (1977).

In the present case, Plaintiffs that were not previously subjected to public website notification face a no-win situation: move away from their families or subject the immediate live-in family members to an equal amount of public scorn and stigma.  Since a registrant's address is listed on the State Patrol website, one of these two outcomes is unavoidable under the New Act.  For example, Doe 12 intended to move into the residence where his wife, Doe G, and their children and stepchildren reside.  He also operates a home business from this location.  Although he does not pose a high risk to the public, Doe 12's residence will now be placed on the State Patrol website, subjecting not only himself to the accompanying stigma, but his family that resides there as well.  Under the New Act, Doe 12 has been placed in the untenable position of either living apart from his wife and children, or subjecting them to public scorn.  Exhibits 12, 27 through 31.  This violates the fundamental right to the personal choices related to marriage and family, or at the very least constitutes a "plus."

**Travel:**  The in-person reporting requirements restrict Plaintiffs' fundamental rights to intra- and interstate travel.  "[T]he right to interstate travel embraces at least three different components: 'the right of a citizen of one State to enter and to leave

another State, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second State, and, for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State.'" Doe v. Miller, 405 F.3d 700, 711 (8th Cir. 2005) (quoting Saenz v. Roe, 526 U.S. 489, 500 (1999)).  The in-person reporting requirements imposed on Plaintiffs by the New Act constitute an actual barrier to interstate and intrastate movement guaranteed to all citizens.

The New Act will force the Plaintiff to receive permission from the State of Nebraska prior to traveling outside of the registrant's county for a period of more than either three days (for purposes of reporting a new temporary domicile) or three working days (for purposes of reporting a new habitual living location).  The in-person requirement is three working days prior to the establishment of the new location, and the registrants must report such new location in the county of their residence.

For Does 1 through 20, this will require them to guess as to how long they will be out of the county or state.  Invariably, some Plaintiffs will underestimate the length of a trip and not report prior to leaving but end up staying longer than three days or three working days away from their home county.  At this point, the Plaintiffs will be faced with two possibilities: not return to complete the in-person report in the home county and be in violation of the New Act, or travel back to the home county, complete the in-person reporting requirement, and then continue on the trip.

This situation is distinguishable from Doe v. Miller.  In that case, plaintiffs challenged a residency restriction for certain sexual offenders.  Doe v. Miller, 405 F.3d 700 (8th Cir. 2005).  The law prohibited certain offenders that had committed offenses

against children from living within 2000 feet of a school or child care facility. Id. at 705. However, Miller addressed the living restrictions within the state of Iowa, and did not address the additional burden the New Act places on registrants who desire to leave the State of Nebraska, yet are subject to the requirement that they report such movement ahead of time.

For Doe 1, this is an actual barrier which precludes him from traveling to visit his out-of-state family.  Essentially, Doe 1 will be forced to inform the sheriff whenever he intends to leave his home county or the state, or he will risk overstaying at his destination and find himself faced with return home or criminal sanctions.  Similarly, John Doe 8 and his wife will be deterred from traveling to visit family and friends out-of-state.  Since Doe 9 cannot predict how long he will be at his family's farm, he will be forced to report every time he leaves the county to help his family. Exhibits 1, 8 and 9. The Plaintiffs' right to travel inter- and intra-state is clearly violated, an independent fundamental.[19]

**Right to Earn a Living:**   Through its stigmatizing effect, the New Act undermines the Plaintiffs' fundamental rights to earn a living and maintain gainful employment.  In the context of employment, the Supreme Court recognized that the Due Process clause is implicated when the state "make[s] any charge against him that might seriously damage his standing and associations in his community." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 573 (1972); see also Calvin v. Rupp, 471 F.2d 1346 (8th Cir. 1973) ("the freedom to take advantage of other employment opportunities is, of course, an interest that can rise to constitutional proportions").  This right is particularly applicable in the present case because the indication through public website notification

---

19 The courts across the nation have routinely upheld such restrictions in the context of parole or probation, but the state cannot have it both ways.  Either the Act is civil in nature and in violation of the Plaintiffs right to travel freely, or the Act is a punitive *ex post facto* law.

is that the registrant is dangerous and likely to commit further crimes, an undesirable trait in an employee or business partner.  In addition, it insinuates the person is immoral and "impose[s] on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." Id.  In Board of Regents of State Colleges v. Roth, the Court denied Roth's Due Process argument by finding that the State "did not invoke any regulations to bar the respondent from all other public employment in state universities. Had it done so, this, again, would be a different case." Roth 408 U.S. at 573-74.

This is one such "different case."  All Does are foreclosed from a range of opportunities because of the stigmatization and intrusive burden placed on registrants' employers that are suddenly subject to search and seizure.  The Plaintiffs that are currently not subject to public website notification are terrified that they will lose their employment once their names are placed on the website.[20]  While previously listed on the website, a vigilante disseminated fliers about Doe 1 to local businesses.  (Exhibit 1).  Doe 3 lost his job when his name was placed on the registry, and is now forced to work from home.  (Exhibit 3).  This "certainly is no small injury." Id. at 574.

If the stigmatizing effect of public notification alone does not result in a loss of employment, the added burden placed on employers to open their businesses up to search, seizure and on-going Internet monitoring certainly will be.  Almost all the Does utilize and possess a work computer as part of their job duties.  In particular, Doe 10 is a paralegal, and her employer Doe C has stated that the law enforcement presence inside of a law firm because of the New Act will almost certainly result in the loss of her employment (Exhibits 10 and 23).  Doe 12 owns an IT business, and the compulsory

---

20 Family members are not insulated from the stigmatizing effects, as Doe 2's wife can attest.

search and seizure will threaten his operations as a viable going concern (Exhibit 12). Doe 17 works for the family company, which specializes in internet conferencing and computer consulting (Exhibit 17).  If he were to take a more active role as the family intends, law enforcement will be omnipresent in the business.  This aspect of the New Act not only constitutes an unreasonable search and seizure, but it forecloses a broad spectrum of jobs that include the use of computers, and certainly all professional occupations.

Furthermore, the in-person reporting requirement for employment or vocation reduces the employability of the registrants.  For example, Does 9 and 11 work in multiple counties across Nebraska, and the additional burden of reporting employment in those counties alone will detract from his other duties and threaten their continued employment.  As an employee of a utility company, Doe 9 can be called out to many locations.  He will be forced to keep a running sum of days that he works in each county for each calendar year.  In order to remain compliant, he must report in each county in which he works for thirty days once he reaches this magical number (Exhibits 9 and 11).

The New Act not only threatens to deprive the Plaintiffs of present employment, its burdens are so onerous that the yoke of unemployability foreclose a broad range of future opportunity in a manner that contravenes Due Process. Roth, 408 U.S. at 574 (internal citations omitted). This is certainly no small injury, and infringes on the protected and fundamental right to reasonable employment opportunities.

**Privacy:** The New Act eliminates Plaintiffs' fundamental right to privacy and the state-created expectation to privacy in their registry information.  "Liberty protects the person from unwarranted government intrusions into…private places. In our tradition the

State is not omnipresent in the home." <u>Sylvester v. Fogley</u>, 465 F.3d 851, 857 (8th Cir. 2006) (quoting <u>Lawrence v. Texas</u>, 539 U.S. 558, 562 (2003)).  Admittedly, "the exact contours of that right are unknown and identifying the precise standard of review to be applied to the government's interference with that right can be formidable." <u>Id.</u>  However, there can be no clearer type of information that is protected within the province of this right than the type of information collected by law enforcement in this case, coupled with the commensurate insinuation of dangerousness.

Not only is this intrinsic within the Constitution, Plaintiffs have an established right and expectation under Nebraska state law to the confidentiality and limited disclosure of the synthesized personal information collected by law enforcement.  Neb. Rev. Stat. § 29-4009 previously stated that "[i]nformation obtained under the Sex Offender Registration Act shall be confidential," with certain exceptions allowed for disclosure to the registrant's victim, law enforcement, Office of Parole Administration, government agencies conducting background checks, and health care providers.  The State Patrol also had the discretion to disclose relevant information necessary to protect the public, and the obligation to disclose some information about a registrant if their individualized risk of recidivism was high. Neb. Rev. Stat. §§ 29-4009(1)-(7) and 29-4013(2)(b)(iii).  Therefore, under the Federal Constitution and Nebraska law, an individual determined to be moderate- or low-risk to recidivate was given the right and expectation to the privacy of his or her information, with certain exception.  The New Act eliminates such rights, thereby infringing on another fundamental right and constituting yet another "plus."

In this case, Plaintiffs will suffer irreparable harm to multiple fundamental liberty interests, including the interest in their name, reputation and standing in their communities; their right to be free from unwarranted challenge the necessity ; their right to maintain and raise a family; their right to inter- and intra-state travel; their right to earn a living; and their right to privacy of personal information.  Such governmental deprivation of these fundamental rights is not justified under either a strict scrutiny or rational relation analysis.

> **ii.    The infringement of the New Act into Plaintiffs' fundamental rights fails to satisfy either the "strict scrutiny" or "rational basis" test.**

Since the New Act erodes fundamental liberty interests, the government carries the burden to establish that the New Act is narrowly tailored to further a compelling government interest.  "If the statute implicates a fundamental right, the state must show a legitimate and compelling governmental interest for interfering with that right." Gunderson v. Hvass, 339 F.3d 639, 643 (8th Cir. 2003) (citing Graham v. Richardson, 403 U.S. 365 (1971)).  "The strict scrutiny test requires the state to show that the law that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest." Republican Party of Minnesota v. White, 416 F.3d 738, 748 (8th Cir. 2005) (internal citations omitted).  "If the statute does not implicate a fundamental right, we apply a less exacting standard of review under which the statute will stand as long as it is rationally related to a legitimate governmental purpose. Gunderson, 339 F.3d at 643 (internal citations omitted).  Since fundamental principles are eroded or eliminated by the New Act, the State must establish a compelling government interest and show that

the New Act is a narrowly tailored scheme to serve that interest.  With very limited

exception, the New Act cannot pass this test.

**Compelling Government Interest:** "[Strict scrutiny] analysis requires, first, a

clear understanding of what the state's interest may be. Clarity on this point is essential

before we can decide whether the purported interest is indeed a compelling state interest."

Republican Party of Minnesota v. White, 416 F.3d 738, 750 (8th Cir. 2005) (internal

citations omitted).   "Precisely what constitutes a 'compelling interest' is not easily

defined." Id. at 749.  In the Eighth Circuit, the test to determine whether the interest is

sufficiently compelling is informed by an examination of the regulation that purportedly

addresses that interest. Id. at 750.

> A clear indicator of the degree to which an interest is 'compelling' is the
> tightness of the fit between the regulation and the purported interest:
> where the regulation fails to address significant influences that impact the
> purported interest, it usually flushes out the fact that the interest does not
> rise to the level of being 'compelling.'  If an interest is compelling enough
> to justify abridging core constitutional rights, a state will enact regulations
> that substantially protect that interest from similarly significant threats.

Id.

The purported interest that LB 97 was intended to further was the strengthening

penalties (i.e. punishment)[21] and the protection of children from sexual predators on the

Internet who find new avenues to pursue their victims, like social networking sites.  LB

285 purports to further the interest in the protection of the public, and in particular

children, from violent sex offenders through a system for registration of sex offenders.[22]

Clearly, the State is authorized to pursue the purported interests of protecting the

community and children from dangerous sex offenders. See Kelley v. Johnson, 425 U.S.

---

21 Introducer's Statement of Intent, LB 97.
22 Introducer's Statement of Intent, LB 285.

238, 247 (1976) ("The promotion of safety of persons and property is unquestionably at the core of the State's police power.")   When an individual threatens those in his community, the State certainly has the authority to generally implement those safeguards that it deems necessary to assuage the threat.

Whether the State has a compelling government interest in the present case turns on the "tightness of fit between the [regulations in the New Act] and the [protection of the community and children from violent Internet predators]." White, 416 F.3d at 750. The tightness of fit is evident between the necessity of public notification of a registrant who has been individually assessed and deemed to pose a high risk to reoffend.  When an individual poses a high risk to reoffend, the State's authority to notify the public of dangerous sex offenders through the State Patrol website and other public dissemination methods constitutes a "compelling government interest."  Plaintiffs do not dispute this.

But is the State's interest compelling when an individual is not a high risk to reoffend?   What if the State determined that the individual posed a "low risk" to reoffend?  Does the State still have a compelling interest to protect the community from low-risk offenders at the cost of stigmatizing that person?  How does the State know who poses a high threat to their fellow citizens and who does not?   And under any circumstance, does the State have a compelling government interest to abridge the right to be free from unreasonable searches and seizures?  This is where the constitutional bottom falls out from under the State's "compelling interest."

Restated, the purported interest of the State is the protection of the community, children in particular, from Internet predators and other violent sex offenders.  The fit between this State interest and the low- and moderate-risk Plaintiffs becomes so

attenuated that the State cannot possibly establish a "compelling interest."  For example, Doe 1 was convicted in 1996 of a sexual offense.  He was 19 at the time, and the offense was a consensual sexual relationship with his 15 year-old girlfriend, who refused to cooperate with the prosecution.  The State removed him entirely from the registry in September 2009, and he had not been subject to public notification since 2003.  Does stigmatizing these registrants through public notification fit with the State's purported interest of protecting children from violent sexual internet predators?

Doe 3 was assessed and determined to be a low risk to recidivate.  He lives with his wife and children and works from home. Doe 7 also lives with his wife and stepdaughter.  He did not receive any jail time, and the State has always assessed him as a "low-risk" registrant.  Doe 11 is married, has three sons, and coaches several sports teams.  He was scientifically determined by the State to be low-risk. Does 9 and 10 were also determined to be low-risk (Exhibit 3, 7, 9 and 10).

Based on the State's individual assessment of him, Doe 2 is a Tier II registrant. He served no jail time, and was seeking redetermination to low-risk status.[23]  Doe 4 was never assessed to be high-risk, and has never been subject to public notification.  Doe 12 is married with children, and is an industry figure in the IT field.  He was assessed to not be a high-risk to reoffend.  Does 13, 14, 16, 17, and 18 have all been individually examined by the State using a scientifically proven instrument and determined not to be high-risk to society.

Public notification through the State Patrol's website of these low- and moderate-risk individuals will not reflect these determinations, and will operate only to stigmatize them as dangerous sexual predators.  These individuals hardly connote the "Internet

---

23 The appeal has been pending before the State Patrol since September 2008.

predators" or "violent sex offenders" that the New Act intends to address.  To put it another way, the tightness of fit between the New Act's requirement to subject moderate- and low-risk registrants to public notification and stigma (the regulation) and the protection of the community and children from violent Internet predators (the purported interest) is, to put it loosely, far too loose.  There is virtually no fit because the New Act is fundamentally flawed: public notification and the commensurate stigma of a sexually violent Internet predator is tied to nothing more than the underlying offense.[24]

Maybe more to the heart of the issue is that the State cannot establish a compelling government interest in the elimination of the individualized risk assessment tool (Exhibit 34).  There is no tightness of fit between the elimination of the risk assessment tool by the New Act and the protection of the community and children from violent Internet predators.  In fact, the New Act contradicts the intent of providing the public with information about violent sexual predators.

LB 97 was intended to protect children from sexual predators on the Internet, and LB 285 was intended to protect of the public, and in particular children, from violent sex offenders.  How does the State know which offenders are "sexual predators" or "violent sex offenders" that require heightened public awareness?  Simply put, it doesn't unless there is an individualized risk assessment model used by the State that measures a registrant's risk to reoffend, risk of being a predator, or risk of being violent.  The State cannot establish that the New Act provides protection through information about "sexual predators" or "violent sex offenders" when, through the very same Act, the State's method to determine who was a sexual predator or violent sex offender is eliminated.  There is no legitimacy in this argument.

---

24 Neb. Rev. Stat. § 29-4003 determines the applicability of the New Act.

This is the source of the "sex offender overload" effect which results in the community being notified of all registrants, both violent sexual predators and low-risk registrants. And the cost for this expediency is that those individuals that are not high-risk are stigmatized. This dilution results in the community being less protected from violent sexual predators because the focus is shifted away from those high-risk individuals by those that are not high-risk. In fact, high-risk offenders, as stated previously, may now be subject to shorter registration durations based on their offense or conviction, and not their dangerousness.

Moreover, the State cannot establish a compelling government interest to justify the New Act's compulsory search, seizure and monitoring of computers and electronic communication devices.[25] There is no constitutional fit under any circumstances, high risk or otherwise, between the New Act's search, seizure and ongoing monitoring of computers and electronic communication devices within a registrant's possession (the regulation) and the protection of the community and children from violent Internet predators (the purported interest).

For example, the New Act would compel search and seizure of computers and electronic communication devices that belong to registrants and non-registrants alike. This includes roommates, family members, employers, etc.[26] For example, Does A through K, and all others similarly situation, will have their right to be free from unreasonable search and seizure abridged by the New Act. (Exhibits 21 through 31). Certainly there is no fit between the New Act's search, seizure and ongoing monitoring

---

25 See Neb. Rev. Stat. § 29-4006(2)(a) and (b). Aside from an unreasonable search and seizure, the New Act also fails constitutionally because the provision for such search, seizure and monitoring does not fit sufficiently to the New Act's purported State interest.
26 See section on Fourth Amendment as to the New Act's over-inclusion of computers and electronic communication devices.

of a registrant's work computer, or devices owned by Does A through K (the regulation) and the protection of the community and children from violent Internet predators (the purported interest).  This does not even pass the "know it when I see it" test, <u>White</u>, 416 F.3d at 750, let alone the more rigorous examination that is required in this case.

The State is certainly within its right to protect the community, and it should exercise that power when necessary and in a manner designed to further public safety. Also, the State has the authority to protect the community, and children in particular, from sexually violent predators.  It logically follows that public notification may be necessary if an individual poses a high risk to reoffend.  But the State does not have a compelling government interest to subject an individual that poses a low or moderate risk to reoffend to public website notification.  Put another way, the State is not constitutionally permitted to stigmatize an individual through public labeling as a sexually dangerous Internet predator unless such labeling is justified because that individual poses an actual, high risk to the community.  Therefore, the State cannot establish a compelling interest in eliminating the risk assessment tool.  Unlike the public notification provision, the State cannot establish a compelling interest in the eradication of the Fourth Amendment right to be free from unreasonable search and seizure under any circumstance.  There is no fit between the warrantless search and seizure without probable cause and the purported interest of protecting the community.  The public notification for all registrants and compulsory search and seizure mandated by the New Act, the regulation, fails to fit neatly, modestly, or even loosely with the purported interest of protecting the community and children from violent Internet predators.  Absent

a compelling interest, the New Act's infringement on fundamental rights is unconstitutional.

**Narrowly tailored:**  Even assuming there is a compelling government interest, the New Act fails miserably at being narrowly tailored to promote this interest.  In fact, it operates in the precise opposite manner by providing the community with "sex offender overload" and diluting the State Patrol website to the extent that the public is provided with no useful information.  "Once a state interest is found to be sufficiently compelling, the regulation addressing that interest must be narrowly tailored to serve that interest." White, 416 F.3d at 751 (citing Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 222 (1989)).  "A narrowly tailored regulation is one that actually advances the state's interest (is necessary),[27] does not sweep too broadly (is not overinclusive),[28] does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement." Id.

There is a regulation that could advance the purported interest better than the New Act and with less infringement.  This alternative regulation is the very one the New Act replaced and eliminated: the risk assessment tool coupled with targeted public notification based on an individual's risk assessment.  The State, utilizing the scientifically based tool described in Exhibit 34, assigned each registrant a risk level based on the presence or absence of certain factors.  Lower-risk registrants were subject

---

27 As discussed above, the State cannot establish the threshold determination of actually advancing a State's interest.  The New Act operates to contradict the purported interest because it detracts from those individuals that pose a high risk to society.
28 As discussed above and in previous sections, the State cannot establish that the New Act does not sweep too broadly.  The statutory structure operates to include individuals on the registry that are not sexual predators or violent sexual offenders, and includes the search and seizure of potentially innumerable computers and electronic devices.

to targeted notification.  High-risk registrants, such as sexual Internet predators and violent sexual offenders, were subject to public notification via the State Patrol website. This mechanism both (1) furthered the compelling State interest by notifying the public about sexual Internet predators, violent sexual offenders and others that posed a high risk to the community, and (2) was the least restrictive infringement upon the fundamental liberty interests of freedom from State-sanctioned stigma, familial integrity, right to earn a living, etc.

The risk assessment gave each registrant the opportunity to present evidence to challenge the continued necessity for public notification.  This further upheld the State's interest in ensuring that the community was aware of sexual Internet predators, violent sexual offenders and others that posed a high risk.  If a high-risk individual posed a lower risk subsequently, the State has an interest in ensuring that the individual does not dilute the pool of high-risk offenders and divert from those the State is intending to notify the public about.

Substantive Due Process guarantees that 'liberty' will be protected against government interference without justification.  In this case, the New Act deprives Plaintiffs of multiple core fundamental liberty interests, including the right to defend one's reputation from stigma, right to the integrity of a family, right to travel, right to earn a living, and the right to privacy of information.  The State cannot show it has a compelling governmental interest for infringing on those rights, and it cannot show that the manner in which the New Act infringes on those fundamental rights is either narrowly tailored or rationally related.

c. The New Act offends the constitutional right to procedural due process by infringing on all Plaintiffs' fundamental rights without a hearing.

"[T]he procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter" life, liberty, or property interests. Paul v. Davis, 424 U.S. 693, 710-11 (1976). To determine whether a person has been denied due process, courts conduct a two-step inquiry: 1) whether the State has interfered with a protected liberty or property interest; and 2) whether the procedures attendant upon that deprivation were constitutionally sufficient. Kentucky Department of Corrections v. Thompson, 490 U.S. 454, 460 (1989) (internal citations omitted). "Procedural due process requires that the government provide parties deprived of such interests adequate notice and an opportunity for a hearing." Parker v. State ex rel. Bruning, 76 Neb. 359, 366 (2008). While substantive due process examines the constitutionality of the underlying rule, procedural due process examines the fairness of the process by which the government applies the rule. In this case, all Plaintiffs will suffer serious harm to fundamental liberty interests as a direct result of the New Act's provisions. The Procedural Due Process violations suffered by Does 1 through 20 are distinct from those of Does A through K.

**Does 1 through 20:** The New Act infringes on Does 1 through 20 by eliminating both state-created interests and statuses, and by infringing on those rights contained within "liberty." These fundamental or state-created rights include: State-created right to the privacy of registry information for lower-risk registrants, the right to defend one's reputation from continued stigma, right to the integrity of a family, right to travel, right to earn a living, and the right to privacy of information.[29]

---

29 See previous argument on threatened fundamental liberty interests.

In <u>Connecticut Department of Public Safety v. Doe</u>, the Supreme Court examined a procedural due process challenge brought by a registrant of Connecticut's sex offender registry. <u>Connecticut Department of Public Safety v. Doe</u>, 538 U.S. 1 (2003). Connecticut enacted a statutory scheme that provided for an undifferentiated public registry of sex offenders, whereby all sex offenders were subject to public notification through the state's website, regardless of their risk of recidivism. <u>Id</u>. at 6. The Supreme Court rejected the petitioner's procedural due process challenge, and held that because risk of recidivism was not relevant to Connecticut's statutory scheme, procedural due process did not apply. <u>Id</u>. at 8. Similarly, in <u>Doe v. Miller</u>, the Eighth Circuit rejected a similar procedural due process claim brought by plaintiffs who were prohibited from residing within two thousand feet of a public of nonpublic elementary or secondary school or child care facility, without opportunity to be heard. <u>Doe v. Miller</u>, 405 F.3d 700 (8th Cir. 2005). The <u>Miller</u> Court rejected the argument, citing <u>Connecticut Department of Public Safety</u>.

These cases are easily distinguishable from the present situation. First, unlike these two cases, Nebraska statutes previously provided for the specific right to the confidentiality of a registrant's information and the right to the ability to request a hearing. Some of Does 1 through 20 took advantage of this appeal mechanism and successfully lowered their assigned risk tier. This constitutes a state-created status or right to which procedural due process applies.

Second, the concurring opinions in <u>Connecticut</u> clearly focused on the fact that the Connecticut law provided for procedures by which certain sex offenders could be exempted from the registration requirements and their information. "A court may exempt

a convict from registration altogether if his offense was unconsented sexual contact, Conn. Gen.Stat. § 54-251(c) (2001), or sexual intercourse with a minor aged between 13 and 16 while the offender was more than two years older than the minor, provided the offender was under age 19 at the time of the offense, § 54-251(b)." <u>Connecticut Department of Public Safety v. Doe</u>, 538 U.S. at 9 (Souter, J., concurring).

Another key distinction between the New Act and the Connecticut law was the enactment of legislation "to mitigate the retroactive effects of the statute," where procedures were provided for an offender convicted prior to the enactment of the registry to petition the court to prevent information from being disseminated. <u>Id.</u> at 10 fn.  The <u>Miller</u> Court also noted that the "law does not apply [retroactively] to persons who established a residence prior to July 1, 2002, or to schools or child care facilities that are newly located after July 1, 2002." <u>Doe v. Miller</u>, 405 F.3d at 705.  While at first glance the New Act and statutes at issue in the previous cases appear similar, the New Act is materially different in that it eliminates specific state-granted rights, infringes on fundamental rights, and fails to mitigate its retroactive effects.

More applicable is <u>Bohn v. County of Dakota</u>.  In <u>Bohn</u>, the parents of an allegedly boy were placed on a state registry of child abusers.  <u>Bohn v. County of Dakota</u>, 72 F.2d 1433, 1434-35 (8th Cir. 1985).  After multiple fruitless attempts to remove their names, the parents filed a § 1983 action, and the district court dismissed the complaint for failure to state a claim on which relief could be granted. <u>Id.</u> at 1435.  On appeal, the Eighth Circuit stated that "[t]he stigma Mr. Bohn suffers as a reported child abuser undoubtedly has eroded the family's solidarity internally and impaired the family's ability to function in the community…Because this stigma strikes so directly at the vitality of the

family, we find the reputation interest at stake to be clearly distinguishable from the respondent's record of petty crimes in <u>Paul</u>." <u>Id</u>. at 1436, fn. 4.  The stigma suffered by a registered sex offender, especially in light of the State's labeling them as sexually violent predators, is more acute, and therefore deserving of more procedural safeguards. Plaintiffs 1 through 20 have been deprived of their right to the privacy of registry information for lower-risk registrants, the right to defend one's reputation from continued stigma, right to the integrity of a family, right to travel, right to earn a living, and the right to privacy of information.  Procedural Due Process rights must be granted.

**<u>Does A through K:</u>** Does A through K suffer a deprivation of their fundamental right to be free from unreasonable search and seizure.  The overbroad sweep of computers and electronic communication devices within the possession of registrant necessarily infringes upon the property of Does A through K in which these Plaintiffs have a legitimate expectation of privacy.  Prior to depriving Does A through K of this right, the State must provide them with a hearing and opportunity to be heard.

Plaintiffs are unequivocally stigmatized by their inclusion on the sex offender registry and public notification website.  In addition, under the New Act Plaintiffs lose tangible expectations and rights granted by state law which rise to the level of a protectable property interest.  Prior to removal of these liberty rights, the Fourteenth Amendment and Nebraska Constitutions require a hearing and opportunity to be heard. For these reasons, the New Act violates the Plaintiffs' rights to procedural due process.

6.    **The New Act violates the equal protection clauses in the United States Constitution, and the equal protection and special legislation clauses of the Nebraska Constitution.**

The New Act violates the Equal Protection Clauses in the United States and Nebraska Constitutions because it is intended solely to disadvantage an unpopular group, and because it treats similarly situated individuals differently, with stigmatizing effect. "The Equal Protection Clause keeps governmental decision makers from treating disparately persons who are in all relevant respects similarly situated." Bills v. Dahm, 32 F.3d 333, 335 (8th Cir. 1994) (citing Nordlinger v. Hahn, 505 U.S. 1, 10 (1992)). Where a law implicates a fundamental right, the law is reviewed under strict scrutiny. If no fundamental right is implicated, the State-imposed burdens that treat some citizens differently than others violate Equal Protection if such a burden is wholly irrelevant to the achievement of the State's constitutional objectives. Peeper v. Callaway County, 122 F.3d 619, 622 (8th Cir. 1997) (internal citations omitted). In addition to the Equal Protection Clause in Neb. Const. art. I, § 3, Nebraska has a "special legislation" clause. "The Legislature shall not pass local or special laws in any of the following cases, that is to say: Granting to any corporation, association, or individual any special or exclusive privileges, immunity, or franchise whatever….In all other cases where a general law can be made applicable, no special law shall be enacted." Neb. Const. art. III, § 18.

a. The New Act violates the Equal Protection Clauses in the United States and Nebraska Constitutions.

In this case, the State has drawn an imaginary line and announced to the public that on that side of the line are uber-violent, sexual predators, and on this side are all of us. That was an accurate, scientifically substantiated statement prior to enactment of the New Act. On January 1, the State will effectively throw some of the lower-risk

registrants over to the other side.  The State will also build a wall where the line once was and announce that, "Once you cross over the sexual predator side, there is no coming back."  This poses two problems.

First, there is an obvious and stigmatizing classification issue for those registrants that were previously determined to be low- to moderate-risk of reoffending.[30]  They are similarly situated to individuals on the "good side" of the soon-to-be wall, but the State has classified them as sexual predators.  This stigmatizes them, and the fallout ripples throughout their lives creating "plusses" in the form of familial breakup, loss of employment, etc.  Because this impacts a fundamental right, Eighth Circuit and Nebraska law requires a heightened scrutiny.[31]

Second, disparate treatment of offenders who have "come into the state" since 1997 is a violation of equal protection.  In Doe v. Pennsylvania Board of Probation, 513 F.3d 95 (3d Cir. 2008), the Third Circuit determined that disparate classification of sex offenders solely for the fact they were convicted in a state other than Pennsylvania violated equal protection.  While the New Act will apply to Nebraska residents convicted, paroled, incarcerated or on probation since January 1, 1997, it treats sex offenders entering the State differently in two ways.  First, the New Act will apply to "any person who on or after January 1, 1997: Enters the state and is required to register as a sex offender under the laws of another village, town, city, state, territory, commonwealth or other jurisdiction of the United States." (LB 285 Section 4, reissue of LB 97 Section 25, revising Neb. Rev. Stat. 29-4003).  This is true even if they were in the other state for a

---

30 In fact, some registrants pushed over to the sexual predator side of the wall have a certificate that says he or she is a low-risk to commit sexual offenses, complete with the State's seal of approval on it.  Not one person who is on the good side of the wall after January 1, 2010, can say that.
31 As previously discussed, the New Act fails to meet this standard.

short period of time and were required to register in that second state merely to comply with the Nebraska registry.  In addition, the New Act applies to all offenders entering the State regardless of when they received their conviction or completed any sentencing requirements.   For example, Doe 8 completed his sentencing requirements under California law in 1993 for a crime he committed in 1989.   Despite completing his requirements for his sexual crimes 16 years ago, the New Act will require Doe 8 to register for life in Nebraska.  Had Doe 8 been convicted in Nebraska and never left the State since, he would not be subject to the New Act.

The New Act, therefore, violates Equal Protection in multiple ways: by infringing on fundamental rights without adequate State interest and by drawing a distinction between in-state and out-of-state offenders.   A closely related topic, the "special legislation" clause of the Nebraska Constitution, yields yet another constitutional violation.

> b. The New Act constitutes special legislation in derogation of the Nebraska Constitution.

"[T]he focus of the prohibition against special legislation is the prevention of legislation which arbitrarily benefits or grants 'special favors' to a specific class." Gourley v. Nebraska Methodist, 265 Neb. 918, 938 (2003).  "A legislative act constitutes special legislation if (1) it creates an arbitrary and unreasonable method of classification or (2) it creates a permanently closed class." Id.

> A legislative classification, in order to be valid, must be based upon some reason of public policy, some **substantial difference of situation** or circumstances, that would naturally suggest the justice or expediency of diverse legislation with respect to objects to be classified. Classifications for the purpose of legislation **must be real and not illusive**; they **cannot be based on distinctions without a substantial difference**. Classification is proper if the special class has some reasonable distinction

> from other subjects of a like general character, which distinction bears some reasonable relation to the legitimate objectives and purposes of the legislation.

Id. at 938-39.  The New Act constitutes not only an equal protection violation, but also a violation of the special legislation clause.

The previous example did not fully describe the effect of the New Act.  True, the State drew an imaginary line and announced to the public that on that side of the line are uber-violent, sexual predators (and then tossed the lower-risk registrants over the line).  But the State did not just draw a line: it built a wall.  It also announced that, "Once you cross over the sexual predator side, there is no coming back."  This again poses two problems for purposes of a "special legislation."

The first problem is, again, the stigma of being a sexual predator but in reality being similarly situated to individuals on the "good side" of the soon-to-be wall.

The second problem is one of the "closed class."  Under the New Act, someone who is on the sexual predator side of the wall cannot even ask permission to come back, meaning they have lost the opportunity to challenge their placement on the sexual predator side.  The New Act eliminates the opportunity to present evidence of subsequent rehabilitation or any other mitigating circumstances.  This applies even if the individual was never a violent sexual predator.  In Nebraska, the State Constitution prohibits a "closed class," which is what the New Act creates by foreclosing this opportunity to remove the stigma of being a sexually violent predator.

"A 'closed class' is one that **limits the application of the law to present condition**, and **leaves no room or opportunity for an increase in the numbers of the class by future growth or development.**  In deciding whether a statute legitimately

classifies, the court must consider the actual probability that others will come under the act's operation. If the prospect is merely theoretical, and not probable, the act is special legislation." Ralston v. Balka, 247 Neb. 773, 781 (1995).

In this case, the New Act applies only to the condition present at the time the registrant was convicted.  With respect to the registrant, there is no room or opportunity for him or her to successfully challenge his or her status and return to the other side. Under the New Act, there is no mechanism by which to do that.  Therefore, by creating a closed class that limits the law's application to the present only, the New Act constitutes special legislation in violation of the Nebraska Constitution.

### 7.      The New Act violates the Plaintiffs' constitutionally protected rights to free speech.

The New Act violates several aspects of the Registrant Doe's protected first amendment rights.  For the Registrant Does subject to Neb. Rev. Stat. § 28-322.05, the New Act will effectively prevent them from accessing the Internet.  Such a restriction is an overbroad regulation that leaves no alternatives place for such registrants to engage in speech.  As detailed infra, (see Ex Post Facto, Affirmative Disabilities and Restraints) internet bans are impermissible in the context of parole or supervised release.  For the Registrant Does subject to Neb. Rev. Stat. § 28-322.05, the New Act will also violate their right to free association as they will no longer be able to use any Internet websites that allow visitors to communicate between each other.

The New Act will violate all of the Registrant Does' right to anonymous speech. This Court should apply exacting scrutiny to the New Act.  Under exacting scrutiny, the government may "regulate the content of constitutionally protected speech in order to

promote a compelling interest if it chooses the least restrictive means to further the articulated interest." Sable Commc'ns, Inc. v. Fed. Commc'ns Comm'n, 492 U.S. 115, 126 (1989).  Even if this Court determines that the New Act achieves a compelling interest, it does not employ the least restrictive means available.  "When a law burdens core political speech, [courts] apply 'exacting scrutiny,' and . . . uphold the restriction only if it is narrowly tailored to serve an overriding state interest." McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347 (1995); Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1099 (10th Cir. 2006) ("Laws that restrict core political speech . . . are subject to 'exacting scrutiny.'").  The New Act will permit law enforcement to monitor any speech, including core political speech.  See *Initiative & Referendum Inst.*, 450 F.3d at 1099 (defining "core political speech" as "interactive communication concerning political change").  The intrusion into the Registrant Doe's ability to engage in anonymous core political speech requires the Court to apply exacting scrutiny. See *McIntyre*, 514 U.S. at 347.  "The First Amendment affords the broadest protection to such political expression in order to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Id. at 346

Courts have broadly agreed that the protection afforded to anonymous Internet users must be related to the importance of the type of speech. See, e.g., Doe I v. Individuals, 561 F. Supp. 2d 249, 254 (D. Conn. 2008) ("However, the right to speak anonymously, on the Internet or otherwise, is not absolute and does not protect speech that otherwise would be unprotected."); Freedman v. Am. Online, Inc., 412 F. Supp. 2d 174, 184 (D. Conn. 2005) ("Although anonymous speech is entitled to First Amendment protection, threatening communications are not."); Sony Music Entm't Inc. v. Does 1-40,

326 F. Supp. 2d 556, 562-63 (S.D.N.Y. 2004) ("Anonymous speech, like speech from

identifiable sources, does not have absolute protection. The First Amendment, for

example, does not protect copyright infringement.").  Because the New Act burdens core

political speech, it infringes upon that "highest, most protected position." R.A.V. v. City

of St. Paul, 505 U.S. 377, 422 (1992).  As the Fourth Circuit has explained:

> The First Amendment protects anonymous speech in order to prevent the
> government from suppressing expression through compelled public
> identification. Forced public revelation discourages proponents of
> controversial viewpoints from speaking by exposing them to harassment
> or retaliation for the content of their speech. Speech is chilled when an
> individual whose speech relies on anonymity is forced to reveal his
> identity as a pre-condition to expression. In other words, the First
> Amendment protects anonymity where it serves as a catalyst for speech.

Peterson v. Nat'l Telecomm. & Info. Admin., 478 F.3d 626, 632 (4th Cir. 2007) (citations

omitted).  The New Act's chilling effect on core political speech cannot be overstated.

**8.     The New Act violates the Plaintiffs' rights under the contract clauses
        of the United States and Nebraska Constitutions and constitutes
        a breach of the plea agreements entered into with the State of
        Nebraska.**

This cause of action is brought by Does 2, 3, 4, 7, 9 through 15, 17, 19, and 20

(Exhibits 2, 3, 4, 7, 9 through 15, 17, 19, and 20).  Both the United States and Nebraska

Constitutions prohibit the state legislature and Congress from passing laws that impair

contracts. U.S. Const, Art. 1, § 10, Neb. Const., Art. I. § 16.  As stated in United States v.

Hand, 913 F.2d 854 (10th Cir) a plea agreement is a contract. ("Where the government

obtains a…plea predicated in any significant degree on a promise or agreement with the

prosecuting attorney, such promise must be fulfilled to maintain the integrity of the plea")

Id. at 856.  See also United States v. Cudjoe, 534 F.3d 1349 (10th Cir 2008) (General

principles of contract law govern the interpretation of a plea agreement).  The threshold

inquiry in determining the constitutionality of the state law in conjunction to preexisting contracts is whether the law operates as a "substantial impairment to the contractual relationship." General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992). To establish that a contract is substantially impaired requires a contractual relationship, a change in the law that impairs that contractual relationship, and that the impairment be substantial. i*d.*

Here, as in most cases, the first two inquiries can be easily established. Plea bargains are enforceable contracts which are the vehicles for the resolution of a vast majority of criminal cases. See Blackledge v. Allison, 431 U.S. 63 (I976).

While Nebraska Courts have routinely found that an unexpected sentence received as a result of a plea bargain does not violate the contract clause of the Nebraska Constitution, this case represents an entirely different set of facts.  When the Does who entered into plea agreements did so, they did knowing that by operation of law they would be subject to the sex offender registry.  And when they entered into such an agreement they knew they would be subject to the registry for a period of ten years, they understood the classification system and how it determined risk and that they would only be subject to notification if they were classified as Tier III.  The legislature recognized just such a problem when the statute was created.  During Floor Debate Senator Brad Ashford said:

> I'm sure we all are aware of situations where people, individuals have pled either no contest or even guilty to [an] offense which were not registrable under prior law and now would be registered under this law.  And that there's a basic unfairness and inequity in doing that, realizing however, that all these offenses must, going forward, be registered in the future."

(Nebraska Legislature Floor Debate, April 27, 2009)  Now, by enforcing the Act the State is violating the contract entered into by many of the Doe Plaintiffs.

Guilty or no-contest Plea Agreements are entered into with an understanding that the state of the law when the contract is entered into regarding, tier level assignments, community notification and lifetime supervision, will be the binding force to ensure that the terms to which they negotiated will stand regardless of subsequent changes in the law. "'The obligation of a contract consists in its binding force on the party who makes it." Romein, 503 U.S. at 189.  The binding force of a contract depends on:

> the laws in existence when it is made; these are necessarily referred to in all contracts, and forming a part of them as the measure of the obligation to perform them by the one party, and the right acquired by the other...If any subsequent law affect to diminish the duty, or to impair the right, it necessarily bears on the obligation of the contract.

Id.  The passage of ex post facto federal and state laws, such as the New Act, which drastically increase, or newly require lifetime supervision, registration and community notification, constitute a complete and serious impairment of the agreement entered into between the accused and the sovereign. It materially alters - in fact, destroys - the benefit of the bargain as to the accused, and as such, violates the contract clause of the State and Federal Constitutions.

In looking at whether the contractual relationship is substantially impaired for purposes of the Contract Clause, courts should increase the level of scrutiny in which the legislation will be subjected to in accordance with the severity of the impairment imposed on the damaged party of the contract. Energy Reserves Group v. Kansas Power & Light Co., 459 U.S. 400. 411 (1983).  Here, the New Act severely impairs the Plea Agreement contracts that Petitioners entered into with State. Petitioners entered into these contracts

with the understanding that the law enacted at the time the contract was created was binding force of the contract and obligated the State to abide by its terms.

One vital term that the New Act substantially impairs is what tier level offenders are placed into, which directly and substantially effects additional terms of the agreement. Prior to the enactment of the New Act, the law looked at the individual and applied factors that assessed the risk of recidivism of each offender in determining the appropriate Tier group. See Neb. Rev. Stat. § 29-4013 (Repealed effective December, 2009). This included such factors as psychiatric evaluations, response to treatment, criminal history, and nature of the offense. Id. The New Act removes all discretion of the old law and makes the determination of tier level based solely on the specific crime committed by the offender. See Neb. Rev. Stat. § 29-4005 (effective January 1, 2010). This alone arbitrarily changed offenders, some of whom had been assessed to be Tier I offenders, who pled to the offense years ago, with no new offense, and now live respectable lives within the communality, to be lifetime registrants. Many of these individuals were at the cusp of being able to petition for removal from registration and community notification but now because of the New Act, will not be able to make such a petition.

The New Act also dramatically changes the terms of registration, who can be notified in the community, and who is placed on the sex offender website. Even more concerning is the threat that the New Act will now place those never subjected to Lifetime Supervision on such restrictive supervision. As shown, the retroactive applicability of the New Act substantially impairs the Plea Agreement contracts in which the Registrant Plaintiffs entered into with the State. Had the New Act been the law in

effect when the Registrant Plaintiffs entered into the contractual agreement, it is probable that they would not have waived their trial rights.  Thus, this Court must apply a great level of scrutiny in reviewing the constitutionality of the New Act.

When the state law is found to substantially impair the contract, as is the case with the New Act, then the State has the burden of showing a significant and legitimate public purpose behind the law or regulation. <u>Energy Reserves Group</u>, 459 U.S. at 411. There is little question that the State here has a legitimate purpose of protecting citizens, especially children of sexual offenders, however, the State's burden also includes showing that the impairment of the rights and responsibilities of the contracting parties is based upon reasonable conditions and of a character appropriate to the public purpose justifying the legislation. <u>Id</u>. at 412.

Furthermore, many Registrant Does signed plea agreements specifically to avoid public humiliation for the sake family members, are now facing just that prospect.  It was the Registrant Doe's expectation that in return for their admission of guilt and successful rehabilitation that the State would abide by the terms required when sentenced, terms that came as a direct result of their Plea Agreement contracts and the law that existed at that time.  The Plaintiffs entered a plea, in reliance on the state law which relieved them of any future obligation when certain conditions are met.  These rights became absolutely vested when the Does entered their pleas and yet the New Act will unilaterally modify those rights.   Clearly, retroactive application of the New Act impairs the contracts negotiated between Does and the State of Nebraska and is unconstitutional under both state and federal law, depriving the Registrant Does of the benefit of the bargain.

Plaintiffs have a right under the contract clause to have the offensive ex post facto legislation declared null and void as to them (and those similarly situated).

Finally, this Court must determine if "the adjustment of the rights and responsibilities of the contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption." Energy Reserves Group, Inc. v. Kan. Power & Light Co., 459 U.S. 400, 412, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (internal quotations and alterations omitted). Given the nature of the substantial impairments forced on the Registrant Does, the New Act is not rationally related to its legitimate public purpose.


9.      **The New Act violates the Nebraska doctrine of separation of powers.**

Most of the Does have received a final judicial order of some kind. In Slack Nursing Home v. Department of Soc. Servs., 247 Neb. 452, 528 N.W.2d 285 (1995), the Supreme Court of Nebraska stated that "the separation of powers doctrine prohibits one branch of government from encroaching on the duties and prerogatives of the others or from improperly delegating its own duties and prerogatives." In State v. Blythman, 201 Neb 285, 267 N.W.2d 525 (Neb. 1978) the Nebraska Supreme Court indicated that "orders determining current status and all orders determining current treatability status as sexual sociopath entered after hearing after summary review shall be considered final orders." Blythman concerned a defendant appealing his classification as a "sexual sociopath". The Does received final judicial orders when they received their original conviction and many received further final orders when they appealed their tier level

classification under the current registry.  In violation of the separation of powers the Nebraska Legislature has changed the terms of those final orders.


**D.    A preliminary injunction is in the Public's interest.**

"Vindicating constitutional rights is in the public interest." <u>McIntire v. Bethel School</u>, 804 F.Supp. 1415, 1429 (W.D. Okl. 1992).  It is in the public's best interest that the Doe's rights are not violated.

This case raises extremely important questions of law, and the Plaintiffs have a reasonable chance of success on the merits of the claims detailed infra. The New Sex Offender Laws in Nebraska are far more extreme than any sex offender laws previously considered by the United States Supreme Court or Eighth Circuit.  Numerous people will fall within its purview, from registrants to employers to family members to friends to roommates, etc.  The requirements and restrictions on the non-registrants are equally severe at those on the registrants. The questions of law raised by the Plaintiffs are of the utmost constitutional importance.   The State should be enjoined from retroactively enforcing legislation that has implications beyond the immediate context of sex offenders and strikes at core fundamental rights.


## IV.

## CONCLUSION

"The District court has no discretion to deny relief by preliminary injunction to a person who clearly establishes by undisputed evidence that he is being denied a constitutional right." <u>Henry v. Greenville Airport Comm'n</u>, C.A. 4th, 1960, 284 F.2d 631,

633.    The Plaintiffs' cases raise serious questions of the constitutionality of law enforcement encroachment into the private lives of registrants, restriction on speech, etc., and they have an excellent probability of success on the merits. The hardships each Plaintiff faces are extreme and far outweigh any potential hardship to the State of Nebraska in not enforcing the changed law.  Indeed, Nebraska can continue to operate under its existing methods of categorizing, tracking, and restricting sex offenders, a system that rationally applies restrictions based on the actual risk an offender poses to society.  Therefore, Plaintiffs pray the Court protect them from imminent and irreparable harm and grant the requested injunctive relief.

DATED this 16th day of December, 2009.


John Doe and Jane Doe 1 through 20,
John Doe and Jane Doe A through K,
Doe 12 on behalf of Does H and K, minors,
and
Doe G on behalf of Doe I, minor,

Plaintiffs.


BY:      s/ Stuart J. Dornan
Stuart J. Dornan, #18553
Jason E. Troia, #21793
Rodney C. Dahlquist, Jr., #23912
Blake Richards, #24705
Dornan, Lustgarten & Troia, PC LLO
1403 Farnam Street, Suite 232
Omaha, Nebraska 68102
(402) 884-7044
Attorneys for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 16, 2009, I electronically filed the foregoing document with the Clerk of the District Court using the CM/ECF system which sent notification of such filing to the following:

N/A

and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants:

Donald W. Kleine
Douglas County
Attorney's Office
100 Hall of Justice
1701 Farnam Street
Omaha, NE 68183

David Streitch
Brown County Attorney
148 W 4th Street
Ainsworth, NE 69210

Francis D. Botelho
Colfax County Attorney
412 E 11th Street
Schuyler, NE 68661

Elizabeth F. Waterman
Dawson County Attorney's
Office
700 North Washington
Lexington, NE 68850

Shawn Eatherton
Buffalo County Attorney
PO Box 67
Kearney, NE 68848

Tom Donner
Cuming County Attorney
137 S Main Ste 2
West Point, NE 68788

Donna Fegler Daiss
Adams County Attorney
PO Box 71
Hastings, NE 68901

Daniel Smith
Burt County Attorney
111 No. 13th
Tekamah, NE 68061

Tami Schendt
Custer County Attorney
431 S 10th Avenue
Broken Bow, NE 68822

Michael Long
Antelope County Attorney
313 Main Street
Neligh, NE 68756

Julie L. Reiter
Butler County Attorney
451 No. 5th Street
David City, NE 68632

Kim W. Watson
Dakota County Attorney
PO Box 117
Dakota City, NE 68731

Richard Roberts
Arthur County Attorney
PO Box 597
Ogallala, NE 69153

Nathan Cox
Cass County Attorney
346 Main
Plattsmouth, NE 68048

Vance Haug
Dawes County Attorney
PO Box 1346
Chadron, NE 69337

James Zimmerman
Banner County Attorney
PO Box 1557
Scottsbluff, NE 69361

George Hirschbach
Cedar County Attorney
PO Box 135
Hartington, NE 68739

Douglas Palik
Deuel County Attorney
PO Box 508
Chappell, NE 69129

Glenn Clark
Blaine County Attorney
PO Box 123
Brewster, NE  68821

John Morgan
Boone County Attorney
222 So. 4th Street
Albion, NE  68620

Kathleen Hutchinson
Box Butte County
Attorney
PO Box 660
Alliance, NE  69301

Ashley Boettcher
Boyd County Attorney
PO Box 186
Butte, NE  68722

Patrick Duncan
Franklin County Attorney
PO Box 207
Franklin, NE  68939

Jon Schroeder
Frontier County attorney
PO Box 4
Curtis, NE  69025

Tom Patterson
Furnas County Attorney
PO Box 368
Beaver City, NE  68926

Randall Ritnour
Gage County Attorney
612 Grant Street, Rm 21
Beatrice, NE  68310

Philip Pierce
Garden County Attorney
PO Box 530
Oshkosh, NE  69154

Arlan Wine
Chase County Attorney
PO Box 1299
Imperial, NE  69033

Eric Scott
Cherry County Attorney
PO Box 349
Valentine, NE  69033

Paul Schaub
Cheyenne County Attorney
PO Box 217
Sidney, NE  69162

Ted Griess
Clay County Attorney
PO Box 350
Sutton, NE  68979

Michael Powell
Hamilton County Attorney
PO Box 167
Aurora, NE  68818

Bryan McQuay
Harlan County Attorney
PO Box 755
Alma, NE  68920

Joel Phillips
Hayes County Attorney
PO Box 370
Hayes Center, NE  69032

D. Eugene Garner
Hitchcock County
Attorney
PO Box 367
Trenton, NE  69044

Thomas Herzog
Holt County Attorney
PO Box 511
O'Neill, NE  68763

Leland Miner
Dixon County Attorney
PO Box 563
Ponca, NE  68770

Paul Vaughn
Dodge County Attorney
PO Box 147
Fremont, NE  68026

James D. Owens
Dundy County Attorney
PO Box 738
Benkelman, NE  69021

Jill Cunningham
Fillmore County Attorney
PO Box 15
Geneva, NE  68361

J. Blake Edwards
Keith County Attorney
PO Box 29
Ogallala, NE  69153

Eric Scott
Keya Paha County
Attorney
PO Box 349
Valentine, NE  69201

David Wilson
Kimball County Attorney
116 W 2nd Street
Kimball, NE  69145

John Thomas
Knox County Attorney
PO Box 41
Center, NE  68724

Gary Lacey
Lancaster County Attorney
575 So. 10th Street
Lincoln, NE  68508

Dale Crandall
Garfield County Attorney
PO Box 310
Burwell, NE  68823

Todd Wilson
Gosper County Attorney
PO Box 325
Elwood, NE  68937

A. James Moravek
Grant County Attorney
Box 460
Alliance, NE  69301

James Swanson
Greeley County Attorney
Box 328
Greeley, NE  68842

Mark Young
Hall County Attorney
PO Box 367
Grand Island, NE  68802

Steve Curry
Merrick County Attorney
1615 17th Avenue
Central City, NE  68826

Jean Rhodes
Morrill County Attorney
PO Box 875
Bridgeport, NE  69336

Rodney Wetovick
Nance County Attorney
PO Box 549
Fullerton, NE  68638

Louie Ligouri
Nemaha County Attorney
1824 N Street
Auburn, NE  68305

George Vinton
Hooker County Attorney
Box 184
Mullen, NE  69152

David T Schroeder
Howard County Attorney
Box 328
Greeley, NE  68842

Linda Bauer
Jefferson County Attorney
411 4th Street
Fairbury, NE  68352

Julie Smith Hogancamp
Johnson County Attorney
Box 208
Tecumseh, NE  68450

David Wondra
Kearney County Attorney
PO Box 110
Minden, NE  68959

Sandra J. Allen
Platte County Attorney
2610 14th Street
Columbus, NE  68601

Ronald Colling
Polk County Attorney
PO Box 367
Osceola, NE  68651

Paul Wood
Red Willow County
Attorney
502 Norris Ave
McCook, NE  69001

Douglas Merz
Richardson County
Attorney
1719 Stone Street
Falls City, NE  68355

Rebecca R. Harling
Lincoln County Attorney
301 N Jeffers, Rm 101A
North Platte, NE  69101

Steve Vinton
Logan County Attorney
PO Box 123
Brewster, NE  68821

Jason White
Loup County Attorney
PO Box 586
Broken Bow, NE  68823

Joseph Smith
Madison County Attorney
Box 269
Madison, NE  68748

Tim Brouillette
McPherson County
Attorney
PO Box 1605
North Platte, NE  69103

Dennis King
Sheridan County Attorney
Box 490
Rushville, NE  69360

Mark Eurek
Sherman County Attorney
PO Box 621
Loup City, NE  68853

J. Adam Edmund
Sioux County Attorney
PO Box 156
Harrison, NE  69346

W. Bert Lammli
Stanton County Attorney
PO Box 995
Stanton, NE  68779

Timothy Schmidt
Nuckolls County Attorney
150 So Main
PO Box 404
Nelson, NE  68961

David Partsch
Otoe County Attorney
115 N 10th
Nebraska City, NE  68410

Victor Faesser
Pawnee County Attorney
PO Box 73
Pawnee City, NE  68420

Richard Roberts
Perkins County Attorney
PO Box 889
Grant, NE  69140

Timothy Hoeft
Phelps County Attorney
PO Box 622
Holdrege, NE  68949

Verlyn Luebbe
Pierce County Attorney
PO Box 203
Pierce, NE  68767

Jerry McDole
Webster County Attorney
443 N Webster
Red Cloud, NE  68970

Timothy F. Dunning
Douglas County Sheriff's
Office
3601 N 156th St
Omaha, Nebraska 68116

Gary Reiber
Dawson County Sheriff's
Office
709 N Grant St
Lexington, Nebraska

Avery Gurnsey
Rock County Attorney
PO Box 425
Bassett, NE  68714

Tad Eickman
Saline County Attorney
PO Box 713
Wilber, NE  68465

Lee Polikov
Sarpy County Attorney
1210 Golden Gate Dr.
Papillion, NE  68046

Scott Tinglehoff
Saunders County Attorney
433 N Chestnut
Wahoo, NE  68066

Tiffany Wasserburger
Scotts Bluff County
Attorney
1725 10th Street
Gering, NE  69341

Wendy Elston
Seward County Attorney
529 Seward Street #104
Seward, NE  68434

James McNally
Wheeler County Attorney
PO Box 164
Neligh, NE  68756

Steve Harper
Brown County Sheriff
142 W 4th St
Ainsworth, Nebraska 69210

Neil Miller
Buffalo County Sheriff
PO Box 1270
2025 Ave A
Kearney, Nebraska 68848

Daniel Werner
Thayer County Attorney
429 Lincoln Ave
Hebron, NE  68370

Warren Arganbright
Thomas County Attorney
PO Box 162
Thedford, NE  69166

Tammy Maul-Bodlak
Thurston County Attorney
PO Box 490
Pender, NE  68047

Glenn Clark
Valley County Attorney
218 S 16th
PO Box 40
Ord, NE  68862

Shurie Graeve
Washington County
Attorney
1555 Colfax Street
Blair, NE  68008

Michael Pieper
Wayne County Attorney
PO Box 427
Wayne, NE  68787

Tim Sieh
York County Attorney
510 Lincoln Avenue
York, NE  68467

Paul Kruse
Colfax County Sheriff
411 E 11th St
Schuyler, Nebraska
68661

Bradley Boyum
Cuming County Sheriff
200 S Lincoln St Rm 203
West Point, Nebraska
68788

Greg Magee
Adams County Sheriff
500 W 4th St
Hastings, Nebraska 68902

Darrell Hamilton
Antelope County Sheriff
PO Box 72
Neligh, Nebraska 68756

Bill Simpson
Arthur County Sheriff
Main St
Arthur, Nebraska 69121

K. Patrick Mooney
Banner County Sheriff
PO Box 43
Harrisburg, Nebraska
69345

Tim Sierks
Blaine County Sheriff
PO Box 42
Brewster, Nebraska 68821

David Spiegel
Boone County Sheriff
217 S 5th St
Albion, Nebraska 68620

Tammy Mowry
Box Butte County Sheriff
PO Box 636
Alliance, Nebraska 69301

David Derickson
Boyd County Sheriff
401 Thayer
Butte, Nebraska 68722

Jerry L. Archer
Franklin County Sheriff
PO Box 292
Franklin, Nebraska 68939

Robert Pickell
Burt County Sheriff
111 N 13th St
Tekamah, Nebraska 68061

Mark Hecker
Butler County Sheriff
451 5th Street
David City, Nebraska 68632

William Bruggeman
Cass County Sheriff
336 Main St
Plattsmouth, Nebraska
68048

Larry Koranda
Cedar County Sheriff
PO Box 415
Hartington, Nebraska 68739

Timothy Sutherland
Chase County Sheriff
PO Box 102
Imperial, Nebraska 69033

Melvin Christiansen
Cherry County Sheriff
PO Box 49
Valentine, Nebraska 69201

Darrell Johnson
Cheyenne County Sheriff
1000 10th Ave
PO Box 75
Sidney, Nebraska 69162

Jeff Franklin
Clay County Sheriff
104 E Edgar St
Clay Center, Nebraska
68933

Kirk Handrup
Hamilton County Sheriff
715 12th St
Aurora, Nebraska 68818

Ted Henderson
Custer County Sheriff
116 S 11th St
Broken Bow, Nebraska
68822

James L. Wagner
Dakota County Sheriff
Courthouse Sq
Dakota City, Nebraska
68731

Karl Dailey
Dawes County Sheriff
PO Box 671
451 Main Street
Chadron, Nebraska

Jeffrey S, Ortgies
Deuel County Sheriff
PO Box 565
Chappell, Nebraska
69129

Dean Chase
Dixon County Sheriff
PO Box 900
Ponca, Nebraska 68770

Steve Hepson
Dodge County Sheriff
428 N Broad
Fremont, Nebraska
68025

Robert S. McBride
Dundy County Sheriff
PO Box 506
Benkelman, Nebraska
69021

William Burgess
Fillmore County Sheriff
900 G St
Geneva, Nebraska 68361

Kevin Mueller
Keith County Sheriff
103 E 5th St
Ogallala, Nebraska
69153

Daniel Rupp
Frontier County Sheriff
PO Box 320
Curtis, Nebraska 69025

Kurt Kapperman
Furnas County Sheriff
912 R St
Beaver City, Nebraska
68926

Millard Gustafson
Gage County Sheriff
County Jail
612 Lincoln St
Beatrice, Nebraska 68310

Doug Miller
Garden County Sheriff
611 Main St
PO Box 494
Oshkosh, Nebraska 69154

Larry D. Donner
Garfield County Sheriff
PO Box 455
Burwell, Nebraska 68823

Dennis Ocken
Gosper County Sheriff
PO Box 316
Elwood, Nebraska 68937

Shawn Hebbert
Grant County Sheriff
105 E Harrison St
Hyannis, Nebraska 69350

David C. Weeks
Greeley County Sheriff
PO Box 248
Greeley, Nebraska 68842

Jerry Watson
Hall County Sheriff
131 S Locust St
Grand Island, Nebraska
68801

Chris Becker
Harlan County Sheriff
706 W 2nd
Alma, Nebraska 68920

Thomas Dow
Hayes County Sheriff
502 Troth St
Hayes Center, Nebraska
69032

Bryan Leggott
Hitchcock County Sheriff
229 East D Street
Trenton, Nebraska 69044-
0306

Ben Matchett
Holt County Sheriff
PO Box 146
O'Neill, Nebraska 68763

Lynn Nichols
Hooker County Sheriff
PO Box 213
Mullen, Nebraska 69152

Harold Schenck
Howard County Sheriff
612 Indian #13
Saint Paul, Nebraska 68873

Nels Sorenson
Jefferson County Sheriff
County Law Enforcement
Bldg
606 3rd St

James Wenzl
Johnson County Sheriff
County Jail
Box 335
Tecumseh, Nebraska 68450

Scott K. White
Kearney County Sheriff
PO Box 185
Minden, Nebraska 68959

Jeff Kirsch
Keya Paha County
Sheriff
PO Box 100
Springview, Nebraska

Harry J. Gillway
Kimball County Sheriff
114 East 3rd Street Ste
12
Kimball, Nebraska 69145

James Janecek
Knox County Sheriff
PO Box 142
Center, Nebraska 68724

Terry Wagner
Lancaster County Sheriff
575 S 10th St
Lincoln, Nebraska 68508

Jerome Kramer
Lincoln County Sheriff
302 N Jeffers
North Platte, Nebraska
69101

Patrick McNeil
Logan County Sheriff
317 Main St
Stapleton, Nebraska
69163

Kirby Holloway
Loup County Sheriff
PO Box 69
Taylor, Nebraska 68879

Vern Hjorth
Madison County Sheriff
PO Box 209
Madison, Nebraska
68748

John Haller
McPherson County
Sheriff
PO Box 14
Tryon, Nebraska 69167

121

Anthony McPhillips
Merrick County Sheriff
1821 16th Ave
Central City, Nebraska
68826

John Edens
Morrill County Sheriff
PO Box 858
Bridgeport, Nebraska
69336

Davis Moore
Nance County Sheriff
209 Esther St
PO Box 309
Fullerton, Nebraska 68638

Brent Lottman
Nemaha County Sheriff
1805 N St
Auburn, Nebraska 68305

James R. Marr
Nuckolls County Sheriff
50 W 2nd
PO Box 392
Nelson, Nebraska 68961

James gress
Otoe County Sheriff
1021 Central Ave
Nebraska City, Nebraska
68410

Jayme Reed
Pawnee County Sheriff
PO Box 267
Pawnee City, Nebraska
68420

James D. Bruggeman
Perkins County Sheriff
200 Lincoln Avenue
PO Box 607
Grant, Nebraska 69140-

Tom Nutt
Phelps County Sheriff
715 5th Ave
Holdrege, Nebraska 68949

John Zavadil
Platte County Sheriff
2610 14th St
Columbus, Nebraska 68601

Dwaine Ladwig
Polk County Sheriff
251 N Main St
Osceola, Nebraska 68651

Gene Mahon
Red Willow County Sheriff
105 West E
McCook, Nebraska 69001

Vernon Buckminster
Richardson County Sheriff
1700 Stone St
Falls City, Nebraska 68355

Willis Haynes
Rock County Sheriff
400 State St
Bassett, Nebraska 68714

Alan Moore
Saline County Sheriff
911 S Main Street
Wilber, Nebraska 68465

Jeff Davis
Sarpy County Sheriff
1208 Golden Gate Dr
Papillion, Nebraska 68046

Kevin Stukenholtz
Saunders County Sheriff
354 W 4th St
Wahoo, Nebraska 68066

Jim K. Lawson
Scotts Bluff County Sheriff
County Administration
Building
1825 10th Street

Terry Robbins
Sheridan County Sheriff
301 E 2nd St
Rushville, Nebraska
69360

Michael Janulewicz
Sherman County Sheriff
PO Box 127
Loup City, Nebraska
68853

William Roe
Sioux County Sheriff
PO Box 305
Harrison, Nebraska
69346

Michael Unger
Stanton County Sheriff
PO Box 635
Stanton, Nebraska 68779

David Lee
Thayer County Sheriff
324 Olive Ave
Hebron, Nebraska 68370

Gary Eng
Thomas County Sheriff
503 Main St
Thedford, Nebraska
69166

Chris Kleinberg
Thurston County Sheriff
106 S 5th
Pender, Nebraska 68047

Casey D. Hurlburt
Valley County Sheriff
125 S 15th St
Ord, Nebraska 68862

Michael Robinson
Washington County
Sheriff
1535 Colfax
Blair, Nebraska 68008

Rick Eberhardt
Pierce County Sheriff
111 W Court Room 7
Pierce, Nebraska 68767

Troy Schmitz
Webster County Sheriff
641 N Cedar St
Red Cloud, Nebraska
68970

Thomas K. Casady
Lincoln Police Department
575 S 10th St
Lincoln, Nebraska 68508

Timothy S. Mullen
Fremont Police
Department
725 N Park Ave
Fremont, Nebraska 68025

William Gumm
Columbus Police
Department
2419 14th St
Columbus, Nebraska
68601

Nebraska State Patrol
c/o Jon Bruning
Nebraska Attorney General
State Capitol Rm 2115
PO Box 98920
Lincoln NE, 68509-8920

Joe Yocum
Seward County Sheriff
261 S 8th St
Seward, Nebraska 68434

Adrian Lindsey
Wheeler County Sheriff
3rd St & Commercial St
Bartlett, Nebraska 68622

Alex Hayes
Omaha Police Department
505 S 15th St
Omaha, Nebraska 68102

Lester Johnson
Bennington Police
Department
11402 North 156th Street
Bennington, Nebraska 68007

Donald Klug
York Police Department
315 Grant Ave
York, Nebraska 68467

Col. Bryan Tuma
c/o Jon Bruning
Nebraska Attorney General
State Capitol Rm 2115
PO Box 98920
Lincoln NE, 68509-8920

LeRoy W. Janssen
Wayne County Sheriff
510 Pearl Street
Wayne, Nebraska 68787

Dale Radcliff
York County Sheriff
510 Lincoln Ave
York, Nebraska 68467

Leonard Houloose
Papillion Police
Department
1000 East First Street
Papillion, Nebraska

Ron Murtaugh
Ralston Police
Department
7400 Main St
Ralston, Nebraska 68127

Jon Bruning
Attorney General
State Capitol Rm 2115
PO Box 98920
Lincoln NE, 68509-8920

State of Nebraska
c/o Jon Bruning
Attorney General
State Capitol Rm 2115
PO Box 98920
Lincoln NE, 68509-8920

BY:     s/ Stuart J. Dornan
          Stuart J. Dornan, #18553

123