1           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEBRASKA
2
    JOHN DOE, et al.,              )      Case No. 8:09CV456
3                                  )
             Plaintiffs,           )
4                                  )
    vs.                            )
5                                  )
    STATE OF NEBRASKA, et al.,     )
6                                  )
    _____Defendants._____)
7   JOHN DOE,                      )      Case No. 4:09CV3266
                                   )
8            Plaintiff,            )
                                   )
9   vs.                            )
                                   )
10  NEBRASKA STATE PATROL, et al., )
                                   )
11  _____Defendants._____)
    JOHN DOE,                      )      Case No. 4:10CV3005
12                                 )
             Plaintiff,            )
13                                 )
    vs.                            )
14                                 )
    STATE OF NEBRASKA, et al.,     )
15                                 )      Lincoln, Nebraska
    _____Defendants._____)      July 16, 2012
16

17

18

19                       VOLUME I
              TRANSCRIPT OF TRIAL PROCEEDINGS
20        BEFORE THE HONORABLE RICHARD G. KOPF
           UNITED STATES SENIOR DISTRICT JUDGE
21

22

23

24

25  Proceedings recorded by electronic sound recording, transcript
    produced with computer.

```
 1                          A-P-P-E-A-R-A-N-C-E-S

 2      FOR THE PLAINTIFFS:  Mr. Rodney C. Dahlquist
                             Mr. Stuart J. Dornan
 3                           Mr. Thomas J. Monaghan
                             Attorneys at Law
 4                           Dornan, Lustgarten & Troia, PC LLO
                             1403 Farnam Street, Suite 232
 5                           Omaha, NE  68102

 6      FOR THE DEFENDANTS:  Ms. Katherine J. Spohn
                             Mr. Kevin L. Griess
 7                           Mr. Ryan S. Post
                             Assistant Attorneys General
 8                           2115 State Capitol Building
                             P.O. Box 98920
 9                           Lincoln, NE  68509-8920

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (At 10:46 a.m. on July 16, 2012, the following

 2       proceedings were had:)

 3              THE COURT:  Please be seated.  Thank you.

 4          Good morning.  We're on the record in John Doe and others

 5       vs. the State of Nebraska.  This is three case -- we're going

 6       to try three cases, 8:09CV456, 4:10CV3266 [sic] and

 7       4:10CV3005.

 8              Counsel, please remain seated but now enter your

 9       appearance.  First for the plaintiffs.

10              MR. DAHLQUIST:  Good morning, Your Honor.  Rodney

11       Dahlquist appearing on behalf of the plaintiffs.

12              MR. DORNAN:  Good morning, Your Honor.  Stu Dornan on

13       behalf of the plaintiffs.

14              MR. MONAGHAN:  And Tom Monaghan on behalf of the

15       plaintiffs.

16              THE COURT:  Counsel.

17              MS. SPOHN:  Good morning, Your Honor.  Katie Spohn on

18       behalf of the defendant.

19              MR. GRIESS:  And Kevin Griess as well.

20              MR. POST:  Ryan Post.

21              THE COURT:  Good morning again.  Okay.  A couple of

22       things.  When we were to begin, I -- well, back up.  I sent

23       you an e-mail on the 9th asking for a stipulation -- actually

24       two stipulations regarding the identification of the Does who

25       remain plaintiffs and their true names and the Does who were
```

1    named plaintiffs but no longer remain plaintiffs and their

2    true names.

3        Do you have the stipulations for me?

4            MR. DAHLQUIST:  We do, Your Honor.

5            THE COURT:  And have you provided copies to counsel?

6            MR. DAHLQUIST:  I have.  Mr. Griess and I worked on

7    this and we came up with a -- a stipulation.  We integrated it

8    into one document.

9            THE COURT:  That's perfectly fine.

10           MR. DAHLQUIST:  Okay.

11           THE COURT:  Would you come forward and give it to the

12   courtroom deputy, please.

13       Let me take a look at it.

14       Thank you.

15       This is very helpful.  Thank you.

16       I'll direct the court clerk -- well, first of all, I'm

17   going to hand this to Janine Rempe, my senior law clerk, and

18   we'll make copies for our office and then give it to the

19   courtroom deputy who will file it as a restricted document.  A

20   restricted document means that it's available to counsel but

21   no one else, okay?

22           MR. DAHLQUIST:  Yes, sir.

23           UNIDENTIFIED MALE SPEAKER:  We have an extra copy if

24   you want one.

25           THE COURT:  That'd be great, sure, if you want to

1    give us an extra copy.

2        You can -- you can just upload that -- well, why don't

3    you change with Jan.  I don't know which one's the original.

4    Thank you.

5            UNIDENTIFIED MALE SPEAKER:  I think they're just

6    copies.  All electronic signatures are on there.

7            THE COURT:  Okay.  Thank you.  Now, with respect to

8    the stipulation with -- in -- in regard to the plaintiffs who

9    are no longer plaintiffs, how shall I -- I need to enter some

10   kind of an order dismissing them.  The question I suppose is

11   whether the dismissal should be with or without prejudice.

12   Will you advise me, please?

13           MR. DAHLQUIST:  Judge, I would ask that that be

14   without prejudice and -- and the reason for that being the --

15   the plaintiffs have brought both a facial and an as-applied

16   challenge --

17           THE COURT:  Uh-huh.

18           MR. DAHLQUIST:  -- to these statutes.  My concern is

19   that if the Court were to dismiss with prejudice, if they were

20   to experience a change in circumstances or something, that

21   would render their claim for the as-applied portion at least

22   different than it stands today or has stood during the

23   pendency of the case.  Then --  My concern is just being

24   precluded from then bringing an action in the event something

25   changes.

```
 1              THE COURT:  Okay.  Let me hear from the defendants.
 2              MS. SPOHN:  Judge, if -- I'm pretty sure that each of
 3    the Does that is no longer a plaintiff you have already
 4    dismissed from the case, and we can get you the ECF filing
 5    number for each of those over the lunch hour if you want us to
 6    but I'm not sure you have to dismiss anyone now 'cause you've
 7    already done so.
 8              MR. DAHLQUIST:  And -- and that's correct.  I think
 9    there were a number of orders.  The only --  There were two
10    that we moved to dismiss recently and --
11              THE COURT:  Yeah, I granted those without prejudice.
12              MR. DAHLQUIST:  Without prejudice.  If those two --
13    and that's correct.  So then there would be an order as it
14    relates to -- should be an order as it relates to all of the
15    plaintiffs dismissing them without prejudice.
16              THE COURT:  Well, if you're all satisfied with that,
17    then I'll just leave the record as it is and we'll proceed
18    accordingly.  Is that okay?
19              MR. DAHLQUIST:  Yes.
20              THE COURT:  Is that okay?
21              MS. SPOHN:  Yes, Your Honor.
22              THE COURT:  Okay.  Then that's what we'll do.
23         That then takes me to the seventh issue in my e-mail.
24    The parties have stipulated in their pretrial conference order
25    that the requirements under Neb. Rev. Stat. Section
```

1    29-4006(1)(k) and (s) that someone has an obligation to

2    provide "Internet Protocol addresses" and "global unique

3    identifiers" based on the technology as it exists today are

4    overbroad and unduly burdensome.  That's what the parties have

5    stipulated with respect to Internet Protocol addresses and

6    global unique identifiers.

7        I construe that as an admission by the State that those

8    provisions of the statute with respect to Internet Protocol

9    addresses and global unique identifiers are unconstitutional.

10        MS. SPOHN:  As technology exists today, Your Honor,

11   yes, that's true.

12        THE COURT:  All right.  Okay.  That I think clears up

13   the issues that I wanted to take up.  For those of you who

14   don't know, Janine Ram- -- or Rempe, she's my senior career

15   law clerk, will be helping with this -- helping me with this

16   case and then Paige Amundson, who is a law student at the

17   University of Nebraska College of Law, and an intern, will be

18   helping as well so those two folks are here in the courtroom.

19        I'm prepared to proceed as you wish.  If you want to make

20   opening statements, that's perfectly okay with me and then we

21   can begin taking evidence.

22        So with that by way of introduction, do you care to make

23   an opening statement, counsel?

24        MR. DAHLQUIST:  We'll make opening statements, Your

25   Honor.

```
 1              THE COURT:  Okay.  And you can make it from the
 2    seated position.
 3              MR. DAHLQUIST:  Thank you, Judge.
 4         Your Honor, this is a case that questions the
 5    constitutionality of what the State intended as a
 6    one-of-a-kind, first-of-its-kind piece of legislation.  The
 7    question boils --  There's a number of questions for the Court
 8    to resolve and I can provide just a quick background of how we
 9    got here.
10         This is --  As the result of the Adam Walsh Act, the
11    federal government provided financial incentives for states to
12    pass minimum requirements with their sex offender -- with
13    their respective sex offender registries.
14              THE COURT:  Right.
15              MR. DAHLQUIST:  Nebraska spearheaded by the Attorney
16    General's Office used this as an opportunity to, again, like I
17    said, pass what was phrased as a first-of-its-kind piece of
18    legislation.  In doing so, Your Honor, it went far beyond what
19    was required under federal Adam Walsh in many respects, and
20    the Court has identified those, and those are the statutes
21    that are at issue here today.
22         The plaintiffs challenged this, and the parties filed
23    what I consider to be dueling summary judgment arguments and
24    motions, and the Court resolved by and large most of the
25    issues but -- but the questions we have to get to today,
```

1    Judge, are whether the State is allowed to say to someone

2    because of a conviction that you had in the past you are now

3    no longer allowed to use what the State has defined as social

4    networking, chat room and instant messaging.

5         The evidence will show that those terms are vague and so

6    broad as to encompass all of what we consider the Internet.

7    It's pretty clear that society today runs a large part of

8    commerce, we communicate with our families, friends,

9    colleagues and maintain our employment by and large by the use

10   of the Internet.

11        So the question is can the State take that ability to use

12   those tools away from someone because of a prior conviction?

13        The question also as it relates to one Doe, Doe 24, who

14   is currently on parole, whether the State can --

15             THE COURT:  You -- you know, as to parole the Supreme

16   Court case just blows you out of the water, doesn't it?  I

17   mean, let's not kid a kidder.

18             MR. DAHLQUIST:  It -- it --

19             THE COURT:  I mean, it --

20             MR. DAHLQUIST:  Well, it certainly doesn't help.

21             THE COURT:  It basically --

22             MR. DAHLQUIST:  I'll acknowledge that, Your Honor.

23             THE COURT:  California says -- well, tell me what --

24             MR. DAHLQUIST:  Sure.

25             THE COURT:  -- California said.

 1          MR. DAHLQUIST:  Yeah.  In -- in the *Samson* case --

 2          THE COURT:  Yeah.

 3          MR. DAHLQUIST:  -- Your Honor?  Basically, it says it

 4   depends on what the terms of parole are.  If the terms of

 5   parole indicate that there is the right to go forward and --

 6   and conduct these invest- -- or conduct a search, then there's

 7   no suspicion required -- no reasonable suspicion required.

 8          THE COURT:  Well, there was a statute there in

 9   California, right?

10          MR. DAHLQUIST:  And it said -- I believe -- and I

11   have to look real quick but I believe it said it can't be

12   arbitrary or -- or there was some minimal -- minimal

13   guidelines that was provided to law enforcement.

14          THE COURT:  Okay.  And -- and -- and then written

15   into the -- this guy's parole conditions -- written into this

16   guy's parole conditions were the search provision, right?

17          MR. DAHLQUIST:  A search -- in -- into this

18   particular --

19          THE COURT:  No, no.

20          MR. DAHLQUIST:  -- Doe 24's --

21          THE COURT:  To the California.

22          MR. DAHLQUIST:  In the California one, yes, sir.

23          THE COURT:  The same thing here, right?

24          MR. DAHLQUIST:  Well, it's the same but it's also

25   very different, Judge.  And the particulars of Doe 24 are

1    he -- he's already completed his sentence for the offense that

2    placed him on the registry first and foremost.

3              THE COURT:  Yeah.

4              MR. DAHLQUIST:  He -- he completed that a year ago.

5              THE COURT:  Yeah.

6              MR. DAHLQUIST:  He's -- he's now back on parole for

7    a -- a different offense --

8              THE COURT:  Sure.

9              MR. DAHLQUIST:  -- an unrelated non-registerable

10   offense.

11             THE COURT:  Right.

12             MR. DAHLQUIST:  In his case, Judge, the --

13             THE COURT:  If there wasn't a statute here, the State

14   could do what -- what it wants to do anyway, right?  'Cause

15   he's -- in his parole condition, it says we get to come and

16   search.

17             MR. DAHLQUIST:  Well, it does and it doesn't.  That's

18   where we have a little bit of a conflict there.  There's some

19   ambiguity.  There's actually -- there's some general terms of

20   parole that -- that indicate that, yeah, he can be searched by

21   his parole officer or an employee of the parole

22   administration.

23             THE COURT:  Why don't you read it to me.  Do you have

24   it in front of you?

25             MR. DAHLQUIST:  I will have it, Judge.

1           THE COURT:  If -- you know, we can get to it.  If you

2    don't have it easily in front of you, I don't want...

3           MR. DAHLQUIST:  It was the last one, of course.

4           THE COURT:  Of course.

5           MR. DAHLQUIST:  There -- there's actually two

6    provisions that apply here, Your Honor.

7           THE COURT:  Okay.

8           MR. DAHLQUIST:  Search and seizure.  You shall permit

9    your parole officer and/or personnel of parole

10   administration --

11          THE COURT:  Right.

12          MR. DAHLQUIST:  -- to conduct routine searches of

13   your person, residence, vehicle or any property under control

14   at such times as they deem necessary.

15       So I'd say in that sense it's limiting its scope to who

16   can conduct the search, who this individual can expect to

17   conduct the search.

18       There's also additional terms that are listed in his --

19          THE COURT:  Well, all the parole office has got to

20   do -- his parole officer -- and they probably do this anyway.

21   That's how we did it in the federal system.  A pretrial

22   service officer or probation officer calls the local cops to

23   say we're going to exercise our search rights, give us a -- a

24   cop with a gun, although we're armed, we're in plainclothes,

25   and so a cop shows up and they walk into the house and do

1      their search.

2              MR. DAHLQUIST:  Well, and I think under those terms

3      they've done it according to the terms of parole.

4              THE COURT:  Right.

5              MR. DAHLQUIST:  But I think what the Nebraska

6      registry 29-4006(2) does was basically does away with even

7      that minimal confine, Your Honor, and that minimal --

8              THE COURT:  Well, as applied to --

9              MR. DAHLQUIST:  -- procedural requirement.

10             THE COURT:  Okay.  Let's hold on for just a minute.

11             MR. DAHLQUIST:  Sure.

12             THE COURT:  As applied to 24, the statute doesn't

13     hurt 24 'cause he's already -- he -- he's already signed these

14     conditions that allow -- allow them to -- the State to do what

15     it is he doesn't want them to do.

16             MR. DAHLQUIST:  Well, it -- it does hurt 24, Your

17     Honor, because it actually -- the terms of his parole go on to

18     say there's -- there's specifics that apply to him as well,

19     and -- and it's a check-the-box system, and if the box is

20     checked, that term applies to you.

21             THE COURT:  Right.

22             MR. DAHLQUIST:  One of the ones that is specifically

23     not checked -- there's only three that are checked.  They

24     relate to continue his alcohol monitoring, (unintelligible),

25     things of that nature.  But what's not checked, Your Honor, is

OPENING STATEMENT - DAHLQUIST                          14

1     you shall not use a computer for any purpose that might

2     further sexual activity.  That's not checked.

3         The other one is you shall not engage in interpersonal

4     communication, including but not limited to chat rooms,

5     instant messaging and so forth.  That's not checked.

6         The other one is you shall consent to unannounced

7     examination, parentheses, search, of any and all computers

8     and/or devices to which you have access to.  This consent to

9     examine including access to data and other -- other kind of

10    ancillary electronic devices.  That is not checked.

11        So -- so that's not a condition of his parole.  So the

12    Statute 29-4006(2) does undermine what examination he would

13    have as a result of this not being checked.

14            THE COURT:  Well, a general search condition is about

15    as broad as you can make it, isn't it?

16            MR. DAHLQUIST:  Well, it seems -- it seems to be

17    broad in -- in a sense as it relates to this particular

18    parolee, Judge, but what 29-4006(2) does was to expand that to

19    say anything within your possession.  And I've got a copy of

20    the statute.

21            THE COURT:  Well, but -- okay.  But -- but in the

22    Samson case, wasn't there a statute -- California statute?

23            MR. DAHLQUIST:  There was and I -- if I'm -- if I'm

24    recalling this correctly, Your Honor, and I have to apologize,

25    but it seemed like there was a statute that -- that provided

1    some minimum level of -- it could not be done in an arbitrary

2    manner.  The search could not be arbitrary and if that -- I

3    believe that's what the statute -- and I believe that's what

4    you're referring to, Judge.

5            THE COURT:  Okay.  I get your point but do you have

6    any case that parses the *Samson* case the way you want me to

7    parse it?

8            MR. DAHLQUIST:  Well, I don't think that there's any

9    specific authority, Judge.  I think this statute goes so

10   far -- and -- and I guess there's another point that I'd like

11   to make.

12           THE COURT:  Sure.

13           MR. DAHLQUIST:  This is talking just about search.

14   29-4006(2) talks about search and the installation of some

15   type of hardware or monitor for ongoing real-time monitoring.

16           THE COURT:  Right.

17           MR. DAHLQUIST:  Nowhere in the terms of parole for

18   Doe 24, either in the general ones or the more specific ones,

19   does it say anything about that.

20           THE COURT:  No.  But -- but if the -- if you have a

21   Fourth Amendment claim, it's got to turn on issues of whether

22   you have some reasonable expectation of privacy in the area to

23   be searched, and if this guy has said it's okay with me that

24   you come in anyplace I'm -- I'm at to search, then what basis

25   does he have to complain that somebody's going to do that and

1    install a monitoring device on his computer?

2            MR. DAHLQUIST:  Well, I think in -- in -- it's a

3    couple different ways, Your Honor, and I think some of the

4    testimony will -- will elicit this.

5            THE COURT:  Sure.

6            MR. DAHLQUIST:  A number of Does have been visited by

7    law enforcement on an extremely regular -- on a very regular

8    basis and not just by one law enforcement agency.  They'd get

9    visited by Omaha police, Lincoln police, Douglas County

10   Sheriff, State Patrol, and they'll do so, you know, kind of in

11   consecutive order so it's fairly regular and it's -- it's all

12   the time.

13          Apparently, what 29-4006 is doing is saying we're not

14   just going to limit this to parole which was the agreement

15   that Doe 24 entered into with -- with the parole

16   administration for parole administration officers or employees

17   to come and search.  It would expand that out to include all

18   of these other law enforcement agencies that could just come

19   arbitrarily at any point in time to conduct a search.  So I

20   think it goes beyond the confines of what he agreed to.

21          THE COURT:  Okay.  Go ahead.  I interrupted you.

22          MR. DAHLQUIST:  Well, I think we covered the Fourth

23   Amendment issue to -- to -- to the degree I wanted to, Your

24   Honor.

25          THE COURT:  You don't have any stalking horse,

1    meaning plaintiff, who's on probation now, do you?

2            MR. DAHLQUIST:  No, sir.  No, sir.

3            THE COURT:  So I can't -- I don't have a real context

4    in which to evaluate that issue.

5            MR. DAHLQUIST:  Understood.  There -- there is only

6    the one Doe and he is on parole under -- under the terms of

7    parole, that's correct.

8            THE COURT:  All right.  So we're really -- so insofar

9    as the Fourth Amendment issue is concerned, we're talking

10   about two categories of Does or plaintiffs.  Those categories

11   of Does who were on probation, parole or supervised release --

12   pardon me.  Anybody who was convicted or was on probation,

13   parole or supervised release after January 1st, 2010, and who

14   is no longer under the supervision, and we have -- what? --

15   five of those?

16           MR. DAHLQUIST:  There's about five.

17           THE COURT:  Anyway, there's -- there's some --

18           MR. DAHLQUIST:  Yeah.  There's -- there's --

19           THE COURT:  -- relatively small number.

20           MR. DAHLQUIST:  That's right.

21           THE COURT:  And then we have Doe 24 who's on parole?

22           MR. DAHLQUIST:  That's correct, Your Honor.

23           THE COURT:  Now, as I've already held the statute

24   unconstitutional with respect to people who were convicted

25   prior to January 1st, 2010, and who were -- were off

1    probation, parole or supervised release prior to that date,

2    right?

3              MR. DAHLQUIST:  Yes, sir.

4              THE COURT:  Okay.  So I'm really concentrating --

5    what is it -- six plaintiffs here?

6              MR. DAHLQUIST:  That -- that would be correct and --

7              THE COURT:  For the as-applied challenge.

8              MR. DAHLQUIST:  For the as-applied.  And -- and

9    that's correct, Your Honor, yes.

10             THE COURT:  Okay.  Go ahead.

11             MR. DAHLQUIST:  Well, and -- and my understanding is

12   because those individuals have come off probation, parole,

13   supervised release, whatever court-monitored supervision they

14   were -- then they would fall under the Court's order as it

15   relates to individuals who have completed their sentence.

16             THE COURT:  Go ahead.

17             MR. DAHLQUIST:  There's -- in addition to the Fourth

18   Amendment, Your Honor, there's significant implications under

19   the First Amendment on a couple of different grounds.  One

20   being can the State, like I said, just basically eliminate

21   someone's ability to communicate through what are the most

22   common mediums used today for commerce --

23             THE COURT:  Well, and --

24             MR. DAHLQUIST:  -- and social...

25             THE COURT:  -- and due process.  You've got a -- a

1    vagueness claim running throughout all of that.  What -- what

2    does it -- what does this really mean?

3           MR. DAHLQUIST:  That -- that's correct.  There's --

4    there's a due process claim because -- the -- the ambiguity --

5    and -- and what the Court didn't have at summary judgment was

6    a good representation of how far this statute stretched, how

7    all-encompassing it really is, and that's what the testimony

8    will be provided to the Court today through Professor Post.

9       The vagueness part of it is some of the terms were kind

10   of unknowable but at the same time the way that the statute

11   has been drafted, it can either mean -- and Professor Post

12   will testify to the fact that could either mean nothing and

13   cover nothing or it could mean --

14          THE COURT:  Everything.

15          MR. DAHLQUIST:  -- everything.

16          THE COURT:  Yeah.

17          MR. DAHLQUIST:  And quite frankly, you know, our

18   position is unambiguously the statute is written to include

19   everything.  There'll be some attempt to impose some age limit

20   that simply is not there, either unambiguously because of the

21   wording of the statute or in practice.  So an attempt to limit

22   this or mitigate the effects, scope of -- of the definitions

23   through the use of an age limitation is just simply not real,

24   Your Honor.  That -- that kind of gets to the vagueness and

25   the due process part of it.

1          The First Amendment's also implicated because of the type

2     of information that is reported, and some of the changes --

3     one of the major changes that were enacted under the -- under

4     SORNA was the requirement to provide online identifiers.

5     Again, the State of Nebraska in an attempt to create this

6     first-of-a-kind restrictive, punitive type of statute went far

7     beyond what SORNA requires.

8          It requires you unambiguously under the definitions in

9     the statute to register your passwords, your online

10    identifiers, where you post information, web sites you

11    maintain, basically anywhere you go online, and provide any

12    type of commentary, opinion, whether that be I don't agree

13    with sex offender laws or I don't like how this particular

14    public official is doing his or her job, you have to report

15    that, and while we can parse this out and kind of split the

16    hair real fine and say, well, we're not reporting the words

17    you type, if you say here's my name, here's my password,

18    here's where I post everything online, you're basically giving

19    full access.

20         And what that does, Your Honor, is it undermines your

21    ability to speak anonymously online which the Supreme Court

22    has said implicates core political speech.

23         So --

24              THE COURT:  So to put this in a specific frame, let's

25    say I go on Doug Berman's blog, Sentencing Law and Policy, and

1    Berman thinks that these sex offender registration laws are

2    goofy and way -- way too restrictive, and I post on that blog

3    an anonymous comment to Berman's commentary, what do I have to

4    do if I'm a register?

5          MR. DAHLQUIST:  Well, Your Honor, you have an

6    unambiguous obligation to go -- well, presuming you're not

7    violating the -- the law of the --

8          THE COURT:  Let's say Berman -- let's assume for the

9    sake of -- of argument that we aren't going to argue at this

10   point about whether 13-year-olds can access this.

11         MR. DAHLQUIST:  Sure, okay.

12         THE COURT:  Okay?

13         MR. DAHLQUIST:  Eliminating that element, Your Honor,

14   you have an obligation to by the next day go to the State

15   Patrol or the sheriff or whomever it is in your jurisdiction

16   that's collecting this information and tell them this is the

17   web site I went to, this is the name I used and what -- the

18   other key is that it is done the next day because it's done

19   almost contemporaneously.  It's a contemporaneous

20   self-reporting.  29-4006, I believe it's subsection 13,

21   requires you to go by the next working day and report that.

22         THE COURT:  So -- so if my comment is, I agree with

23   you, Professor Berman, that these are goofy laws --

24         MR. DAHLQUIST:  Uh-huh.

25         THE COURT:  -- and I write that and I post it

1    anonymously, the next day I've got to go to the Patrol and

2    tell them I posted on Professor Berman's blog under the --

3    under the name Anonymous?  That's my reporting?

4              MR. DAHLQUIST:  That's what 4006(1) sub s says.

5              THE COURT:  Miss Spohn; is that right?

6              MS. SPOHN:  Only if you've never done it before, Your

7    Honor.  If you've never been to Berman's web site before and

8    uploaded content before 'cause it says you're required to

9    identify all sites at which you have or intend to post

10   comments and blogs.

11        So if when you initially register you provide a laundry

12   list of web sites that you plan to visit and upload comment

13   and web site -- and web sites that you plan to talk -- message

14   on -- post messages on, you have no obligation to go the very

15   next day if you previously reported that to the State Patrol.

16             THE COURT:  But the first time you do?

17             MS. SPOHN:  Correct, Your Honor.

18             THE COURT:  And then if you use another pseudonym

19   that you haven't previously disclosed, you've got an

20   obligation?  Anonymous 2.

21             MS. SPOHN:  I believe so, Your Honor.  If you were to

22   use a new pseudonym?  Is that what your question was?

23             THE COURT:  Yeah.  The first one is just Anonymous.

24   The second one is Anonymous 2 but you didn't previously

25   disclose Anonymous 2.

```
 1              MS. SPOHN:  Yeah.

 2              THE COURT:  Okay.  Go ahead, counsel.

 3              MR. DAHLQUIST:  I think it's pretty clear why that

 4     implicates the First Amendment, Your Honor.  You're -- if

 5     you're talking about having to report the place you post

 6     information, content, commentary, whatever that might be,

 7     under which name you post that information, content,

 8     commentary, and I guess at least on the first time where --

 9     what time you did that, that allows basically some type of de

10     facto self-reporting.  It's monitoring, whatever it might be,

11     that implicates your ability to speak online anonymously, and

12     if you are eliminating the ability to speak online

13     anonymously, we're talking about implicating core political

14     speech.  So -- so it's pretty clear why that implicates the

15     First Amendment.

16              THE COURT:  Okay.  Let me ask you this.

17              MR. DAHLQUIST:  Uh-huh.

18              THE COURT:  Let's assume I agree with you that's

19     stupid and way overbroad and -- and not sufficiently

20     restrictive, all the magic language of the First Amendment.

21     What's the --  It is undisputable -- indisputable, rather,

22     that predators use social networks, right?  You don't dispute

23     that?

24              MR. DAHLQUIST:  Well, no.  I think that's at least on

25     a -- sure, absolutely.  Absolutely.
```

1          THE COURT:  Okay.  So what's the State to do?  I

2     mean, how do they get at the places that kids use and -- and

3     predators know they use, Facebook, whatever?

4          MR. DAHLQUIST:  Well --

5          THE COURT:  I mean, I suppose you're -- you're --

6          MR. DAHLQUIST:  I -- I could tell you how not to do

7     it, Your Honor, and it would be by completely banning them

8     from the Internet which is what this does.  If -- if the goal

9     of the State is to say we don't want certain individuals

10    communicating with minors, there would be a way to craft

11    language more precisely and more narrowly to get to that, and,

12    in fact, the State has already done that, Your Honor.

13        It has criminalized the -- the crime of online

14    enticement.  It's a crime under the State of Nebraska.

15         THE COURT:  No, no, I understand that.  But they --

16    the State doesn't have to sit back -- the State doesn't have

17    to sit back and wait until some kid gets hurt.  The State has

18    a perfect right to be proactive.  So my question is if I'm

19    sitting here over at the legislature and I -- you know, all I

20    want to do is separate predators or potential predators from

21    kids, how do I do that?

22         MR. DAHLQUIST:  I -- I think one way you do it is you

23    fund law enforcement, Your Honor.  I mean, there -- there are

24    other ways to do it.  We could -- we could -- you know, can --

25    we could have more individuals online posing as minors, more

1    law enforcement online posing as minors.  That way we're

2    actually --

3              THE COURT:  That incidentally has become a cottage

4    industry.  There's -- there's huge numbers of people doing it.

5    I had an opportunity to see that for a variety of reasons.

6              MR. DAHLQUIST:  Well, and I think that would be one

7    way to actually -- here -- here's the problem.

8              THE COURT:  You're saying it's an all or nothing

9    proposition, that there's no way to do what the State wants to

10   do here?

11             MR. DAHLQUIST:  Well, and I'm going to hedge my

12   answer a little bit.  We're here to challenge this law, Your

13   Honor, but I understand the Court's question.

14             THE COURT:  Well, the --

15             MR. DAHLQUIST:  The -- the -- I --

16             THE COURT:  Wait a minute.  The -- the reason that

17   I'm asking the question is -- is -- is not simply to cause you

18   angst but because one of the tests of -- as you know is what?

19   Essentially --

20             MR. DAHLQUIST:  Well --

21             THE COURT:  -- have they used a reasonably least

22   restrictive alternative?

23             MR. DAHLQUIST:  Sure, sure.  Is this the least --

24             THE COURT:  So -- so --

25             MR. DAHLQUIST:  -- is this tailored to the degree it

1      needs to be?

2              THE COURT:  Yeah, yeah.  You know, whatever the magic

3      language is.  So the question I'm putting to you is what --

4      how could they have done this in a way that would have been

5      less intrusive but accomplished their goal?

6              MR. DAHLQUIST:  Well -- and -- and I don't want to

7      infringe on what Professor Post can testify to but I think the

8      State could have in certain circumstances said, look, if you

9      are a certain individual, you simply cannot go online and

10     communicate with minors.  Now, I don't know if that would be

11     constitutional or not.

12          You could target the person who's making the statement

13     and the person who's receiving the communication.  Basically,

14     the concern is online communication.  You could limit who's

15     sending it and who's receiving it.  The way not to do it is to

16     just blow up the whole system.  I think the language is burn

17     the house to -- to cook the roast or burn the whole --

18              THE COURT:  Let me ask you this --  It's been so long

19     since I've had children of that age but let's assume that the

20     marketing people could tell us, and they probably can, what

21     the market penetration is -- what the demographics are for a

22     variety of social networks, Facebook, that sort of thing, and

23     the statute said, okay, if you're one of these people, you

24     can't use Facebook.  Isn't that a -- a reasonable restriction?

25              Let's -- let's assume that 200 million kids use Facebook.

1    Okay.  We acknowledge that it's Facebook.  Or we -- we -- we

2    say, oh, no, that's going to be a problem 'cause we're always

3    going to have to rewrite the statute.  Then we give to the

4    State Patrol some very specific directions.  You can -- you

5    can ban use under these circumstances.  If the market

6    penetration of -- of -- of a site is -- if it has by the

7    last -- whoever accumulates these statistics shows 10 million

8    kids, then by regulation you can ban them.

9         Wouldn't that be a -- a perfectly okay restriction?

10             MR. DAHLQUIST:  I -- I still don't believe it would

11   be, Your Honor.

12             THE COURT:  Why?

13             MR. DAHLQUIST:  Well, the test is when -- when we're

14   talking about tailoring, it's not just are we getting to --

15   are we prescribing what is otherwise protected speech in an

16   absolute sense --

17             THE COURT:  Well, don't you --

18             MR. DAHLQUIST:  -- as well as in a relatively sense.

19             THE COURT:  -- want to tell me that maybe it would,

20   maybe it wouldn't, Judge, but it -- but at least it'd be

21   better than what we have now?

22             MR. DAHLQUIST:  Well, if I can convince you that

23   you're still wrong, Your Honor, then I'm going to say that

24   what we have here is also wrong so -- but, yes, and -- and

25   basically the thrust of it is we're here to -- to address the

1    scope and the breadth and the depth of this statute.

2        But if you were to say -- even I -- I still think it's

3    constitutionally deficient to say certain individuals

4    convicted of these offenses cannot go on Facebook.

5            THE COURT:  Why?

6            MR. DAHLQUIST:  Because Facebook, Your Honor, not

7    only caters to minors and is used by minors, it's used by

8    businesses every day.

9            THE COURT:  So what?

10           MR. DAHLQUIST:  It's -- there is more protected

11   activity being engaged in on Facebook than there would be

12   unprotected activity that could be addressed in a different

13   manner.

14           THE COURT:  Okay.  And I asked you what the different

15   manner is and -- and -- and you wanted to tap dance.  Tell me

16   what the different manner is.

17           MR. DAHLQUIST:  Well, the different manner would be

18   if you are one of these people that we don't want

19   communicating with minors --

20           THE COURT:  Yeah.

21           MR. DAHLQUIST:  -- you can't go online and

22   communicate with minors.

23           THE COURT:  We already say that and it doesn't work.

24           MR. DAHLQUIST:  Well, then I guess the other option

25   would be, Your Honor, to, like I said, ramp up law enforcement

1    to the extent that would --

2            THE COURT:  We already do that.

3            MR. DAHLQUIST:  -- maybe capture --

4            THE COURT:  We're throwing tons of money.  The

5    Patrol's got --  How many people do you have sitting all day

6    looking at this crap?

7            MS. SPOHN:  A lot.  I can't give you an exact number

8    but it's a lot.

9            MR. DAHLQUIST:  Well, one of the -- one of the

10   criticisms we raised at the beginning of this case, Your

11   Honor, is that statutes like Nebraska's and registries like

12   Nebraska that have done away with saying this person's

13   dangerous, this person we should keep an eye on, and this

14   person has a low risk to reoffend.

15           THE COURT:  Right.

16           MR. DAHLQUIST:  By eliminating that --

17           THE COURT:  Right.

18           MR. DAHLQUIST:  -- what we've done is basically --

19   now we do have a lumping problem.  Yeah, we're -- we're

20   talking about prescribing speech by an individual -- and there

21   will be testimony to this -- that was of low risk to reoffend,

22   Level 1, who is now subject to the registry for life --

23           THE COURT:  Right.

24           MR. DAHLQUIST:  -- and would be subject to this

25   unlawful use of the Internet crime for life.

1              THE COURT:  Right.

2              MR. DAHLQUIST:  For life.  He would forever be banned

3      when he didn't use any of the mediums but -- but still would

4      be -- that's -- that's the problem and -- and it is --

5              THE COURT:  But you lost that --

6              MR. DAHLQUIST:  And -- and I understand.

7              THE COURT:  -- that -- that -- that's gone because --

8              MR. DAHLQUIST:  That is gone.

9              THE COURT:  -- because the feds said -- Congress said

10     that's perfectly okay to do.  You don't have to have this --

11     this sorting mechanism.

12             MR. DAHLQUIST:  We don't have to, Judge, but -- but

13     by eliminating some things, I think we have chosen as a policy

14     and the legislature has chosen as a matter of policy to accept

15     that there are problems with this and -- and to accept that

16     maybe the First Amendment doesn't allow us to just get to

17     those people we really truly do care about monitoring and

18     that's got to be a policy decision.

19             THE COURT:  Go ahead.

20             MR. DAHLQUIST:  Thank you, Your Honor.

21         All of these --

22             THE COURT:  Mr. Monaghan wants you to say

23     something --

24             MR. DAHLQUIST:  He wants me to say --

25             THE COURT:  -- so go ahead -- go ahead and --

1           MR. DAHLQUIST:  He wants me to say the State went way

2      beyond what was required here and -- and that dovetails nicely

3      into my final point for opening, Judge, is that this is an ex

4      post facto law.  There's significant --

5           THE COURT:  How do you ever prove incidentally under

6      the Supreme Court's test that the motivation here was

7      punitive?

8           MR. DAHLQUIST:  I think we can.

9           THE COURT:  I don't think you can.

10          MR. DAHLQUIST:  Well, I think the evidence is going

11     to convince you otherwise, Your Honor.  I certainly hope so.

12          THE COURT:  Well, but I think you can fall back on

13     the second test but when -- when Judge Zwart -- and I agree

14     with her -- said you guys couldn't haul in three or four of

15     the legislators, which I think was the proper ruling, I don't

16     know what the Supreme Court means.

17      I don't -- I mean, unless some -- unless 49 of these

18     legislators stood up and said, oh, by the way, we are

19     intending to enact this retroactive legislation as a punitive

20     measure, I don't see how you ever really prove it.

21          MR. DAHLQUIST:  Well, it's -- it's a problem of --

22     there's a couple issues that I think every plaintiff's

23     struggling -- or bringing an ex post facto claim is going to

24     struggle with, Your Honor, and that's, one, there's

25     statutory -- or there's case law out there that says passing

 1    comments can't be attributed to the entirety of the

 2    legislature.

 3              THE COURT:  Right.

 4              MR. DAHLQUIST:  Well, that -- that seems to be used

 5    as a shield to say if there's a comment, you can never

 6    attribute it to anyone else but that's not what it says.

 7              THE COURT:  Yeah.  I think -- I think your probably

 8    stronger argument is going to be whether or not we can prove

 9    the body intended to act in a punitive manner.  We can take

10    what statements we -- we know were made either in the floor

11    debate or otherwise and then look at the effect of the

12    statute, and when we marry those two things together, then

13    this sure looks punitive.

14        The search provisions, the -- we -- we take you

15    completely out of the Internet from your perspective.  The

16    monitoring provisions -- those begin to look like exactly what

17    I do -- what I did on Friday when I sentenced somebody in a

18    kiddie porn case.

19              MR. DAHLQUIST:  Absolutely.  Absolutely, Your Honor.

20    And in many ways it goes beyond what some of those terms are.

21              THE COURT:  Yeah.  It's longer than my supervised

22    release term.

23              MR. DAHLQUIST:  Yeah.  Yeah.  Well, and that -- this

24    is kind of bringing a lot of different ideas together, Your

25    Honor.  It's -- it's because under supervised release you can

 1    tailor those terms to that particular person's circumstances,

 2    that particular conviction.  Those -- those terms that you

 3    impose on that person are intended to complete the punishment

 4    aspect but also reintegrate --

 5              THE COURT:  Yeah.  As a matter of fact, if I imposed

 6    what -- if I imposed as a supervised release condition the

 7    conditions that are imposed here and Dornan took me up to the

 8    Eighth Circuit, they'd turn me around so quick.  The

 9    supervised release terms would get blown up in the Eighth

10    Circuit, which is not known for its liberality.

11              MR. DAHLQUIST:  No.  I'm not going to dispute you

12    there, Your Honor.

13         And -- and, absolutely.  And that's -- that's the thrust.

14    I mean, the -- in your summary judgment order, you said --

15    Your Honor, you said look at these statutes discretely,

16    individually as well as cumulatively.  Well, I think that

17    28-322.05 stand-alone is punitive if you were to tell someone

18    because of a prior conviction you can never use these mediums

19    ever again or for at least the period of time that you're on

20    the registry.

21              THE COURT:  Which is at a minimum what?

22              MR. DAHLQUIST:  The registry period would be 15 --

23              THE COURT:  The minimum --

24              MR. DAHLQUIST:  Well, 15 and if you asked for a

25    reduction, it would be 10.

 1              THE COURT:  But the statutory minimum absent the --

 2      the grace of the --

 3              MR. DAHLQUIST:  Right.

 4              THE COURT:  -- the State is 15 years?

 5              MR. DAHLQUIST:  Fifteen years absent some additional

 6      action.  Fifteen, twenty-five or life.  Yes, Your Honor.  So

 7      that stand-alone looks an awful lot like punishment.

 8              THE COURT:  How many Doe plaintiffs and who are they

 9      would the retroactivity issue apply to?

10              MR. DAHLQUIST:  That, Your Honor, I can -- for

11      28-322.05 -- for the -- the unlawful use crime?

12              THE COURT:  Well, your entire retroactivity issue.

13              MR. DAHLQUIST:  Well, it would apply to all of them.

14      It would apply to all of them in the sense that we're talking

15      about every -- every plaintiff is required to register all of

16      the information listed.

17              THE COURT:  Your ex post facto claim.

18              MR. DAHLQUIST:  The ex post facto claim.

19              THE COURT:  The ex post facto claim is measured from

20      January 1, 2010, right?

21              MR. DAHLQUIST:  Yes, sir.

22              THE COURT:  Okay.  How many plaintiffs were convicted

23      and off the registry -- pardon me, were convicted and no

24      longer on probation, parole or supervised release prior to

25      January 1, 2010, that this would apply to?

1          MR. DAHLQUIST:  All but about five, I believe.  All

2     but five.

3          THE COURT:  All plaintiffs?

4          MR. DAHLQUIST:  Well, Your Honor, at the time we

5     filed -- as of January 1, 2010, all of the plaintiffs but

6     for -- and -- and I don't want to give an inaccurate number

7     and I can find this out -- I believe there were five or so had

8     completed their -- their -- whatever terms of their sentence

9     were.

10         THE COURT:  Yeah.  My question is -- is real

11    specific.  Which of the plaintiffs had been convicted, had

12    served their sentence and were no longer on supervised release

13    as of January 1, 2010?

14         MR. DAHLQUIST:  I believe it to be Doe 12, Doe 13,

15    17, Doe 23 and 25.

16         THE COURT:  Okay.

17         MS. SPOHN:  You've got that backwards.

18         MR. DAHLQUIST:  Oh, I have it backwards, I'm sorry.

19    I'm sorry.  Yeah, all except for those five, Your Honor.

20    Those five were still under some court-monitored supervision,

21    whatever form that may be, as of January 1, 2010.  The rest

22    had completed their sentence.

23         THE COURT:  Okay.  Now, are all -- all of the

24    plaintiffs in your stipulation then who are presently

25    plaintiffs -- are those all people who were criminal

1    offenders?

2              MS. SPOHN:  The numbered -- the numbered Does were,

3    yes, Your Honor.  There are lettered Does that are not.

4              THE COURT:  And the alphabetic Does are spouses?

5              MS. SPOHN:  Correct.  Or children or some connection

6    with a Doe.

7              THE COURT:  But are not offenders?

8              MS. SPOHN:  Correct.

9              MR. DAHLQUIST:  That's correct.

10             THE COURT:  Okay.  Thank you.

11             MR. DAHLQUIST:  That's correct.

12             THE COURT:  Go ahead.

13             MR. DAHLQUIST:  Well, so in those senses, Your Honor,

14   that the new crime of the unlawful use looks a lot like and in

15   many ways goes pretty far beyond what we would consider to be

16   conventional -- a conventional form of criminal punishment.

17        When we couple that with the search and monitoring

18   provision to the extent it has some play and we couple that

19   with the expanded information that has to be disclosed, to the

20   extent that it does undermine First Amendment rights, all of

21   those taken in totality look a lot like punishment, and

22   they're foreign to SORNA.

23        They're not required under federal SORNA.  They're not

24   required by the State.  Just to take --

25             THE COURT:  SORNA specifically says that nothing that

 1    we're saying in here is meant to be exclusive or words --

 2            MR. DAHLQUIST:  Sure.

 3            THE COURT:  -- to that effect.

 4            MR. DAHLQUIST:  Sure.  And it gives some -- some --

 5    yeah, sure.  It gives the states the ability.  It's just a

 6    minimum set of guidelines that have to be complied with in

 7    order to not lose certain funding.

 8        But I -- I just want to quickly take a step back -- and

 9    then I'll conclude -- and look at the intent issue again.

10    Intent is not just what you say.  You can infer intent also

11    from the circumstances that are -- the actual language is the

12    circumstances that are surrounding the passage of the bill.

13        Well, in this case what this is is a piece of -- these

14    are -- these are bills that were part of the Attorney

15    General's legislative package.

16            THE COURT:  Sure.

17            MR. DAHLQUIST:  These were generated by the Attorney

18    General's Office in collaboration with other state entities so

19    when we're talking about the circumstances surrounding this,

20    these are basically prosecutors creating a piece of

21    legislation.  I think that gets to the punitive intent when

22    you look at the things that it eliminated.  While the Court

23    has --

24            THE COURT:  Well, the Attorney General's got

25    obligations far beyond prosecution.  He's -- I mean, his

 1    obligations are -- are -- he has certain obligations from a

 2    criminal perspective, from a civil perspective and then aside

 3    from the issue of prosecution he has concerns about protecting

 4    the public proactively so he doesn't have to prosecute.

 5         So the fact that it emanates from the Attorney General's

 6    Office is hardly surprising.  No more than it is from the

 7    Justice Department when they -- when they propose all sorts of

 8    legislation.

 9              MR. DAHLQUIST:  And -- and I would agree with you in

10    that sense, Your Honor, but what is surprising is the way it

11    was done and kind of the environment that was surrounding the

12    way this bill was passed.  There's comments by the

13    legislators, there's comments by the attorneys -- the

14    attorneys that were working on this in the Attorney General's

15    Office that indicate some type of derision for sex offenders,

16    that they can never be reformed, that they can never be

17    reintegrated back into society and we don't think that that

18    can happen.

19         And so to the extent we can punish them again -- and this

20    is -- we're talking about a class of people --

21              THE COURT:  Yeah.  There's a difference between

22    saying sex offenders cannot be rehabilitated and sex offenders

23    ought to be punished again.  One can hold one view without

24    necessarily holding another.  But go ahead.

25              MR. DAHLQUIST:  Well, and that -- and that's true.

1    We also have to take into consideration that there was

2    indication that the Attorney General's Office knew that at

3    least part of this statute, the search and monitoring

4    provision, was unconstitutional --

5             THE COURT:  I'm going to be very interested in that.

6             MR. DAHLQUIST:  -- was unconstitutional.  Yes, Your

7    Honor.  I -- I -- our office was as well.

8             THE COURT:  Because -- because bless the attorney --

9    when Mr. Cookson came here originally, he fell on the sword

10   right away, which I would expect nothing less.  I mean, it --

11   you read Judge Hamilton's opinion, I think it's pretty clear.

12   On the other hand, you could argue that that's just one

13   Federal District Judge in Indiana and who cares about -- I

14   mean, that's certainly not binding on -- on anybody around

15   here.

16       But it was a very thoughtful opinion.  Of course, Judge

17   Hamilton's now in the Seventh Circuit.  He's no schlep.  But

18   if they were aware of it and they proceeded, maybe you're

19   right.  Maybe there was something here that -- that indicates

20   a punitive concern.

21            MR. DAHLQUIST:  Well, and I think the other part of

22   this is the timing of it also.

23            THE COURT:  In what regard -- tell me what you're

24   referring to.

25            MR. DAHLQUIST:  Their -- the communication between

 1          the Attorneys General.

 2                  THE COURT:  Yeah.

 3                  MR. DAHLQUIST:  I can pull out the exact exhibit for

 4          Your Honor.

 5                  THE COURT:  Just summarize it.

 6                  MR. DAHLQUIST:  Basically, it was an e-mail if -- I

 7          believe it was generated from Mr. Cookson and the date I

 8          believe is sometime in late April or early May of 2009 with a

 9          comment saying search and monitoring provision found

10          unconstitutional, a federal cite, and about 15 to 20 minutes

11          later, I can't remember the exact, there was a response by one

12          of the other Attorney Generals saying I've taken a look at

13          this and it looks like it was decided under state law.

14              Obviously, the accuracy of that we can -- I mean, that's

15          not -- simply not the case.  There was no mention of the

16          Indiana constitution in that --

17                  THE COURT:  Right.

18                  MR. DAHLQUIST:  -- case anywhere.

19                  THE COURT:  Right.

20                  MR. DAHLQUIST:  It was decided exclusively under the

21          Fourth Amendment.  So the reason I brought up the dates,

22          though, Judge, is because I think it's important.  That was

23          sometime in the spring -- and the exact date will be shown by

24          the exhibit -- but sometime in April or May.  The Attorney

25          General, through other memorandum to law enforcement and

1    county attorneys, continued to promote this as a

2    first-of-its-kind piece of legislation.  This is -- and

3    continued to promote this search and monitoring provision with

4    the knowledge that, hey, there's some issues -- this is

5    constitutionally suspect at the very least, and I think while

6    it is an Indiana district case and maybe isn't binding here,

7    it cites to Supreme Court cases.

8         THE COURT:  Well, but -- but if Cookson was so -- I

9    mean, not Cookson.  It apparently was some or -- some other

10   young man in the -- or young person in -- in the office.  If

11   they were really motivated poorly, why did he come in and

12   almost immediately say, Judge, we're -- we aren't fighting

13   about this?

14        MR. DAHLQUIST:  Well --

15        THE COURT:  I mean, he was very straightforward.

16        MR. DAHLQUIST:  Well, sure.  And I think that gets to

17   the fact that going into this, going into January 1, 2010,

18   there was knowledge that that particular part at the very

19   least was unconstitutional.

20        THE COURT:  Well, all I'm saying is it's possible for

21   Mr. Cookson to have thought -- or for the AG's office to have

22   thought throughout the drafting process that there's --

23   there's contrary authority out there but we can make a

24   reasonable argument on the other side, and then after the

25   statute is passed and they look at the statute in its entirety

1      conclude the better analysis is as Judge Hamilton set forth,

2      and we have an obligation to tell the Court that, and they do,

3      I don't see that as necessarily an indication of a punitive

4      intent.  I suppose it's how you spin the facts.

5            MR. DAHLQUIST:  Well, and that's it.  And I don't

6      necessarily think we need to spin it a whole lot, Your Honor,

7      because we're putting that -- we're looking at these

8      discretely.  We're looking at that.  We're looking at

9      comments.  We're looking at where this originated from.  You

10     know, we're looking at different things along the spectrum and

11     you kind of touched on this at the beginning, Your Honor.

12        How do you go about proving intent when, you know, there

13     seems to be -- the test is kind of stacked against you?  Well,

14     you have to pull from a number of different sources.

15            THE COURT:  Well, I agree, yeah.

16            MR. DAHLQUIST:  And -- and that's definitely one.

17     And I think that's a big one.

18            THE COURT:  Your far stronger one is the introducer's

19     statement.

20            MR. DAHLQUIST:  And there was a lot of comments made

21     there.  A lot of comments made there.  And that's where I kind

22     of specifically said that there was some type of derision and

23     revulsion that he expressed -- that Senator Lautenbaugh

24     expressed.  He even indicated that, hey, I might not be the

25     right person to introduce this because I don't have an

```
 1    unbiased -- and maybe he acknowledged his own self-limitation

 2    that as -- as a legislator you shouldn't take on something

 3    that you hold such strong opinions about.

 4        I think that's an acknowledgement that he lacked

 5    objectivity and maybe did his job in -- in a manner that --

 6            THE COURT:  Of course, the State's going to say you

 7    can't attribute that to the other 48 members.

 8            MR. DAHLQUIST:  I'm sorry, Your Honor.

 9            THE COURT:  Go ahead.

10            MR. DAHLQUIST:  Our plaintiffs --

11            THE COURT:  Well, let me tell you something.  Having

12    those two sitting next to you --

13            MR. DAHLQUIST:  They wanted me to sit in the middle,

14    Judge, and I said no.

15            THE COURT:  No, no.  No, no.  And -- and after we

16    take our break, I would tell them that you're deaf in the left

17    ear.  Go ahead.

18            MR. DAHLQUIST:  Well, it -- at some point along the

19    way -- you know, to kind of address what the Court was saying,

20    at some point along the way, if there was an acknowledgement

21    that, hey, maybe this is unconstitutional, that could have

22    been acknowledged.  It took a lawsuit -- it took a lawsuit and

23    it took a hearing -- when this case was filed, we could have

24    been provided with a stipulation that, hey, this particular

25    provision at least we understand is unconstitutional but it
```

 1    took a filing of a lawsuit because this is affecting -- this

 2    has far-reaching effects for a lot of our clients --

 3              THE COURT:  Sure.

 4              MR. DAHLQUIST:  -- so they came to us to file this

 5    lawsuit.

 6         It took this lawsuit and it took the Court scheduling a

 7    preliminary injunction hearing for that to happen.  So I think

 8    that indicates that, you know, somewhere along the way maybe

 9    that happened, maybe it didn't.  We don't know that.  But it

10    took this lawsuit and it took the Court to call us all down

11    here before you for the State to make that concession.

12         And -- and I think when taken in totality, when we look

13    at the aggregate of all of this, you can't go online, you

14    can't -- it seems to indicate that you can't pick up a cell

15    phone.  You can't pick up a landline and call someone.  These

16    Internet -- it's not an Internet restriction so much as it is

17    a forms of communication restriction.

18         It just so happens that the Internet is by and large used

19    today so freq- -- is -- is used so frequently that it -- it

20    kind of seems to be subsuming the communication prohibition

21    but that's really what this is, and when you take all those

22    and -- and you take all that prohibition and you take the --

23    the manner in which this was codified, you take the statements

24    that were made not only by Senator Lautenbaugh but also by

25    the -- what appears to be the individual in the Attorney

1    General's Office that wrote the bill, that had the final say

2    in some sense as to how the terms were defined, when you

3    look --

4              THE COURT:  Is this Mr. O'Brien?

5              MR. DAHLQUIST:  This is Mr. O'Brien, yeah.  And --

6    and his communication to Senator Lautenbaugh when -- when the

7    two of them were -- well, it seems like he was presenting

8    Senator Lautenbaugh with here's our bill.  He says, look, if I

9    could I'd ban them from the Internet forever but that would be

10   unconstitutional.  Well, what the State wrote was something

11   that bans them from the Internet forever and so it seems to be

12   that even Mr. O'Brien would acknowledge that what was written

13   is unconstitutional.

14       When you take that and you couple it with again the

15   information that has to be required -- again, Judge, this

16   includes passwords.  One of the things that is specifically

17   included in the definitions of chat room identifiers and

18   instant message identifiers is user name and password.

19       Well, there wouldn't be any reason to collect a password

20   if you just wanted to monitor.  What they want to get to is

21   watching who -- where these people go on the Internet, what

22   they're doing, who they're talking to, comments they're

23   making, whether innocuous or criminal.

24       You take all these together, Judge, and you're violating

25   the First Amendment, you violate the ex post facto clause.

1    They're written in such a manner as to be vague both for a

2    person attempting to comply with the law -- frankly, we have

3    to have Professor Post come in to tell us how this is going to

4    work.  If we need an expert to the degree and the stature of

5    Professor -- Professor Post to come in and tell us, I don't

6    know how a man on the corner could possibly know what's

7    prohibited.

8         When you're talking about all of these things, Judge,

9    we -- we believe that the evidence is going to show that these

10   are unconstitutional and we'd ask you to rule in that manner.

11             THE COURT:  Thank you.

12        Counsel.

13             MS. SPOHN:  Thank you, Your Honor.  We're here today

14   asking the Court to uphold Nebraska's efforts to protect its

15   children against online sexual predators.  Plaintiffs are

16   challenging both facially and as applied the constitutionality

17   of our revisions --

18             THE COURT:  Do you concede that they can do that?

19             MS. SPOHN:  Do I concede that they can --

20             THE COURT:  Bring both a facial and -- and -- and an

21   as-applied challenge?

22             MS. SPOHN:  A facial challenge to the extent that it

23   has not been forced against these individuals at this --

24   against these particular Does?  Is that what you mean?  This

25   is not a class action that they're asking as a facial.  Is

1    that what you mean?

2              THE COURT:  What I asked -- what I mean is what I

3    ask.  Do you concede the plaintiffs -- these plaintiffs may

4    bring both a facial and an as-applied challenge?

5              MS. SPOHN:  To the extent the law has been applied --

6    as applied to them, yes, they can.

7              THE COURT:  Well, then what does the facial challenge

8    mean?

9              MS. SPOHN:  Is there any way that this law can be

10   interpreted...

11             THE COURT:  And you con- -- and you concede that

12   these plaintiffs may bring that facial challenge?

13             MS. SPOHN:  I don't think so, Your Honor.

14             THE COURT:  Okay.  Why can't they?  Incidentally, you

15   can go deaf in your right ear.

16             MS. SPOHN:  Apparently, I am.

17             THE COURT:  No, you can consult with your -- with

18   your co-counsel if you like.

19        (An off-the-record discussion was had.)

20             MS. SPOHN:  Judge, they've been going forward

21   facially and as applied since the beginning of this and --

22             THE COURT:  And no one's raised that.

23             MS. SPOHN:  And no one has raised that.  And...

24             THE COURT:  And you aren't raising it?

25             MS. SPOHN:  And we aren't -- we have not raised it in

1        our post -- in our pretrial brief, no, Your Honor.

2                    THE COURT:  All right.  So go ahead.

3                    MS. SPOHN:  There's three provisions that are at

4        issue here.  The mandatory disclosure of e-mail addresses and

5        online identifiers.  That's being challenged under the ex post

6        facto and the free speech clause.  I think those are the two

7        provisions that apply -- or the two issues that apply to that

8        statute.

9             The consent to search and monitor provision as applied to

10       individuals on probation, parole and court-monitored

11       supervision.  Doe 24 is challenging that as applied to himself

12       both facial- -- and then -- but as to the remaining

13       plaintiffs, none of them are on probation and none have been

14       on probation since January 1 of 2010; therefore, the ex post

15       facto claims as applied to them are moot.

16            Finally, there's the third crime -- the new crime which

17       prohibits child abusers from communicating on social

18       networking, instant messaging and chat room services that

19       permit minors to use their services.  That provision's being

20       challenged under the ex post facto, the due process and the --

21       the free speech of the First Amendment.

22            We'll present evidence over the course of the next

23       several days that each of these provisions withstand the

24       plaintiffs' constitutional challenge.

25            As the Court has heard repeatedly since the inception of

1    this case, the Internet is the online equivalent of a

2    real-world playground but unlike the real-world playground

3    where adult supervision helps prevent offenders from pursuing

4    their victim, in the virtual world the offender has the

5    opportunity and the luxury of unsupervised time to groom a

6    child over a period of time and to develop a false trust with

7    that child and to build on that trust until the offender

8    convinces the child to meet in the real world for an illegal

9    encounter.

10        The laws adopted by the State of Nebraska serve the

11   compelling interest of protecting kids from online advances of

12   sex offenders who have committed crimes against other kids.

13   It will be shown throughout the course of the next several

14   days provisions in question prohibit law enforcement --

15   provide law enforcement with the necessary tools to apprehend

16   sex offenders quickly.

17        These critical tools have been crafted in a way that does

18   not preclude all use of the Internet by sex offenders but

19   insures the greatest amount of protection is afforded to our

20   children without wrongfully encroaching on plaintiffs' rights.

21        Testimony will be provided at trial which will show how

22   easy it is for the registrants to provide the information

23   required under law.

24            THE COURT:  Yeah, but -- but let's take the blog

25   example that I -- I spoke with with counsel.  One of their

1    people jumps on Berman's blog and anonymously posts something

2    highly critical of the Attorney General for -- let's say he

3    says, I think Attorney General Bruning is pushing this not

4    because he cares about children but for his own political

5    ends.

6         This offender now has an obligation the next day to

7    inform the highway patrol that he has made that post, right?

8             MS. SPOHN:  That he has posted on Berman's -- that he

9    has --

10            THE COURT:  He's made a post on -- on Berman.  And --

11   and so --

12            MS. SPOHN:  And assuming that he's never done that

13   before.

14            THE COURT:  I -- I realize that --

15            MS. SPOHN:  Okay.

16            THE COURT:  -- this is the first time.  What possible

17   interest does the State have in knowing that?

18            MS. SPOHN:  Again, we're assuming that Berman's blog

19   is one that allows access to children --

20            THE COURT:  It's just open.

21            MS. SPOHN:  -- or any --

22            THE COURT:  It's just an open blog like hundreds of

23   thousands of them are open who don't -- the -- who because of

24   the -- I suppose because of the nature of their blogging

25   efforts they don't care who -- who enters the blog and enters

1    the blog as a...

2              MS. SPOHN:  And I'll get -- get to that part of it in

3    a bit, Your Honor.

4              THE COURT:  But what --

5              MS. SPOHN:  As to -- as to what do we care about it?

6              THE COURT:  Yeah.

7              MS. SPOHN:  We care because there are a whole host of

8    places where these individuals are -- we don't care about the

9    content of what he said with Berman.  What we care about is

10   the places where they're going and -- and seeking out children

11   and --

12             THE COURT:  Yeah, but --

13             MS. SPOHN:  -- using these blogs to entice -- entice

14   an illegal encounter with a child.  We want to know where they

15   are going.

16             THE COURT:  You want to know anyplace they go on the

17   Internet in which a child has access, right?

18             MS. SPOHN:  Correct, Your Honor.

19             THE COURT:  Children are ubiquitous in the real world

20   and the virtual world.  Let me give you an example.  Let's say

21   that you go to the Presbyterian Church here in Lincoln, and

22   the Presbyterian Church here in Lincoln has a parishioner who

23   commits abortions -- who does abortions, and let's say that

24   you stand on the sidewalk with a graphic picture of an aborted

25   fetus, and the only way little children can get into the

 1    Presbyterian Church is to walk by those aborted fetuses, okay?

 2              MS. SPOHN:  Uh-huh.

 3              THE COURT:  What restriction can the State impose

 4    upon the people who -- who put up these terrifying images to

 5    children?

 6              MS. SPOHN:  I'm not sure I can answer that in the

 7    real world, Judge, but I can tell you --

 8              THE COURT:  That is a real-world case.

 9              MS. SPOHN:  -- but I can tell you the answer online

10    what the restriction -- what we've done with this law to make

11    sure that it's not a problem for kids, that kids are not on

12    that site.

13              THE COURT:  Basically, what you've said is large

14    spaces of the -- of the Internet, just like large spaces of

15    sidewalks around churches, are free from certain activity on

16    the theory that kids are everywhere.  No?

17              MS. SPOHN:  That's not what we're going to say, Your

18    Honor.  When you --

19              THE COURT:  No, no, I know you aren't going to say it

20    like that but -- but -- but isn't that basically what you've

21    done?  You've said anytime there's going to be a kid

22    potentially in an area, we get to know that you're there --

23              MS. SPOHN:  Anytime --

24              THE COURT:  -- and we -- we get to know your identity

25    essentially.

1              MS. SPOHN:  Anytime you are going to communicate --

2              THE COURT:  Sure, holding up a sign that says --

3              MS. SPOHN:  We --

4              THE COURT:  -- this is -- you're aborting a fetus.

5       That's a communication.

6              MS. SPOHN:  The first time that you do so you have to

7       notify -- notify law enforcement that you --

8              THE COURT:  So in my -- my real-life example, it

9       would be perfectly okay for the City of Lincoln to say to the

10      guy who holds up the aborted fetus, You are obligated as soon

11      as you do that to go down to the City of Lincoln and tell them

12      your name and your address?

13             MS. SPOHN:  If you were a sex offender subject to the

14      crime and that was --

15             THE COURT:  No, no, not a sex offender.  Just --

16      just -- just because children may be harmed.

17             MS. SPOHN:  But -- but the general public is not

18      subject to the laws.  Only the -- the only people --

19             THE COURT:  No, no, I appreciate that.  But -- but it

20      would be okay to do that?  It's -- it's -- to require in my

21      example that the person go down and identify himself, anybody

22      who holds up that sign?  Because the sign is by definition

23      harmful to children.

24             MS. SPOHN:  I'm not sure that it would, Your Honor,

25      be okay, but I'm -- but that's not the situation.

1           THE COURT:  And it's not the situation here because

2    we have a -- a previously convicted offender.

3           MS. SPOHN:  Correct.  Subject to the sexual offender

4    registry provision.

5           THE COURT:  Go ahead.

6           MS. SPOHN:  We'll also show at trial how the new

7    crime can be complied with in a simple two-step process.

8           THE COURT:  And -- and how is that?

9           MS. SPOHN:  A sex offender wants to visit a web site.

10   He first has to determine what he wants to do on that web

11   site.  If he wants to communicate on that web -- or if he

12   doesn't want to communicate, he simply wants to look at

13   pictures, he wants to read a blog, if he wants to find out

14   what's going on in the news, he's free to do so and he can do

15   so without fear of prosecution.

16          THE COURT:  Does he have any obligation to do -- to

17   tell anybody anything?

18          MS. SPOHN:  No, not if all -- if he's not

19   communicating.  If he's simply looking at the Internet and

20   looking through and reading things, looking at pictures, he's

21   free to do whatever he wants so long as he's not

22   communicating.

23      If he decides he wants to communicate, the very first

24   thing he has to do is go to the terms of use of that web site.

25   He looks at the terms of use.  If they say 18 or older or if

```
 1      they're silent, he's free to use that site because under the

 2      plain language of the statute, he doesn't have the requisite

 3      knowledge, knowing and intentional.

 4                  THE COURT:  What does "access" mean as opposed to

 5      "use"?

 6                  MS. SPOHN:  Use -- we would argue that access

 7      means -- access is simply looking at the site or if -- acc- --

 8      well, access means you're authorized to use the -- let's

 9      see --

10                  THE COURT:  The statute uses "access or use".  Why

11      does it use those two terms?

12                  MS. SPOHN:  Because access is just simply looking at

13      the site.  It's -- it's --

14                  THE COURT:  So any 13-year-old who can access the

15      site, whether they're permitted to use the site, bans the

16      access of the offender; isn't that right?

17                  MS. SPOHN:  No.

18                  THE COURT:  Well, read the statute with me.

19                  MS. SPOHN:  It -- well, it allows access or use to

20      its social networking sites for purposes of -- but when you

21      look at the terms of use, they will say -- and it prohibits

22      the use by sex offenders of those sites.

23                  THE COURT:  Why does the statute use the word

24      "access"?

25                  MS. SPOHN:  I'm not sure why it uses "access".
```

1           THE COURT:  "Access" must be different than "use,"

2    wouldn't you agree?

3           MS. SPOHN:  It is, Your Honor.  Access is simply

4    looking at the site but use would require registration,

5    log-in, actual work on those social networking, instant

6    messaging --

7           THE COURT:  Okay.  So do you --

8           MS. SPOHN:  -- or chat room services.

9           THE COURT:  -- agree then if a 13-year-old is

10   prohibited from using the site but can access the site, the

11   site is barred?

12          MS. SPOHN:  We would argue, Your Honor, that -- that

13   it should only apply to children that are allowed to use the

14   site under the --

15          THE COURT:  Well, then --

16          MS. SPOHN:  -- terms of use.

17          THE COURT:  -- what does "access" mean?  Why is --

18   why is it in there?  Do I read it out of the statute?  I

19   suppose that's your argument is, Judge, if -- hell, we don't

20   know what it means but you got an obligation, as the Chief

21   Justice just most recently indicated, to read statutes to make

22   them constitutional so read it out.  It really just means use

23   and -- and lawyers are stupid.  They always use three words

24   when they could use one, sometimes they use two.  If you read

25   a contract, what -- what are the contract words?  Joint and

1    several and blah, blah, blah.  There's always three com- -- or

2    two commas.

3         MS. SPOHN:  Yes, Your Honor.  I think we would argue

4    that it -- it is only -- it is only use.  That -- that if the

5    terms of use express -- expressly authorize children under the

6    age of 18 to use those sites, then someone subject to this

7    law, who's a known convicted sex offender that committed a

8    crime against a child, should not be allowed to use that site.

9         THE COURT:  Okay.  Why didn't the statute say that?

10        MS. SPOHN:  Why does the -- why --

11        THE COURT:  Why didn't it say that?  We only ban

12   sites in which the written policy of the originator of the

13   site expressly permits children under the age of X to use it.

14        MS. SPOHN:  I'm not sure that I know why the statute

15   says "access" -- uses the word "access".

16        THE COURT:  No, no.  Okay.  Forget --

17        MS. SPOHN:  But --

18        THE COURT:  I jerked you around about that partly to

19   have fun and -- and partly 'cause I'm serious.  But let's

20   assume I could fix that.  You just gave me a narrowing

21   construction of the statute.  Why didn't the statute just --

22   why wasn't the statute itself written that narrowly?

23        MS. SPOHN:  I think it is.  It says it allows a

24   person who's less than 18 years of age to use its social

25   network web site.  I mean --

```
1            THE COURT:  But -- but you just -- you gave me a
2    narrowing instruction, didn't you?  That expressly permits in
3    writing in the policy of the entity, right, three things?
4    Now, if the statute was intended to be read that way, why
5    wasn't it written that way?
6            MS. SPOHN:  It -- it is, Your Honor, because it says
7    who knowingly and intentionally uses a social networking site,
8    and no sex offender could knowingly and -- have the knowing
9    and intentional intent to use the site if they were -- if it
10   was for any -- if it was -- they don't need to use it
11   expressly because they use the knowingly and intentional, and,
12   again, the statutes are more complicated than they need to be
13   but --
14           THE COURT:  Well, look, everybody in the world knows
15   without reading the -- the -- what's the -- what are the
16   sites -- the MySpace --
17           MS. SPOHN:  Social network sites?
18           THE COURT:  No.  What's one?  MySpace and what's the
19   other --
20           UNIDENTIFIED MALE SPEAKER:  Facebook.
21           MR. DORNAN:  Facebook.
22           THE COURT:  And Facebook.  Everybody in the world
23   knows that kids use that.  They don't need to read something,
24   do they?
25           MS. SPOHN:  Probably everyone in the world knows that
```

1    MySpace and -- and Facebook are accessible for teens 13 -- or

2    that kids use it.  They may not know in the terms of use

3    it's -- it's 13 and older.

4              THE COURT:  No -- okay.  That's my point.  But

5    couldn't you violate the statute without reading the terms of

6    use?  Are you telling me that the next time this thing -- if

7    this is ever prosecuted that Dornan, when he was Douglas

8    County Attorney, is going to have to prove that the

9    perpetrator read the terms of use?

10             MS. SPOHN:  No, it'll be -- the terms of use show for

11   the sex offender which sites they're able to use.  'Cause

12   you're right.  MySpace and Facebook they might not know.

13             THE COURT:  What if he says I didn't -- I just didn't

14   read it?  I didn't know.

15             MS. SPOHN:  But that's the same with the contract.

16   If you don't know the terms of your contract, then that's no

17   excuse for your being obligated to use the contract.  The

18   terms of use are a contract for using that particular site.

19             THE COURT:  Knowingly and intentionally?  Isn't that

20   what the statute says?

21             MS. SPOHN:  It does say -- it does say that, yes,

22   Your Honor.

23             THE COURT:  What does "intentional" mean under your

24   construction of that statute unless the person has read it?

25             MS. SPOHN:  Or that they, as you have indicated, know

1    by the -- from the whole world that the site is used by

2    children 13 or older.  And, honestly, that's a -- that's a

3    prosecutorial case and that doesn't make the statute

4    unconstitutional.  It's a question of burden of proof then for

5    the prosecutors going forward.

6            THE COURT:  Yeah.  With respect -- I'm asking you due

7    process-related questions but go ahead.

8            MS. SPOHN:  Fair enough, Your Honor.

9        The purpose of these laws in question is to insure these

10   online venues for children who are most vulnerable and have

11   restricted access for those most like -- for those that are

12   most likely to cause harm.  They're easily observed by law

13   enforcement should an imminent risk to a child's safety arise

14   and for these reasons we're asking the Court to uphold the

15   constitutionality of the mandatory disclosure and consent to

16   search provisions of 29-4006 and the new crime which is

17   contained in Nebraska Revised Statute 28-322.05.

18           THE COURT:  State of Louisiana lost one of these

19   recently.  State of Indiana won one.  Are there any other

20   states in which litigation is pending that I should know

21   about?

22           MS. SPOHN:  I believe Maryland has litigation pending

23   as well.

24           THE COURT:  In the federal court, do you know?

25           MS. SPOHN:  I can't say that for sure, Your Honor.

1      I -- I want to say yes but I can't say that for sure.

2              THE COURT:  Yeah.  And in the Indiana case, that was

3      not -- it looked to me like that was entirely a facial

4      challenge to the statute.  Would you agree with that?

5              MS. SPOHN:  Yes, Your Honor.  As I recall, it was a

6      preliminary injunction hearing that they converted into a full

7      trial on the merits.

8              THE COURT:  Well, yeah.  But my question is they

9      didn't have a plaintiff talking about his particular situation

10     in the Indiana case.  They -- they -- they were talking about

11     plaintiffs all -- everyone.  They were looking --  It was a

12     First Amendment challenge only, right?

13             MS. SPOHN:  Correct, Your Honor.

14             THE COURT:  Not a due process challenge.

15             MS. SPOHN:  I don't believe so, Your Honor.

16             THE COURT:  All right.  You've made your opening

17     statements.  It's now about 10 after 12.  We got started late.

18     What would you like to do?

19             MR. DAHLQUIST:  Your Honor, I think we would like to

20     continue.  We have --

21             THE COURT:  Oh, sure.

22             MR. DAHLQUIST:  Yeah.  We -- we have Professor Post

23     here and he's pretty much available today so we would like

24     to --

25             THE COURT:  Okay.

```
 1          MR. DAHLQUIST:  -- move forward, if possible.

 2          THE COURT:  My question is do you want to break for

 3    lunch?

 4          MR. DAHLQUIST:  No.

 5          THE COURT:  Mr. Dornan says no.  When is Professor

 6    Post's plane?

 7          MR. DORNAN:  Tomorrow morning, Judge.

 8          THE COURT:  Okay.  Here's what we'll do.  We'll go to

 9    1 -- we'll go to 1:30 and -- well, no, wait a minute.  We do

10    have the law clerks.  I'll tell you what.  Do you mind if

11    we -- well, I guess I really don't care if you mind.

12       Let's take a -- I have to have a meeting and then let's

13    start again at one o'clock and we'll start again then.

14       Counsel are excused.  We stand in recess.

15       (Recess had at 12:11 p.m.)

16       (At 1:02 p.m. on July 16, 2012, the following proceedings

17    were had:)

18          THE COURT:  We're back on the record.  The plaintiffs

19    may proceed.

20          MS. SPOHN:  Your Honor?

21          THE COURT:  Yes, uh-huh.

22          MS. SPOHN:  Briefly, we'd like to move to sequester

23    the witnesses.

24          THE COURT:  Okay.  Why?  Does it really make that

25    much difference?  I mean, I -- I --
```

```
 1              MS. SPOHN:  Not necessarily.  Just for the experts is
 2     all we're talking about and if...
 3              THE COURT:  Well, who's going to be your first
 4     witness?
 5              MR. DAHLQUIST:  Well, Professor Post is, Your Honor.
 6              THE COURT:  So since he's going to testify first, you
 7     don't need him to be sequestered, do you?
 8              MS. SPOHN:  But -- but if ours follows this
 9     afternoon.
10              THE COURT:  Well --
11              MS. SPOHN:  So long as there's not then a need to
12     call him back up to redirect.
13              THE COURT:  Oh, I won't sequester -- once he's
14     testified, I won't stop him from listening to your expert's
15     testimony just as if your expert wants to listen to his.  That
16     I don't think is appropriate.
17              MS. SPOHN:  Okay.
18              THE COURT:  The --  Have you all exchanged expert
19     reports?
20              MR. DAHLQUIST:  Absolutely, yes.
21              THE COURT:  Have you all exchanged expert reports?
22              MS. SPOHN:  Yes, Your Honor.
23              THE COURT:  Yeah.  Here's why I won't.  Particularly
24     with the experts in this case.  The -- the -- the fear that
25     motivates the typical sequestration order doesn't exist, at
```

1   least in my opinion.  As to the other -- as to fact witnesses

2   or parties, I'm perfectly happy to enter such an order.  For

3   example -- well, but as to the experts I'm not going to

4   preclude them from hearing the testimony of each other.

5        Frankly, I think it'd be helpful to make sure the experts

6   can interact with one another so I can have a -- a fulsome

7   understanding of their views so...

8             MS. SPOHN:  Okay.  Well --

9             THE COURT:  What -- what are you concerned about?

10            MS. SPOHN:  We didn't necessarily want to have the

11   back and forth in calling the experts up, that -- you know,

12   after we get done testifying having --

13            THE COURT:  Well, that's --

14            MS. SPOHN:  -- the experts called back up and --

15            THE COURT:  -- that's -- that's -- that's really a

16   different question.  I'm not much interested in that either

17   but I can handle that in a different way.

18        All right.  Counsel.

19            MR. DAHLQUIST:  Would you like me to address the

20   motion or proceed, Your Honor?

21            THE COURT:  No, you won.

22            MR. DAHLQUIST:  Excellent.  Best work I ever did,

23   Judge.

24        Your Honor, I'm going to offer what has been marked as

25   Exhibits 101 through 146.  These are screen shots of various

```
 1      web sites including the terms of use.
 2              THE COURT:  Including the terms of use, if any?
 3              MR. DAHLQUIST:  If any, yes, sir.
 4              THE COURT:  Okay.  Counsel.
 5              MS. SPOHN:  Your Honor, we'd object on --
 6              THE COURT:  Relevancy and hearsay.
 7              MS. SPOHN:  Yes, Your Honor.
 8              THE COURT:  Overruled.  You aren't offering these to
 9      prove the truth of the matter asserted, are you?
10              MR. DAHLQUIST:  No, we don't -- we don't really
11      particularly care what they say.
12              THE COURT:  Well --
13              MR. DAHLQUIST:  Well, we do in the sense that they
14      exist but not for the truth of the matter asserted, no.
15              THE COURT:  Right.  You don't have any -- counsel,
16      you don't have any serious foundational issues with any of
17      these, do you?
18              MS. SPOHN:  No.
19              THE COURT:  Okay.  The objection is overruled.  The
20      exhibits are received.
21              MR. DAHLQUIST:  Okay.  May I approach?
22              THE COURT:  Sure.
23              MR. DAHLQUIST:  Your Honor, the plaintiffs would call
24      Professor David Post.
25              THE COURT:  Professor, if you'll take a seat in the
```

```
 1    witness stand.  Once you're seated there, my court clerk will

 2    swear you in.

 3             COURTROOM DEPUTY:  Please state and spell your name

 4    for the record.

 5             THE WITNESS:  My name is David Post.  D-a-v-i-d,

 6    P-o-s-t.

 7             COURTROOM DEPUTY:  Thank you.  Please raise your

 8    right hand.

 9          DAVID POST, PLAINTIFFS' WITNESS, SWORN

10             THE COURT:  Counsel, will you pull that microphone

11    close to you.  You may inquire.

12             MR. DAHLQUIST:  Is that good?

13             THE COURT:  That is.

14             MR. DAHLQUIST:  Okay.

15                     DIRECT EXAMINATION

16    BY MR. DAHLQUIST:

17    Q.   Sir, you are Professor David Post?

18    A.   Correct.

19    Q.   And you are a professor of law at the Beasley School of

20    Law, Temple University?

21    A.   Correct.

22    Q.   And can you explain to the Court what -- what area you

23    teach in?

24    A.   I teach mostly in the area of intellectual property and

25    law of the Internet, sort of cyberlaw, and mostly within --
```

1    intellectual property's mostly copyright and trademark in

2    addition to this Internet law specialty.

3    Q.   How long have you been a professor at Temple?

4    A.   Fifteen years.  1997 I began.

5    Q.   And how long have you been teaching Internet and

6    cyberlaw?

7    A.   Since then actually.  Since I started.

8    Q.   During your tenure at Temple, have you been -- have you

9    helped publish or authored any publications?

10   A.   A number of things.  Law journal articles about -- again,

11   mostly about the Internet and the legal ramifications, legal

12   problems on the Internet.  So I've published, I don't know,

13   several dozen law review articles.  I have a casebook on --

14   it's called *Cyberlaw,* with three other co-authors, West -- a

15   casebook for use in law school classes and I wrote a book on

16   Thomas Jefferson and the Internet.  *In Search of Jefferson's*

17   *Moose* it's called for those of you interested.  There is a

18   connection between Thomas Jefferson and the -- and the

19   Internet that -- we may not have time to get into that in this

20   testimony.

21   Q.   Well, you took away my next question.

22   A.   Okay.

23   Q.   Could you briefly tell the Court what that book is about?

24   A.   Yeah.  What -- what that book is about is an attempt to

25   recreate Jefferson -- Jefferson wrote a book -- published a

1    book in his lifetime, *Notes on the State of Virginia*, which

2    was sort of an encyclopedic treatment of Virginia, although

3    Virginia in those days covered a lot more territory than it

4    does today so it really was the entire sort of Appalachian

5    Mountain region.

6         And it went through the natural history and the political

7    history of Virginia through the unusual Jeffersonian

8    perspective on things, and what I tried to do is to recreate

9    that book in effect for cyberspace, for the new world, if you

10   will, so notes on the state of cyberspace as opposed to the

11   state of Virginia.  So to go through what Jefferson did for

12   Virginia, think about the things that make it a new place and

13   how communication proceeds, et cetera, et cetera, to do that

14   for -- for the -- for the Internet.

15   Q.   And you also said you authored a textbook --

16   A.   Correct.

17   Q.   -- a hornbook?

18   A.   Right.

19   Q.   And what was the name of that?

20   A.   It's called Cyberlaw:  Problems in Juris Prudence and the

21   Policy in the Information Age.  It's a fairly typical law

22   school casebook.  It has lots of excerpted materials from

23   cases and treaties and statutes and -- with explanatory

24   materials from me and from the other -- my co-authors.

25   Q.   And did you author any particular portion of that

1    textbook?

2    A.    Yeah, I did.  There are some -- I think it has 12

3    chapters and I was responsible for maybe two or three of them.

4    I think I did the chapter on domain names and trademark law.

5    I think I did the chapter on copyright -- copyright law and

6    the chapter on juris- -- on jurisdiction, Internet juris- --

7    personal and subject matter jurisdiction on the Net.

8    Q.    I presume you went to postsecondary education somewhere?

9    A.    I did, yeah.

10   Q.    And can you --

11   A.    Loads of it.

12   Q.    -- explain to the Court your educational background?

13   A.    Yes.  I have a -- I have a Ph.D. in anthropology I got in

14   1978 from Yale.  I went to law school at Georgetown.  I have

15   my J.D. from Georgetown in 1987 -- '86 or '87.  I'm sorry, I'm

16   blanking out on that.

17   Q.    And following graduation from Georgetown, where -- where

18   did you go from there?

19   A.    I went -- from Georgetown I clerked for Judge Ruth

20   Ginsburg, who was then on the -- a judge on the D.C. Circuit

21   Court of Appeals.  I did that for one year, '86 to '87.  I

22   worked at Wilmer, Cutler and Pickering for about

23   six-and-a-half years, a large Washington, D.C. multipurpose

24   law firm.  I practiced mostly in the intellectual property and

25   sort of high-tech transactions group.

1           Then I went back actually to clerk for now Justice

2      Ginsburg who had been appointed to the Supreme Court in -- in

3      the 1993 term.  After that year I went to George- -- back to

4      Georgetown to teach for three years.  I was a visiting

5      professor at Georgetown and then 1997 I went off to Temple.

6      Q.   How did you first get involved in the Internet or

7      Internet law?

8      A.   It was actually during my years of practice.  We had a

9      small group at the law firm of which I was a part that was

10     doing as I said sort of high-tech transactions.  We had a

11     number of clients, software developers and systems integrators

12     and the like, and this was the late 1980s.

13          The Internet was just beginning to become a commercially

14     significant -- just beginning to become commercially

15     significant around '89 -- 1989, 1990, and some of our clients

16     were involved in it just because they were in that world, a

17     sort of high-tech world.

18          The partner who was in charge of that little group I was

19     in was very forward-looking.  I think he realized --

20     recognized that the Internet -- way before most people

21     did that the Internet was something important as a

22     communications medium, and so we got talking and -- and

23     writing about it fairly early on, 19- -- in the early 1990s.

24     Q.   Have you ever served as an expert witness in any

25     litigation prior to this one?

1    A.    Yes, I have.

2    Q.    And what cases were those?

3    A.    Okay.  I gave you a list.  There were three or four.

4    There was a trademark action in federal court last year,

5    *Warden vs. Falk*, I believe, involving a application of

6    trademark law principles to person names.

7         There was a copyright -- I'm trying to remember the exact

8    name of the case.  I'm sorry, I'm blanking on it.  But a

9    copyright -- it was a copyright malpractice action.  I was

10   called in as a witness -- expert witness on the duties of a

11   lawyer who's handling a copyright-related matter and what --

12   the reasonable standard of care.

13        There was another case involving again a copyright

14   infringement case, a question about the copyrightability of

15   certain plans and systems and programs for local hospitals in

16   Philadelphia.  I think that's -- I think that's it.

17        Or there was an early copy- -- another copyright

18   infringement action about jewelry -- a copyrightability of

19   jewelry designs.  I was called in for -- on plaintiff's behalf

20   on that case.

21   Q.    And you were provided a number of materials to review and

22   you reviewed those materials?

23   A.    Yes.

24   Q.    And what were those?

25   A.    Materials I reviewed for this?

1    Q.   For this case, yes, sir.

2    A.   The statutory -- the Nebraska statutes, the original

3    memorandum and order that the -- the judge issued, the

4    defendants' expert report.  I think that's it, what I was --

5    was supplied.  I reviewed a number of other things in

6    preparation of my report.  Textbooks about Internet

7    engineering, among other things.

8         I reviewed the web sites that I listed in the -- in the

9    appendix of the report and I did some work on the -- on the

10   Internet to try to elucidate what the statutory terms meant

11   but I don't think there was any other material that -- that

12   you supplied to me other than that.

13            MR. DAHLQUIST:  Your Honor, may I approach, please?

14   BY MR. DAHLQUIST:

15   Q.   Sir, I'm handing you what is marked as Exhibit 304.

16   Could you identify that document?

17   A.   Yes.  That is the expert report I prepared and provided

18   to you back in December of 2010.

19   Q.   And that is as a result of your reviewing the materials

20   that you testified to here today?

21   A.   Correct.

22   Q.   And at the back at the end, is there a copy of your

23   resume attached to this?

24   A.   Yes.

25   Q.   And is that an accurate depiction of your resume, sir?

1    A.   Yes.   There are a couple of additional things since

2    December of 2010 that I published, some smaller things, but

3    this is an accurate reflection of my background.

4         MR. DAHLQUIST:  Your Honor, I'm going to offer what's

5    been marked as Exhibit 304 and I would move to certify

6    Professor Post as an expert in Internet law and its

7    application.

8         THE COURT:  Well, let's take up Exhibit 304 first.

9    Is there any objection?

10        MR. GRIESS:  No, Your Honor.

11        THE COURT:  It's received.  I don't typically accept

12   or reject experts on a tender.  You've laid a sufficient

13   foundation.  You may proceed.  I'll leave it up to you.

14        MR. DAHLQUIST:  Fair enough.  Thank you, Judge.

15        THE COURT:  Certain places they do that.  Certain

16   places they don't.  This is one of the places they don't.  If

17   you want to know my reasoning, if a jury was here and I was

18   asked to do that, the jury might think what I said was

19   important and, frankly, it isn't.  The preliminary

20   determination -- I think you've laid enough to satisfy me that

21   the professor can talk about Inter- -- Internet law

22   (inaudible) but let's take it by a question-by-question basis.

23        For example, if we got into a coding question, I don't

24   know that the -- the professor would -- maybe he is -- could

25   tell us about coding but right now I don't know that so that's

1    why I do it.

2        Go ahead.

3            MR. DAHLQUIST:   Okay.   Thank you.

4            THE COURT:   Uh-huh.

5    BY MR. DAHLQUIST:

6    Q.    Sir, have you formed an opinion about the application of

7    Nebraska Revised Statute 28-322.05 as it relates to the

8    Internet and its -- its scope?

9    A.    A number of opinions about that, yes.

10   Q.    And what are those opinions?

11   A.    You want --  Generally speaking, that the -- the

12   definitions in the statute, chat room, instant messaging

13   service and social networking web site, are -- to the extent I

14   can understand what they mean, they either cover vast --

15   almost unknowable vast universe of material that is available

16   on the Internet and -- and would prohibit access and use to

17   almost everything on the Net, or if interpreted slightly

18   differently, it's difficult to know because some of the

19   language is ambiguous, I think.

20       If interpreted differently, might cover virtually nothing

21   on the Internet.   It's sort of an either/or problem that I

22   think the -- the -- the statute -- statute presents.   I'm not

23   sure either of those alternatives is quite what the

24   legislature had intended but the -- the language is

25   susceptible to -- to two different interpretations.

1    Q.   Well, I want to focus a little bit --  And do you have a

2    copy of the statute sitting in front of you?

3    A.   I actually do if I'm allowed to -- this is just -- I

4    don't know if you want me to --

5              THE COURT:  No, sir.  That's fine.

6    A.   Just -- it's a copy of the relevant definitional sections

7    in the statute from my -- from my notes.

8              MS. SPOHN:  And Your Honor?

9              THE COURT:  Sure.

10             MS. SPOHN:  Just -- sorry to interrupt.

11             THE COURT:  Sure.

12             MS. SPOHN:  You do have a notebook in front of you

13   that has the statutes in question on them -- on -- on your

14   desk if -- if at all you want to look at those.

15             THE COURT:  Yes.  Thank you very much.

16        Go ahead.

17             MR. DAHLQUIST:  Your Honor, I'm going to -- if I

18   could, could I approach and put a copy of the statute up on

19   the ELMO?  ELMO.

20             THE COURT:  Sure.

21             MR. DAHLQUIST:  Thank you.

22             THE COURT:  Professor, are you seeing that on your

23   screen?

24             THE WITNESS:  No.  On this...

25             THE COURT:  The courtroom deputy will assist you,

1    sir.

2              THE WITNESS:  Thank you.

3              THE COURT:  Are you getting it, Jan?

4              THE WITNESS:  Ah, something happened.  It's still --

5    it flashed for a minute but it's still saying out of range.

6    Same message (unintelligible) blue.

7              THE COURT:  Let's do this rather than spend our time

8    worrying about that.  Let's take the -- the big flat screen

9    and turn it --

10             THE WITNESS:  So I can see it.

11             THE COURT:  -- so the professor can see it.

12             THE WITNESS:  That'd be great.  Thank you.

13             UNIDENTIFIED FEMALE VOICE:  Are you able to see it?

14             THE WITNESS:  Yes, I am.  Thank you.

15             THE COURT:  That way the professor is -- cannot see

16   Mr. Monaghan which is a good thing.

17             MR. MONAGHAN:  Can -- can I move over here in

18   (unintelligible) this afternoon?

19             THE WITNESS:  That's very good.  It's killing --

20   killing two birds as it were.

21             THE COURT:  That -- that -- that's right.

22       Go ahead.

23   BY MR. DAHLQUIST:

24   Q.   Sir, I want to focus your attention to the screen and

25   specifically this is 28-322.05 and you reviewed this --

 1    A.    Yes, I did.

 2    Q.    It talks about a prohibition by an individual -- and I'm

 3    kind of paraphrasing here.  I want to get to the -- the part

 4    of it -- who knowingly and intentionally uses a particular

 5    medium --

 6    A.    Right.

 7    Q.    -- and we'll come back to those mediums -- that allows a

 8    person who's less than 18 years of age to access or use its

 9    particular medium.

10    A.    Right.

11    Q.    So I want to talk about the phrase "that allows a person

12    who's less than eighteen years of age to access or use."  What

13    is your understanding of the Internet and its working as far

14    as is there any prohibition for any medium as far as access

15    goes?

16    A.    As far as access goes, it's difficult for me to think of

17    a social networking web site, instant messaging service or

18    chat room service that does not allow persons who are under

19    the age of 18 to access the service or the site.  There's no

20    effective prohibition against someone who's under the age of

21    18 from using -- from accessing a instant messaging service.

22    For example, I don't know of any instant messaging services

23    that even purport to keep minors out.  Same for chat rooms.

24          And in terms of accessing a social network service, even

25    though -- even those that may have in their terms and

1    conditions something that says you may not use this service if

2    you are less than 17 years old or 18 years old, the access to

3    those sites is possible if only to read the terms and

4    conditions.  So a 13-year-old can access any social networking

5    site on the Internet as far as I'm aware.

6    Q.   So, in other words, is it your opinion that all social

7    networking web sites -- and we'll come back to what that

8    means -- but all social networking web sites allow access to a

9    person who is less than 18 years of age?

10   A.   I think that's correct, yeah.  I think that's right.

11   Q.   And would that also --

12   A.   Again, if -- if only to access the page that discusses

13   the terms and conditions of use which may themselves say you

14   can't use the service if you are under age but the access to

15   the site is -- is available to anyone irrespective of their

16   age.

17   Q.   Would that also be your opinion as it relates to instant

18   messaging and chat room service?  And, again, we'll come back

19   to what those mean but...

20   A.   Yes.  And -- and if -- if anything, my opinion is that

21   it's -- the -- the 18-year-old clause is even less effective

22   or less meaningful in a sense with respect to instant

23   messaging services because I'm not aware of any instant

24   messaging services that in their terms and conditions would

25   prohibit someone from using the instant messaging site --

1    service so -- so in that sense the same idea applies.  That

2    persons who are under the age of 18 can access all instant

3    messaging services, all chat rooms and all social networking

4    services more or less.

5    Q.   And how would -- and this might be a very basic question

6    but how would someone who was under 18 access a social

7    networking web site?

8    A.   Oh.  Log -- go to www.facebook.com and you are now

9    accessing a site that I think clearly falls within the

10   defin- -- the statutory definition of a social networking

11   site, and www.facebook.com is a publicly accessible site that

12   anyone with access to the Internet can -- 13-year-old,

13   9-year-old can -- can get access to that site even before they

14   have -- whether or not they can join, they can log in and

15   register and do various things on that site is a separate

16   question that we can get to but in terms of -- that's

17   accessing the main Facebook page that I think would qualify as

18   access to a social networking site.

19   Q.   And then would that --

20   A.   And anyone who's under the age of 18 can -- can use that

21   if they can use the Internet, if they can type and all those

22   things.

23   Q.   Would that also allow access -- as you mentioned before,

24   that would allow access to the terms of -- terms of use or

25   terms of service, whatever that --

1    A.    Correct.

2    Q.    -- might be?

3    A.    On the Facebook.com -- on that page that you get to, if

4    you go to Facebook.com, there'll be something at the bottom

5    that -- typically that says legal notices or terms of use or

6    copyright violations.  There'll be links to other pages

7    that -- that will show you things like the terms and

8    conditions of service and that too is open whether or not you

9    are a Facebook account holder.

10        They don't even ask at that point are you over the age of

11   17 or -- or something when they -- when they allow people

12   to -- to access that.  That's -- that's publicly available

13   information to anyone who clicks on the right part of the

14   page.

15   Q.    I want to shift just a little bit now and turn to the

16   term "use".  So same phrase but now focus on the word "use".

17   A.    Uh-huh.

18   Q.    Would you agree that a statute only permits use when the

19   terms of service limit that use to a particular age group, in

20   this case, someone who's over the age of 18?

21   A.    I'm not -- not sure I quite understand the question.

22   Q.    Would you agree that there's only individuals over the

23   age of 18 using a social networking web site if the terms of

24   use say you can only use this if you're over the age of 18?

25   A.    I -- I think my answer is no to that question.  That --

1      that many -- I think it's well-known among those who spend

2      time on the Internet that sites may have prohibitions -- many

3      kinds of prohibitions in their terms of service, including an

4      age limitation, that are both unenforced and probably

5      unenforceable, that they can't really tell.

6          They may say you may not use this site -- do not enter

7      this site unless you are over the age of 18 but, in fact, if

8      you then go and attempt to enter the site, there's no way that

9      they can tell at that point whether or not you are over the

10     age of 18.  So you can gain entry to it even if that is -- as

11     a practical matter, you can gain entry to most of those sites

12     like Facebook, which does have an age limitation, I believe

13     it's 13 on Facebook, but a 12-year-old can get access to --

14     can get access to Facebook and can use Facebook even though

15     that is in violation of the stated terms and conditions.

16     Q.   So, in other words, in your opinion would -- in that

17     situation Facebook allows an individual under the age of its

18     stated terms to use its web site?

19     A.   I think that's -- that's right.  I think that is at least

20     a perfectly plausible reading of -- of the statutory language.

21     That it allows -- if -- there may be a sign -- as we drove by

22     the football stadium today.  There may be a sign at the

23     doorway of the football stadium that says you may not enter if

24     you're under the age of 12, may -- but if -- if they don't

25     check anyone's age when they come in and if there are 7,000

 1     people under the age of 12 at a football game, I would regard

 2     that as that the stadium allows people who are under the age

 3     of 12 to enter because there they are.  There are thousands of

 4     them in there.

 5         And I think the same is true for most -- for most

 6     Internet sites.  There are sites that use -- the most frequent

 7     proxy that's used for age identification on the Net is a

 8     credit card.  There are some sites, particularly prevalent

 9     amongst sort of adult -- adult sites, hard core pornographic

10     sites, that will, in fact, not let you enter unless you put in

11     a credit card number on the reasonable assumption that most

12     people who are underage don't have access to credit cards and

13     so that's -- that's -- that's a different category.

14         That's a small category of web sites that do that but the

15     vast majority of sites that fall under the category social

16     networking sites in the statute have -- whatever they may say

17     in their terms and conditions, they have no enforcement

18     mechanisms at all to keep people who are underage from using

19     that site.  So I would regard that as allowing people who are

20     under the age of 18 too.

21         MR. GRIESS:  Your Honor, I would object to the

22     defendant's [sic] answer.  I don't think the foundation has

23     been established to establish his credentials in regard to his

24     answer.

25         THE COURT:  What foundation is lacking?

1            MR. GRIESS:  His knowledge of Facebook policies and

2     instant messaging service policies and the like.

3            THE COURT:  Overruled.  Go ahead.

4            MR. DAHLQUIST:  Thank you, Your Honor.

5     BY MR. DAHLQUIST:

6     Q.   I said we'd come back to those some things, those three

7     mediums.  I'd like to turn now to the way those three mediums

8     have been defined.

9            MR. DAHLQUIST:  And I -- if I could, Judge, can I

10    approach and change the --

11           THE COURT:  Uh-huh.

12           MR. DAHLQUIST:  -- ELMO?

13           THE COURT:  Yes.

14    BY MR. DAHLQUIST:

15    Q.   Now, one of those three mediums would be chat room,

16    correct?

17    A.   Correct.

18    Q.   How -- and you reviewed the Section 29-4001.01,

19    subsection 3?

20    A.   Yes.

21    Q.   And what is your opinion on the -- on how this subsection

22    3 would be applied to the Internet and -- and can you describe

23    some of the general types of services that would be included

24    in the -- the definition?

25    A.   Yes.  The first problem I think in this statutory

1    language is -- is -- is that it talks about a chat room

2    means -- one can read this statutory section as follows:  Chat

3    room means a communication network primarily designated for

4    the instantaneous exchange of text or voice transmissions or

5    computer file attachments among two or more electronic

6    communication device users.

7        If -- if that's how it's read, it covers -- the ordinary

8    telephone service, for example, is a communication service

9    that allows virtually instantaneous exchange of voice among

10   electronic communication users.  So the ordinary telephone

11   system.  The cellular telephone system I think could fall

12   under this definition and all systems of which I am aware that

13   call themselves instant messaging.  SMS systems, text --

14   texting systems also allow the virtually instantaneous

15   exchange of text amongst two or more computers or electronic

16   communication device users.

17       That's the -- I think a broad reading of this statute --

18   statutory section taking out -- there's -- there's no comma.

19   I need -- I need a comma to tell me how to read this, whether

20   communications network stands on its own or not.

21       If it doesn't, then a chat room means server space on a

22   communication network that is primarily designated, etc.  I

23   think there again when you or I communicate by electronic

24   mail -- ordinary e-mail service I think would be

25   encompassed -- clearly encompassed by this definition of chat

 1    room.  There is server space that is dedicated to our

 2    instantaneous -- virtually instantaneous exchange of text.

 3    That server space may be on the Internet or it may be on some

 4    other communications network but there is a little piece of

 5    storage somewhere on the Gmail server, for example, if we use

 6    the Gmail electronic mail system.

 7         So we are now participating -- when I send you an

 8    e-mail -- an ordinary electronic mail with text and maybe a

 9    file attachment, I think as a perfectly reasonable reading of

10    the statute that we are now engaged in a chat room interaction

11    because there's server space on the Internet that is

12    designated for the instantaneous exchange of texts amongst the

13    two of us.

14    Q.   Would this also encompass what are kind of the more

15    conventionally thought of chat rooms?

16    A.   Yes, it would.  So there'd be ordinary -- what -- what I

17    think of as the ordinary -- the -- the term "chat room" arose

18    and still used to designate -- it arose in the 1990s.  America

19    Online had specially designated "places" -- they're not really

20    places, they're just server space where -- that simulated a

21    room where people could enter, leave messages, other people

22    could participate in the conversation.

23         I think those -- and there are still many such places on

24    the Internet that have that functionality.  I think that's

25    clearly within the bull's-eye as it were of this statutory

POST - DIRECT (Dahlquist)                                86

1    definition in addition to this broader reading that it

2    encompasses text, instant messaging communication, e-mail

3    communications, etc.

4    Q.   What other types of services could fall under this?

5    Would there be commercial web sites or portions of commercial

6    web sites that could be encompassed under the definition of

7    chat room?

8    A.   Yes.  Amazon.com, a familiar shopping web site, has -- is

9    a web site.  It has server space that is designated for the

10   instantaneous exchange of text between two or more computer

11   users.  I can send you -- I can find your -- if you're a

12   registered Amazon user and you've listed -- you've written a

13   review of my book, I can instantaneously communicate with you

14   using the Amazon system.  I think that qualifies as a chat

15   room in -- under -- under this definition.  And there are lots

16   of commercial sites like that that allow the instantaneous

17   communication.

18   Q.   When you say there's lots of commercial sites, you've

19   studied the Internet, correct?

20   A.   I have, yeah.

21   Q.   And you use the Internet, correct?

22   A.   I do, yeah.

23   Q.   And you teach Internet law --

24   A.   I do.

25   Q.   -- correct?

```
 1        Could you provide some -- and this might be a no but

 2   could you provide some estimation of the scope that chat room

 3   as written would be applied to just commercial web sites?

 4            MR. GRIESS:  Objection, foundation.

 5            THE COURT:  What foundation is lacking?

 6   BY MR. DAHLQUIST:

 7   Q.  You have used the Internet over the course of your

 8   career?

 9            THE COURT:  (Unintelligible.)

10            MR. DAHLQUIST:  Oh, I'm sorry.  Oh, I thought you --

11            THE COURT:  I had --

12            MR. DAHLQUIST:  -- ruled on that.  I'm sorry.  I

13   thought you were telling me foundation was lacking.  I was

14   going to --

15            MR. GRIESS:  That's what I thought too, Your Honor.

16   I...

17            THE COURT:  Okay.  Well, then let's start -- start

18   over.  There was a question, there was an objection as to

19   foundation.  Foundation can be as broad as a bread basket or

20   narrow as a pin.  I typically say if you don't -- aren't

21   specific with me what foundation is lacking.  That's what I

22   asked counsel.  That flummoxed counsel.  He paused.  That

23   flummoxed you too.  You went forward with the question.  So

24   we're going to go back to counsel and he's going to answer my

25   question.
```

 1           MR. GRIESS:  Again, Your Honor, I don't think that

 2     the foundation regarding the professor's experiencing --

 3     experience surfing the Internet, his -- his knowledge of all

 4     of the Internet web sites that are out there has been

 5     established.

 6           THE COURT:  Okay.  Why don't you be specific?  What

 7     would you like to know?  How many times he was on the

 8     Internet?  Would that be enough?  If he was on it 10,000

 9     times, would that be okay?  I mean, is that the sort of thing

10     you want to know?

11           MR. GRIESS:  I don't think there's a bright line to

12     be drawn anywhere.

13           THE COURT:  No.  I'm -- I'm being specific with you

14     because I want to know what you think is lacking.  What do

15     you -- what foundation would he need in order to be able to

16     answer that question?  If you -- if you were preparing him, if

17     he were your expert and -- and -- and you were paying his

18     exorbitant fee, what -- pardon me, Professor, I'm teasing

19     you -- what would -- what would you want him to know?

20           MR. GRIESS:  Well, Your Honor, I -- I would want more

21     assurance that -- that the professor knows every corner of the

22     Internet and -- and his experience using the Internet and --

23     and teaching it to his students and -- and --

24           THE COURT:  You don't think the fact that West

25     decided that he was good enough to publish his casebook and

 1    he's taught it for 17 years and he's got a Ph.D. in another

 2    discipline, that would suggest to you that he knows how to do

 3    original research?  You don't think those things are enough?

 4            MR. GRIESS:  No, Your Honor.

 5            THE COURT:  Okay.  But you don't want to tell me what

 6    is enough?

 7            MR. GRIESS:  I -- I've explained it as best as I can,

 8    I think.

 9            THE COURT:  Overruled.  Go ahead.

10            THE WITNESS:  I can't remember the question.  I'm

11    sorry.

12    BY MR. DAHLQUIST:

13    Q.   I'll -- I'll go back to the question.  I think...

14         In your experience do most, if not all, commercial web

15    sites -- and by commercial web sites I mean web sites operated

16    by businesses -- do they allow or permit some functionality

17    that falls within the definition of chat room?

18    A.   Yes.  If only to allow -- I mean, again, I don't know

19    every corner of the Internet and I have not seen all

20    commercial web sites.  Obviously, there are hundreds of

21    millions of them but my experience has been that a large

22    proportion of them at least allow communication -- there's

23    space on the site, there's functionality on the site that

24    allows me as a user to communicate with the web site operator,

25    for instance.  Maybe the web master's only the person who's

POST - DIRECT (Dahlquist)                                          90

1    actually responsible for the site and/or the customer service

2    at the -- you know, say leave a comment here or if you have a

3    problem, click here and it sends off what is equivalent to an

4    electronic mail message so someone in the customer service

5    department.

6         My experience is that millions -- I think it is safe to

7    say millions of sites have that functionality and would

8    therefore fall -- ordinary business sites that may be selling

9    eyeglasses or shoes or books or whatever have that

10   functionality and would therefore fall within the chat room

11   definition as I read it.

12   Q.   And it's also your opinion that this would include cell

13   phone usage and landline usage; would that be fair?

14   A.   Again, depending upon which I think is -- is an ambiguity

15   in the -- in the way the statute is -- is written.  If I can

16   read this, as I think I -- I think I can, as follows:  Chat

17   room means a dot, dot, dot communication network primarily

18   designated for the virtually instantaneous exchange of text or

19   voice transmissions, et cetera, then I believe that covers all

20   of the cell phone networks I'm aware of, all of the landline

21   networks that I'm aware of.

22        If it's restrictive to the alternate reading which puts a

23   comma in -- after server space, I guess, it means it's a web

24   site or server space, it's on the Internet or another

25   communications network, and it has this functionality.  I -- I

1     think it's -- it's a little bit of a stretch at that point to

2     say that ordinary telephone service, which would fall under

3     the definition under reading one -- I think it's a little bit

4     of a stretch to say that ordinary telephones -- because

5     there's now not a web site or server space in the ordinary but

6     many cell phone networks would qualify, many instant messaging

7     services would qualify.

8          To the extent I just sent off an -- a text message with a

9     file attachment to a friend of mine over lunch, there's a

10    little piece of server space on a communications network that

11    is designated to -- for our communication back and forth

12    between two electronic communication device users.  I think

13    that's a statutory chat room.  It's not a chat room in the

14    ordinary sense of the term but it is a chat room under this --

15    under this definition.

16    Q.   I want to turn to subsection 10.  And you reviewed this

17    subsection as part of preparing -- preparing for your

18    testimony?

19    A.   Yes, I did.

20    Q.   And did you come to a conclusion or do you have an

21    opinion, rather, as to the scope of those services that are

22    encompassed within the definition of instant messaging?

23    A.   Yes, I do.

24    Q.   And what is that opinion?

25    A.   Once again I -- I -- I think there's a very serious and

1        substantive ambiguity in the language.  Direct and dedicated

2        communication services are not well-defined terms.  If by

3        dedicated -- a dedicated communication service -- one reading

4        of dedicated would mean that you or I have -- there's actually

5        a line of a physical piece of wire that is dedicated to our

6        communication, you and I let us say.  That is the way that the

7        telephone system actually works.

8             The old-fashioned landline system actually dedicates

9        space on the -- on the wires for our communication.  If -- if

10       we call each other -- if I call you on a landline system,

11       there'll be a line dedicated to that for the duration of the

12       call.

13            If that's -- that's not how in most Internet

14       communications -- not -- or any Internet communication works.

15       It doesn't dedicate space in that way and most cell phone and

16       instant messaging systems don't dedicate it in this way.  So

17       if that's what the legislature meant by "dedicated," then it

18       would only cover landline service which I can't believe was --

19       I don't think was what they meant by this.

20            If they're talking a little more broadly about dedicated

21       and private, that is, communications that's not publicly

22       accessible but is only accessible to the participants in

23       the -- in the communication, then I think it covers everything

24       meaning all Internet communication, all e-mail, all text

25       messaging is a private -- it's a direct -- when I send you a

 1    text, it's a direct, private communication service accessed

 2    with an electronic communications device that allows us to

 3    instantaneously transmit texts and computer file attachments

 4    to other users.

 5        So either this term "dedicated" has this sort of

 6    specialized meaning which would narrow it only to the

 7    old-fashioned telephone system which I don't believe is what

 8    the legislature intended or it -- it is just referring to

 9    private communications systems of the ordinary kind that we

10    use every day, electronic mail and texting and voice

11    communication and Internet communication through -- mediated

12    through web sites and all the rest.

13        So it covers an enormous swath of -- of elec- -- all

14    elec- -- virtually all electronic communication I think would

15    fall under this definition of instant messaging.

16    Q.   Can you provide some of the more popular services that

17    you believe fall within the definition of instant messaging

18    system?

19    A.    Sure.  Well, Google.  Certainly, the Gmail system is an

20    instant messaging system.  But Hotmail is an instant messaging

21    system.  It's private.  It allows a direct private

22    communication between you and I, sending and receiving texts

23    and computer file attachments to other selected users of the

24    service.

25        So those --  Facebook is clearly an instant messaging

1    service that allows the same thing.  Messenger -- Yahoo

2    Messenger is an instant messaging service.  I suppose even

3    sites that are primarily information-oriented sites like

4    Wikipedia.  I can communicate with other users of Wikipedia

5    directly.  I can click on their name -- if they're registered

6    users, I can click on their name and I can send them a message

7    directly and privately so I suppose that's an instant

8    messaging service as well.

9         YouTube is an instant messaging service I think for the

10   same reason.  I can -- if I go to a video, there'll be a

11   little box that says who posted this video and if they're a

12   registered user, I can click on their name and I can

13   communicate with them.  I can leave a comment to them.  I can

14   find their e-mail address and send them an e-mail.  I think

15   all of that makes this an instant messaging system because it

16   allows virtual instantaneous transfer of texts and computer

17   file attachments.

18   Q.   And, again -- well, we'll move on.

19        I want to move on to subsection 13.

20   A.   Is it social networking?

21   Q.   Yeah.  And you reviewed this subsection in preparation

22   for your expert report --

23   A.   Yes --

24   Q.   -- and testimony?

25   A.   -- I did.

1    Q.   And did you come to a conclusion or form an opinion,

2    rather, as to the scope with which this definition would be

3    applied to the Internet?

4    A.   Yes.

5    Q.   And what is that opinion?

6    A.   Once again, there's a potentially serious -- some

7    threshold statutory ambiguity that has to be resolved before

8    one can make sense of this definition and -- and in this

9    definition it refers to this collection of web site language.

10   The -- the statute says a social networking web site means a

11   web page or a collection of web sites that has certain

12   functionality.

13        The functionality itself is mostly -- is to create a

14   profile -- searchable profile.  If I can create a searchable

15   profile that others can comment on or communicate with me,

16   they can find my profile and send me a message of some kind,

17   then it has the -- the substance that is -- is listed here.

18        And then the question becomes am I at a web page that is

19   part of a collection of sites that has that functionality.

20   "Collection of web sites" is just not a well-defined term in

21   the industry.  I'm prepared to say I think it's -- it could be

22   Internet itself.  This definition could cover everything that

23   is on the World Wide Web because the World Wide Web is itself

24   a collection of web sites.  That is what it is.

25        Some of them have this functionality so one reading of

1    this statute is -- is -- is just colossally broad which would

2    just say anytime I'm at any web page, I'm at a -- one, I'm

3    at -- at one of a collection of web sites, the Internet, that

4    allows -- that -- that possesses this functionality.  So that

5    would cover literally every one of the 840 million or however

6    many there are pages out there on the Net because of -- it's

7    in the collection of web sites.

8        Even if you take that definition, read it a little more

9    narrowly, you still have things like Google.com.

10   Google.com -- you type in Google.com to your browser and it

11   comes up with a search page, the familiar page.  That page

12   doesn't have profile information on it.  I can't enter my

13   profile on that page but I can enter a pro- -- searchable

14   profile on any number of pages that are linked to the Google

15   web page so I can go from the Google.com page to Blogger, to

16   Gmail, to YouTube, those -- and in one click I'm at a site

17   where I can have a searchable profile that viewers can access.

18       So then the statutory question becomes is Google.com --

19   even though it does not have this functionality, is it part of

20   a collection of web sites that has this functionality, and I

21   think the answer is, yeah, it is because it's so -- the

22   statutory ambiguity leaves -- it's not easy to make a law

23   professor speechless but -- but it's difficult to know even

24   why -- I know that they're in the same collection of web

25   sites.  Blogger is owned by Google so I suppose that makes it

1    part of the same collection.  It's one link away from Google

2    so it's part of a collection.  Google encourages you -- the

3    Google.com site encourages you to go to Blogger, to go to

4    YouTube.

5         So I think it's -- to me as a user, I'm -- when I'm at

6    the Google.com page, I'm at -- I'm in a collection of web

7    sites that has this functionality so the Google.com page is a

8    social networking web site.  Even though it does not have this

9    functionality, it's part of the collection that does.

10        So that's one opinion that I came to is that the

11   collection of -- the collection of web site language broadens

12   this definition out to cover a -- a -- just a vast array of --

13   of sites that I'm not sure was in the legislature's vision

14   when they passed the statute but -- but is in the -- is in the

15   language.

16        I guess the -- the second opinion I have is that even

17   take -- putting that aside -- or to excise that language, the

18   number of web sites -- forgetting the collection issue, the

19   number of web sites that have this functionality I think is

20   much broader than what we would ordinary *[sic]* call social

21   networking -- the ordinary social networking site.

22        The paradigm social networking site is something like

23   Facebook or MySpace, but this definition would clearly again

24   include many, many commercial sites that wouldn't ordinarily

25   think of themselves as social networking but they have this

1    functionality.  Amazon has this functionality, for example.

2    L.L.Bean has this functionality.  You can put a profile in,

3    tell the world who you are.  You can leave reviews under your

4    assumed name.  Because you have a profile, you're a registered

5    user, people can click on your name and see where you're from.

6    They can see if you have a e-mail address if you've chosen to

7    leave that e-mail address.  They can see if you have a web

8    site if you've chosen to leave that.

9        Lots of commercial sites, not all but many, a large

10   proportion of them, allow people to post searchable profiles

11   and to communicate one-on-one with other users because they

12   see that as a way to generate traffic to the site and to form

13   some sort of a community so people get to know one another and

14   they have discussions amongst themselves and that too

15   generates traffic to the web site.  So this is very common

16   from -- even putting aside the ambiguity of the collection of

17   web sites.

18       I don't think Amazon.com thinks of itself -- people who

19   run Amazon.com think of themselves as running a social

20   networking site but under this definition they clearly are or

21   L.L.Bean for -- for that matter or lots of these -- Archived

22   Music that lets you buy CD's but also has a way for you to

23   post your profile and talk to other users.

24       That's what this -- is encompassed by the statutory

25   definition and I think it has an enormous -- covers a great

 1    swath of ordinary commercial web sites that are out there.

 2         Not to mention things, of course, like blogging sites

 3    that are -- Blogspot and WordPress and those which also allow

 4    you to have a searchable profile that can be accessed by other

 5    members and that -- where the members can communicate with one

 6    another.  I think those are also all encompassed by even a

 7    narrow definition of "social networking web site" and -- under

 8    this statute.

 9    Q.   So is it fair to say you think there's an ambiguity in

10    each of these three definitions?

11    A.   I do.

12    Q.   An ambiguity that requires -- well, let me step back.  If

13    you were to read these statutes unambiguously, it seems that

14    you're saying this includes all of the Internet, all cell

15    phone use, all landline use and virtually all electronic

16    communication?

17    A.   I think that's -- that's right.  That is a reasonable

18    reading of the unambiguous language of this statute is that it

19    covers virtually the entire universe of electronic

20    communication.

21    Q.   I want to step back to the criminal statute -- now that

22    we've kind of gone through the definitions step back to

23    28-322.05.

24    A.   Uh-huh.

25    Q.   So, Professor, it's your opinion that this language does

1    not provide unambiguously for any age limitation; is that

2    correct?

3    A.   Well, I mean, the -- the statutory --

4    Q.   Let me --

5    A.   -- provision has the 18 years of age.

6    Q.   Well, let me rephrase this.

7    A.   Is that what you meant?  Yeah.

8    Q.   Let me rephrase this.

9    A.   Sorry.

10   Q.   Unambiguously, the way the statutory age limit is written

11   does not provide for any real --

12   A.   Limitation.

13   Q.   -- or effective age limitation --

14   A.   Correct.

15   Q.   -- at all?

16   A.   In other words, if -- if -- as we just said, if social

17   networking web site, instant messaging site, chat room service

18   have these enormously broad definitions, the criminal

19   provision here does limit the penalties you -- only to those

20   that -- those social networking sites, instant messaging

21   services, chat room services that allow persons who are less

22   than 18 years of age to access or use them but that limitation

23   is virtually meaningless.

24        That -- that -- that eliminates -- out of this vast array

25   of services and sites that the definitions cover, a very small

1    proportion of them would be -- don't allow persons who are

2    less than 18 to access or use those sites.  So we're left with

3    still this -- we haven't restricted that universe in any

4    meaningful way by including the less than 18 years of -- of

5    age language in the -- in the statute in my opinion.

6    Q.   So did you -- could you provide some guidance or can you

7    give your opinion on how -- if you're an individual subject to

8    this restriction as you have construed it, what impact would

9    that have on you in your ability to be a -- an individual able

10   to be employed or engage in society in any meaningful way?

11          MR. GRIESS:  I'll object on foundation and

12   speculation.  I -- and Professor --

13          THE COURT:  Sustained as to form.  I mean, the --

14          MR. DAHLQUIST:  Understood, yeah.

15          THE COURT:  I mean --

16          MR. DAHLQUIST:  I'll rephrase.

17          THE COURT:  -- is the Internet important?  Yeah, it

18   is, and to the degree that you excluded these category of folk

19   from the Internet -- I mean, I think it -- it's obvious but if

20   you -- but you go ahead.

21   BY MR. DAHLQUIST:

22   Q.   Is the Internet important?

23   A.   Yes.  The -- the Inter- -- I -- well...

24   Q.   Go ahead.

25   A.   Well, I mean, I don't want to...

1            MR. GRIESS:  If there's a question, then...

2            THE COURT:  Yeah, it'd be good to ask a question.

3    Why is the Internet important?

4    BY MR. DAHLQUIST:

5    Q.   Is the Internet important, Professor?

6    A.   I mean, the Internet is -- is important -- the Internet

7    and -- I mean, I -- I think it is important to -- to note that

8    this is broader than the Internet.  It's not just the Internet

9    that is excluded.  It's Internet and instant messaging

10   services and -- and the like and they're important because

11   they are the means by which people communicate with one

12   another for commercial purposes and for personal purposes.

13       It's -- and -- and going forward into the 21st century,

14   that will be more rather than less true even than it is today

15   is my summary of the importance of the Internet.

16   Q.   You were in the courtroom when we did opening arguments

17   and --

18   A.   Yes.

19   Q.   -- you were -- you were present when the -- the Court

20   asked questions about the statutes and how they could be

21   limited; is that correct?

22   A.   Yes.  Right.

23   Q.   And in your role as a law professor, you deal with

24   statutory language on a regular basis --

25   A.   On a --

1    Q.    -- I would imagine?

2    A.    -- regular basis.  On a regular basis.

3    Q.    Could the state have crafted language that was less broad

4    to address the concerns that were raised by counsel on

5    opening?  Specifically with regard to child enticement online?

6    A.    Yeah.  I -- I think they could.  I'm not -- not going to

7    tell the State of Nebraska how to draft its statutes but

8    anything from a prohibition -- a narrow prohibition on

9    one-to-one communication between registrants and minors, for

10   example, would be a much narrower prohibition than the statute

11   or even I think as -- as the judge was suggesting in the -- in

12   the colloquy over opening -- the opening statements saying

13   that one may not visit a site that is targeted to minors I

14   think is -- may have its own ambiguities and -- and -- and --

15   and we'd have to work on crafting language but the idea

16   being -- the idea it seems to me -- and this is -- goes back

17   to the beginning of the Net -- of the Internet.  This has

18   always been a problem of sort of what's the analogy.

19        We want to keep people away from school playgrounds, from

20   the junior high school dance, from places where young people

21   congregate.  That's relatively easy to do in the real world

22   because there are spaces that are marked school playground,

23   junior high school dance and -- and the -- and the rest.

24        On the Internet that's very difficult to do but one

25   possibility would be something like web sites that

1    specifically target juveniles and there are lots of those for

2    perfectly innocent purposes obviously where they're actually

3    encouraging children to come and join and be members and talk

4    and join the community.

5         Or as I think the judge suggested even an objective

6    measure of sites that have -- 30 percent of their users are

7    under the age of 18 or 40 percent or some -- some number.

8    That even the State could provide as part of a service

9    actually of saying we have -- here's our survey evidence.

10   Every month they could put out a bulletin that says here are

11   the sites that have -- more than 30 percent of their users are

12   minors and those are off limits.  Those you can't use.

13        You know, I'm enough of a law professor to know there

14   will be problems and arguments and difficulties with crafting

15   that statute too but that's clearly a less restrictive

16   alternative than the -- the statutory model that the State --

17   that is, it would leave open most of this vast range of

18   Internet communications -- movie sites and book and blogs and

19   shoe sales and all the rest of the stuff that's going on,

20   Wikipedia -- while targeting the places where children are

21   particularly like -- likely to congregate.

22        I think there are ways to do that that would be

23   considerably less -- vastly less broad than -- than the

24   statutory language the State has chosen.

25   Q.   And you're not opining on the constitutionality of that

1   statute?

2   A.   I'm not.

3   Q.   You're just --

4   A.   I'm not and would have to -- want to think more about it

5   and analyze it more carefully but in terms of whether it would

6   be -- you could -- you could get at those sites, you could

7   craft a statute that would narrow the prohibition to the sites

8   where I think the State interest is strongest, that is, sites

9   where really there are large numbers of children who are

10  socializing in such a way that you wouldn't run into this

11  problem, where Google would not be on that list, Amazon.com

12  would not be on that list, Yahoo would not be, etc.

13       You would allow people to continue to use the majority of

14  the Internet sites for perfectly ordinary business and

15  personal purposes while fencing off, zoning off the sites that

16  are like the playground or that are like the -- the junior

17  high school dance.  I think it can be done.

18  Q.   Would you consider this statute a restriction?

19  A.   This statute is a -- is a -- yes.  This statute is a

20  most -- in my opinion this statute restricts the ability of

21  persons covered by the statute, registrants, to conduct their

22  lives in the 21st century honestly.  Personal and professional

23  and even their private lives, yes.

24  Q.   Professor, would this be a -- a punishment, if you were

25  subject to this, to be denied the right to access the

```
 1    Internet?

 2              MR. GRIESS:  Objection, that calls for a legal

 3    conclusion.

 4              THE COURT:  I think so too.  That'll be sustained.

 5         Counsel --

 6    BY MR. DAHLQUIST:

 7    Q.   Professor --

 8              THE COURT:  -- I get your point.

 9              MR. DAHLQUIST:  I understand, Your Honor.

10              THE COURT:  To be utterly candid, I've got to make

11    that call and I appreciate the professor's expertise but his

12    view on that really wouldn't help me very much.

13              MR. DAHLQUIST:  Understood, Your Honor.  I'm humoring

14    Mr. Monaghan, Your Honor.

15              THE COURT:  I'm trying to encourage you not to.  It's

16    sort of -- sort of like feeding a voracious animal.  Once you

17    start it just --

18              THE WITNESS:  Yeah.  They get the taste, yeah.

19              THE COURT:  -- goes on and on and on.

20              MR. DAHLQUIST:  I'm noticing.

21    BY MR. DAHLQUIST:

22    Q.   Professor, you were also asked to review subsection

23    29-4006, subsection (1)(k) and (s); is that correct?

24    A.   I'm trying to recall the statutory numbering system.

25    Sorry, is that the reporting requirements?
```

1    Q.    The -- the information that you have to report, yes, sir.

2    A.    Yes.  Yes, I did review that.

3    Q.    And I want to focus on subsection s.

4    A.    S, yeah.

5    Q.    And in particular I want to focus on towards the end

6    there after the final comma.  So an individual subject to the

7    reporting requirement has to register X, Y, Z information "and

8    all blogs and Internet sites maintained by the person or to

9    which the person has uploaded any content or posted any

10   messages or information," and in particular I want to focus on

11   the "to which the person has uploaded any content."

12   A.    Uh-huh.

13   Q.    Are you familiar with when you go to a site how does that

14   work?  Can you explain for the Court how that works?

15   A.    Yeah.  When you -- going to a web site, of course, is a

16   metaphor.  We don't go anywhere.  We sit at our desks and we

17   have a machine and what it means is very simple actually.

18   It's a request for -- you send a request for a file.

19   That's --  When you type out, you know, www.amazon.com, that

20   gets translated in the guts of your machine into a request for

21   a web -- a -- a file to be transmitted back to you, goes out

22   to the site that has the address that is associated with

23   www.amazon.com, that site gets this request and it says, oh,

24   they're -- they're asking me for the home page, for example,

25   and they send back the file that constitutes their home page,

POST - DIRECT (Dahlquist)                                      108

1   and when you receive it on your computer, it gets displayed on

2   your browser.

3        So it's all file transmissions -- file requests and file

4   transmissions that constitute -- you know, surfing the web is

5   a -- a long series of those requests for files.

6        When you click on a link, the same thing happens.  It

7   goes to a different site.  The -- the --  Your -- your request

8   for the file goes to whatever site is in the link address.

9   The site sends you back a page.  It's displayed and -- and on

10  and on it goes.

11  Q.   And during the course of that transaction at requesting

12  different web sites, does a person upload content at any

13  point?

14  A.   Well, there -- there is the -- obviously, sometimes

15  there's a kind of conscious and obvious uploading of content.

16  If you're submitting a -- a photograph onto a -- a blog page

17  and you say send this photograph and it gets displayed, that's

18  an obvious upload but uploading can occur in lots of ways that

19  are much less visible, even invisible sometimes, to the user.

20       Things like cookies.  A cookie is a little bit of a file

21  that the web -- the first time you go to Amazon.com it -- when

22  it sends back the file that you have requested, it also sends

23  back a little file that gets stored on your machine invisibly

24  to you.  It's called cookies.  It's in the cookies part of

25  your machine, and it's just a little text file that says this

1    machine visited on July 15th at this time, and it -- it may

2    have some other information about what you did on the web page

3    that the web site is sending to you, and then the next time

4    you visit Amazon -- visit Amazon meaning the next time you ask

5    from Amazon that home page, the Amazon home page -- when

6    Amazon sends you the home page, they request from your machine

7    the cookies file, and you technically upload that file to

8    Amazon, and they read that cookies file to see when you were

9    there last, for example, or what you saw last so that they can

10   show you a page that is perhaps tailored to your particular

11   visit.

12       So that could be -- that happens hundreds of times in --

13   in the course of a -- daily as you're -- as you're making your

14   way around the Net.  Again invisibly to you.  This is

15   happening in the background.

16       If you are technically sophisticated, you can figure this

17   out.  If -- you can even stop it from happening if you want to

18   if you know how to do that but for most -- the vast majority

19   of Internet users, this is taking place invisibly in the

20   background.

21       Cookies files are being deposited on their machine and

22   then sent to the web sites from their machine the next time

23   they go visit and that could be considered the uploading of

24   content.  That would according to this have to be reported

25   even though you don't really know you're doing it in -- in the

1    vast majority of -- of -- of cases.

2    Q.   So, in other words, every time you go to a web site

3    you're uploading a little bit of the --

4    A.   You could be.  It depends upon how the web site is set

5    out but you don't -- you don't know but it's certainly

6    possible that each time you go to -- to the -- the site --

7    certainly, if it's one you have been to before, they could

8    have deposited a cookie on your machine and you are now

9    uploading it to them as part of your request to -- to -- to

10   get access to that site again.

11           MR. DAHLQUIST:  Your Honor, could I just have one

12   moment, please?

13           THE COURT:  Sure.  You might want to mute those

14   mikes.

15           MR. DAHLQUIST:  Your Honor, I have nothing further.

16           THE COURT:  Counsel, you may inquire.

17                         CROSS-EXAMINATION

18   BY MR. GRIESS:

19   Q.   Good afternoon, Professor.

20   A.   Afternoon.

21   Q.   If you could, it's just bugging me a little bit.  Could

22   you move that microphone out of our line of sight?

23   A.   This?

24   Q.   Thank you.

25   A.   Okay.

1    Q.    You've been a professor since 1994, correct?

2    A.    Right.

3    Q.    Before that you were a practicing attorney?

4    A.    Right.

5    Q.    And a judicial clerk?

6    A.    Uh-huh.

7    Q.    And an anthropologist?

8    A.    Right.

9    Q.    Have you ever prosecuted sex offenders before?

10   A.    No.

11   Q.    Have any of your academic pursuits ever focused on online

12   child safety issues?

13   A.    Yes.  I -- I did -- I provided testimony to the -- there

14   was a commission who back in the late '90s, I believe -- a

15   child online pornography commission that was attempting in the

16   wake of several cases in which the court struck down

17   attempts -- congressional attempts to limit the access --

18   children's access to indecent material online.  Different

19   problem than -- than the one we're facing here but related I

20   guess to child safety.

21        Congress formed this child online -- the COPA Commission

22   it was called, Child Online Pornography, I think.  And I gave

23   some testimony about the difficulties of -- of finding this

24   material and categorizing it as indecent and some of the First

25   Amendment issues but -- but other than that I think it has not

1    been a focus of my research.

2    Q.   And you said that was in the 1990s?

3    A.   I think it was.  I -- I think it's on my resume.  If it

4    isn't, I can -- I can update that but I believe it was in the

5    late -- the late 1990s when they were -- which eventually led

6    to the -- a -- the COPPA, C-O-P-P-A, legislation, the child

7    online prevention of pornography act, or -- or something like

8    that.  There was legislation that came out the back end of

9    that and that is at least ten years old so I think we're

10   talking about something 10, 12 years ago.

11   Q.   Earlier you -- you mentioned what people think of as chat

12   rooms.

13   A.   Yeah.

14   Q.   Professor, what do you think of as a "chat room"?

15           MR. DAHLQUIST:  I'm going to --

16   BY MR. GRIESS:

17   Q.   How do you define that term?

18           MR. DAHLQUIST:  I'm going to object as to relevance.

19           THE COURT:  Overruled.

20   A.   In ordinary usage, ordinary sort of Internet user speak

21   as it were, I think a chat room is -- it's the kind of

22   functionality that enables one to -- one-to-one communication

23   amongst people who are in the room, and -- and I want to put

24   quotes around in the room, get back to that in a second.

25           It enables one-to-one communication and one to many.  I

1    think an important feature of what most people think of as a

2    chat room is that you can go into -- again, quote, into the

3    room and you can post a message that everyone else who's in

4    the room can see simultaneously.

5         Now, the -- the -- again, the room is a -- is entirely a

6    metaphor.  There is no room but I think they're called chat

7    rooms because in the early days of the Net, America Online in

8    particular was quite well-known in the early days for these --

9    this chat room functionality which they tried to actually make

10   visually look like a room.

11        They were encouraging you to think about this as entering

12   a place where other people were and you could say, Hi, I'm

13   David Post, you know, who else is here, and everybody else who

14   was, quote, present who had logged into this place would be

15   able to see that and would be able to respond either to

16   everyone or individually to me.  That's what I think of as

17   a -- that functionality I think is generally regarding as a

18   chat room.

19   BY MR. GRIESS:

20   Q.   So breaking that down --

21   A.   Yeah.

22   Q.   -- a chat room to you requires communication?

23   A.   Oh, yes, right.  It is a communications platform medium.

24   Q.   And it requires the proverbial room?

25   A.   Well, I wouldn't want to say that because there is no

1    proverbial room.  It -- it is -- the organizing metaphor is

2    that of a room.  Sometimes it will be taken far enough so that

3    the software will actually look like a room, you know, with a

4    door and a window and people sitting around a table to sort of

5    encourage you to -- but that's all software mediated.  I mean,

6    there is no real room.  Obviously, that's just pretending to

7    be a room.

8         But it was a way to encourage -- a way to explain to

9    people in a sense what this functionality was doing.  Think of

10   this as a room is what America Online was saying.  It's just

11   like you're in a room with these people except they're all

12   hundreds of miles away from one another and all that but think

13   of it as a room that you have entered.

14        You can yell so everybody can hear you or you can whisper

15   to the person who's next to you.  It has that functionality.

16   So it's like a room.  I think that's the -- that to me is --

17   that functionality that mimics a room is part of what most

18   people mean when they -- when they think of -- when they --

19   when they say -- use the term "chat room".

20   Q.   But that functionality mimicking the room not need be

21   present --

22   A.   That --

23   Q.   -- need not exist?

24   A.   The -- the actual, like, visual display of the room

25   certainly doesn't have to exist.  You don't have to make it

 1    look or feel like an actual room for it to be a chat room.

 2    But to me the critical functionality is it allows one-to-one

 3    or one-to-many communication from amongst a set of people who

 4    have voluntarily come together into a place.

 5        All these -- all these metaphors get difficult.  It's not

 6    really a place but -- but I hope you understand what I mean.

 7    That have all agreed to communicate with one another by,

 8    quote, entering the room and can do so one to one or one to

 9    many.  That's a chat room, I think.

10    Q.   So boiled down it really just requires communication

11    either one to one or one to many?

12    A.   I think that's right.  I think that's -- that's what...

13    Just like this room -- I'm sorry.  Excuse me.  I'm a law

14    professor.

15    Q.   This is cross- --

16    A.   I --

17    Q.   -- -examination, Professor.

18    A.   Forgive me.

19    Q.   If I recall, in your report you had a problem with the

20    term "virtually instantaneous" as used in the definitions of

21    chat room and instant messaging --

22    A.   Yeah.

23    Q.   -- is that right?

24    A.   Yes.

25    Q.   And you believe that term is ambiguous?

1    A.    I do.

2    Q.    Would you agree that's -- that the instant message sent

3    from my smartphone to your smartphone arrives at your phone

4    virtually instantaneously?

5    A.    That depends.  I mean, since I don't -- if I think it's

6    ambiguous, I can't answer that because I don't know what it

7    means so if it -- it can take three seconds, that's easily --

8    and I don't know -- it can take -- electronic mail can take

9    four, five, six seconds actually from when you hit send to

10   when it comes up on someone else's machine.

11         For most ordinary purposes of conversation, is that

12   pretty much instantaneous?  Yeah, it is.  If we're talking

13   about video, is that instantaneous?  No, it's not.  It's not

14   fast enough.  Instantaneous has to be -- so I -- I honestly

15   don't -- I don't understand exactly what's in and what's out

16   of -- of the category of the virtually instantaneous.

17   Q.    But for you there's a bright line somewhere how many

18   seconds is -- is virtually instantaneous?

19   A.    There must be, right?  We would all agree that the --

20   four minutes is not virtually instantaneous.  I think we would

21   all agree -- or eight minutes or there's some number at which

22   the -- it's no longer instantaneous.  It's -- it's

23   asynchronous and -- whereas a tenth of a microsecond, I think

24   we would probably all agree that's instantaneous.  It's

25   imperceptible time difference.

1           And then there's the two between and -- and I think it

2      really does matter.  It matters what kind of application

3      you're talking about.  E-mail is virtually instantaneous.

4      You'll get it in a few seconds.  So I'm comfortable about

5      saying it's virtually instantaneous but not for --

6      Q.    Professor, you said --

7      A.    -- a video.

8      Q.    -- in your report that --

9      A.    Well --

10     Q.    -- all messages whether instant messages or requests for

11     web files, those are sent, were they not, at the speed of

12     light?

13     A.    Correct.

14     Q.    All of them?

15     A.    That's correct.

16     Q.    Let's go back to the example -- the discussion that

17     centered around the word "allows," whether these sites or

18     individuals allow minors to use them.  You said that there is

19     some site out there that requires, for example, credit card

20     use?

21     A.    Right.

22     Q.    And that you're reasonably certain that those sites, the

23     sites that require credit cards to be entered, that those

24     sites don't allow minors?

25     A.    I -- you know, reasonably certain.  I -- I'm comfortable

1    with saying those sites do not allow minors to enter.  They --

2    they will say -- if -- if a web site says nobody under the --

3    18 may enter and in order to enter you must enter a -- your

4    own credit card, which you can only get if you are of the age

5    of majority, then I'm more comfortable saying that site

6    doesn't allow minors to enter.

7    Q.   But you recognize that minors can take a credit card,

8    their parents' card --

9    A.   Correct.

10   Q.   -- for example --

11   A.   I do.

12   Q.   -- is that...

13   A.   Yes.

14   Q.   And still even when the minor explicitly evades the

15   conditions of the sites, that minor could still use the site?

16   A.   Yes.  Yes.

17   Q.   Okay.

18   A.   Right.

19   Q.   The definition of chat room isn't up on your screen.

20            MS. SPOHN:  (Unintelligible.)

21            THE COURT:  Sure.

22   BY MR. GRIESS:

23   Q.   Professor, you said that a site like Amazon dot --

24   dot-com would fall under the definition of chat room?

25   A.   Yes.

1    Q.   And you said that lots of commercial sites would also

2    fall under that definition.  So in your opinion, Professor,

3    does, for example -- is Amazon.com primarily designated for

4    communication, exchange of voice transmissions or the like?

5    A.   No, but it -- it -- well, yes, actually.  I mean,

6    Amazon.com is designated -- what else does Amazon.com actually

7    do other than allow for the virtually instantaneous exchange

8    of text or voice communications amongst two or more computers?

9    So in that sense I think Amazon -- that's -- that is what

10   Amazon does.  Amazon.com is primarily -- primarily designated

11   for that and even more narrowly it had -- there is server

12   space controlled by Amazon --

13   Q.   I'm not asking about the server space.

14   A.   Okay.

15   Q.   Just as far as primarily designated.  That's -- that's

16   what Amazon.com is there for, to communicate with one -- for

17   two people to communicate with each other?

18   A.   It doesn't say -- it doesn't say two people.  It says

19   "two or more computers."

20   Q.   Who's sitting at the computers?

21   A.   I don't know.  I mean, people are sitting -- the --

22   nobody is sitting at the computer that is the Amazon computer.

23   Amazon has a computer that is running the Amazon web site and

24   all sorts of software that when I send it a message and it

25   communicates with me virtually instantaneously -- my message

1    is please show me the Amazon home page and (indicating sound)

2    it comes right back to me.

3        That's primarily designated for the virtually

4    instantaneous exchange of computer file attachments among two

5    or more computers.  I think that fits Amazon.com.  I do.

6    Q.   I asked you a minute ago to provide the definition as --

7    as you think of it of chat room.  Would you do the same for

8    instant messaging.

9    A.   Instant messaging is any system that allows one-to-one

10   text commun- -- communications via text.  I think I'm

11   comfortable with that, yeah.

12   Q.   Any system that allows one-to-one communication via text?

13   A.   Yeah.

14   Q.   That's your common understanding of instant messaging?

15   A.   Yeah.  Yes.

16   Q.   So, of course, the -- the most important element there is

17   the one-to-one communication?

18   A.   Correct.  Can I just clar- --

19   Q.   No.

20   A.   If I may -- no, no, I don't want to clarify that

21   definition.  Just what I'm trying to do in -- in answering

22   your questions.  You're -- you're asking me not about the

23   statutory definition.

24   Q.   Right.

25   A.   You're -- you're now asking me about what I think --

1    Q.   I'm not asking you --

2    A.   Okay.

3    Q.   Yes.

4    A.   I just want to make sure that's...

5         THE COURT:  I -- so everybody understands what I

6    understand the series of questions to be is forget about the

7    statute, Professor, and forget about technical definitions.

8    Just in common parlance tell me what it is you understand

9    "chat room" or "instant messaging" to mean, right?

10        MR. GRIESS:  Yes.

11        THE COURT:  Is that how you understood it, Professor?

12        THE WITNESS:  Yes, basically, yes.

13        THE COURT:  Okay.  Go ahead.

14   BY MR. GRIESS:

15   Q.   Okay.  And now I think I want to talk about the

16   definition of instant messaging.

17        MS. SPOHN:  May I approach the ELMO?

18        THE COURT:  Sure.

19   BY MR. GRIESS:

20   Q.   Your difficulty in this statute, Professor, dealt with

21   the words "direct" and "dedicated"?

22   A.   Correct.

23   Q.   And you -- I think -- I believe your testimony was that

24   dedicated may have a particular technical term but that's not

25   how you thought the legislature was using it here?

1    A.    Right.

2    Q.    And how did you think the legislature was using it here?

3    A.    Well, I -- I think the legislature was using -- actually

4    using the term "dedicated" as synonymous with private to be

5    honest.  I think it is statutory surplusage.  That it's a --

6    that they meant private.

7         Sending Mr. Dahlquist a message.  I'm not posting it on a

8    blog.  I'm not putting it up on the Internet.  It's going one

9    to one and they're using dedicated and private to -- to

10   capture that.

11   Q.    And what was your issue with regard to the word "direct"?

12   A.    I don't -- it doesn't add anything to the statutory

13   definition.  It's not a -- it -- it either means nothing --

14   when I send an e-mail message to someone, is that direct or is

15   it indirect?  I mean, I guess the opposite of direct is

16   indirect.

17        Internet messages don't go directly from one place to

18   another.  They move about indirectly.  They bounce around.

19   The ordinary course of Internet, whether this is a phone

20   conversation we're having over the Internet, a Voice over

21   Internet, Skype, or an e-mail message that I send to you or a

22   Facebook instant messaging system message from me to you, to

23   call it direct --

24   Q.    You -- Professor, you talk about that process in your

25   book.

1    A.    Yeah, yeah.

2    Q.    Would you explain a little bit how those messages are not

3    sent directly.

4    A.    Yes.  Over the Net -- anything that's traveling over the

5    Internet, anything, e-mail, web, instant messaging,

6    anything -- when it goes -- I send it to you.  It's eventually

7    going to make its way to your computer.  We are communicating

8    with one another.  When it leaves my machine, several things

9    happen to it.

10        It gets broken up into tiny pieces.  It's as though I've

11   written it out on paper and then the first thing we do is we

12   tear the paper up into a hundred pieces, little tiny pieces,

13   and then we send each of those pieces out a different way.

14   Some go via Europe, some go on the train that's going up to

15   Montreal, and some go to Mexico, and -- and they all converge

16   virtually instantaneously on your machine later.

17        I don't know what direct -- if -- if direct is trying to

18   say not like that, that's not direct.  That's one plausible

19   meaning for direct is that communication is -- is not direct.

20   It's something else because it's indirect.  It bounces around.

21   Then nothing on the Net is -- is direct.  So I don't -- I just

22   don't know -- that doesn't add -- it's not a word that is

23   helpful to me in understanding what kind of communication they

24   want to cover and what kind of communication they don't want

25   to cover.

1    Q.   But it would be your opinion that because the legislature

2    used the word "direct" that any type of instant message or

3    request for a web is -- is not direct because as you said it

4    gets broken up into pieces and sent everywhere?

5    A.   Well, what -- what -- what I was trying to say is that

6    there -- as with several of these statutory abresions

7    (phonetic), there are sort of two ways to read it.  If that's

8    what they meant, then it covers nothing -- it covers nothing

9    that takes place on the Internet.  No Internet communication

10   is direct in the sense of traveling -- in the -- in the sense

11   of the old telephone network.

12       The old telephone network was direct.  We had a dedicated

13   telephone network system we still have, the landline system.

14   I call you on a landline, we have -- there's a dedicated line.

15   There's --  I could actually walk from my office to your

16   office following a line that is holding our conversation.

17   It's open until we hang up, an actual physical line.  That's

18   direct and dedicated.

19       If that's what the legislator [sic] meant by direct and

20   dedicated, then it covers no Internet communication

21   whatsoever.  It covers no cell phone communication whatsoever.

22   So my guess is that's not what they meant.  My guess is what

23   they meant, they were trying to capture a sort of private

24   one-to-one nature of conversation as opposed to one to many or

25   many to one.  That -- that's what I think this is.

1          It's the private nature of this that -- that they were --

2     and I think that comports somewhat with the ordinary use of

3     the term and -- it's you and me.  It's just between you and

4     me, these -- these text message.  Direct and dedicated does

5     not add to that -- to my understanding of -- of what's going

6     on.

7     Q.   With regard to the definition of social networking web

8     site, your primary problem with that was the collection of web

9     sites language, correct?

10    A.   Yes.

11    Q.   Are you familiar with the term top-level domain?

12    A.   Yes.

13    Q.   Can you describe that?

14    A.   Yes.  The way the naming system works for the Internet

15    names are organized into domains.  The familiar ones -- there

16    were originally seven of the so-called top-level domains.  It

17    was the -- the highest level category you had to be in to have

18    a name on the -- on the Internet, either dot-com, dot-gov, I'm

19    blanking -- oh, dot-edu, dot-org, etc.  Those are top-level

20    domains.

21         They are the ones that are --  Internet reads right to

22    left for some reason.  So those are the ones at the far right

23    most of your address.  Www.google.com.  That's in the dot-com

24    top-level domain.  Temple.  Www.temple.edu is in the edu

25    top-level domain.

1          There were originally seven of those plus top-level

2     domains for each country.  So there's a dot-us; dot-jp for

3     Japan, dot-de for Germany, etc.

4     Q.    And then the next level down?

5     A.    Next level down is called the second-level domain so you

6     can register a second-level domain in a top-level domain so I

7     could get the davidpost.com.  I have the David -- my -- it's

8     registered to me.  But David Post is the second-level domain

9     within the dot-com top-level domain and on and on it could go.

10    Q.    And what's the next level down or third or --

11    A.    Third level.  Www.davidpost.com is -- that's the

12    third-level domain is the www within the David Post.

13    Second-level domain within the dot-com top-level domain.

14    Q.    Now, Professor, I -- I know web sites will often have

15    something to the right of the dot-com.

16    A.    Correct.

17    Q.    For example, if I went to David -- www.davidpost.com,

18    there might be a back slash and then --

19    A.    Index.

20    Q.    -- or a symbol "about" where it has your bio.

21    A.    Correct.

22    Q.    What's that about?  What -- how would you describe that?

23    A.    That's a directory.  That -- that's an ordinary -- on the

24    machine that has the address www.davidpost.com, that's --

25    there is a physical machine to which messages would be

1    directed on the Internet that has an IP address -- that has an

2    IP number at that name and that machine can like your ordinary

3    laptops be organized into different subdirectories.

4        There can be the file subdirectory, the picture

5    subdirectory, the -- et cetera or it can have individual files

6    like about dot-html on that machine.

7        So that's designating something that's -- it's not part

8    of the addressing system -- the Internet's addressing system.

9    The Internet addressing system is to the left of the slash.

10   Top-level domain, second-level domain, third-level domain,

11   fourth-level domain.  That's all resolved on the Net.

12       So the right of the slash is in a sense your business on

13   your machine.  You can have any sorts of directories and files

14   on your machine that you want that will appear on the right

15   side of that.

16   Q.   So if I'm administrator of a -- I guess it'd be

17   third-level domain -- or let's take you, for example.  You

18   have the web site www.davidpost.com.

19   A.   Right.

20   Q.   You're the administrator for that site.

21   A.   Okay.

22   Q.   You control everything that would appear in any directory

23   which is -- would be to the right of that?

24   A.   Correct.  That's -- that's -- that's correct.

25   Q.   Would it be fair to say that all of those directories --

1    that would be a collection of web sites?

2    A.    I mean, the -- the only problem I'm having with --

3    with -- with that question is that they may not be web sites.

4    You know, there's -- to the right of the slash, I could have

5    lots of files.  They could just be individual picture files.

6    My vacation in Nebraska 1.jpg, my vacation in Nebraska 2.jpg.

7    They could all appear to the right.

8         Calling that a collection of web sites is a little -- a

9    collection of web sites -- a collection of something and I

10   guess given that if it's accessible over the Internet -- if it

11   was www.davidpost.com slash my vacation in Idaho and then

12   Nebraska 1.jpg, then I guess that could be a collection of web

13   sites, I suppose.  It's --  I'm a little uncomfortable with

14   that just because they're not web sites.

15   Q.    But you would have control over all of those --

16   A.    But I -- but -- correct.  I would have -- I could make

17   those visible or invisible in my capacity as controlling

18   the -- the machine that has the address www.davidpost.com.

19   Q.    So, for example, having control over all those

20   directories underneath davidpost.com, you would not have

21   control over any directories that fall under kevingriess.com,

22   correct?

23   A.    Correct.  Right.

24   Q.    With regard to the -- I refer to it as (k) and (s)

25   information, the subsections k, subsection s.  You're familiar

1    with those --

2    A.   Right.

3    Q.   -- provisions?

4         Would you agree that it's fairly simple for an individual

5    to know what their e-mail address is?

6    A.   I think so, yeah.

7              THE COURT:  Except if you work for the government.

8              THE WITNESS:  Right.

9    BY MR. GRIESS:

10   Q.   And you also agree, Professor, that it would be easy for

11   a person to know what their chat room identifier is, correct?

12   A.   I'm a little more -- I'd like to go back and look at the

13   definition of chat room again.

14   Q.   Isn't that -- isn't any identifier of a person

15   self-selected?

16   A.   Well, I don't -- I guess I don't know.

17             MS. SPOHN:  May I approach the ELMO?

18             THE COURT:  Sure.  And you all can have continuing

19   leave to do that.

20             MS. SPOHN:  Okay.  Thank you.

21             THE WITNESS:  I think that's a little more

22   problematic actually than -- if -- if chat room means server

23   space on a communications network, if -- if that --

24   BY MR. GRIESS:

25   Q.   I'm talking about the identifier.

1    A.   Well, I understand that.  But what is my identifier when

2    I communicate with someone via a SMS via a text system?  I

3    guess it's my phone number but I -- I don't really know.  I

4    don't know.  That's not a term I'm -- I'm comfortable with or

5    familiar with to be -- to be honest.

6         If you're asking do you -- the self-selected identifiers

7    you should be able to -- to report fairly easily.  In the

8    ordinary chat room, the common sense chat room definition, the

9    America Online chat room where you come in and you have a

10   screen name that you're identified with, that's fairly

11   straightforward, I think, yes.

12   Q.   So which -- you just a second ago said that certain

13   identifiers may not be identifiable --

14   A.   Well --

15   Q.   -- or known to a person?

16   A.   Yeah.  Just like the Internet Protocol address it

17   would -- could be a chat room identifier, I guess, given the

18   chat room is practically -- the definition of chat room

19   practically covers the entire Internet.

20        I don't know what my Internet Protocol address is when I

21   sent Dahlquist an e-mail message this morning.  I don't know

22   what my identifier is when I send him a -- a -- a text

23   message.  I mean, I -- it might be my phone number, the number

24   on my phone, or it might be some internally generated address

25   that the -- AT&T uses to identify me, 5JG791234X.  I have no

1    idea.  It finds it -- there must be an identifier because if

2    he hits reply, it comes back to me.  It's probably my phone

3    number but I -- honestly, I don't know that.  I -- I'd need to

4    know more about how that system worked.

5    Q.   But the identifier that you just spoke about in the

6    answer you provided, that's not the identifier that shows up

7    on the screen I'm typing away to somebody else, is it?

8    A.   Well, it may not be.  That's the problem in a sense.

9    Just as your IP address doesn't show up on the screen when you

10   send an e-mail or request a web page but it's a critical

11   component of identifying you.  So if my text system uses some

12   crazy identification system -- I know -- I know enough about

13   the engineering of this to know that they could be.  They

14   don't have to use the phone number.  They could have a whole

15   different system for identifying where did this message come

16   from so that when you get it and you reply to it, it makes its

17   way back to me.  That could be the serial number of my device

18   for all I know.  I don't know how -- what they're using as an

19   identifier.

20   Q.   So you're distinguishing -- distinguishing between --

21   distinguishing that type of identifier from the identifier

22   that -- for example, if I'm using a chat room and I log in as

23   HuskerFan#1 --

24   A.   Correct.

25   Q.   -- that's the identifier that's going to show --

1    A.    I think that those are --

2    Q.    -- up to the screen?

3    A.    -- those are different and -- and, clearly, it is easier

4    to -- just as you said you know what your e-mail address is.

5    Yeah, you -- when you choose a -- a handle, a screen name, a

6    pseudonym for your e-mail, that's not burdensome to -- to know

7    what that is.

8         I know what my e-mail addresses are.  I don't know all

9    the identifiers -- my -- all my chat room identifiers within

10   the meaning of this because it's not restricted to the ones I

11   have chosen.

12        Many of these are machine generated, and -- and they are

13   largely invisible to me as a user just like the IP address is

14   machine generated and it's not visible to me but it's hard --

15   hard to find.

16   Q.    Next, Professor, I want to revisit the cookies

17   discussion.  So if I understand this right, if I -- if I type

18   in www.amazon.com, that web page comes back to my computer and

19   it's displayed on my browser --

20   A.    Right.

21   Q.    -- at the same time they send a little file that -- the

22   cookie --

23   A.    Right.

24   Q.    -- that's embedded on my computer?

25   A.    Right.

1    Q.    And anytime I interact then with Amazon, I'm sending

2    something their way?

3    A.    They're -- they're -- they are sending a -- a message to

4    your computer that says please send me the cookies file, if

5    you have one, in effect from Amazon.

6    Q.    And that's a request made by Amazon to my computer?

7    A.    I think that's correct.  I -- I'm -- I would want to

8    check that.  I'm reasonably certain that that is correct that

9    that comes -- it's not automatically sent -- as I'm speaking,

10   I'll realizing it -- it -- it could -- I'm not sure.  I think

11   that may vary actually.

12         That may be software dependent as to whether the web site

13   requests it -- Amazon requests the transmission after they

14   receive my request or actually simultaneous with my request to

15   Amazon I say, Please send me your home page and, oh, by the

16   way, here's my cookies file that you deposited on my machine

17   two weeks ago.  I'm not sure how that -- my guess is it

18   probably can work either way.

19   Q.    But as I'm sitting --

20   A.    Yeah.

21   Q.    -- at my computer --

22   A.    Yeah.

23   Q.    -- using Amazon.com, I'm not consciously making a

24   decision that, hey, I need to send my cookie file?

25   A.    No, no, no.  That's certainly true, right.  Whatever --

1    however it gets transmitted, it's entirely in the background

2    and in -- largely invisible to you as a -- certainly as an

3    ordinary user all that is invisible.

4              MR. GRIESS:  That's all the questions I have, Your

5    Honor.

6              THE COURT:  Redirect?

7                        REDIRECT EXAMINATION

8    BY MR. DAHLQUIST:

9    Q.   Professor, I want to take a step back and talk about the

10   conversation you had with Mr. Griess about collection of web

11   sites under the definition of social networking web site.

12   A.   Uh-huh.

13   Q.   We -- we don't necessarily need to put it up.  Just a --

14   just a couple of questions.  So if you are the administrator

15   of a www.davidpost.com --

16   A.   Uh-huh.

17   Q.   -- you can -- can you explain again -- and I wasn't too

18   clear on this.  You can control where the -- the web sites

19   that are pulled up by describing something after the dot-com

20   part?

21   A.   Yes.  In other words, the Internet's job is finished at

22   the -- at the dot-com part.  In other words, www.davidpost.com

23   unambiguously from anywhere on the Net around the world -- if

24   you send a message to that machine, the Internet will get it

25   to a particular machine that is sitting somewhere that I have

1    designated because I am the registrant of that domain.  I

2    designated all messages go to this machine.  It could be the

3    machine in my office.  It could be a hosting machine.  It

4    could be anywhere but I -- you know.

5         The Internet at that point is thank you very much, I've

6    done my job.  I've -- that's what it does is it routes

7    messages directly based on their addresses, their domains.

8         On that machine I can -- I can put a file right now -- I

9    could put a file on that machine that I could -- oh -- let me

10   explain it this way:  There can be individual files on that

11   machine that are retrievable by requests.  I could put a file

12   that's a photograph 1 onto the -- in the memory of that

13   machine and if you go to the, quote, web site

14   www.davidpost.com/photograph1, it will retrieve not the home

15   page but the index -- index.html or about.hml *[sic]*.

16        It will retrieve this file photograph.1.jpg.  That's a

17   filed that I've placed there that -- and you could have

18   multiple file -- just as on your machine.  You have multiple

19   levels of -- so -- so if you think about the system.  To the

20   left of the slash, that's the Internet's hierarchy.

21   Www.davidpost -- it could be even

22   engineeringdepartment.computersciences.schoolofartsandsciences

23   .temple.edu.  That's the Internet's hierarchy.  The Internet

24   works out what that'll mean.

25        To the right of the slash is my hierarchy.  I can set up

1    that machine to have 14 different directories; pictures,

2    photographs, texts, downloads, uploads, this stuff, bad stuff,

3    good stuff.  And under that files and subdirectories and

4    sub-subdirectories and sub-subdirectories just like you do on

5    your -- and other Windows machine, you have directories and

6    sub -- all that information is to the right of the slash.

7         So I could -- I could post a file 14 levels deep in my

8    machine under the work files folder and 2012 subfolder, July

9    subfolder, Nebraska SORNA case subfolder, constitutional

10   issues sub- -- all that and I could put that on that machine

11   and then you could retrieve -- if you knew -- if you knew it

12   was there, you could retrieve it by typing www.davidpost.com

13   slash, put in its address -- its local address on my machine

14   to the right of the slash.  That's the best I can explain it.

15   Q.   Okay.  And that -- that's what I want to focus on --

16   A.   Okay.

17   Q.   -- that -- how you know it's there.  So could you --

18   let's -- I'm thinking of a typical web site here.  We're on

19   the -- say, the right-hand or either the left-hand column has

20   links and you can go to, say, in this example -- could you set

21   it up so you do www.davidpost.com -- could you set it up where

22   those different directories are listed --

23   A.   Oh, that's exactly what I do actually.  If you go --

24   Q.   Okay.

25   A.   -- yeah, most people do this.  In other words, www dot --

1    if you send a request to www.davidpost.com, just type that

2    into your browser, you'll get back a page that -- that I have

3    entered in at some point in the past.  On that page -- that's

4    a file.  It's just a file that's residing in this computer

5    that gets sent to you automatically.

6         In that file there can be links so I -- I do have links

7    to amicus briefs.  There'll be a -- a thing in the upper left.

8    It'll say read the amicus brief I just filed.  That's

9    residing -- if you click on that link, you then go to -- you

10   are taken to -- the code in the back of that link takes you to

11   www.davidpost.com slash, the folder called amicus briefs, and

12   in that -- and then you see what's in that folder and then you

13   click on one of those and you bring up the file.

14        So it's a way you can make the internal directory

15   structure of your machine visible to people on the Net if you

16   want to using this -- to the right of the slash is where

17   you -- you -- you encode that information, if you will.

18   Q.   And so that's how you -- that system, that directory

19   you're talking about, that's how you inform someone looking at

20   your web site what is on your --

21   A.   That's --

22   Q.   -- directory?

23   A.   -- correct.  That's one way to do it --

24   Q.   Okay.

25   A.   -- is just to -- to list it and -- and to link to it and

1    then they say, oh, yeah, I want to read that amicus brief and

2    they click and, lo and behold, it comes up.  If you look at

3    the address, you'll see it's got a slash in it and it's got

4    some directory but ordinarily you don't care about that.

5    Q.   And so let's say at the bottom of that list, could you

6    also provide a link to, say, another directory?

7    A.   Absolute -- absolutely.  Absolutely.

8    Q.   And you wouldn't necessarily have control over that

9    directory but you could link to it?

10   A.   You could have a link to a directory on another machine

11   which you would have no control over.  Is that what you mean?

12   In other words, I could have a -- a list -- well, I'm sorry.

13   Q.   Yeah.  For example, could you have a link to

14   www.kevingriess.com?

15   A.   I could, absolutely.  And -- and I can -- and it will

16   look -- the Internet is designed to make these more or less

17   interchangeable.  That is, you don't know -- if you go to my

18   home page, I'll have a list of five things; read my papers,

19   here's some interesting blog posts, stuff I've read in the

20   past few days, important breaking news and something else.

21       Some of those will -- if you click on them will bring you

22   files that are coming from my machine.  Some of them will

23   bring you files that are coming from elsewhere on the

24   Internet, that are coming from Kevin's machine and -- it's

25   designed to allow that sort of transparency.  It's not -- the

1    user doesn't have to know.

2         That's the -- really the wonderful part of it in a sense

3    is that the links look the same, the files look the same

4    whether they've come from just one level deeper in this

5    machine or some machine that's sitting in Shanghai.  It's very

6    hard for you to know.  It's largely invisible to the user

7    which -- which is really happening.

8    Q.   Professor, you also answered a few questions about the

9    term "allows" --

10   A.   Yeah.

11   Q.   -- again, whether a web site "allows" someone under the

12   age of 18 to use or access its web site.  Would an emancipated

13   minor who is potentially under the age -- let -- let me phrase

14   this differently.

15        Are you familiar with whether an emancipated minor could

16   form a legally binding contract?

17   A.   I wasn't expecting that question.  I'm familiar with --

18        MR. GRIESS:  I'll object, Your Honor, on foundation.

19   A.   -- I'm familiar with that as a -- as a difficult legal

20   issue, yes.

21        THE COURT:  I -- I think that that will be sustained.

22        THE WITNESS:  Oh.

23        THE COURT:  The -- there was an objection that you

24   didn't here, Professor, I'm sorry.

25        THE WITNESS:  Sure.

POST - REDIRECT (Dahlquist)                                    140

 1              THE COURT:  I -- I don't think this is -- that --

 2     that's sort of an -- you know, Paige, who's made the Law

 3     Review, is going to have to write a Law Review article next.

 4     So if you want to write --

 5              THE WITNESS:  It's a good one.

 6              THE COURT:  -- an emancipated minor being able to log

 7     onto --

 8              THE WITNESS:  Right.

 9              THE COURT:  -- www.dr.post.com even though he

10     prohibits anybody from 18 from doing so, have at it.

11              THE WITNESS:  Yeah.

12              THE COURT:  So we don't need to answer that.

13              THE WITNESS:  Okay.

14              THE COURT:  Go ahead.

15     BY MR. DAHLQUIST:

16     Q.   Professor, for your time and involvement in this case,

17     you were paid a fee; is that correct?

18     A.   Yes.

19     Q.   And what -- what are you charging the plaintiffs in order

20     to provide that?

21     A.   Three hundred dollars an hour is my fee, I think.

22              MR. DAHLQUIST:  If I didn't do it previously, I would

23     like to offer Exhibit 304, which is the expert report and --

24     did I offer it?  Okay.

25              MR. DORNAN:  I think you did.

```
 1                THE COURT:  I've received it.

 2                MR. DAHLQUIST:  Okay.  I couldn't remember.  I don't

 3      have anything further, Judge.

 4                THE COURT:  Professor, I've got a -- just a couple of

 5      very quick questions.  With regard to this collection of

 6      Internet -- "collection of web sites" issue --

 7                THE WITNESS:  Uh-huh.

 8                THE COURT:  -- if -- if I understood your concern, it

 9      was twofold.  One, anything to the right of the dot-edu you

10      said could conceivably be looked at as a collection of -- of

11      sites.

12                THE WITNESS:  Right.

13                THE COURT:  But your primary concern was not that.

14                THE WITNESS:  Correct.

15                THE COURT:  Your --  Let's take the Chrome Operating

16      System.  Are you familiar with that?

17                THE WITNESS:  Uh-huh.

18                THE COURT:  Is that a collection of web sites?

19                THE WITNESS:  No, I don't think Chrome -- no, I -- I

20      wouldn't say --

21                THE COURT:  Give me an example then.

22                THE WITNESS:  Oh, a -- a -- a collection of web sites

23      could be Google, the search page of Google, Google Maps,

24      Blogger, YouTube, Google Translate.  Those are all different

25      sites but plausibly connected as a collection -- even as I say
```

1    that, I'm -- why do I think they're a collection?  Well,

2    they're a collection of sites -- they're a single collection

3    of sites because they're all listed, for example, on the

4    Google home page.  So I can reach them in one click from

5    Google dot-com --

6              THE COURT:  But you could also reach them separately?

7              THE WITNESS:  But I can also reach them separately.

8    Some of them may be in the Google.com domain.  So some may

9    be -- it may be blogger.google.com or gmail.google.com.  Some

10   are not.  YouTube has got its own dot-com.  That's -- To the

11   engineers they don't care about that.

12             THE COURT:  Sure.

13             THE WITNESS:  Irrelevant.  I have --  So there are

14   various ways one could define this collection.  It could be a

15   corporate definition.  They're in the same collection because

16   we are, in fact, all controlled by Google but I happen to know

17   that but other people may not.

18             THE COURT:  Sure.

19             THE WITNESS:  I only don't know where this collection

20   of sites -- how do I know when I'm in a different collection

21   of sites?  I think that's a very difficult ambiguity in the

22   statute.  It really is.

23             THE COURT:  All right.  There are sites now that --

24   Are you familiar with VIBar?  VIBar, V-i-b-a-r.  It's -- it's

25   a Voice over IP where you call internationally.

```
1                    THE WITNESS:  Oh, sure.

2                    THE COURT:  All it does is provide audio.

3                    THE WITNESS:  But -- okay.

4                    THE COURT:  Would -- would VIBar be covered by any of

5          these definitions?

6                    THE WITNESS:  Oh, sure.  Isn't it a -- it's a chat

7          room.  It's a chat room, I believe, because it is service

8          based on the Internet or communications network for the

9          virtual instantaneous exchange of voice transmissions between

10         two or more computers.

11             I think Voice over IP is a -- is a -- any Voice over IP

12         function -- service would be -- would be a statutory chat room

13         even if that's all it does.

14                   THE COURT:  So in VIBar you can also exchange the

15         text messages but --

16                   THE WITNESS:  Right.

17                   THE COURT:  -- but the more we use Voice over IP and

18         go away from what we consider standard landlines --

19                   THE WITNESS:  Yeah.

20                   THE COURT:  -- it's your view that the, quote,

21         telephone is covered by this statute?

22                   THE WITNESS:  The -- the old-fashioned telephone --

23                   THE COURT:  No, no.  The -- what --

24                   THE WITNESS:  Oh.

25                   THE COURT:  -- we generically think of the
```

```
1     telephone --
2              THE WITNESS:  Oh.
3              THE COURT:  -- is covered by the statute?
4              THE WITNESS:  Correct.  In other -- that -- that when
5     people now say, oh, I called my grandmother in whatever, she's
6     visiting in Australia, they can mean, and often do mean
7     nowadays that they used a Voice over IP service.  I mean, the
8     distinction between -- to the use -- whether it's a cell
9     network call, a landline call or a Voice over IP call, it's
10    largely -- we don't care as we -- we call it all a telephone
11    call.
12             THE COURT:  Well, not to put too personal a point on
13    it.  I have a grown child in Australia and a grown child in
14    China and on my iPhone I have a green thing that looks like a
15    phone --
16             THE WITNESS:  Right.
17             THE COURT:  -- and a purple thing that looks like a
18    phone.
19             THE WITNESS:  Right.
20             THE COURT:  One is VIBar and one I got to pay for --
21             THE WITNESS:  Right.
22             THE COURT:  -- and I try not to hit the one I got to
23    pay for --
24             THE WITNESS:  Right.
25             THE COURT:  -- when I -- when I hit -- when I make
```

1     those choices.  And one is entirely over the -- the Internet.

2               THE WITNESS:  Correct.  Right.  The VIBar is entirely

3     over the Internet.  That's why they can do it so cheaply.  It

4     does have this feature that Mr. Griess was -- it -- it does --

5     it's not dedicated -- you don't have a dedicated line with

6     your son or daughter in Australia in the way that you used to

7     with a -- if it's going over the Internet, it -- it does take

8     this indirect route.

9               THE COURT:  Well --

10              THE WITNESS:  It's amazing how it works but it does.

11              THE COURT:  But if it's encrypted, it's sort of

12    dedicated, isn't it?

13              THE WITNESS:  It's certainly private.

14              THE COURT:  Yeah.

15              THE WITNESS:  It is -- and I think it is private.

16    Dedicated in a -- I don't know exactly what they meant by

17    "dedicated".  That's my problem.

18              THE COURT:  Okay.

19              THE WITNESS:  But I think in answer to your question,

20    yes, we would call that a phone call even though it's covered

21    by the statutory definition of chat room.  That's right.

22              THE COURT:  All right.  I've got to let the lawyers

23    follow up.  First for the plaintiff and then the defendant and

24    then the plaintiff.

25              MR. DAHLQUIST:  I have no further follow-up.

```
 1              THE COURT:  Counsel.

 2              MR. GRIESS:  I have none.

 3              THE COURT:  Thank you, Doctor -- or, Professor.  I

 4    appreciate your testimony.

 5              THE WITNESS:  Thank you.

 6              THE COURT:  Shall we take a 15-minute break now?  Is

 7    that agreeable?

 8              MR. DAHLQUIST:  That's agreeable.

 9              THE COURT:  All right.  Fifteen minutes.

10         (Recess had at 3:18 p.m.)

11         (At 3:36 p.m. on July 16, 2012, the following proceedings

12    were had:)

13              THE COURT:  Be seated.  Counsel.

14              MR. DAHLQUIST:  Your Honor, we've -- we agreed with

15    the attorney for the State that the State's expert, Mr. Nigam,

16    would be testifying after Professor Post.  We relied on that.

17    Professor Post, you know, came into town and made

18    accommodations to be here and --

19              THE COURT:  Sure.

20              MR. DAHLQUIST:  -- we -- it's my understanding that

21    the State's not intending to call -- we -- we would like to

22    have Mr. Nigam called to the stand now.  We -- we kind of

23    planned on that.  That was -- for purposes of travel

24    arrangement, that's what we would like to do.

25              THE COURT:  You mean so you can call him as a
```

1    rebuttal expert?

2            MR. DAHLQUIST:  That's right.  We'd like him to be

3    here when their expert testifies but I think there's a little

4    bit of a...

5            THE COURT:  Counsel.

6            MS. SPOHN:  Your Honor, we're not going to get done

7    with Mr. Nigam today or I don't anticipate that we would be

8    done with him yet today and we want to use a little bit of

9    time to ingest what plaintiffs' expert has said today in

10   further developing our testimony, and there's plaintiffs

11   for -- Does that are here right now whose testimony we could

12   accomplish at this time.

13           THE COURT:  Okay.

14           MR. DAHLQUIST:  Your Honor, they --

15           THE COURT:  Hang on just a minute.

16           MR. DAHLQUIST:  Sure.

17           THE COURT:  When does your professor leave?

18           MR. DAHLQUIST:  Well, he's planning on leaving

19   tomorrow.  We're trying to get a -- later tomorrow in the

20   morning, about 10 -- 10:30.  And so what we were -- we're

21   trying to see if we could get a later flight that day but...

22       They've -- they've -- and the issue of digesting what

23   Professor Post testified to, Your Honor, they've had his

24   report, they deposed him.  There's no need to integrate what

25   he said into whatever they're -- questioning they're going to

1    have for their expert.  I -- I think we -- we talked about

2    this in advance with counsel, and this was the plan, and what

3    we'd like to do is have him -- have their expert come and --

4    and testify so we can have Professor Post here and --

5            THE COURT:  Sure.  Okay.  Did you all tell them that

6    you were going to -- this is okay?  That you'd call your guy

7    after their guy testified?

8            MS. SPOHN:  Out of order but we never agreed that it

9    would be immediately after and our thinking had been that we

10   would be allowed to have him do it all at one time as opposed

11   to spread it out over the course of a few days.

12           THE COURT:  Was your guy here for Professor --

13           MS. SPOHN:  He can be, yes.

14           THE COURT:  No.  Was he here to listen to Professor

15   Post --

16           MS. SPOHN:  Yes, Your Honor.

17           THE COURT:  So it's not as if you have to describe

18   the testimony to him?

19           MS. SPOHN:  No.

20           THE COURT:  He was here -- has he gone home or back

21   to the hotel or...

22           MS. SPOHN:  No.  No.  He's --

23           THE COURT:  Hanging out?

24           MS. SPOHN:  -- downstairs.

25           THE COURT:  He's what?

```
1            MS. SPOHN:  He went to get a coffee.

2            THE COURT:  Okay.  Well, here's what we're going to

3      do.  If --  I'd like you to put him on but you certainly can

4      have the morning -- we'll start a little bit early in the

5      morning so you can have time to -- you can address the issues

6      that he's unprepared to address with Professor Post in the

7      morning.

8         Is Professor Post flying out of Lincoln or Omaha?

9            MR. DAHLQUIST:  Out -- out of Omaha.

10           THE COURT:  And you say his -- his airplane's at

11     10:30?

12           MR. DAHLQUIST:  Ten -- ten o'clock.

13           MR. DORNAN:  Ten o'clock, Your Honor.

14           MR. MONAGHAN:  Your Honor, I called the office to see

15     if there are later flights.  He's flying from -- on Delta to

16     Cincinnati and then to Hartford so that he can drive to

17     Boston.  I haven't heard back from the office yet to see

18     whether or not there are available flights.

19           THE COURT:  Well, we --

20           MR. MONAGHAN:  And we haven't looked to see whether

21     that's available in Lincoln.  We can do that as well.

22           THE COURT:  Well, the best I can do to accommodate

23     both sides is let's -- if -- if you don't have a really big

24     objection -- and if you do, you can make it and I'll rule on

25     it -- but let's put your guy on, have him testify what he was
```

1        going to testify to and then if -- if you aren't done with

2        him, we'll start again in the morning but we'll start early

3        and that'll give you the evening to prepare him to address

4        Professor Post's comments.

5                  MS. SPOHN:  Okay.

6                  THE COURT:  Is that acceptable?

7                  MS. SPOHN:  Yes, Your Honor.

8                  THE COURT:  Okay.  All right.  Do you want to go get

9        him?

10                 MS. SPOHN:  We're retrieving him right now.

11                 THE COURT:  Okay.  Hello, sir.  You're --

12                 UNIDENTIFIED MALE VOICE:  (Unintelligible.)

13                 THE COURT:  No, no.  Don't worry about it.  Have a

14       seat in that witness stand there, sir.  You can give counsel

15       your coffee if -- I think -- yeah.  There you go.  And if you

16       need -- there's a glass of water there, sir.  Then if you'll

17       follow this lady's directions, she'll swear you in.

18           If you'll let him get his water first.  Okay.  Swear the

19       witness.

20                 COURTROOM DEPUTY:  Please state and spell your name

21       for the record.

22                 THE WITNESS:  My name is Hemanshu Nigam, and it's

23       spelled H-e-m-a-n-s-h-u, last name's N-i-g-a-m.  N like Nancy,

24       i-g-a, m like Mary.

25                 COURTROOM DEPUTY:  Thank you.  Please raise your

 1    right hand.

 2                 HEMANSHU NIGAM, DEFENDANTS' WITNESS, SWORN

 3                 THE COURT:  Counsel, you may inquire.

 4                           DIRECT EXAMINATION

 5    BY MS. SPOHN:

 6    Q.   Mr. Nigam, where do you work?

 7    A.   I actually run a company called SSP Blue and SSP stands

 8    for safety, security, privacy, and our tag line is your

 9    blueprint for online safety, security and privacy, and it's

10    based out of Los Angeles.

11    Q.   And what's your position there?

12    A.   I'm the founder and CEO.

13    Q.   Did our ask -- our office ask you to prepare an analysis

14    as to the constitutionality of Nebraska Revised Statute

15    29-4006 and 28-322.05?

16    A.   Yes.  And I -- I think your request wasn't actually

17    whether or not it's constitutional but how does the statute

18    apply in real-life terms as opposed...

19    Q.   Thank you.  What materials did you review in preparing

20    for your testimony today?

21    A.   I looked at some of the materials provided by

22    Assistant General Counsel -- or whatever you guys are

23    officially called -- Kevin Griess, one of which was the

24    judge's request for further information.  Other -- another

25    was -- was a report submitted by Professor Post and then

1   material that I had on my own as well as Internet research.

2   Q.   Did you also look at the statutory language?

3   A.   Yes.

4   Q.   Did you --  And the questions raised by the judge would

5   have been part of the summary judgment order --

6   A.   Yes.

7   Q.   -- he issued?  Okay.

8        And did you complete your analysis?

9   A.   Yes.

10  Q.   And are you prepare- --

11  A.   In January I think 18 of 2011.

12  Q.   And are you prepared to discuss that today?

13  A.   Yes.

14  Q.   Before we get there, let's -- let's go back a little bit

15  to what you're doing at SSC -- SSP Blue.  Can you explain your

16  duties there?

17  A.   Yeah.  I -- I run a company whose job is to provide

18  strategic bill consulting to corporations and sometimes

19  governments and non-profits on anything from technology to

20  policy to public relations and anybody in between that's tied

21  to online safety, security and privacy.  So we can -- I don't

22  know if you want examples or what would help.

23  Q.   Yes, that'd be helpful.

24  A.   We could have a client who comes to us and says that

25  they're having trouble with either hackers or Internet

1    predators or privacy issues on the site.  They're trying to

2    figure out what they should be doing about it from a

3    technology perspective, an educational perspective, a policy

4    perspective, a law enforcement perspective or even a public

5    relations perspective and we provide the strategic counsel

6    needed to -- counsel not from a legal counsel but counsel from

7    a business sense in terms of what should be done on the

8    technology side, what should be done on the education side,

9    what types of non-profits they should -- they should work with

10   to gain further expertise, what kind of educational material

11   should they provide to their users and to the public, what

12   type of information should be given to the press so that they

13   understand what's going on.

14       If they're in discussions with government, whether it's

15   investigators or law enforcement, the kinds of information

16   that would be helpful to retain to provide when it's legally

17   acceptable to disclose it.

18       We do things like even hack into people's web sites and

19   figure out if there's vulnerabilities and then help them fix

20   it.  We look at privacy policies and compare it to actual

21   practice on the company site from the perspective of what data

22   is being collected, who owns -- who owns the data, where's the

23   access controls on that data, whether the data is encrypted at

24   rest or in motion or whether it should be, what types of

25   password controls they have, what type of internal controls

NIGAM - DIRECT (Spohn)                                          154

1    they have versus external controls.

2         We in essence become your virtual team for online safety,

3    security and privacy from every aspect you can think of in

4    that sense.

5    Q.   How does -- how does SSP Blue enhance the online safety

6    for children?  How do you -- for your customers or your

7    clients?

8    A.   So from a child-specific perspective, we will do things

9    like assess the product.  We will take a product such as a

10   social networking site and we will access using our own people

11   the product from the perspective of a Internet predator, from

12   the perspective of a government agent investigator, from the

13   perspective of a typical user, and we will try to do things

14   that we think that type of person would be doing on the site,

15   find out where the vulnerabilities are, find out where the

16   successes are in terms of whether, for example, access was

17   blocked between a stranger and a -- a teenager on the site

18   that should have been blocked or if that was allowed when it

19   should have been allowed, and then we will create a report --

20   an assessment report with a series of recommendations on what

21   the company can do to make improvements in that area.

22        And those improvements can be in the areas of using the

23   product from the front end, the featured -- features and

24   controls, the reporting mechanisms, what should be happening

25   on the back end.  In other words, when the personnel inside

1    the company is getting a report, how should they structure

2    responding to, say, a suicide threat, an Internet safety

3    threat, a harassment threat, a bullying threat, a -- a bomb

4    threat or blowing up a school threat, whatever it is, but

5    anything that pertains to the safety of children on the site

6    or we'll look at content controls.

7        So if somebody's uploading child pornography, when would

8    it be identified, how would it be identified, how would it be

9    reported to things like the National Center for

10   Missing/Exploited Children.  We will look at adult pornography

11   or any other kind of inappropriate conduct that the content at

12   the site has said it doesn't allow them to -- under the terms

13   of use and we'll examine whether that's possible to do.

14       If it is done, how long does it take to identify it, how

15   do you report it, how do you take it down, what does the staff

16   do, what kind of training the staff has, what kinds of

17   guidance the staff has in determining what things should be

18   taken down, what things should be kept up.  If there is a

19   report, whether or not an account should be terminated or

20   warned or other things like that.

21       We look at conduct between individuals.  So we look at

22   content, contact and conduct.  Those are the three c's we try

23   to simplify it into.  And in terms of conduct, we'll

24   examine -- if there's a teenager on the site under the age of

25   18, can an adult contact the person, can -- if they can send a

1    friend request, for example, can an individual block another

2    person.

3         We'll look at whether or not there are trigger mechanisms

4    on the back end so an adult who may have been contacting ten

5    kids and all of them have blocked it or rejected the friend

6    request, do they have some sort of bells and whistles that go

7    off on the back end that tell a support person take a look at

8    this particular site 'cause there seems to be too quick, too

9    many blocking of an adult from children on the site,

10   therefore, there may be a possible predator alert.

11        We'll look at whether a company has controls in place

12   that stop registered sex offenders from joining the site, if

13   that's what they want to do.  We actually provide a service

14   for that as well to two companies out there right now of

15   access to a registered sex offender database that has

16   registered sex offenders in the database from 51 different

17   locations, 50 states plus the Washington -- Washington, D.C.

18   district.

19   Q.   Prior to SSP Blue, where were you employed?

20   A.   I was the chief security officer of News Corporation and

21   MySpace, which was owned by News Corporation, as well as for

22   Fox Interactive Media, which was another division inside of

23   News Corporation.  I served in all three of those capacities

24   during my four-year tenure there.

25        In the News Corporation tenure, I was responsible for the

1    online safety, security and privacy of 40-plus digital

2    properties that News Corporation owned.  I was also

3    responsible for all of the safety, security and privacy

4    aspects of MySpace and the Fox Interactive Media web sites

5    which included sites like ign.com, AmericanIdol.com,

6    foxnews.com.

7        Fox Interactive Media also owned askmen.com,

8    rottentomatoes.com which is now sold -- some of those have

9    been sold to other proper- -- other companies.  There was also

10   photobucket.com which is a photo site much like Flickr so...

11   Q.   What kind of safety and privacy features did you

12   implement at News Corp. or MySpace?

13   A.   In the MySpace I -- and some of these other sites, I

14   think we put in over 150 different types of features and

15   controls and programs during my time there.  They included

16   things like controls on who can access the site, who can

17   connect with whom on the site, what types of content can be

18   uploaded, how did that content get identified, how does an

19   individual block another individual, changing the reporting

20   mechanisms, adding specific features in reporting so that you

21   can choose what type of contact or conduct you're reporting.

22       I mean, I don't know how -- what type of areas you want

23   to focus on but I can...

24   Q.   What about -- what was the minimum age for someone at

25   MySpace to -- in its terms of use?  What -- what was the

1    minimum age?

2    A.   When it was actually initially --

3         MR. DAHLQUIST:  I'm going to object -- object on

4    foundation, Your Honor.  Just state that it doesn't -- the

5    question doesn't specify what time -- time period we're

6    talking about, whether it covers when Mr. Nigam was associated

7    with it or -- or contemporaneously.

8         THE COURT:  Sustained.

9    BY MS. SPOHN:

10   Q.   When you were employed at MySpace, what was the minimum

11   age for someone to use MySpace?

12   A.   For the Court's benefit, I was actually the chief

13   security officer at MySpace from May 1 of 2006 until

14   April 30th of 2010.  I launched SSP Blue on May 1 of 2010.

15   Q.   And what was the minimum age requirement while you were

16   at MySpace?

17   A.   The minimum age requirement for the company, it was

18   started at 16.  It was changed to 14 when I started there and

19   then changed again to 13 during my tenure there and it is

20   still 13 when I left.  And it's actually still 13 today.

21   Q.   Can you explain why they made the -- they reduced the

22   minimum age from 16 to 14 to 13?

23   A.   Well, originally, the site was created with the intention

24   of appealing to high school students and then the recognition

25   came from some of the founders that they actually realized

1    high school students were also 14 and 15 and then we realized

2    that high school students can also be 13 years old but nobody

3    wanted to go below the age of 13.

4    Q.   Why not?

5    A.   Mostly because of the Child *[sic]* Online Privacy

6    Protection Act 'cause it has requirements that trigger when

7    you allow a site -- when a site says they're allowing under

8    13-year-olds to access the site, then all of the sudden

9    there's all these other requirements that you have to follow,

10   and from a company perspective, it was easier to keep it

11   from -- at 13 plus rather than go under 13.

12   Q.   What kind of efforts did MySpace make to ensure that kids

13   under 13 were not on the site?

14   A.   It started -- it was probably what I would call a

15   multi-tiered approach.  The first step was when you're signing

16   into the site, what you have to do is register in order to use

17   it.  When you register for the site, it asks you to fill in

18   your age, your birth date, your location, information about

19   yourself.

20        During that process, if the birth date that you filled in

21   comes back as under the age of 13, then the individual's

22   informed that they're not allowed to access the site and

23   that's the end of that registration process.

24        We then draft what is called a session cookie.  I know

25   the Court was listening to the definition of cookie earlier

NIGAM - DIRECT (Spohn)                                                 160

 1     but we draft a session cookie on that machine so that if

 2     somebody wanted to what we call back button -- in other words,

 3     go back to the original page and try to do it again and change

 4     the date to be older than 13, they couldn't do that, which

 5     also had unfortunate other circumstances where somebody using

 6     the same machine might not be able to sign up but that was a

 7     decision we made and took.

 8         We also ran what are called search queries on the site

 9     based on text that individuals who were under the age of 13

10     were using, and what we would do is look at how people were

11     talking on the site once they were on, and if somebody was

12     saying, I'm really 11, I'm really 12, we had queries

13     triggering those types of results and then our staff would

14     look at it, make a decision on whether the person was actually

15     under the age of 13.

16         If they were, then all of their friends who had connected

17     with them were examined and their profiles were examined one

18     by one by the staffer to determine if they were under the age

19     of 13, and it was what we called a deep dive, and then we

20     would remove the original person that was identified through

21     the search algorithm and then we would remove all their

22     friends.

23         We would also -- based on communications with law

24     enforcement, we identified that sex offenders were looking for

25     children on the site who were listed as 99 years old but they

1    were doing a search on their height, their weight and their

2    age of being 99 'cause what they had identified from their own

3    discussions with children was that they were thinking 99 was

4    funny and it was a good way to get around getting onto a site

5    that said it's for 13 plus.

6         And so registered sex offenders and others had figured

7    out that's what we were doing and that's why they were looking

8    for 99-year-olds.  So then we noted -- we went through that

9    entire 99 age group of which at the time I think there was 2

10   million of them.  Some were actually adults who had thought 99

11   was funny.  Others were kids who thought 99 was the way to get

12   in and it was in their mind cute.

13        So we did a sweep of that entire area.  We stopped anyone

14   from registering who was also -- the other one was 99 -- the

15   other one was 69 actually 'cause for the jokes that are

16   surrounding the 69 number, people were using that and we went

17   through and did a sweep of that and then changed the age --

18   the highest age you could be on the site from not being

19   anything higher than 68 which, of course, led to some seniors

20   who objected but we had an explanation sent to them explaining

21   why even if they were 70 years old or 69 years old, they

22   couldn't register themselves as that and that was an

23   understandable discussion we had but we took that chance and

24   we did that.

25        We ran quite a few of -- then we also added a reporting

1    abuse feature on the site that would let us know if there was

2    an underage user.  Because what we found in our own community

3    was that many, many people were using the rules and the terms

4    of service that was in the -- in the site and enforcing it

5    themselves.

6         This is something that I think even today Facebook is

7    constantly saying publicly that the community itself likes to

8    self-enforce.  So we had complaints coming in from individuals

9    telling us that somebody was under the age of 13 and didn't

10   belong in the site or that somebody was under the age of 18

11   but -- but listed as an adult and, therefore, we would go into

12   that account, take action against the account and that action

13   included either deleting the person and blocking the

14   information they used to sign up or asking them to correct

15   their age, if there was a way to figure out what that was, and

16   then setting it and locking it in.

17        We also added another feature where we didn't allow

18   individuals from going from over the age of 18 to a number

19   that was under the age of 18.  You could if you were 18 or

20   over change your age within the 18 or over groups.  A woman

21   who was 29 years old when she turned 30 could change it back

22   to 29 'cause that was something people wanted to do; however,

23   if you were under the age of 18, you couldn't change your age

24   from 13 to 14 or 14 to 15.  Once you had set an age, you were

25   locked into that.

1      We then did a sweep of all the 18 or plus category

2   looking -- informing users that if they were -- if they had

3   put in their wrong, incorrect age that this was their one

4   chance to correct it but if we found out otherwise or if we

5   identified it through our algorithms or anything else, we

6   would delete their account and they would be blocked from the

7   site.

8   Q.   Did MySpace have a policy regarding sex offenders that

9   used their service -- to use their service?

10  A.   Yeah.  We --  Our policy was that we didn't allow

11  registered sex offenders to sign up to the site or once we did

12  identify a registered sex offender, we deleted the account, we

13  preserved the information and we provided it to the Attorney

14  General's Office of Connecticut who then I think distributed

15  whatever was relevant in different states in the 49 states.

16  Q.   You probably get the gold medal for talking close to the

17  microphone but --

18  A.   Oh, sorry.

19  Q.   -- you may need to back out just a little bit.  There's a

20  little feedback coming back with --

21  A.   I'm usually sitting at counsel table when I used to

22  practice.

23  Q.   And I feel like I'm eating my -- my mike as well but

24  probably need to be a little closer.  What other efforts did

25  you use to protect children from predators at MySpace?

1    A.   We had built trigger mechanisms which would tell us if an

2    individual after signing up on the site was attempting to

3    befriend -- who was an adult was attempting to prevent --

4    befriend people who were under the age of 18 in a fashion that

5    was abnormally high.

6         For example, sending 15 friend requests to children as

7    soon as they sign up.  Sometimes we recognized -- and -- and

8    support staff would look at that because we recognized that

9    teachers may be setting up a page in order to communicate with

10   their kids and asking their kids to become friends that were

11   in their classroom.

12        We set up a requirement that if you were over the age of

13   18, in order to send a friend request to somebody under the

14   age of 18, you had to know either their last name or their

15   e-mail address.  Neither of the information was available

16   publicly on the site and in essence you had to know it as

17   though you had met them in the physical world and there was no

18   other way to find that information out.

19        We separated out the 15, 16, 17 category from the 13- and

20   14-year-olds on the site -- I'm sorry, 13, 14, 15 from the 16

21   and 17 and so that there was -- cross-communication was

22   limited in one-directional instead of bidirectional.

23        We didn't allow any messaging between an adult and a

24   child until there was a friendship established and that

25   friendship could not be established unless they knew that

1    information about that individual on the site.

2         There was other things that I could think of probably

3    while I'm sitting here but...

4    Q.   Can you tell me about Sentinel SAFE?

5    A.   Okay.  That was a service that we utilized that was

6    created by a company called Sentinel Tech Corporation, which I

7    don't think exists anymore, in Florida which had amassed a

8    database of registered sex offenders in the country and they

9    created what was called a searchable database of those

10   registered sex offenders and that database existed of what was

11   called Megan's Law so anything that was publicly accessible

12   was obtained by this company.

13        That database was sitting inside of a MySpace server

14   database where we would access it, any -- and compare

15   registered users against that database and determine if

16   somebody was a match, and then we staff ranked those matches

17   based on possibility of being precise, and then a staff member

18   would look at every single one of those and determine which

19   was a match, which wasn't a match, which didn't have

20   information on it.

21        And based on those results, we would either send --

22   either delete the account if it was a match and preserve it

23   for law enforcement or allow the account to remain or mark it

24   as incomplete information and then when more information was

25   added, we would add -- we would check it again or staff would

 1    check it again.

 2    Q.    While you were at MySpace, did you assist in the drafting

 3    of legislation regarding sex offenders?

 4    A.    Yes.  One of them is probably relevant in this courtroom

 5    today which was the e-mail registration requirements.  I was

 6    the person who was one of the brains behind the law itself.  I

 7    was -- when I was a prosecutor in the LA County District

 8    Attorney's Office, I had prosecuted sex offenders, including

 9    for registration violations, and one of the discussions

10    that -- that came about during our discussions with the state

11    AG's task force that was headed by General Blumenthal from

12    Connecticut at the time was can something be done in the

13    Internet space that is similar to what happens in the physical

14    space today and that is where the concept of e-mail

15    registration came about.

16    Q.    Akin to what we're requiring of sex offenders in Nebraska

17    right now which is --

18    A.    Correct.

19    Q.    -- an e-mail identifier --

20    A.    I don't --

21    Q.    -- e-mail addresses?

22    A.    Correct.  I don't know the exact number of states but I

23    think 33 states have it.  It was first introduced either in

24    Virginia or New York.  Connecticut, Virginia, New York or

25    Florida, one of those states was the first to introduce it.

1     Q.    Prior to MySpace, where were you employed?

2     A.    I was a executive at Microsoft Corporation.

3     Q.    And what did you do at Microsoft?

4     A.    I started in Microsoft in July of 2002 until April of

5     2006, and when I started, I was first in the law and corporate

6     affairs department as a director of law and corporate affairs

7     but primarily responsible for four different aspects.

8           One was all company internal investigations of employees

9     for misconduct or criminal misconduct.  Second was for

10    building their worldwide criminal compliance program and that

11    purpose of that program was to work with law enforcement

12    whether it was in the U.S. or any other country, anything from

13    state, local, federal, as well as agencies like the NSA, the

14    Central Intelligence -- Intelligence Agency, on information

15    that they needed from Microsoft for conduct that may be

16    involved in a criminal investigation or national security

17    investigation or a foreign law enforcement investigation

18    coming out of Hotmail, MSN, Windows Client, Instant Messenger

19    or any of the other communication services that Microsoft had

20    at the time.

21          I also was in charge of creating what's called a security

22    enforcement program where we were identifying people who were

23    hacking into customers' or Microsoft networks in order to

24    disrupt the network, plant a virus, create a worm, any types

25    of things that were happening from that perspective to figure

1    out who it was, identify the individual and then turn that

2    individual to law enforcement for prosecution.

3        I was also responsible for looking at things like

4    violations of child pornography, child predators who were

5    trying to get to people who are members of our services,

6    whether it was customers in the MSN site, in the Hotmail site

7    or in some of the groups that the individuals were using and

8    investigating those and either referring them to law

9    enforcement directly or to the National Center for

10   Missing/Exploited children.

11       I was also responsible for looking at all the content

12   that was coming into the site to demarcate content that was

13   considered illegal and content that was just in violation of

14   our terms of use and helping the company think about how to

15   handle that.

16       And then from the legal group I moved into the business

17   development and strategy group and I was responsible for

18   creating a child safety initiative that would examine how

19   Microsoft was thinking about child safety from a product

20   perspective and a business strategy perspective and

21   implementing a strategy that took child safety and put it into

22   Microsoft products across the field as opposed to having

23   different products in different divisions.

24       So Xbox was built with parental controls, Windows Vista

25   was built with parental controls, Windows Live was built with

 1    parental controls, Instant Messenger was built with -- the

 2    same way, Hotmail had some controls in it, and we built what

 3    was called a perseverance strategy were things were similar no

 4    matter what product you were using so our customers weren't

 5    getting confused by different things by -- simply because they

 6    were using different products.

 7        I also was the director of consumer security outreach

 8    whose job was to do outreach to the public in helping them

 9    think about -- think about protecting themselves and their

10    family and their information, and I was going out on the road

11    and teaching individuals on how to -- how to protect their

12    family and their information in the online communities and in

13    the online world.

14        I was responsible for our non-profit connections in the

15    child advocacy community so I built relationships with groups

16    like the National Center for Missing/Exploited Children,

17    Internet Keep Safe Coalition, Enough is Enough amongst --

18    some -- Web Wise Kids, some of the other ones out there.

19        I also started what was called an international law

20    enforcement training program with the International Center for

21    Missing and Exploited Children which ended up teaching well

22    over a thousand police officers around 90 something countries

23    by the time I left all on how to investigate Internet --

24    Internet-related child predator cases or child pornography

25    cases that were taking place in either instant messaging, chat

1    rooms.  At the time social networking was just in baby stages

2    so we didn't really focus on that much.  And -- and e-mails

3    and web cams and Voice over IP was starting at the time as

4    well.

5         So -- I don't know.  That's what I can remember right

6    now.

7    Q.   Thanks.  Could you explain how --  You mentioned that

8    Microsoft -- Microsoft offers instant messaging and chat room

9    services, correct?

10   A.   Correct.

11   Q.   And how did you make those services safer for children at

12   Microsoft?

13   A.   We did -- we added several things that are actually being

14   used by most of the industry or many of the industry has

15   adopted since then, especially the -- the major players in the

16   industry.  In the instant messaging site, we -- we connected

17   those where parents could determine whether or not -- where

18   they would be notified if a individual was added to their list

19   of contacts, what was called a buddy list by AOL or a contact

20   list -- every company used a different term for it but in

21   essence the list of people they were communicating with and

22   they could be notified.

23        They could ask -- they could block it.  They could set it

24   up so that they have to give permission for that.  We had a

25   report abuse button at the bottom of it, and during a

1    conversation inside a window, an individual could click that

2    button and report that individual and then it would be

3    reviewed by our support staff.

4         And all our support staff was working 24/7 whether it was

5    inside the company or outsourced to a vendor.  And in the chat

6    rooms, we often had people who were monitoring chat rooms, in

7    other words, actually inside the chat room during the

8    conversation, and if any type of activity was going in

9    directions that wasn't appropriate or was illegal, it would be

10   reported.  If it was illegal, it would be -- an action would

11   be taken against the person if it was considered inappropriate

12   or in violation of terms of use in other types of ways.

13        And illegal activity could be anything from somebody

14   searching for child pornography, it could be somebody

15   looking -- who's an adult looking for places that they could

16   meet under 18-year-olds, sometimes under -- under 13-year-olds

17   or under 12-year-olds or under whatever the age group that

18   person may be looking for.

19        We invited law enforcement to the campus -- Microsoft

20   campus, and we sat down with them to understand how Internet

21   child pornographers and Internet predators were using our

22   services trying to gain access to children and then we tried

23   to enter -- educate our own customer service staff and our

24   support staff on ways to identify that kind of conduct or to

25   go into places and use key words to find rooms that were being

1    created -- chat rooms were creating *[sic]* for that purpose and

2    then either block the rooms or ban the naming of those rooms,

3    and we created a list of terms that would be banned so that

4    people couldn't -- it would be harder for them to create rooms

5    like that, and when it was harder, the goal was eventually

6    they would either go somewhere else or not do it.

7    Q.   Prior to Microsoft where were you -- where were you

8    employed?

9    A.   I was the vice president of worldwide Internet

10   enforcement at the Motion Picture Association of America, and

11   I was hired during the time when -- in August of --

12   August 30th of 2000 is when I started -- or August 28th, I

13   can't remember the exact date, and I left on June 21st of

14   2002.

15        And I was brought in to build their worldwide Internet

16   enforcement department whose job was to try to find movies

17   that were being pirated in the Internet space around -- around

18   the world for the member companies which was MGM at the time,

19   Paramount, Disney, Warner Bros., Sony -- Sony Pictures, and

20   Fox was the other one.

21   Q.   How did your work at MPA enhance online child safety?

22   A.   What we did was during the process we -- we worked with a

23   lot of outside companies to identify some of the technology

24   that they had in order to identify Internet movie files, and

25   during the process of identifying Internet movie files using

1    the technology that we implemented, we were finding that

2    individuals were hiding their child pornography movie files

3    inside of pirated movie files so that they wouldn't be

4    detected by law enforcement.

5         And when we recognized this trend, we sat down with the

6    FBI, we sat down with the Internet Crimes Against Children

7    Task Forces, especially the one in the -- in the LA field

8    office, and figured out how to create a reporting mechanism.

9    We trained our staff on how to spot movie files that might be

10   doing something like this and we made referrals -- what were

11   called referrals to law enforcement.  In other words, we

12   preserved the information, we tried to identify where that

13   file was being posted from, we identified the IP address, the

14   Internet Protocol address, of that file for law enforcement,

15   and any other information that could be used in order to

16   identify who the individual was behind it and then we made

17   package referrals to law enforcement.

18        We also trained law enforcement in the FBI community and

19   the federal, state and local community, especially in LA -- in

20   Los Angeles, how to investigate Internet crimes related to

21   movie piracy but in the process how to investigate crimes

22   related to Internet predators and Internet movie files -- or

23   of child pornography.

24   Q.   Prior to the MPAA where did you work?

25   A.   I was the -- what was officially called the trial

1    attorney but most people call the federal prosecutor in the

2    U.S. Department of Justice in Washington, D.C. in the criminal

3    division and inside the criminal division is the child --

4    child exploitation and obscenity section and then later the

5    computer crime and intellectual property section.

6    Q.   What kind of crimes did you prosecute while at USDOJ?

7    A.   When I first started there, which was April of 1997 and I

8    stayed there until August of 2000, I was in the child -- child

9    exploitation and obscenity section, CEOS was the nickname for

10   it.  I was brought in as one of their first Internet crimes

11   against children prosecutors.

12       I was responsible for working with law enforcement to

13   prosecute Internet-related child predators or Internet-related

14   child pornography.  I was also responsible for trafficking of

15   women and children cases that were coming in from outside the

16   country inside the United States for prostitution or other

17   (unintelligible).

18   Q.   While you were prosecuting those crimes against children,

19   did you notice a pattern that predators use to groom their

20   victims?

21   A.   Well, I mean, I think before I answer that one of the

22   things that I ended up doing was working very closely with the

23   FBI's -- what was called the Innocent Images Project and that

24   project was specifically created to create undercover

25   operations where the Federal Bureau of Investigation would

1    work with the state and local officers as well as Secret

2    Service and other agencies, and that's when the Internet

3    Crimes Against Children was originally launched, and then I

4    trained the first set of Internet Crimes Against Children Task

5    Forces in how to investigate Internet crimes, how to identify,

6    how to figure out what predators were doing.

7         And what -- and during the prosecution and during that

8    time frame, what we learned was the process of a Internet

9    predator of meeting a child in the Internet space was very

10   similar -- and then eventually meeting them in the physical

11   space was actually very similar to what happens in the

12   physical world where they go through what's called a grooming

13   process, and the grooming process is essentially creating a

14   relationship with a child and a relationship in which every

15   time a child feels like they need someone to talk to, the

16   person is there, anytime the child feels like that they're --

17   things aren't going their way, they're there to inspire them.

18        The understanding of the children's world, in other

19   words, what kind of bands they're in, what music that they

20   like, what kind of clothing is really the in clothing nowadays

21   and having those conversations and having the ability to have

22   that conversation.  The person would strike up a relationship

23   in which case a quote/unquote relationship would be existing

24   as opposed to a stranger meeting a stranger -- a stranger

25   child and all of the sudden a physical-world occurrence

1    occurred.

2         That process could sometimes run for one week, it could

3    run for two months, it could run for six months with the

4    ultimate goal of being -- of creating a physical world

5    encounter where the predator would eventually say I'd like to

6    meet with you and then send a bus ticket if the person was

7    living far away or choose a location, whether it was a mall,

8    it was a motel room or wherever that location was eventually

9    to lead into a private encounter that would be of an illegal

10   nature.

11   Q.   Is there -- in your experience is there a particular type

12   of child that sex offenders targeted?

13   A.   Interesting -- I mean, this is -- this was something

14   that -- I think four different research studies have been done

15   now but each one concluded with something similar which was if

16   a child was what is considered at risk in the physical world,

17   they were also considered at risk online as much as they were

18   in the physical world, and from the cases that were -- that we

19   prosecuted, what we found is that the child who was led into a

20   grooming situation almost always was an at-risk child in the

21   physical world to begin with.

22        So it was a child who was seeking attention who didn't

23   have what their -- their needs weren't being met at home, they

24   were having trouble in school of some kind, they were -- they

25   were in a relationship situation in school where they felt

1    like they didn't have enough friends or -- or they didn't

2    belong to the right type of crowds or something was going on

3    in their child's life that was leading them to be vulnerable

4    to a predator situation.

5    Q.   Prior to USDOJ where were you employed?

6    A.   Well, after the child online -- child exploitation

7    section, I went into the computer crimes section and I

8    prosecuted computer crime cases.  During this four -- three-

9    to four-year tenure, I also taught at the -- actually taught

10   at the State Attorney General Academy and I think it was

11   Missouri or Mississippi -- I don't know which state and I hope

12   I don't offend them but it's one of the two.

13        I also taught at -- in South Carolina at the federal

14   academy on how to do Internet cases and then prior to that I

15   was a prosecutor in the Los Angeles County District Attorney's

16   Office.

17   Q.   What do you mean by taught them how to do Internet cases?

18   A.   So one of the things I -- I did quite a bit of was

19   identify inside the Internet industry when I was in the

20   government experts who were experts in how news groups

21   operate, how chat rooms work, how instant messenger programs

22   work, how e-mail works and then -- and then how things are

23   done in the back end, in the front end, in other words, what

24   does the customer see versus what's happening in the back end,

25   and then help law enforcement figure out what type of data is

1    going to be useful to locate and target an individual who's

2    using one of those services to commit a crime, what type of

3    laws would be useful in order to prosecute whether it was a

4    child pornography law, a child enticement law, whether it was

5    better to do a federal prosecution or a state prosecution or a

6    local district attorney prosecution, how to get information

7    preserved.

8         I also worked with the forensic teams on how to identify

9    inside the hard drive of a computer where to look for

10   information that would tell you what an offender was doing so

11   that that case would be brought to court, which cases would be

12   worth bringing, which cases really didn't have prosecutable

13   information in them.

14        I also looked at -- I also worked a lot with the private

15   sector in trying to figure out the best way for the law

16   enforcement community to work directly with the private sector

17   community all within the bounds of the law, especially the

18   Electronic Communications Privacy Act.  I also was a technical

19   advisor to the Child Online Protection Act Commission, what's

20   actually called the COPA commission, and -- which is separate

21   from the Child [sic] Online Privacy Protection Act.  A lot of

22   people actually confuse the two.  One is the COPPA.  The other

23   is COPA.  I don't know how the court reporter's going to write

24   that down.

25   Q.   When -- So then prior to DOJ you were at the Los Angeles

1    DA's Office?

2    A.    Yes, the Los Angeles County District Attorney's Office.

3    Q.    And what kind of cases did you do there?

4    A.    I started in juvenile court where I prosecuted juvenile

5    offenses, anything from misdemeanors to felonies that included

6    murders and gang murders and child exploitation.  Then I

7    spec- -- then I was inside the -- what was called the sex

8    crimes unit which handled all adult sex crime prosecution as

9    well as all child prosecutions and that included child

10   molestation, child abuse, baby murders and adult rapes, adult

11   sexual assault and anything gang related that had a sexual

12   component to it.

13   Q.    Crimes involving the Internet?

14   A.    At the time -- this was -- I was there from 1990 until

15   1997 and AOL had just started which was actually why I was

16   recruited by the Justice Department but we had one crime

17   involving the Internet which at that time in 1996 we didn't

18   know how to handle it so we referred it to the federal agency.

19   Q.    Who then recruited you to --

20   A.    And then eventually I was asked to join the Justice

21   Department in Washington, D.C.

22   Q.    Were any of the sex offenders that you prosecuted at the

23   D -- DA's office reoffenders?

24   A.    Yes, quite a few of them were.

25   Q.    In your experience how soon after committing a first

1    offense would a registrant reoffend?

2              MR. DAHLQUIST:  Objection as to relevance, Your

3    Honor.

4              THE COURT:  That question is so broad that I think

5    I'll -- I'll sustain it.  If you mean a sex offender as

6    defined in this statute, that's pretty broad and -- and that's

7    really my concern.  Now, if you want to narrow it, I suppose

8    that's a different issue but I'll leave that to you.

9    BY MS. SPOHN:

10   Q.   Were sex offenders subject to -- that -- the type of sex

11   offenders that are subject to the Sexual Offender Registration

12   Act in Nebraska and particularly the ones that would have

13   committed crimes against children and been prohibited from

14   using the site under the new crime 28-322.05, in your

15   experience in prosecuting individuals that would have

16   committed those sort of crimes, did they commit -- did they

17   reoffend?

18             MR. DAHLQUIST:  I'm going to object to relevance

19   again, Your Honor.  And I'm going to object on foundation.

20   The witness hasn't testified to any knowledge --

21             THE COURT:  I think that'll be sustained too.

22   There's -- I know just a little bit about this and there's a

23   great debate, for example -- the empirical evidence is not at

24   all clear in my judgment when -- about possessors, for

25   example, of -- well, in the federal system of -- of mere

```
 1    receipt cases about whether -- what the recidivism rates

 2    really are.

 3         Now, if we're going to talk about something else, that's

 4    a different question but even that provision of the statute

 5    is -- is awfully broad so that's why I'm sustaining it.

 6         To be clear I don't think anybody disputes the fact that

 7    the issue of recidivism is a enormous concern with respect to

 8    offenses against children but the parameters of recidivism I

 9    think everyone also agrees change pretty dramatically

10    depending upon a number of factors that are not implicit in

11    your question and so that's why I'm sustaining it.  It just

12    frankly wouldn't help me very much to have that answer because

13    the question's so broad.

14         Go ahead.

15              MS. SPOHN:  Thank you, Your Honor.

16    BY MS. SPOHN:

17    Q.   Mr. Nigam, can you give us a little bit about your

18    education -- tell us about your educational background.

19    A.   You mean schooling?

20    Q.   Education, yeah, your -- what you did -- your degrees.

21    A.   Oh, I have a bachelor of arts in political theory in

22    government from Wesleyan University in Connecticut and I have

23    a law degree from Boston University School of law, graduated

24    in 1990.

25    Q.   Let's turn now to your expert report.  In there you
```

1    explain how enforcement of the statutes would actually impact

2    sex offenders required to register under SORA, correct?

3    A.    Correct.

4              MS. SPOHN:  May I approach?

5              THE COURT:  Yes, and you may have continuing leave.

6    BY MS. SPOHN:

7    Q.    I'm showing him what's been marked --

8              MS. SPOHN:  Judge, do you want a copy?

9              THE COURT:  Is this his vitae?

10             MS. SPOHN:  I'm sorry?

11             THE COURT:  Is this his curriculum vitae?

12             MS. SPOHN:  Yes, it is.

13             THE COURT:  I don't need to see it.  I've seen it.

14   Thank you.

15             MS. SPOHN:  Okay.  It's actually his expert report

16   and his vitae's attached to it.

17             THE COURT:  It's okay.  Go ahead.

18             MS. SPOHN:  Okay.

19   BY MS. SPOHN:

20   Q.    I'm showing you what's been marked as Defendants' Exhibit

21   305.

22   A.    Uh-huh.

23   Q.    Is this the copy of your report?

24   A.    Yes.

25   Q.    Did you draft this report?

1    A.    Yes.

2    Q.    Is this a true and accurate copy of your report?

3    A.    Yes.

4          MS. SPOHN:  Your Honor, at this time we'd offer

5    Exhibit 305 into the evidence.

6          MR. DAHLQUIST:  No objection, Your Honor.

7          THE COURT:  It's received.

8    BY MS. SPOHN:

9    Q.    Let's start with an overview of what's required by sex

10   offenders to be produced under the Statute 29-4006(1)(k) and

11   (s).

12         MS. SPOHN:  If we can put it up on the screen.

13         THE COURT:  Sure.

14         MS. SPOHN:  You want to turn that so we can see it.

15         UNIDENTIFIED MALE VOICE:  (Unintelligible.)

16   A.    I have (k) up here.  Is that what you want?

17   BY MS. SPOHN:

18   Q.    Okay.  You can see it up there?  Great.  Now, let's start

19   with the first type of information.  Include serial numbers,

20   telephone numbers and account numbers, correct?

21   A.    Do you have but not limited to U -- G-U-I-D, serial

22   numbers, IP addresses, telephone numbers?

23   Q.    Correct.

24   A.    Yes.

25   Q.    And I believe IP addresses are -- are no longer at issue

1    here as are -- as with GUID'S.  So serial numbers, telephone

2    numbers and account numbers.

3    A.   Correct.

4    Q.   Right?

5    A.   Yes.

6    Q.   Where's the serial number for a communication device

7    located?

8              MR. DAHLQUIST:  Objection, Your Honor.  It doesn't --

9    the question doesn't identify which electronic

10   communication -- I mean, there's a myriad of different devices

11   that fall under that.

12             THE COURT:  That'll be overruled.  Go ahead.

13   A.   It depends on the device but almost always you look at

14   the bottom of the device.  You turn it over.  Like on your

15   laptop, if you turn it over, you'll see yours.

16   BY MS. SPOHN:

17   Q.   How about on my cell phone?

18   A.   That depends on the cell phone.  Usually, you open the

19   back where the battery is, take the battery out and it's

20   listed under there.

21   Q.   The regis- -- registrant must also provide their phone

22   numbers and account numbers for their remote communication

23   devices, correct?

24   A.   Correct.

25   Q.   How would those numbers assist law enforcement?

1    A.   Well, all of these numbers are numbers that -- if law

2    enforcement -- if -- for example, if you're -- if you're an

3    offender, whether it's registered sex offender or not, but

4    just if you're an individual trying to connect with a under 18

5    individual for illegal purposes, during undercover operations

6    or oftentimes law enforcement will get a complaint from a --

7    usually a mother of a victim who's identified that something

8    is happening with an adult and there's a telephone because

9    that's coming through a text message or they've actually

10   talked on the phone and she's gone through the phone calls

11   made by the child and they find a number, then law enforcement

12   will take that number, subpoena the company that owns that

13   telephone number and figure out who the owner of the account

14   is.

15        Is that --

16   Q.   But if this --

17   A.   -- is that your question?

18   Q.   -- but if this information was at the ready of law

19   enforcement, they wouldn't have to go through the subpoena

20   process?

21   A.   Well, if that information was provided to law

22   enforcement, they can also search databases of other law

23   enforcement which we asked our investigators to do on every

24   case that we had was check certain databases to see if there's

25   another agency already investigating that.

1        In fact, at Microsoft we created a program specifically

2    to help law enforcement have a place to put their data in

3    Internet Crimes Against Children investigations so that they

4    could cross-reference.  So, for example, if the customs

5    department in Virginia was investigating a case and had a

6    telephone number as part of their case, hadn't gone further

7    than that but it was one of those that came in, the FBI office

8    in Los Angeles using the same software could then do a query

9    on it, identify that there's a customs agent working on it,

10   then share information and then make it easier to target a

11   person who is behind some sort of Internet Crimes Against

12   Children case.

13   Q.   But let's -- let's move on to 1(a) -- 1(s) then.  It

14   talks about requiring disclosure of e-mail addresses and --

15   and identifiers.

16   A.   Uh-huh.

17   Q.   What's a -- what's a real-world analogy to an identifier?

18   A.   Well, what happens --  Are you talking about where it

19   says instant messaging identifier --

20   Q.   Chat --

21   A.   -- chat room -- any of those?

22   Q.   Correct.

23   A.   Okay.  When you're going to use an instant messaging site

24   or a chat room site, companies ask you to create an identifier

25   and this way a company knows, number one, who you are 'cause

1    it's asking to -- basically asking you to register, and once

2    you're registered, then they collect certain information about

3    you.

4         Some companies will register with a lot of information.

5    Other companies will require limited information but it makes

6    that person unique so that when they're in a room and they're

7    talking in a chat room, for example, then the list of people

8    who are listed -- if you're one of those people, your chat

9    room identifier will be there and people can talk to you.

10        If you're doing instant messaging, that will persist with

11   you as long as that -- you're using that client.  Most

12   companies won't let you change the primary one 'cause that's

13   now tied to information about you and that allows

14   communication to happen between one person that you're instant

15   messaging with to another person.  And so those things are

16   almost always chosen by the individual who's actually using

17   that chat room or using that instant messaging service.

18        THE COURT:  Counsel, before you leave this, I'm

19   interested in the difference, if there is any, between instant

20   messaging and SMS texting.

21        MS. SPOHN:  Go ahead.

22        THE COURT:  No, ma'am.  I don't ask the questions.

23        MS. SPOHN:  Okay.

24        THE COURT:  I just -- I give that to you for

25   whatever -- I might ask it afterwards but I don't want to

1    interrupt your direct but if this is a convenient place and

2    you care to ask the question, that would be helpful to me.

3            MS. SPOHN:  What?  What is the difference between

4    instant messaging S -- and SMS texting?  Is that what your

5    question was?

6            THE COURT:  Yes, that is my question.

7            THE WITNESS:  I think probably the easiest -- can I

8    ask the Court for some leeway to talk?

9            THE COURT:  Sure.

10           THE WITNESS:  Okay.  Probably the best way to think

11   about really all of these is to look at it from a

12   physical-world perspective.  When the Internet was being

13   created, one of the things that people were trying to do was

14   try to create what's happening in the real world, and so when

15   e-mail was being created, which is one of the original ones,

16   the whole concept behind it was when you go into your mailbox

17   in the physical world, you go to a place, mailman knows where

18   to deliver a letter that comes, say, from the court to myself.

19       An e-mail was the same idea.  Let's have a place -- an

20   address that we know belongs to the court, an address that

21   belongs to me, and when you want to send me something, you put

22   my address on it and I will eventually go to my mailbox and I

23   will get it so that's how e-mail was created.

24       Then the concept became, well, how do we make that

25   faster?  E-mail was fast but let's make it even faster.  So in

1    the wireless community, there was a texting created, and these

2    things all are using different language or what's called

3    different protocol, and that's why -- SMS is one type of

4    protocol.  SMTP is the simple mail transfer protocol that's

5    used for e-mails.

6        There's different protocols for instant messaging.

7    There's a different protocol for chat rooms.  Some are what's

8    called web-based.  In other words, they're using the WWW, the

9    World Wide Web, protocol.  All that really means is it's

10   talking a different language that lets people who talk that

11   language talk to each other.  All right?

12       So, in other words, if you're chatting with somebody in

13   one language, somebody who's using Instant Messenger cannot

14   all of the sudden decide they're going to become chatters

15   using chatting language 'cause they're not talking that

16   language and they have been designed not to do that.

17       So the text messaging is something that happens through a

18   different kind of SMS, what's called an SMS protocol.

19       Now, they also use MMS.  You may see that on your -- I

20   don't know if you have an iPhone or an Android phone but when

21   you see that -- when you send a photograph, it all of the

22   sudden transfers it to an MMS message as opposed to an SMS

23   message.  In essence it's nothing more than -- instead of

24   passing text, you're passing a picture file or a video file.

25       Now -- and then comparing that to an instant messaging,

NIGAM - DIRECT (Spohn)                                              190

 1    what happens in the instant messaging system in the background

 2    is you have an address, I have an address, and instead of --

 3    for that -- for you to communicate with me, it becomes a

 4    direct communication.  You know what my address is on the

 5    Internet, I know what your address is so when I send -- you

 6    send me something, it doesn't have to go to some other

 7    company's server space and have them pass it to me.  It goes

 8    directly to me and that -- that becomes an SM- -- or that

 9    becomes an instant message.

10        And it's called instant because even though, you know,

11    people can say it'll take two seconds or it'll take half a

12    second, the fact is that I don't have to do anything.  I

13    know -- you hit send, I get it on my machine, I see it in

14    front of me whereas in mail I actually have to go somewhere,

15    go get it, open my mail, log into my mail, pull it out or

16    download it.

17        Oftentimes you'll be on the phone with somebody, for

18    example, and you'll be saying, I didn't get your mail, I

19    didn't get your mail, and they'll say to you, hit

20    send/receive, hit send/receive.  It's another way of saying go

21    check your mailbox, go check your mailbox.

22        Now they've changed that mail and evolved it even more

23    because people are so obsessed with getting things almost in

24    real time that it's doing it for you.  The machine is actually

25    set up -- for example, I've set my machine to check mail every

1    one minute.  Every one minute --  Government machines when I

2    was in the Justice Department were set to 15 minutes which

3    annoyed all the prosecutors 'cause they would get a whole

4    bunch of e-mails and nothing would happen for 15 minutes and

5    then you'd get a whole bunch of e-mails or you'd send an

6    e-mail and that person on the other end would be calling you

7    and saying, I didn't get it, I didn't get it 'cause it was set

8    for 15 minutes by the government and you couldn't change it

9    'cause you didn't have the rights to do that.

10        I don't know if I'm answering your question but that's...

11           THE COURT:  Well, since I've interrupted I'll

12    continue to interrupt.  I still don't see the difference

13    between the text and an instant message -- SMS text.  I

14    realize that they're -- they may be utilizing different

15    language.

16           THE WITNESS:  From a practical point of view, that is

17    probably -- maybe that's your question?

18           THE COURT:  Yeah.

19           THE WITNESS:  If -- the --  A text message goes to a

20    company that then delivers it to you.

21           THE COURT:  Right.

22           THE WITNESS:  An instant message goes to you.

23           THE COURT:  Yeah.  But you're always --

24           THE WITNESS:  So the company steps aside.

25           THE COURT:  Even though --

1              THE WITNESS:  Once a connection -- I'm sorry.

2              THE COURT:  But even with an instant message, you're

3       always going through the server of the provider, aren't you?

4              THE WITNESS:  Not in an instant message.

5       Originally -- once the communication -- once the accounts are

6       set up --

7              THE COURT:  Yeah.

8              THE WITNESS:  -- the provider says you know that

9       address -- this is your address and -- and I have my address.

10      The provider steps aside and lets that communication take

11      place directly whereas in a text message the provider stays in

12      the middle of that transaction.

13          E-mail, the provider stays in the middle of that

14      transaction but goes even further than that.  It holds the

15      communication that was sent until somebody on the other side

16      decides to go get it.

17          If you -- if you compare it to the phone world, when the

18      phones originally started, you would call someone and they

19      would -- the operator would pick up, figure out what line,

20      they would plug it into the next line and they would take

21      place of being in the middle of it, right?

22          Now days, it goes into a place -- the phone company says,

23      Oh, I'm calling the court, and then it would make that

24      transmission happen and it would still be in the middle of the

25      process.  It always stays in the middle of that process.

```
 1              THE COURT:  Thank you.
 2          Go ahead, counsel.  Thank you for accommodating me.  Go
 3      ahead.
 4      BY MS. SPOHN:
 5      Q.   Of course, we'll -- we'll continue on the instant
 6      messaging definition.  If we can put that term up on the site.
 7      In the meantime, can you give me -- what's the real-world
 8      equivalent of an instant message?
 9      A.   It's -- if I asked you to step outside and just talk to
10      you privately and nobody else listening, I would be instant
11      messaging with you.
12      Q.   And how is that different than a chat room?
13      A.   In a chat room what happens is the company who owns the
14      feature of the chat creates a space often called a room, and
15      in that space it allows people to come into it, and when I
16      type something on my machine and hit send, it shows up.  In
17      other words, everybody hears what I just said.  The next
18      person who speaks and they hit send, it shows up on my screen
19      and I can read what they said.
20          It's very similar to -- let's say you go to a party or,
21      actually, if you take this courtroom, if there was a rule that
22      we could all talk and, you know, not have to just be whoever's
23      on the stand and whoever's asking questions, we would -- we
24      could become a chat room.  We could be sitting here talking to
25      each other and if one of us wanted to have a private
```

1    conversation, sometimes chat rooms allow you to have that

2    private conversation but all of it is being maintained by the

3    company that provides the chat services.

4         There is a place in some location inside those company

5    servers that are allowing all of that connections to take

6    place.  That company knows who each of the people is connected

7    to that particular room.  It knows the information -- what IP

8    address they're collect -- connecting from, in other words,

9    what place on the Internet have they connected and from there

10   came into that room, and it maintains all that.

11        It can keep it forever or it can delete it.  It can do

12   whatever it wants with it but that company controls that

13   information, owns that information and -- and provides that

14   space for that to occur.

15   Q.   If you look at the statutory definition of instant

16   messaging, number 10 there, it talks about "direct" and

17   "dedicated".

18   A.   Okay.

19   Q.   Plaintiffs' expert said that that substantially restricts

20   the -- the -- what qualifies as instant messaging here.  What

21   do "direct" and "dedicated" -- what does "direct" and

22   "dedicated" mean to you?

23   A.   It means that nobody else can listen.  I mean, that --

24   from an industry point of view, the whole purpose of instant

25   messaging was created because people wanted to talk to

1    somebody else privately without waiting for that whole e-mail

2    process to take place.

3        E-mails were one to one or one to many but you still had

4    to send it and wait for them -- that person to check their

5    mailbox and do things like that so there was a lot of pressure

6    to make that go even faster until somebody came up with the

7    concept of instant messaging.

8        Now what happens is my location on the Internet is

9    identified using instant messaging protocols, your location is

10   identified and that instant messaging protocol is often

11   proprietary to the company.  So Microsoft created one called

12   Instant Messenger.  Google just created one called Google

13   Talk.  Yahoo created one called Yahoo Messenger.

14       And then even a company created one that allowed all of

15   those different languages -- as I was telling the Court, all

16   of those languages to be translated into one language so a

17   company called Trillian created one where you could be using

18   Yahoo, AOL and Microsoft's messenger product and still

19   communicate directly with somebody using a different product

20   'cause they did the translation for you but it's all different

21   languages that allow that communication between myself, for

22   example, and you to happen where I type and you don't have to

23   do anything to receive it.  The moment I hit send, you see it

24   on your screen and it's delivered directly to you.

25   Q.   Turning now to the definition of chat room -- well, can

1    you give me an exam- -- give an example of a chat room?

2    A.   Yeah.  Yahoo provides a lot of chat rooms.  AOL provides

3    chat rooms.  A lot of companies provided those types of

4    services.

5    Q.   If you look at the definition which is number three here,

6    does that conform with the industry's use of the term?

7         MR. DAHLQUIST:  I'm going to object on foundation,

8    Your Honor, and form of the question.  I don't know what

9    industry we're talking about and there could be subsets of

10   that industry.  I don't know what the question's trying to do.

11        THE COURT:  Would you restate it for us.

12   BY MS. SPOHN:

13   Q.   Looking at the definition and in -- in number three

14   there, does that term conform with your understanding of the

15   term -- your understanding of the use of the term?

16   A.   Yes.  And -- and my understanding actually comes from

17   having spent -- I mean, I've worked with probably every major

18   Internet industry in this country and many of them around the

19   world and that's because I was part of the Internet Service

20   Providers Association, one of the people in the original

21   organization when it was first created, and that included

22   Microsoft, Yahoo and today includes Google as well and

23   included many of -- ISP's that originally -- today don't even

24   exist anymore but the discussions in those groups were all

25   centered around how to work in the chat room areas, instant

1     messaging areas, the e-mail areas and all the different

2     communication protocols that we had, how to work with law

3     enforcement, how to determine what kinds of policies to set in

4     those, how to determine what kind of information to keep, what

5     kind of challenges the different companies were having.

6          For example, in the chat room were people experiencing a

7     lot more use of it by Internet predators versus by instant

8     messaging devices and there was a lot of sharing happening.

9          I was also part of the Justice Department's Internet

10    Industry Task Force that was created specifically to analyze

11    all of these areas and during all of these discussions, we

12    never had actually a single instance where somebody said I

13    don't talk about chat rooms the same way you talk about chat

14    rooms.

15         I mean, it was something that if somebody said chat room,

16    we all knew what we were talking about.  If somebody said

17    instant messenger, everybody knew what type of product in

18    their company that referred to.

19    Q.   Are there chat rooms that use cellular telephone

20    platforms?

21    A.   I don't quite understand.

22    Q.   If I were to use a chat room on my cell phone, would

23    those be excluded under this -- under this definition?

24    A.   Not -- not in my opinion, no.

25    Q.   Does -- I think if you look at this statutory definition,

1    it talks about web site or server space.  Does that

2    (unintelligible) to be (unintelligible) restrict the actual

3    number of prohibited chat rooms?

4    A.   What it does, it says that chat rooms that are using the

5    World Wide Web protocol for the web site and server space is

6    really where a chat room sits so it's actually saying if a

7    chat room -- it's -- it's almost redefining what a chat room

8    is in a particular server space.

9         You asked about cell phones.  From a perspective -- a

10   cell phone -- I think probably I should -- I want to try to

11   make sure we're clear on this because people talk about cell

12   phones but if you look at the market out there, you have cell

13   phones and you have smartphones.  You have phones that only

14   allow you connections for making a phone call.  Say, I make a

15   phone call to this courtroom on a cell phone that has no

16   ability to connect to the Internet.

17        If I have a phone that has the ability to connect to the

18   Internet, I'm actually walking around with a minicomputer and

19   a cell phone connected under one little package.  An iPhone is

20   what Apple calls it.  An Android is what some of the other

21   companies have called it.  Sprint has its own.

22        Everybody's creating their own smartphones, and that's

23   the reason why they've been nicknamed smartphones 'cause you

24   can allow -- you can use it to text message, you can use it to

25   instant message, you can use it to make a phone call and you

 1    can use it to connect to the Internet or to surf the web.  You

 2    can use it for videos.  You can use it for taking pictures.

 3    So it has different types of things that people were doing in

 4    their everyday lives put into one little box, create -- shrunk

 5    into a teeny package that fits into your pocket.

 6         So from a perspective in the real world, it used to be

 7    you would have to take out your digital camera or your SLR

 8    camera in order to take pictures.  You would have to go get a

 9    video camera to take videos.  You would have to go to your

10    desktop or your laptop to go connect and use your e-mail or go

11    connect to the Internet.

12         You would have to pick up a different device whether it

13    was your home landline or your cell phone to talk on the

14    Internet -- or, I'm sorry, to talk on a phone and now peep- --

15    companies have figured out how to shrink it enough so that all

16    fits into one device and just use that one device for all the

17    different areas.

18         So when you're actually using a chat room, you're not

19    using the cell area.  You're using a platform that has an

20    operating system on it that specifically was designed to be

21    able to work in this little teeny device like an iPhone and

22    then you're using that to connect to a chat room service that

23    might be sitting on the web or is through an application that

24    a company has created specifically for chatting purposes.

25    Q.   So you're using the Internet basically, just on a

1    smartphone?

2    A.   Right.  You would have to connect to the Internet.  So,

3    for example, if you took your iPhone and you put it in

4    airplane mode, it cuts off your wireless connection, it cuts

5    off your Wi-Fi as well as your wireless site and you can't

6    connect to the Internet, you can't use any of that

7    communication device.

8    Q.   Okay.  Could posting comments on a web page or blog be

9    considered a chat room?

10   A.   No.

11           MR. DAHLQUIST:  I'm going to object to the form of

12   the question and -- I don't know if we're talking about per

13   the definitions or as Mr. Nigam's understanding of the terms

14   or -- or how the contours of that question are shaped.

15           THE COURT:  Are -- are you asking within the context

16   of -- of the statute?

17           MS. SPOHN:  Yes, Your Honor.

18           THE COURT:  Of the statutes at issue here?

19           MS. SPOHN:  Yes, Your Honor.

20           THE COURT:  With that understanding the objections's

21   overruled.

22       You may answer, sir.

23   A.   Say --  What was your question again?

24           THE COURT:  Could posting something on a blog be

25   involving yourself in a chat room as you understand the

 1    definition of chat room within the provisions of Nebraska

 2    Revised Statute umpty, umpty, ump here?

 3            THE WITNESS:  Okay.  No, it would not be.

 4    BY MS. SPOHN:

 5    Q.   Why not?

 6    A.   Well, a blog is specifically -- even the way this -- this

 7    definition is written, it is a place where you go and -- it's

 8    almost like in the physical world setting.  A blog is very

 9    much like -- you know those kiosks that especially

10    universities have where you -- used to be a bulletin board and

11    now it's more called a blog where you post something and then

12    everybody can come in there and look at it, and if somebody

13    else wants to post something, they have to go there and write

14    whatever they want on it, and if somebody else wants to do it

15    and that happens -- which is very different than a chat room

16    where somebody types something, hits send, it shows up

17    immediately and somebody else sees it immediately and -- I

18    mean, in a blog the owner of that blog can actually decide who

19    gets to upload it, if it's going to go through, if it's going

20    to be visible to anyone, if it's going to be sitting in a

21    holding pattern until the blog site owner decides that it's

22    acceptable for display to anybody else.  A chat room doesn't

23    work like that.

24    Q.   Would e-mail fall under the statutory definition of a

25    chat room?

1    A.    No.

2    Q.    Why not?

3    A.    'Cause e-mail is something where -- first, number one, it

4    speaks a different language going back to the protocol.

5    Number two, when you send an e-mail, I send it to a particular

6    address that is tied to that protocol and then it's only to

7    that person or persons and then you have to go and pull it.

8          It's just --  I mean, it's almost like all of these

9    different things are -- one's an apple, one's an orange, one's

10   a watermelon and one's a, I don't know, papaya.

11   Q.    Let's -- let's go to the definition of social networking

12   site now.  But while he -- while Kevin's doing that, can you

13   give us an example of a social networking site?

14   A.    MySpace probably is the most obvious and Facebook is the

15   other one.

16   Q.    And what's a real-world equivalent of a social networking

17   site?

18   A.    A social networking site is -- was formed around the

19   concept from the real world of what people do as humans which

20   is socialize.  They like to share their photos.  They like to

21   make new friends.  They like to connect with people.  They

22   like to comment on each other's photos.  They like to use

23   their friends to meet new friends of their friends so it takes

24   all of those concepts and tries to create a location on a

25   single platform where a community can be formed where people

1    can do all those types of things.

2    Q.   Turning now to the definition on subparagraph 13 there,

3    does that statutory language -- does that definition conform

4    with your experience in -- in working at Microsoft and -- and

5    at MySpace and -- and -- does that conform industry's use of

6    the term "social networking site"?

7    A.   Yes.

8         MR. DAHLQUIST:  Your Honor, I'm going to object on

9    form and foundation to the industry.  We don't know what

10   industry we're talking about, Your Honor, and which subset of

11   that industry or...

12        THE COURT:  That'll be overruled.  You may answer.  I

13   think his answer was yes and now you probably want to have

14   him -- would you explain the basis for your answer.

15   BY MS. SPOHN:

16   Q.   Can you explain -- explain the basis for your answer?

17   A.   Yes.  Some of it is from direct -- directly from my

18   experience at MySpace and when we were looking at the site all

19   the different features that we looked at, and every time we

20   had meetings to determine what would be the next feature we

21   would add, it was always tied to what do people like to do, is

22   there a way we can create that physical experience and

23   integrate it into the online experience.

24        Those discussions even happened in the safety space where

25   if we couldn't solve that real-world translation to the online

1    world, we would look at other avenues to either not allow it

2    or to create a different thing that would feel like it was the

3    same.

4        I was also part of -- when I was -- I was actually one of

5    the founders of the Internet Safety Technical Task Force at

6    the request of the state attorney's general and that task

7    force was specifically to study social networking sites and

8    safety around it, and one of the primary discussions that we

9    engaged in in almost I think the first one to -- I believe the

10   first, second and third meetings was how do you define social

11   networking sites and what is included and what is -- what is

12   excluded, and all of these things were things that were

13   included in the definition of a social networking site.  I --

14   I was actually pointing to section 13.

15   Q.   So is there an easy way to identify a social networking

16   web site?

17   A.   Well, I mean, an -- yes.  Number one, you have to

18   subscribe and -- and in a real-world setting, it's either

19   you're invited to the party or you're not and you're either

20   allowed in or you're not or into a community of people.

21       So you have to subscribe and during that subscription

22   process, there's information that's asked that you create

23   what's called a profile.  So it provides the ability to create

24   a profile of yourself.  In other words, this is who I am, this

25   is my photo or at least the photo I want people to see that

1    represents me, this is some information, how tall I am, am I

2    married or not, am I dating, am I -- what kinds of interests I

3    have and other types of personal information.

4        There's also areas for -- or for open -- what would be

5    called free -- free -- I'm trying to think of the best way to

6    describe it.  Instead of checking a box, you can actually

7    write what your own interests are.  For example, what kinds of

8    movies do you like and you can fill in the blank and write

9    whatever you want in there.

10       It allows you to search for people of like likenesses to

11   you or other types of searching to see if you can then send

12   what's called a friend request to that other person and if

13   they accept your friend request, then you're now connected.

14   You can see their profile.

15       You can take your information and mark it private or keep

16   it public.  Most of the sites if you're under the age of 18

17   will automatically make it private.  Some sites for everyone

18   will make it private and not visible until you're registered.

19       You can upload content -- what's called user-generated

20   content, or UGC in short form, which is a video or it can be

21   photographs or it can be pictures that you've created or

22   information you want to write.  You can create your own blog

23   on it.

24       So you can also communicate using some of the features

25   that are built inside the social networking site, and

1    oftentimes a social networking site will build a chat

2    capability inside the platform or they will build an instant

3    messaging capability inside the platform or they will build --

4    sometimes it's called private e-mail but in essence it's

5    e-mail except it's happening only inside that circle so

6    it's -- it's not translating between one domain and another.

7    It's simply on the domain of the platform of the company that

8    created it.

9    Q.   Okay.  Turning to the definition here of -- of social

10   networking site, it talks about a "collection of web sites".

11   Plaintiffs' expert has testified that that would necessarily

12   result in this involving the entire Internet -- the definition

13   incorporating the entire Internet.  Would you agree with that

14   conclusion?

15   A.   No.

16   Q.   Why not?

17   A.   I'll say that with due respect, Professor.  I think -- I

18   think there's some confusion around "collection of web sites"

19   versus different properties a company owns.  So, for example,

20   Google, the company, owns Google Talk, it owns Gmail, it owns

21   I think 72 or something different properties.

22        News Corp. -- News Corporation is the same thing.  At the

23   time it owned MySpace, it also owned fox.com, it also owned

24   foxnews.com, AmericanIdol.com, photobucket.com, igr.com,

25   American Idol -- or American -- rotten tomatoes, askmen.com,

1    all the different dot-com properties but when you're talking

2    about a "collection of web sites," you're talking about that

3    one property and all the different pages that are associated

4    to the site because those are the web pages that are part of

5    that web site.

6    Q.   So if I conducted a Google search and that search led me

7    to a social networking site, would Google be then -- is Google

8    then a social networking web site?

9    A.   Google is the thing that you used in order to find

10   direction.  It's almost like your GPS in your car.  Actually,

11   it is like your GPS in your car.

12   Q.   Let's -- let's go back to (1)(s) one more time --

13           THE COURT:  Counsel, it's five clock.

14           MS. SPOHN:  Oh, my gosh.

15           THE COURT:  Time flies.

16           MS. SPOHN:  It does.

17           THE COURT:  I won't fill out the remainder of that

18   phrase.  I'm perfectly happy to go a little bit later now if

19   you want.  You tell me what you'd like to do.  If this is a

20   good stopping point, fine --

21           MS. SPOHN:  It's a good stopping point, Your Honor.

22   We can continue from here.

23           THE COURT:  Okay.  Now, having said that tell me how

24   much more time you're going to need.

25           MS. SPOHN:  No more than -- I'd say 35 minutes.  No

1    more than 30 minutes.

2              THE COURT:  Okay.  Now I'm going to turn to the

3    plaintiffs.  Tell me about airplane reservations.

4              MR. MONAGHAN:  While I was sitting here, I had my

5    phone turned off but not on the airplane mode so I did get an

6    E -- a text saying that was -- there was a flight at 1:00 and

7    at 1:40.  It sounds like the professor did the same thing.

8              THE COURT:  Will that -- will that work with -- with

9    your...

10             PROFESSOR POST:  It -- it probably would.

11             THE COURT:  Okay.  Shall we start at eight in the

12   morning then and then -- and that should -- we ought to be

13   able to conclude with this witness and then if -- then if you

14   want to do your rebuttal -- are you agreed that they can call

15   the professor out of turn in order to do rebuttal which is

16   sort of odd but not really when you think about it because

17   we'll have the experts back-to-back and that kind of makes

18   sense.

19             MS. SPOHN:  That's fine, Your Honor.

20             THE COURT:  Okay.  We'll start at eight in the

21   morning then?  Will that work for everyone?

22             MS. SPOHN:  Uh-huh.

23             THE COURT:  All right.  Thank you, sir.  You may step

24   down.  We'll see everyone in the morning at eight o'clock.  We

25   stand in recess.

1          (Recess had at 5:02 p.m.)

2          I, Rogene S. Schroder, certify that the foregoing is a

3     correct transcription to the best of my ability from the

4     digital recording of the proceedings held in the

5     above-entitled matter.

6          */s/Rogene S. Schroder*                    August 20, 2012
            Transcriber                              Date

7

8                              I-N-D-E-X

9     Opening Statement - Mr. Dahlquist    Pages  8 to 46

10    Opening Statement - Ms. Spohn        Pages 46 to 61

11
                                   Direct Cross Redirect Recross
12
      WITNESSES:
13    FOR THE PLAINTIFFS:

14    David Post                      66   110   134

15    WITNESSES:
      FOR THE DEFENDANTS:
16
      Hemanshu Nigam                       151
17

18                                                      Ruled
      MOTIONS                                Made         On
19
      Defendants' sequestration motion        62         63
20
                                                        Ruled
21    EXHIBITS:                             Offered       On

22    101.  Yahoo screen shots               64          65

23    102.  *USA Today* screen shots         64          65

24    103.  Wikipedia screen shots           64          65

25    104.  What is My IP Address? screen shots  64      65

| | EXHIBITS: | Offered | Ruled On |
|---|---|---|---|
| 105. | Ms.Sirimangalo screen shots | 64 | 65 |
| 106. | Hulu screen shots | 64 | 65 |
| 107. | Craigslist screen shots | 64 | 65 |
| 108. | LinkedIn screen shots | 64 | 65 |
| 109. | Amazon screen shots | 64 | 65 |
| 110. | YouTube screen shots | 64 | 65 |
| 111. | Film Affinity screen shots | 64 | 65 |
| 112. | Twitter screen shots | 64 | 65 |
| 113. | Google+ screen shots | 64 | 65 |
| 114. | IMDB.com screen shots | 64 | 65 |
| 115. | HomeDepot.com screen shots | 64 | 65 |
| 116. | Pandora screen shots | 64 | 65 |
| 117. | Weather.com screen shots | 64 | 65 |
| 118. | ESPN.com screen shots | 64 | 65 |
| 119. | Flickr screen shots | 64 | 65 |
| 120. | MySpace screen shots | 64 | 65 |
| 121. | Facebook screen shots | 64 | 65 |
| 122. | CNN.com screen shots | 64 | 65 |
| 123. | Times Free Press screen shots | 64 | 65 |
| 124. | Politico screen shots | 64 | 65 |
| 125. | DiabetesDaily.com screen shots | 64 | 65 |
| 126. | BreastCancer.org screen shots | 64 | 65 |
| 127. | Daily Strength screen shots | 64 | 65 |

| | EXHIBITS: | Offered | Ruled On |
|---|---|---|---|
| 128. | Couch Surfing screen shots | 64 | 65 |
| 129. | Live Mocha screen shots | 64 | 65 |
| 130. | Wordpress.com screen shots | 64 | 65 |
| 131. | Skype screen shots | 64 | 65 |
| 132. | Target.com screen shots | 64 | 65 |
| 133. | Husker Spot screen shots | 64 | 65 |
| 134. | SupportGroups.com screen shots | 64 | 65 |
| 135. | Careerbuilder.com screen shots | 64 | 65 |
| 136. | Blogger screen shots | 64 | 65 |
| 137. | eBay screen shots | 64 | 65 |
| 138. | Walmart.com screen shots | 64 | 65 |
| 139. | Acurazine.com screen shots | 64 | 65 |
| 140. | Reddit.com screen shots | 64 | 65 |
| 141. | Foursquare screen shots | 64 | 65 |
| 142. | GoToMeeting.com screen shots | 64 | 65 |
| 143. | Shoutlife.com screen shots | 64 | 65 |
| 144. | WhiteHouse.gov screen shots | 64 | 65 |
| 145. | United States Senate screen shots | 64 | 65 |
| 146. | Governor Dave Heineman screen shots | 64 | 65 |
| 304. | Expert Report of David G. Post | 73 | 73 |
| 305. | Expert Report of Hemanshu Nigam | 183 | 183 |